**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| Chartis Specialty Insurance Company,<br><br>    *Plaintiff*<br><br>    v.<br><br>Tesoro Corporation,<br><br>    *Defendant*. | Civil Action No. 5:11-cv-00927-OLG |

_____

**DEFENDANT TESORO CORPORATION'S MOTION TO DISMISS, STAY, OR**
**TRANSFER THESE PROCEEDINGS TO THE NORTHERN DISTRICT OF**
**CALIFORNIA**
_____

Defendant Tesoro Corporation respectfully moves to dismiss, stay, or transfer these

proceedings to the United States District Court for the Northern District of California.

**I.      INTRODUCTION**

This matter arises from a dispute over the scope of insurance coverage provided by

Plaintiff Chartis Specialty Insurance Company (formerly known as American International

Specialty Lines Insurance Company, a member of the American International Group of

insurance companies, hereinafter "AIG") to Defendant Tesoro Corporation and its wholly-owned

subsidiary Tesoro Refining and Marketing Company (collectively "Tesoro").  The Court should

decline to decide this declaratory judgment action for two reasons.  First, the AIG complaint is a

classic example of litigation by ambush: In this Circuit, such behavior is a manifest abuse of the

Declaratory Judgment Act, and warrants dismissal of the declaratory action.  Tesoro was in the

midst of what it thought were good faith settlement negotiations with AIG, through the

California counsel whom AIG had designated for that purpose, when AIG filed its Complaint. Rather than deny coverage outright and openly, AIG pretended to negotiate in California, through one law firm, even as it was rushing, through undisclosed separate lawyers, to file this action.  AIG's preemptive filing appears to be a desperate attempt to suppress evidence of AIG's intent regarding the operation of the policy's $50 million self-insured retention ("SIR").  What the AIG underwriter said regarding that SIR at the time AIG was collecting the premium for the policy is exactly the opposite of what AIG now says in litigation as AIG is resisting payment on Tesoro's claim.  AIG's effort to suppress this evidence will not succeed in either venue, but AIG's preemptive strike is an abuse of the Declaratory Judgment Act, and AIG's complaint should be dismissed for that reason alone.

The second reason for this Court to dismiss the case is that a more comprehensive action between the parties is pending before the Northern District of California, which is the more appropriate forum in which to resolve this dispute.  In the California action, Tesoro has sued AIG for breach of contract, declaratory relief, and breach of the implied covenant of good faith and fair dealing.  The California action seeks relief on all issues and claims in dispute between the parties, not just the construction of the SIR.  Indeed, the California action includes ripe claims for coverage of more than $10 million in covered loss that is not subject to the SIR.

Tesoro's complaint was filed several days after this action, but should not be given precedence over Tesoro's later-filed action for several reasons.  One reason is that a first-filed action does not gain precedence over later litigation when the earlier filing was the result of a deception contrived by the plaintiff to sabotage compromise negotiations and secure its choice of forum.  Second, as noted, the California action encompasses more claims, including a claim that is not subject to the $50 million SIR, and thus will provide more complete resolution of the

coverage dispute.  Third, California is the most appropriate and convenient forum for this litigation because California law should apply in any event, and also because the insured facility and much of the relevant evidence are located there.

As a result, the Court should exercise its discretion to dismiss or stay this action; or, in the alternative, transfer it to the Northern District of California to be consolidated with the pending dispute between the same parties.

## II.    FACTUAL BACKGROUND

The Golden Eagle Refinery (the "Refinery") is a 2,100 acre facility located in Contra Costa County, California.[1]  In 2000, Ultramar Diamond Shamrock Corporation ("Ultramar") purchased the Refinery from Tosco Corporation ("Tosco").[2]  Under the Asset Purchase and Sale Agreement, Tosco agreed to indemnify Ultramar for certain environmental liabilities, whether known or unknown, up to a limit of $50 million ("Tosco Environmental Liability").[3]  To cover any costs exceeding the Tosco Environmental Indemnity, Ultramar purchased a Pollution Legal Liability Select Insurance Policy from AIG (the "AIG Policy" or "Policy").[4]  The Policy covers environmental costs for known conditions in excess of a $50 million self-insured retention ("SIR"), and costs for unknown, later-discovered conditions subject to a $500,000 deductible.[5]

---

[1] *See* Complaint ¶ 25, *Tesoro Corp., et al. v. Chartis Specialty Insurance Co*., C11-05718 (N.D. Cal. Nov. 29, 2011) ("Tesoro Complaint"), Exhibit A to Declaration of Bernard P. Bell ("Bell Declaration") (November 30, 2011) (Attachment 1); Complaint ¶¶ 8–9, *Chartis Specialty Insurance Co. v. Tesoro Corp*., 5:11-cv-00927 (W.D. Tex. Nov. 7, 2011) (Dkt. #1) ("AIG Complaint").

[2] Tesoro Complaint ¶ 36; AIG Complaint ¶ 19.

[3] Tesoro Complaint ¶¶ 37–38; AIG Complaint ¶ 19.

[4] Tesoro Complaint ¶ 39; AIG Complaint ¶ 7.

[5] Tesoro Complaint ¶¶ 41–48; AIG Complaint ¶¶ 11–12.

Tesoro, an independent refiner and marketer of petroleum products, purchased the Refinery from Ultramar in 2002.[6]  Tesoro succeeded to Ultramar's rights and obligations under both the Tosco Environmental Indemnity and the AIG Policy.[7]  In February of 2007, Tesoro provided AIG with a notice of circumstances under the Policy with respect to the Facility and on October 8, 2009, it demanded coverage.[8]  For years, Tesoro has attempted to engage in good faith settlement discussions with AIG regarding the insurer's obligations under the Policy. Toward that end, the parties met on three separate days in the summer and fall of 2011.[9]  Each of these meetings was held in California, either at the Refinery or in San Francisco.[10]  AIG was represented during these meetings by counsel from a California law firm.[11]  Tesoro produced more than 250,000 pages of technical documentation and cost support at AIG's request.[12]

In furtherance of these negotiations, the parties agreed to a fourth meeting to be held in New York on November 15, 2011.[13]  When Tesoro's counsel sought on Friday, November 4, 2011, to finalize the start time and address of that meeting, AIG's California counsel responded, at the close of business, "Will chase down confirmation Monday morning."[14]  The following Monday morning, November 7, 2011, without notice that it was withdrawing from settlement

---

[6] Tesoro Complaint ¶ 50; AIG Complaint ¶ 20.

[7] Tesoro Complaint ¶¶ 51–52; AIG Complaint ¶¶ 20–21.

[8] Tesoro Complaint ¶¶ 85–87; AIG Complaint ¶¶ 29 & 36.

[9] Bell Declaration ¶ 3.

[10] *Id.*

[11] *Id.*

[12] *Id.* at ¶ 4.

[13] *Id.* at ¶ 5.

[14] *Id.* at ¶ 7 & Ex. C.

discussions or denying Tesoro's claims, AIG filed this action in Texas through a Texas law firm that had not been directly involved in any claim negotiations with Tesoro.[15]

Tesoro has since filed a more comprehensive action against AIG in the United States District Court for the Northern District of California, in which Tesoro has alleged breach of contract and breach of the implied covenant of good faith and fair dealing, and sought declaratory relief.[16]

## III.   ARGUMENT

### A.   Declaratory Relief is Discretionary, And is Not Appropriate Here Because the AIG Complaint is the Product of Procedural Fencing

AIG brings this action under the Declaratory Judgment Act, 28 U.S.C. § 2201, pursuant to which a "court of the United States . . . *may* declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." *Id.* (emphasis supplied).  Courts in this Circuit have repeatedly affirmed a district court's discretion to decline to entertain a declaratory action.  The Fifth Circuit has held that a district court "is not required to provide declaratory judgment relief, and it is a matter for the district court's sound discretion whether to decide a declaratory judgment action." *Mission Ins. Co. v. Puritan Fashions Corp.*, 706 F.2d 599, 601 (5th Cir. 1983) (citing *Brillhart v. Excess Ins. Co. of America*, 316 U.S. 491 (1942)).  *See also USAA Casualty Ins. Co. v. Dydek*, SA-05-333-OG, 2006 WL 3068890, at *1 n.10 (W.D. Tex. Sept. 27, 2006) (district courts have "broad discretion in deciding whether to entertain an action for declaratory relief").  The Declaratory Judgment Act "gives the court a choice, not a command." *Mission*, 706 F.2d at 601 (internal citation omitted).

---

[15] *Id.* at ¶ 8.

[16] *Id.* at ¶ 2 & Ex. A.

Courts in this Circuit have exercised this discretion to dismiss declaratory suits when the complaint is the result of one party's attempt to short-cut good faith settlement negotiations and surreptitiously file a preemptive suit.  In *Mission*, the Fifth Circuit explained that anticipatory suits are "disfavored because they are an aspect of forum-shopping."  *Id*. at 602 n.3.  The "wholesome purposes of declaratory acts would be aborted by its use as an instrument of procedural fencing either to secure delay or to choose a forum."  *Id*. (internal citations omitted).

The *Mission* case is particularly instructive because there, as here, the plaintiff insurance company was in the midst of discussions with the insured corporation about whether it would cover an alleged loss.  *Id*. at 600.  Rather than provide a written denial, however, the insurance company orally rejected the claim and immediately filed a declaratory judgment suit in federal court.  *Id*.  The Fifth Circuit upheld the district court's dismissal of that suit, noting that the facts indicated that the insurance company had  filed so quickly in Texas in order to secure the application of what it perceived as favorable Texas law regarding a key legal issue in the case. *Id*. at 602 n.3.

 Similarly, in *Texas Instruments, Inc. v. Micron Semiconductor, Inc.*, 815 F. Supp. 994, 998 (E.D. Tex. 1993), the Eastern District of Texas noted that "federal declaratory judgment is not a prize to the winner of the race to the courthouse."  (internal citations omitted).  *See also 909 Corp. v. Village of Bolingbrook Police Pension Fund*, 741 F. Supp. 1290, 1292 (S.D. Tex. 1990) ("[C]ourts have held that a declaratory claim should be dismissed if it was filed for the purpose of anticipating a trial on the same issues in a court of coordinate jurisdiction.").

The "primary reason" for denying the choice of the Texas forum to the preemptive litigant is to ensure that courts do not "penaliz[e] a party that has attempted to settle a dispute out of court."  *Twin City Ins. Co. v. Key Energy Servs., Inc.*, Civ. No H-09-0352, 2009 WL 1544255,

at *5 (S.D. Tex. June 2, 2009).  In *Twin City*, the Southern District of Texas described the classic

example of inequitable and underhanded conduct that should lead a court to dismiss a declaratory

case: "When Party A notifies Party B of a dispute in an effort to settle the dispute without

initiating litigation only to have Party B rush to the courthouse to secure its desired forum in the

event that settlement discussions fail."  *Id.*

Other Circuits have also declined to entertain declaratory judgment actions when one

party races to the courthouse in the midst of seemingly good faith settlement negotiations.  The

Sixth Circuit has explained that:

> Courts take a dim view of declaratory plaintiffs who file their suits mere days or
> weeks before the coercive suits filed by a "natural plaintiff" and who seem to
> have done so for the purpose of acquiring a favorable forum. Allowing
> declaratory actions in these situations can deter settlement negotiations and
> encourage races to the courthouse, as potential plaintiffs must file before
> approaching defendants for settlement negotiations, under pain of a declaratory
> suit. . . .  [W]here a putative defendant files a declaratory action whose only
> purpose is to defeat liability in a subsequent coercive suit, no real value is served
> by the declaratory judgment except to guarantee to the declaratory plaintiff her
> choice of forum — a guarantee that cannot be given consonant with the policy
> underlying the Declaratory Judgment Act.

*AmSouth Bank v. Dale*, 386 F.3d 763, 788 (6th Cir. 2004).  In *Dale*, the plaintiff in the

declaratory judgment action had indicated a willingness to consider settlement and behaved as if

negotiations were ongoing.  Only one day before filing its declaratory action, counsel for the

plaintiff sent a letter stating that the company was "still considering" the other party's demands,

and that counsel would "be in touch in the near future concerning a written response and a

possible meeting . . . ."  *Id.* at 789.  Under those circumstances, the Sixth Circuit found that the

plaintiff "filed declaratory actions not to resolve issues of liability that were hindering their

normal behavior, but instead to gain procedural advantage."  *Id.*  The court held that the district

court had abused its discretion by allowing the declaratory judgment action to proceed in that

context.  *Id.* at 791.

As in *Mission* and *Dale*, the circumstances of this case clearly indicate that AIG's complaint is an attempt to use the Declaratory Judgment Act to secure a perceived procedural advantage.  At the time the complaint was filed, AIG and Tesoro had been engaged in negotiations about whether, and to what extent, AIG would cover Tesoro's claim.  Like the plaintiff in *Dale*, AIG was behaving as if it were negotiating (albeit at a snail's pace), and there was no indication of impasse.  Representatives for the two sides had met on July 21, July 22, and September 8, 2011.  Tesoro had also provided voluminous documentation regarding the claim beginning in the fall of 2010 and continuing since then.

Most recently, on October 20, 2011, Tesoro provided documentation of extrinsic evidence supporting its interpretation of the SIR policy language in dispute.[17]  That documentation consists of notes of a meeting between Tesoro and AIG on May 29, 2002, shortly after AIG had substituted Tesoro for Ultramar as the Named Insured on the Policy.[18]  The AIG underwriter who had issued the policy to Ultramar previously confirmed to Ultramar in the August 29, 2000 written coverage binder that "Tosco will be responsible for the $50 million [SIR]."[19]  In the May 29, 2002 meeting notes, the AIG Underwriter directed Tesoro that "expenditures to satisfy the Tosco indemnity [should be] submitted to AIG in satisfaction of the retention under the policy."[20]  These statements by the AIG underwriter flatly contradict AIG's position in this litigation that costs spent pursuant to the Tosco Environmental Indemnity do not apply against or erode the SIR.

---

[17] Bell Declaration ¶ 6.

[18] *Id.* at ¶ 6 & Ex. B.

[19] *Id.* at ¶ 9 & Ex. D.

[20] *Id.* at Ex. B.

Tesoro provided this extrinsic evidence in support of negotiations that AIG had agreed to conduct on November 15, 2011.[21]  When Tesoro's counsel sought clarification regarding that planned meeting, AIG's counsel responded on November 4 at the close of business: "Will chase down confirmation Monday morning."[22]  On Monday, November 7, 2011, without notice that it was withdrawing from settlement discussions or denying the Tesoro claim, AIG filed this action.[23]

AIG's filing is a bad faith attempt to secure its choice of forum.  Had AIG rejected Tesoro's claim outright, AIG would have expected Tesoro to file a claim for breach of contract in California, the site of the insured property.[24]

AIG's receipt of the May 29, 2002, meeting notes may explain why it seeks to avoid litigation in California.  A California court would likely apply California law to this dispute.  *See Frontier Oil Corp. v. RLI Ins. Co*., 63 Cal. Rptr. 3d 816, 840 (Cal. Ct. App. 2007) (applying the law of the state in which the insured risk is located).  Understandably, AIG is desperate to prevent a trier of fact from considering the AIG underwriter's statements as evidence of the meaning of the SIR, because that statement (as well as other secondary evidence) directly contradicts AIG's current position regarding the SIR, and directly supports Tesoro's construction of the policy.  Under California law, a court must receive extrinsic evidence of intent as part of its determination of whether a contract is ambiguous.  *See In re Western Asbestos Co*., 416 B.R. 670, 695 (N.D. Cal. 2009).  Texas law, on the other hand, is more restrictive than California regarding the admission of secondary evidence.  *See Nat'l Union Fire Ins. v. CBI Indus*., 907

---

[21] *Id.* at ¶¶ 5–6.

[22] *Id.* at ¶ 7 & Ex. C.

[23] *Id.* at ¶ 8.

[24] Indeed, as explained in Part B, *infra*, Tesoro has since filed just such a complaint in the Northern District of California.

S.W.2d 517, 520 (Tex. 1995).  Because a litigant may not abuse the Declaratory Judgment Act in this fashion, this Court should dismiss AIG's complaint.

Moreover, despite AIG's preemptive strike, Texas choice-of-law principles compel that California law be applied to this dispute even in Texas, further confirming that this Court should decline to hear this case.  Texas courts have deferred to out-of-state litigation when a different state's law would govern the dispute.  *See Youngblood v. JTH Tax Servs., Inc*., 06-CA-380-XR, 2006 WL 1984656, at *5 (W.D. Tex. July 17, 2006) ( "Virginia court is better equipped to try the case because it is governed by Virginia law."); *Ecoproduct Solutions, L.P. v. MMR Constructors, Inc.*, H-06-3671, 2007 WL 4414039, at *5 (S.D. Tex. Dec. 14, 2007) (where issue governed by Louisiana law was at heart of dispute, "it seems preferable that the issue be determined by a judge who is expert in Louisiana law").

Here, choice-of-law principles suggest that California law should govern the dispute, thus making a California court the most appropriate venue.  Texas courts apply the "most significant relationship" test to determine choice-of-law issues in contract cases.  *Sonat Exploration Co. v. Cudd Pressure Control, Inc*., 271 S.W.3d 228, 233 (Tex. 2008).  This test is based on the Restatement (Second) of Conflicts, which enumerates myriad factors for a court to consider in assessing which state has the most significant relationship.  *See, e.g*., Restatement (Second) of Conflicts § 188 (1971).  But the Restatement provides that in insurance matters "the location of the insured risk will be given greater weight than any other single contact in determining the state of the applicable law provided that the risk can be located, at least principally, in a single state."  *Id*. § 193 cmt. b (1971).  The Policy at issue covers a single facility in California. Accordingly, under the Restatement test, if this Court were to hear the case, California law should apply.  *See Jones v. Francis Drilling Fluids, Ltd*., G-07-0178, 2008 WL 5158268, at *6

(S.D. Tex. Dec. 9, 2008) (citing the Restatement comment and applying the law of Louisiana, the location of the insured risk, in a single site case).

In fact, when it suited their purposes, AIG argued in Texas federal court that Louisiana law should apply to AIG's coverage dispute with a Texas petroleum company under a Pollution Legal Liability Select policy, because the refinery at issue was in Louisiana. *Pennzoil-Quaker State Co. v. Am. Int'l Specialty Lines Ins. Co*., 653 F. Supp. 2d 690, 703 (S.D. Tex. 2009).

Resolution of this litigation will hinge on interpretation of California law. Because a California court will be better suited to apply California law to this dispute, in addition to the bad faith nature of AIG's filing, this Court should exercise its discretion and decline to hear this case.[25]

**B.    A More Comprehensive Action is Pending in the Northern District of California, the More Appropriate Forum**

Tesoro filed its own action against AIG in the United States District Court for the Northern District of California on November 29, 2011, in which Tesoro alleged breach of contract and breach of the implied covenant of good faith and fair dealing, and sought declaratory relief.[26] Although Tesoro filed that complaint several days after this action, the "first-to-file" rule does not apply, further suggesting that this case should be dismissed, stayed, or transferred for consolidation with the California action.

In the Fifth Circuit, "the court initially seized of a controversy" is ordinarily the one to decide whether it will try the case, and ordinarily will proceed with the first-filed action. *Mann Mfg., Inc. v. Hortex, Inc.*, 439 F.2d 403, 407 (5th Cir. 1971); *see Igloo Prods. Corp. v. The*

---

[25] Courts may also consider other relevant factors in applying their discretion to dismiss a declaratory judgment suit, including whether parallel litigation is pending, the interests of judicial economy, and the convenience of parties and witnesses. *See Mission*, 706 F.2d at 602. As explained in Part B, *infra*, each of those factors weighs in favor of deferring to the action pending in the Northern District of California.

[26] Bell Declaration ¶ 2 & Ex. A.

*Mounties, Inc.*, 735 F. Supp. 214, 218 (S.D. Tex. 1967). But "the first-to-file rule is a discretionary doctrine," *Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 603 (5th Cir. 1999), and courts have recognized "compelling circumstances" in which the doctrine should not be applied. First, a court will not apply the first-to-file rule if the first suit was filed in a bad faith attempt to secure a particular forum. *Amerada Petroleum Corp. v. Marshall*, 381 F.2d 661, 663 (5th Cir. 1967). Second, the first-filed case should defer to a later-filed case if the latter seeks more comprehensive relief. *Lateena Girls, L.L.C. v. Latina Media Ventures, L.L.C.*, SA-06-CA-217-RF, 2006 WL 2547884, at *6 (W.D. Tex. Aug. 9, 2006). Third, courts must balance the convenience to the parties and witnesses of the later filed action. *Igloo Prods.*, 735 F. Supp. at 218. Finally, courts in Texas will defer to later-filed actions when the applicable choice-of-law principles point away from Texas law. *Youngblood v. JTH Tax Sers., Inc.*, 06-CA-380-XR, 2006 WL 1984656, at *5 (W.D.Tex. July 17, 2006). Here, each of these factors independently weigh in favor of dismissing, staying, or transferring this action, and collectively they present circumstances clearly compelling this court to defer to the California action.

First, as explained in Part A, *supra*, the context of the parties' actions leading up to this litigation shows that AIG filed this complaint in an underhanded, bad faith attempt to secure its choice of forum. Such chicanery is an "inequity justifying deviation from the first-to-file rule," *Twin City Ins. Co. v. Key Energy Servs., Inc.*, Civ. No H-09-0352, 2009 WL 1544255, at *5 (S.D. Tex. June 2, 2009), and compels deference to the later-filed action.

Second, the first-to-file rule should not apply because the pending California litigation is a far more comprehensive action, which includes coercive relief in addition to declaratory relief, including a multi-million dollar claim that is not related to the SIR issue raised by AIG and will not be resolved in the Texas action as plead. *See Latina Media Ventures*, 2006 WL 2547884 at

*6  ("[W]hen both federal actions involve the same issues and parties, the better alternative is to allow the broader relief action to proceed, since it certainly would address the relief sought, rather than the restricted declaratory judgment action.") (internal citations omitted).  In Texas, AIG asserts a single count seeking declaratory relief regarding the meaning of the SIR provision.

In contrast, the complaint filed by Tesoro in California covers five different claims for relief, and is a coercive action, not merely a declaratory one.  In California, Tesoro has alleged breach of contract and seeks declaratory relief regarding AIG's failure to compensate Tesoro for multi-million dollar losses under the portion of the policy that is subject to the SIR.  The California litigation also includes claims for relief for breach of contract and declaratory relief for Tesoro's loss under a different coverage grant that is not subject to the SIR.  Specifically, Tesoro has spent over $10 million in costs to address pollution conditions at the Amorco Terminal, and AIG has refused to cover these costs to the extent they exceed the $500,000 deductible.[27]  Tesoro's California complaint includes claims for breach of contract and declaratory judgment counts seeking to resolve that issue and order AIG to compensate Tesoro for the covered Amorco costs.  Further, the California litigation includes bad faith claims against AIG.  Thus, the California action will provide more comprehensive relief to the parties, making it the best venue in which to resolve this dispute.

Third, California is the more appropriate and convenient forum for this action.  Texas courts may defer to a second-filed action if "the convenience of parties and witnesses" or "the interests of justice" compel that result.  *Igloo Prods., Inc.*, 735 F. Supp. at 218 (drawing an analogy to the considerations governing transfer of venue under 28 U.S.C. § 1404(a)).  In *Igloo Products*, the court found that the first forum was the most efficient and convenient choice

---

[27] Bell Declaration ¶ 2 & Ex. A.

because it was the focus of the contract and the site at which the nonparty witnesses were all located. *Id.*

For the same reasons that the court in *Igloo Products* found that the first forum was more appropriate, this court should find that the Northern District of California is more convenient. First, the Northern District of California is the forum in which the insured property is located. The policy covers conditions arising at a single facility in Contra Costa County, within the territory of the Northern District of California.  Second, the majority of the evidence in the case, including documentation regarding the costs spent by Tesoro under the policy, as well as the individuals responsible for the remedial work, are located in the Northern District of California. For example, the remediation team is located in Oakland, California, and Tesoro maintains its cost documentation at the Facility and with consultants located in Northern California.  Thus, the practical burdens and cost of litigating the case will be higher in Texas than in California.

California also has the greatest policy interest in the outcome of this dispute.  This litigation will determine coverage for the costs of cleaning up pollution conditions at a refinery in California.  The government agency that currently has lead jurisdiction over the investigation and remediation process is the California Regional Water Quality Control Board for the San Francisco Bay Region.  To the extent either party must pay for remediation, that obligation arises in California.  Whether and to what extent the pollution conditions at the Refinery are quickly and clearly addressed affects California residents and their environment.  Because California has a strong interest in the outcome of this dispute, this Court should allow the Northern District of California to hear the case.

Finally, the choice-of-law principles applicable to this case make California the most appropriate venue.  As explained in Part III.A, *supra*, Texas courts have deferred to later-filed

actions when a different state's law would govern the dispute.  *See Youngblood*, 2006 WL 1984656 at *5 ("Virginia court is better equipped to try the case because it is governed by Virginia law.").  Here, because this dispute involves coverage of an insured risk is located entirely within California, Texas choice-of-law rules compel that this Court should apply California law.  *See Jones v. Francis Drilling Fluids, Ltd*., G-07-0178, 2008 WL 5158268, at *6 (S.D. Tex. Dec. 9, 2008) (citing the Restatement comment and applying the law of Louisiana, the location of the insured risk, in a single site case).  Because California law is likely to govern this dispute, in addition to the many other reasons listed above, the Northern District of California is best equipped to resolve this case.

### C.    The Court Should Dismiss the AIG Litigation, Stay it Pending the Outcome of Proceedings in the Northern District of California, or Transfer it to That District

This Court has three courses available to it for avoiding duplicative litigation and rejecting AIG's declaratory action complaint.  First, it can dismiss the case.  *See Mission Ins. Co. v. Puritan Fashions Corp*., 706 F.2d 599, 602 (5th Cir. 1983) (upholding district court dismissal).  Second, it can stay the case pending the outcome of the California litigation.  *See generally Landis v. N. Am. Co*., 299 U.S. 248, 254 (1936) ("[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.").  Third, it can transfer the case to the Northern District of California.  *Igloo Prods. Corp. v. The Mounties, Inc.*, 735 F. Supp. 214, 218 (S.D. Tex. 1967).  Tesoro respectfully submits that any of these three measures would suffice in this case.

**IV.     CONCLUSION**

For the foregoing reasons, this Court should dismiss the instant action, stay it pending the outcome of the lawsuit Tesoro filed in the Northern District of California on November 29, 2011, or transfer it to the Northern District of California.


Dated:  November 30, 2011                    Respectfully submitted,

                                             /s/  Roy T. Atwood_____

                                             Roy T. Atwood (Tex. Bar No. 01428040)
                                             JONES DAY
                                             2727 North Harwood Street
                                             Dallas, Texas 75201-1515
                                             Telephone: (214) 220-3939
                                             Facsimile: (214) 969-5100

                                             Bernard P. Bell
                                             JONES DAY
                                             51 Louisiana Ave. NW
                                             Washington, D.C. 20001
                                             Telephone: (202) 879-3939
                                             Facsimile: (202) 626-1700

                                             *Counsel for Tesoro Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was served by first class United States mail or by electronic transmission through the Court's Case Management Electronic Case Filing system to David H. Timmins, Esq. and Matthew Schroeder, Esq., 3000 Thanksgiving Tower, 1601 Elm Street, Dallas, Texas 75201, this 30th day of November, 2011.

/s/ Roy T. Atwood
Roy T. Atwood

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| Chartis Specialty Insurance Company, | |
| *Plaintiff* | |
| v. | Civil Action No. 5:11-cv-00927-OLG |
| Tesoro Corporation, | |
| *Defendant*. | |

## DECLARATION OF BERNARD P. BELL

I, Bernard P. Bell, declare:

1.      I am a partner in the law firm of Jones Day, counsel for Tesoro Corporation ("Tesoro"). I submit this Declaration in support of Tesoro's Motion to Dismiss, Stay, or Transfer These Proceedings to the Northern District of California. This Declaration is based upon my personal knowledge of the facts set forth herein, unless stated otherwise, and also based upon information derived from a review of the exhibits attached hereto.

2.      Attached as Exhibit A is a true and accurate copy of the Complaint filed in the Northern District of California on November 29, 2011, by Tesoro against Chartis Specialty Insurance Company (formerly known as American International Specialty Lines Insurance Company, a member of the American International Group of insurance companies, hereinafter "AIG").

3.      I, along with Tesoro personnel, met with AIG in-house personnel, AIG's outside counsel and AIG's environmental consultants on three separate days in the summer and fall of 2011 to discuss AIG's obligations under the Pollution Legal Liability Select Insurance Policy

issued by AIG and covering Tesoro as the Named Insured.  During these meetings, AIG was represented by California counsel from the firm of Sinnott, Puebla, Campagne & Curet, which on information and belief is not affiliated with the Texas firm of Gardere Wynne Sewell.  We held each of these three meetings in California, either at the Golden Eagle Refinery or in Jones Day's San Francisco offices.

   4.  As part of these negotiations and settlement, and in response to AIG's requests, Tesoro has produced over 250,000 pages of technical and cost documentation in support of its claim.

   5.  In furtherance of these negotiations, Tesoro and AIG agreed to a fourth meeting to be held in New York on November 15, 2011.

   6.  In furtherance of these negotiations, on October 20, 2011, I sent by e-mail to California counsel for AIG a copy of notes of a meeting held on May 29, 2002.  The notes are in handwriting identified to me to be that of Charles Doerr, who at the time was a Tesoro employee, and who was in attendance at the meeting.  A true and accurate copy of these notes is attached as Exhibit B.

   7.  On Friday, November 4, 2011, I sought to finalize the start time and address of the November 15, 2011 meeting.  Attached as Exhibit C is a true and accurate copy of email correspondence between me and California counsel for AIG dated November 4, 2011.  Personal, non-relevant information has been redacted from the attached copy.

   8.  Before it filed this lawsuit in Texas on Monday November 7, 2011, AIG did not notify Tesoro that AIG was denying Tesoro's claim, nor did AIG notify Tesoro that AIG was withdrawing from settlement discussions.  The Texas law firm of Gardere Wynne Sewell was not directly involved with Tesoro in any negotiations regarding this claim.

   9.  Attached as Exhibit D is what I am informed and believe to be a true and accurate copy of the August 29, 2000 coverage binder issued by the AIG underwriter to the broker who placed the insurance coverage at issue.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on

November 30, 2011.

Bernard P. Bell
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700
bpbell@jonesday.com

*Counsel for Tesoro Corporation*

# EXHIBIT A

1   David W. Steuber (State Bar No. 58398)
    dsteuber@jonesday.com
2   JONES DAY
    555 South Flower Street
3   Fiftieth Floor
    Los Angeles, CA
4   Telephone:      (213) 489-3939
    Facsimile:      (213) 243-2539
5
    Bernard P. Bell
6   bpbell@jonesday.com
    JONES DAY
7   51 Louisiana Ave N.W.
    Washington D.C.
8   Telephone:      (202) 879-3939
    Facsimile:      (202) 626-1700
9
    Attorneys for Plaintiffs
10  TESORO CORPORATION AND TESORO
    REFINING AND MARKETING COMPANY

11

12                  UNITED STATES DISTRICT COURT

13                  NORTHERN DISTRICT OF CALIFORNIA

14                        OAKLAND DIVISION

15                                              C11-05718

16  TESORO CORPORATION, a Delaware          CASE NO.
    Corporation, and TESORO REFINING AND
    MARKETING COMPANY, a Delaware          Assigned for all purposes to
17  Corporation;

18                 Plaintiffs,             COMPLAINT FOR BREACH OF
                                           CONTRACT; DECLARATORY
19       v.                                RELIEF; AND BREACH OF
                                           IMPLIED COVENANT OF GOOD
20  CHARTIS SPECIALTY INSURANCE            FAITH AND FAIR DEALING
    COMPANY, an Illinois Corporation;
21                                         DEMAND FOR JURY TRIAL
                   Defendant.
22

23

24

25       Plaintiffs Tesoro Corporation and Tesoro Refining and Marketing Company (collectively

26  "Tesoro"), by their attorneys Jones Day, for their complaint against Defendant Chartis Specialty

27  Insurance Company state as follows:

28

                                          1
                                      COMPLAINT

## NATURE OF ACTION

1. This is a civil action for breach of an insurance contract and declaratory relief. Tesoro, an independent refiner and marketer of petroleum products, is insured under a Pollution Legal Liability Select Policy issued by Defendant Chartis Specialty Insurance Company, formerly known as American International Specialty Lines Insurance Company, a member of the American International Group of insurance companies ("AIG"). AIG has wrongfully denied insurance coverage to Tesoro for the covered costs of environmental investigations and clean-up at Tesoro's Golden Eagle Refinery ("Refinery") in Contra Costa County, California. Tesoro seeks compensatory, punitive and exemplary damages, declaratory judgment, and other relief against AIG.

2. AIG markets its Pollution Legal Liability Select policies as "support for environmental indemnities in M&A transactions."

3. Effective August 31, 2000, AIG issued a Pollution Legal Liability Select policy ("the Policy") to facilitate a corporate acquisition, specifically to protect a buyer of the Refinery, Ultramar Diamond Shamrock Corporation ("Ultramar"), should Ultramar's liability for certain known scheduled pollution conditions at the Refinery exceed a $50 million indemnity provided to Ultramar by the seller, Tosco Corporation ("Tosco"). To effectuate that purpose, the policy contains a $50 million self-insured retention ("SIR") with respect to costs for those scheduled pollution conditions, and provides $100 million in insurance coverage above that SIR.

4. The Policy states that the $50 million SIR "is to be borne by the Insured and not to be insured." AIG now contends that "borne by the Insured and not to be insured" should be re-written to say "*paid* by the Insured, and not to be *indemnified* by Tosco." But that is not what the Policy says, that is not what the parties intended, and that is the exact opposite of what AIG stated to Ultramar when AIG issued the Policy. On August 29, 2000, the AIG underwriter of the policy

issued a written coverage binder to Ultramar in which he confirmed: "It is our understanding Tosco will be responsible for the $50,000,000."

5.      Fewer than two years later, Ultramar sold the Refinery to Tesoro.  Ultramar extended to Tesoro for value the $50 million Tosco environmental indemnity and assigned to Tesoro for value the Policy, which insured, with respect to scheduled known conditions, the next $100 million in covered loss.  AIG substituted Tesoro for Ultramar as the Named Insured on the Policy effective May 17, 2002.

6.      The Policy also covers other losses sustained by reason of the discovery during the Policy period of unscheduled pollution conditions.  This coverage is subject to a $500,000 deductible, not the $50 million SIR.

7.      In a meeting with Tesoro on May 29, 2002, the same AIG underwriter who had sold the policy to Ultramar, and who had told Ultramar that "Tosco will be responsible for the $50 million [SIR]", directed Tesoro that "expenditures to satisfy the Tosco indemnity [should be] submitted to AIG in satisfaction of the retention under the policy."

8.      Following its sale of the Refinery to Ultramar in 2000, Tosco directly spent at least $16.3 million pursuant to the $50 million environmental indemnity.  (Tosco had the option to pay the costs directly, or reimburse the Refinery owner.)  These amounts spent directly by Tosco apply against and erode the Policy's $50 million SIR.  In the words of the AIG underwriter, these "expenditures to satisfy the Tosco indemnity" apply "in satisfaction of the retention under the policy."

9.      In addition to these amounts spent directly by Tosco, Tesoro itself has directly spent since 2007 at least $70 million in costs for scheduled conditions covered by the Policy. Tesoro paid these costs directly.  These costs apply against, erode and have exhausted the $50 million SIR.  Tesoro has not insured those costs, other than by the Policy at issue (and another

COMPLAINT

1    policy in excess of the Policy), and therefore the source of the funds that Tesoro used to pay those

2    costs and exhaust the SIR is irrelevant.

3           10.     Tesoro has also spent at least $10 million in costs for unscheduled conditions

4    covered by the Policy, which are subject to a $500,000 deductible, not a $50 million SIR.

5

6           11.     Tesoro has demanded and AIG has refused to pay Tesoro covered costs in excess

7    of the applicable SIR or deductible.  Accordingly, because AIG has refused and failed to honor,

8    and continues to refuse and fail to honor, the Policy obligations owed by it to Tesoro, an actual

9    controversy exists between the parties for which a judgment setting forth the parties' respective

10   rights and obligations is necessary.

11          12.     Tesoro also seeks money damages and other relief caused by AIG's failure to

12   fulfill its obligations under the Policy and, further, its tortious breach of the implied covenant of

13   good faith and fair dealing. Its compensatory damages include at least $70 million in out-of-

14   pocket costs expended by Tesoro above the scheduled conditions SIR, and at least $10 million in

15   out-of-pocket costs expended by Tesoro above the deductible applicable to unscheduled

16   conditions, and also include other sums reasonably incurred by Tesoro as a result of AIG's breach

17   of its Policy obligations. All such damages will be the subject of further proof.

18          13.     Tesoro also seeks punitive and exemplary damages against AIG for its breach of

19   the implied covenant of good faith and fair dealing.  Such relief is justified for several reasons.

20   First, AIG has advanced a construction of the SIR provision that has no support in fact or in law,

21   and indeed is directly contrary to the parties' agreement.  AIG has unreasonably, wrongfully and

22   vexatiously refused to provide insurance coverage owed to Tesoro.

23          14.     Second, AIG also has breached its duty of good faith and fair dealing in its

24   unreasonable, wrongful handling of this claim.  Tesoro has in good faith engaged in protracted

25   negotiations, directly with AIG and through AIG's designated California counsel, in an attempt to

resolve the claim.  Tesoro has complied with AIG's serial requests for more and more information, and has by now supported its claim with a production of documents that exceeds 250,000 pages.  These documents support – on an invoice-by-invoice level – the expenditure of remedial costs in amounts far exceeding the $50 million SIR.  Tesoro also has spent hundreds of hours of engineering and attorney time educating AIG claims personnel and counsel on the environmental investigations and response actions at the Refinery.

15.    In furtherance of these protracted negotiations, AIG and Tesoro agreed to a face-to-face claim negotiation meeting to be held on November 15, 2011, which would have been the fourth such meeting.  But on November 7, 2011, while the California counsel whom AIG had represented to Tesoro as its legal representative was corresponding with Tesoro about the logistics of the agreed meeting, AIG's separate and undisclosed Texas counsel was filing a coverage lawsuit in Texas.

16.    AIG has acted and is acting affirmatively to abandon its insured, Tesoro, defeat coverage, obfuscate issues, delay or avoid payment under the Policy, and otherwise to deprive Tesoro of the benefits to which it is unquestionably entitled under the Policy. AIG's acts are inconsistent with the reasonable expectations of its insured, are contrary to established claims practices and applicable law, were and are being done willfully, without justification and with the intent to deprive Tesoro of the insurance coverage protection to which it is entitled and for which substantial premiums were paid, and constitute utmost bad faith.

17.    In short, rather than honor its contractual promises, AIG has subjected Tesoro to an "investigation" that never ended and payments that never began, all followed by an underhanded preemptive lawsuit against Tesoro as supposedly good faith negotiations were ongoing.

**PARTIES**

18.     Plaintiff Tesoro Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in San Antonio, Texas.  Tesoro Corporation transacts business in the state of California through its wholly-owned subsidiary, Plaintiff Tesoro Refining and Marketing Company, a corporation organized and existing under the laws of the State of Delaware.

19.     On information and belief, Defendant Chartis Specialty Insurance Company is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business in New York, New York.  Chartis was formerly known as American International Specialty Lines Insurance Company, a member of the American International Group of insurance companies.

**JURISDICTION AND VENUE**

20.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the matter in controversy is between citizens of different states and exceeds the sum of $75,000, exclusive of interest and costs.

21.     The Oakland Division of the Northern District of California is the proper venue for the present action pursuant to 28 U.S.C. § 1391(a)  and Civil L.R. 3-2(c) because the property insured by the insurance policy in question is entirely within Contra Costa County, California and Defendant is subject to personal jurisdiction in the Northern District of California.

22.     An actual case or controversy of a justiciable nature exists between Tesoro and AIG involving a dispute concerning their respective rights, duties and obligations under the relevant Pollution Legal Liability Select Policy.  The controversy may be resolved by a judgment of this action without other suits.

**INTRADISTRICT ASSIGNMENT**

23.     Assignment to the Oakland Division is proper pursuant to Civil L.R. 3-2(c) and (d).  The events or omissions that give rise to this claim occurred in Contra Costa County, and the property that is the subject of this action is situated in Contra Costa County.

**FACTS**

**Ownership History of the Golden Eagle Refinery**

24.     Tesoro through its subsidiary Tesoro Refining and Marketing Company has owned and operated the Golden Eagle Refinery (the "Refinery") since May 17, 2002.

25.     The Refinery is located on about 2,100 acres of property east of the City of Martinez on the southern shore of Suisun Bay in Contra Costa County, California.  The Refinery assets also include an approximately 100-acre loading/unloading terminal and wharf (the "Amorco Terminal"), which is located about two miles west of the refinery proper.

26.     The Refinery has been in operation since approximately 1913 and was formerly known as the Avon Refinery.

27.     On information and belief, from 1913 to 1966 the Refinery was owned by three related companies.  Later, Texaco Inc. ("Texaco") and subsequently Chevron Corporation ("Chevron") became the successor in interest to all three companies.

28.     Phillips Petroleum Company ("Phillips") owned and operated the Refinery from 1966 to 1976.

29.     Tosco Refining Company and Tosco Corporation (collectively "Tosco") owned and operated the Refinery from 1976 to approximately September 1, 2000.

30.     Ultramar Diamond Shamrock Corporation and its successors owned and operated the Refinery from approximately August 31, 2000 to May 17, 2002.

COMPLAINT

**The JEIRC Agreement**

31.     From time to time, the governments of the United States of America and the State of California have issued written orders imposing remedies and alleging liability or responsibility on  past and present owners of the Refinery for, among other things, the investigation, removal, remediation including monitoring, or disposal of soil, surfacewater, groundwater or other contamination at the Refinery.

32.     These written demands have included:

    a.     an Administrative Order issued on or about February 24, 1989, by the United States Environmental Protection Agency, Region 9, and captioned *In the Matter of Tosco Corporation, Avon Refinery, Martinez, California,* EPA ID # CAD 000/072/751, pursuant to Section 3008(h) of the Resource Conservation and Recovery Act of 1976 ("EPA 1989 RCRA Order"), as amended on or about September 6, 1990 ("EPA 1990 RCRA Order"); and

    b.     Order No. 90-083 issued on or about June 20, 1990, by the California Regional Water Quality Control Board ("CRWQCB"), San Francisco Bay Region, ("Water Board 1990 Order"), as amended by Order No. 92-078 issued on or about July 15, 1992, by the CRWQCB ("Water Board 1992 Order").

33.     In July 1993, Tosco, Phillips, and Texaco entered into a Joint Investigation and Remediation Agreement to perform investigation and remediation work at the Refinery, including work responsive to the EPA 1989 RCRA Order, the EPA 1990 RCRA Order, the Water Board 1990 Order, and the Water Board 1992 Order.  The Agreement created a committee that was named the Joint Environmental Investigation and Remediation Committee ("JEIRC").

34.     Under the JEIRC Agreement, Tosco was responsible for 50% of the JEIRC costs and Phillips and Texaco were each responsible for 25% of the JEIRC costs.

35.     Thereafter, the JEIRC (including Tosco) received further written demands, including:

      a.     Order No. 99-083 issued on or about October 20, 1999, by the California Regional Water Quality Control Board ("CRWQCB"), San Francisco Bay Region, ("Water Board 1999 Order"); and

      b.     Order No. 00-21 issued on or about March 15, 2000, by the CRWQCB ("Water Board 2000 Order)."

### The Tosco – Ultramar Transaction (2000)

36.     In August 2000, Tosco sold the Refinery to Ultramar Diamond Shamrock Corporation ("Ultramar").  On information and belief, the parties closed the transaction with an effective date of August 31, 2000.

37.     In the Asset Purchase and Sale Agreement ("APSA"), Tosco indemnified Ultramar for certain environmental liabilities, which were defined to include liabilities arising from, among other things, pollution conditions disclosed prior to the closing date, and other pollution conditions later demonstrated to have arisen from operations prior to the closing (the "Tosco Environmental Indemnity").

38.     The APSA limited the Tosco Environmental Indemnity obligations to environmental liabilities identified on or within ten years after the closing date, and further limited those obligations to a total aggregate amount of $50 million.

### The Pollution Legal Liability Insurance Policy

39.     To supplement the Tosco Environmental Indemnity, Ultramar purchased from AIG Pollution Legal Liability Select Policy No. PLS 6190132 (the "Policy").

9.

40. The Policy was issued for the policy period August 31, 2000 to August 31, 2010.

41. In the Policy, AIG agreed to pay "**Loss** on behalf of the **Insured . . .** that the **Insured** becomes legally obligated to pay as a result of **Claims** made against the **Insured.**"

42. The Policy defines "**Loss**" to include, among other things, "**Clean-up Costs.**"

43. The Policy defines "**Clean-Up Costs**" to include:

> expenses including reasonable and necessary legal expenses incurred with the Company's written consent, incurred in the investigation, removal, remediation including monitoring, or disposal of soil, surfacewater, groundwater or other contamination: (1) to the extent required by Environmental Laws, or specifically mandated by court order, the government or any political subdivision of the United States of America or any state thereof, or Canada or any province thereof duly acting under the authority of Environmental Law(s); . . .

44. As issued by AIG, the Policy also contained an Endorsement No. 4 drafted by AIG and called the "Separate Self-Insured Retention For Specified Known Pollution Conditions Endorsement." This Endorsement amended the definition of **Loss** to provide that:

> only with respect to the following scheduled **Pollution Conditions, Loss** means: (1) costs, charges and expenses incurred in the defense, investigation or adjustment of **Claims** for **Clean-Up Costs**, or (2) **Clean-Up Costs**, in excess of the **Self-Insured Retention.**

45. Endorsement No. 4 also added a Separate Self-Insured Retention for Specified Known Pollution Conditions. The Endorsement states:

> With respect to **Clean-Up Costs** or **Loss** resulting from the following scheduled **Pollution Conditions**, and covered under Coverage A or Coverage D, this Policy is to pay covered **Clean-Up Costs** or **Loss**, as the case may be, in excess of a **Self-Insured Retention** of $50,000,000, up to but not exceeding the applicable 'Each Incident' limit of coverage. . . . The **Self-Insured Retention** is to be borne by the **Insured** and is not to be insured.

46.   Prior to issuance of the actual Policy by AIG, on August 29, 2000, the AIG underwriter issued a written policy coverage binder to the placing broker in which he confirmed: "It is our understanding Tosco will be responsible for the $50,000,000 [SIR]."

47.   The Policy as issued by AIG also contained an Endorsement No. 9,  drafted by AIG, that contains an insuring agreement regarding conditions discovered during the policy period.  This insuring agreement stated in part:

> The Company agrees to pay **Clean-Up Costs** on behalf of the **Insured**, on or under the **Insured Property**, if such **Clean-Up Costs** are sustained solely by reason of the discovery by the **Insured** during the **Policy Period** of Pollution Conditions on or under the **Insured Property** provided:
>
> (1)   the discovery of such **Pollution Conditions** is reported to the **Company** in writing during the **Policy Period** or during the **Extended Reporting Period**, if applicable, and in accordance with Section II of the [AIG Policy], and
>
> (2)   such **Pollution Conditions** have been reported to the appropriate governmental agency in compliance with applicable **Environmental Laws** in effect as of the date of discovery.  Provided, however, that the unintentional failure to report such **Pollution Conditions** will not invalidate coverage but will only serve to reduce the **Company's** obligation to the extent that the **Company** was prejudiced by such additional delay in reporting the **Pollution Conditions**.

48.   **Clean-Up Costs** covered under Endorsement No. 9 are not subject to the $50,000,000 SIR, but rather are subject to a $500,000 deductible.

### Valero-Tesoro Transaction

49.   In 2001, Valero Energy Corporation acquired Ultramar.  Valero was required to divest the Refinery as a condition of regulatory approval of the acquisition.

50.   In May 2002, Ultramar sold and Tesoro purchased the Refinery for valuable consideration.  The Policy was attached as Schedule 10.3.6 to the Sale and Purchase Agreement for the Refinery between Ultramar and Tesoro.

51.     Ultramar and Tesoro sought and received Tosco's consent for Tesoro to assume certain of Ultramar's rights and obligations under the APSA, including the provisions of Article 13 and 14 of the APSA governing the Tosco Environmental Indemnity.

52.     AIG consented to the assignment of rights under the Policy to Tesoro, and amended the Policy effective May 17, 2002, to substitute Tesoro for Ultramar as the Named Insured.

53.     In a meeting with Tesoro on May 29, 2002, the same AIG underwriter who had sold the policy to Ultramar, and had previously confirmed to Ultramar and its broker in the August 29, 2000 binder that "Tosco will be responsible for the $50 million [SIR]", directed Tesoro that "expenditures to satisfy the Tosco indemnity [should be] submitted to AIG in satisfaction of the retention under the policy."

## Continuation of JEIRC (After 2000)

54.     The APSA empowered Tosco to supervise and perform ongoing remediation at the Refinery for projects in which Tosco had at least 50% responsibility.  Tosco exercised this power after 2000 to continue its supervisory role regarding certain JEIRC environmental projects.

55.     The APSA permitted Tosco to make payments for which it remained liable under the Tosco Environmental Indemnity, at its own election, either directly to third parties, or by reimbursing Ultramar or Tesoro.

56.     On information and belief,  Chevron became a legal successor in interest to Texaco in 2001, and thereafter Chevron from time to time performed certain of Texaco's responsibilities under the JEIRC Agreement.  After 2005, these responsibilities were carried out by a Chevron subsidiary named Texaco Downstream Properties Inc. ("TDPI").

57.     On information and belief, ConocoPhillips became the legal successor in interest to Tosco and to Phillips in 2002, and thereafter ConocoPhillips from time to time performed certain of Tosco's obligations under the APSA and the JEIRC Agreement.

58.     On information and belief, after 2002, and continuing until a date in 2007, the JEIRC was funded 75% by ConocoPhillips, as successor in interest to both Tosco and Phillips, and 25% by Chevron as successor to Texaco, either directly or through TDPI.

59.     After its sale of the Refinery in 2000, Tosco also continued to incur liability for certain environmental conditions, the costs of which Tosco did not share with other JEIRC members.

### Tesoro and Tosco Dispute Resolution Process (2003-07)

60.     In November 2003, Tesoro filed suit in Contra Costa County Superior Court against Tosco alleging that Tosco misrepresented, concealed and failed to disclose certain environmental conditions at the Refinery related to soil and groundwater contamination.

61.     In December 2003, Tesoro also initiated arbitration proceedings against Tosco, seeking a determination that Tosco was responsible for certain environmental liabilities arising from pre-2000 operations at the refinery.

62.     In response to Tesoro's claims, Tosco filed counterclaims in the lawsuit, moved the court to compel arbitration, and filed its own notice of arbitration.

63.     In March 2004, the court granted Tosco's motion to compel arbitration of Tesoro's claims.  Tesoro subsequently amended its arbitration demand to include the fraud claims originally brought in Superior Court.

64.     Beginning in 2006, ConocoPhillips, Tosco's successor,  replaced Tosco as the named defendant in the arbitration.

65.     In the arbitration, ConocoPhillips moved for declaratory relief that the $50 million limit on the indemnity obligation in the APSA should apply to any current liability of ConocoPhillips arising from past operations of the Refinery by Phillips, as well as liability arising from past operations by Tosco. On January 4, 2007, the arbitrators denied ConocoPhillips' motion.

### The 2004 and 2007 Water Board Orders

66.     During the pendency of the dispute between Tesoro and Tosco, and then ConocoPhillips, Tesoro and others received additional government orders, including:

a.      Order No. R2-2004-0056 issued on or about July 21, 2004 by the CRWQCB ("Water Board 2004 Order"); and

b.      Order No. R2-2006-0087 issued on or about January 4, 2007 by the CRWQCB ("Water Board 2007 Order").

67.     The Water Board is a part of the government of the State of California.

68.     The Water Board issued the 2004 and 2007 Orders in part pursuant to Title 27, Division, of the California Code of Regulations ("Title 27").

69.     Title 27 is an "Environmental Law" as that term is defined in the Policy.

70.     In issuing the 2004 and 2007 Orders, the Water Board was "duly acting under the authority of the Environmental Laws", as that phrase is used in the definition of "Clean-Up Costs" in the Policy.

71.     As a result of government orders, including without limitation the EPA 1989 RCRA Order, the EPA 1990 RCRA Order, and the Water Board 1990, 1992, 1999, 2000, 2004 and 2007 Orders, Tesoro has become legally obligated to pay Clean-Up Costs, as defined in the Policy.

**The Tesoro Settlement with ConocoPhilips (2007)**

72.     In March 2007, Tesoro settled its dispute with ConocoPhillips.  Tesoro received payment of $58.5 million, assumed responsibility for certain environmental liabilities, and released ConocoPhillips from any claims arising from either Tosco's or Phillips' prior ownership of the Refinery.

73.     At the time of the 2007 settlement, Tosco (or Phillips or ConocoPhillips as legal successor to Tosco) had paid at least $16.3 million in Clean-Up Costs, as defined in the Policy. These costs were net of any amounts paid by ConocoPhillips and attributable to Phillips' share of JEIRC costs.

74.     Tesoro has spent at least $70 million in Clean-Up Costs, as defined by the Policy, at the Refinery.

75.     Tesoro remains legally obligated to pay additional Clean-Up Costs, as defined in the Policy, at the Refinery, and continues to pay Clean-Up Costs on an ongoing basis.

**The Amorco Terminal**

76.     Under the Water Board 2004 Order, Tesoro and other dischargers were required to investigate two surface impoundments near the Amorco Terminal at the Refinery.

77.     The investigations revealed the presence of methyl tertiary-butyl ether ("MTBE") in groundwater that, on information and belief, was not associated with the surface impoundments.

78.     As a result of these sampling results, the EPA and CRWQCB required certain parties, including Tesoro, to take remedial actions.

79.     Beginning in October 2006, Tesoro and other parties implemented an interim remedial measure at the Amorco Terminal, which involved extracting and treating contaminated groundwater.

80.     Additionally, the Water Board 2007 Order ordered Tesoro and ConocoPhillips to, among other things, (1) submit remedial investigation work plans designed to determine the lateral and vertical extent of MTBE pollution; (2) submit work plans to evaluate the feasibility of remedial actions to treat the MTBE pollution; and (3) implement the recommended final remedial actions.

81.     On March 2, 2007, pursuant to the settlement with ConocoPhillips, Tesoro assumed full responsibility to implement the work required by the Water Board 2007 Order.

82.     The conditions at the Amorco Terminal are not scheduled Pollution Conditions under the Policy.  Therefore, they are not subject to the SIR, but rather are subject to a $500,000 deductible for Coverage A under Item 3 of the Policy's Declarations.

83.     Tesoro has spent at least $10 million in Clean-Up Costs on the Amorco Terminal, far in excess of the $500,000 deductible.

84.     Tesoro remains legally obligated to pay additional Clean-Up Costs, as defined in the Policy, for its remediation efforts at the Amorco Terminal, and continues to pay Clean-Up Costs on an ongoing basis.

## Claim History

85.     On February 13, 2007, Tesoro provided AIG with notice of circumstances under the Policy with respect to soil and groundwater conditions at the Refinery.

86.     On or about July 24, 2007, Tesoro received a response to this notice from AIG. AIG reserved its rights under the Policy.  AIG acknowledged the $50,000,000 SIR and requested that Tesoro "keep us apprised of all developments in this matter and advise us immediately if costs approach the policy SIR."

COMPLAINT

87.     On or about October 8, 2009, Tesoro demanded coverage from AIG and updated the February 13, 2007 notice of circumstances letter.  Tesoro stated its expectation that covered environmental liabilities had exceeded or would exceed applicable deductibles or the SIR.

88.     On October 15, 2009 and October 27, 2009, AIG acknowledged receipt of Tesoro's demand, and stated that AIG would begin its investigation.

89.     After receiving no further response to its October 8, 2009 demand for nine months, Tesoro sent a letter to AIG on July 20, 2010, reiterating Tesoro's demand for coverage.  Tesoro also supplemented its earlier demand notice to include certain costs incurred at the Amorco Terminal, and demanded coverage of the Amorco costs above the $500,000 deductible.

90.     On August 26, 2010, Tesoro again reiterated its demand and supplemented earlier correspondence with a demand for reimbursement of specific costs incurred at the Refinery.  Tesoro stated that covered and documented past Clean-Up Costs totaled more than $69 million, exhausting the $50 million SIR.

91.     Nearly a full year after it allegedly had begun its investigation, AIG responded on September 2, 2010 stating that the claim was still "under review," and that AIG would contact Tesoro "if additional information is needed."

92.     On October 8, and October 22, 2010, Tesoro updated its demand for coverage with additional cost documentation, including invoice-level support for at least $70 million in costs spent by Tesoro.

93.     On November 10, 2010, AIG  issued another letter reserving its rights under the policy.  AIG requested that Tesoro produce further voluminous documentation.

94.     In response to AIG's requests, Tesoro produced information on November, 19, 2010, March 16, 2011, and May 2, 2011.  These productions included over 150,000 pages of

17
COMPLAINT

technical documentation of remedial activity at the Refinery, and evidence of payment for at least

$16.3 million in costs spent by Tosco and ConocoPhillips.

95.     On May 2, 2011, Tesoro requested a meeting with AIG in May or June 2011.

96.     On May 10, 2011, AIG issued another request for documents.

97.     On May 20, 2011, Tesoro produced over 400 pages of information in response to AIG's supplemental request, and repeated its request for a face-to-face meeting with AIG in June 2011.

98.     Representatives from Tesoro and AIG, including counsel for both parties, met at the Refinery on July 21, 2011, and met in the San Francisco offices of Tesoro's counsel for negotiations on July 22, 2011.

99.     During these meetings, AIG issued further requests for documents, and on August 16, August 30, and September 3, 2011, Tesoro produced the requested information. These productions included over 100,000 additional pages of information.

100.     Tesoro and AIG representatives, including counsel, met again in San Francisco on September 8, 2011.

101.     During that meeting, AIG requested yet more documentation, which Tesoro agreed to provide.  The parties scheduled a follow-up meeting for October 27, 2011, in New York.

102.     Tesoro produced the requested additional documentation on October 7, 2011. This production included over 1500 more pages of information bringing the total document production to over 250,000 pages.

103.     AIG through California counsel requested time to review the documentation and a postponement of the October 27, 2011 meeting until November 14, 15 or 16, 2011.

104.     In response, Tesoro counsel: (a) requested that the parties hold a telephone conference call October 27, 2011 so that Tesoro could make a presentation addressing technical

questions; (b) agreed to a face-to-face meeting on November 15 or 16, 2011, in New York at a location to be determined; and (c) requested the scheduling of another meeting to occur the week of December 12, 2011.

105.    AIG's California counsel responded that: "(a) we are a no-go, regretfully, for 10/27 due to lack of adequate progress in reviewing the materials most recently forwarded; (b) we are available either 11/15 or 16 in NYC for next meeting, and request that the presentation you had proposed to make on 10/27 be rolled over to that meeting: and (c) we are flexible the week of 12/12."

106.    Tesoro agreed to meet on November 15, and offered the use of its counsel's New York offices for the meeting.  Notwithstanding AIG's agreement to meet on November 15, AIG did not respond during the week of October 31, 2011 to Tesoro's repeated requests to fix the address and start time of the November 15, 2011 meeting.

107.    On Friday afternoon, November 4, 2011, at approximately 12:15 p.m. Eastern time, Tesoro's counsel contacted AIG's California counsel by e-mail in furtherance of these scheduling efforts.

108.    AIG's California counsel responded at 4:30 pm Eastern Time on Friday, November 4, 2011: "Will chase down confirmation Monday morning."

109.    On the morning of Monday, November 7, 2011, rather than confirm the agreed settlement meeting, AIG through Texas counsel filed a lawsuit against Tesoro in the United States District Court for the Western District of Texas.

### FIRST CLAIM FOR RELIEF:
### BREACH OF CONTRACT-
### SCHEDULED POLLUTION CONDITIONS

110.    Tesoro repeats and re-alleges the allegations of paragraphs 1–109, as if fully set forth herein.

111.     Tesoro has complied fully with all of the terms and conditions of the Policy, and has fulfilled each obligation on its part to be performed.

112.     Defendant AIG has breached its obligations to Tesoro under the Policy by failing and refusing to pay Tesoro's Clean-Up Costs or Losses resulting from scheduled pollution conditions on, under or beyond the Refinery  in excess of the applicable retention.

113.     As a direct and proximate result of AIG's breach of contract and failure to recognize and abide by its duties under the Policy, Tesoro has been injured and damaged in an amount exceeding the jurisdictional minimum of this Court, and to be proven at trial.

<div align="center">

**SECOND CLAIM FOR RELIEF:**
**DECLARATORY RELIEF –**
**SCHEDULED POLLUTION CONDITIONS**

</div>

114.     Tesoro repeats and re-alleges the allegations of paragraphs 1–109, as if fully set forth herein.

115.     An actual, justiciable controversy exists between Tesoro and AIG concerning interpretation of the Policy's Self-Insured Retention ("SIR") provision.

116.     The controversy is of sufficient immediacy to justify the issuance of a declaratory judgment.

117.     The issuance of declaratory relief by this Court will terminate some or all of the existing controversy between the parties.

118.     Tesoro is entitled to a declaration of the rights and obligations of the parties, including, but not limited to, a finding that:

        a.     Past costs spent as a result of federal and state government orders have exhausted and exceeded the $50 million SIR;

<div align="center">

20
**COMPLAINT**

</div>

b.  AIG must reimburse all of Tesoro's past Clean-Up Costs and Losses,

resulting from scheduled pollution conditions at or around the Refinery,

that are in excess of any applicable self-insured retention; and

c.  AIG must cover all of Tesoro's future Clean-Up Costs or Losses resulting

from scheduled pollution conditions at or around the Refinery, including all

such Clean-Up Costs or Losses resulting from the ongoing groundwater

and Free Phase Liquid Hydrocarbon Recovery Programs, or from

scheduled pollution conditions at or emanating from any of the waste

management units or areas of concern, identified in (without limitation) the

EPA 1989 RCRA Order, the EPA 1990 RCRA Order, and the Water Board

1990, 1992, 1999, 2000, 2004 and 2007 Orders, subject only to the upper

limit of the Policy.

**THIRD CLAIM FOR RELIEF:**
**BREACH OF CONTRACT –**
**UNSCHEDULED POLLUTION CONDITION AT AMORCO TERMINAL**

119.  Tesoro repeats and re-alleges the allegations of paragraphs 1–109, as if fully set forth herein.

120.  Tesoro has complied fully with all of the terms and conditions of the Policy, and has fulfilled each obligation on its part to be performed.

121.  Defendant AIG has breached its obligations to Tesoro under the Policy by failing and refusing to pay Tesoro's Clean-Up Costs or Losses at the Amorco Terminal in excess of the $500,000 deductible.

122.  As a direct and proximate result of AIG's breach of contract and failure to recognize and abide by its duties under the Policy, Tesoro has been injured and damaged in an amount exceeding the jurisdictional minimum of this Court, and to be proven at trial.

**FOURTH CLAIM FOR RELIEF:**
**DECLARATORY RELIEF –**
**UNSCHEDULED POLLUTION CONDITION AT AMORCO TERMINAL**

123. Tesoro repeats and re-alleges the allegations of paragraphs 1–109, as if fully set forth herein.

124. An actual, justiciable controversy exists between Tesoro and AIG concerning Tesoro's Clean-Up Costs at the Amorco Terminal, an unscheduled pollution condition.

125. The controversy is of sufficient immediacy to justify the issuance of a declaratory judgment.

126. The issuance of declaratory relief by this Court will terminate some or all of the existing controversy between the parties.

127. Tesoro is entitled to a declaration of the rights and obligations of the parties, including, but not limited to, a finding that:

      a.    AIG must reimburse all of Tesoro's past Clean-Up Costs and Losses spent at the Amorco Terminal, an unscheduled pollution condition, that are in excess of the $500,000 deductible; and

      b.    AIG must cover all of Tesoro's future costs of responding to government orders regarding environmental conditions at the Amroco Terminal, including without limitation the Water Board 2007 Order.

**FIFTH CLAIM FOR RELIEF:**
**BREACH OF THE IMPLIED COVENANT OF**
**GOOD FAITH AND FAIR DEALING**

128. Tesoro repeats and re-alleges the allegations of paragraphs 1–109, as if fully set forth herein.

129. AIG at all material times had a duty to act fairly and in good faith toward Tesoro in carrying out its responsibilities under the Policy. Part of AIG's obligation to act fairly and in

good faith toward Tesoro is its duty to promptly and fairly respond to claims and requests of Tesoro, and to make reasonable, good faith evaluations and decisions concerning such claims and requests.  The implied covenant of good faith and fair dealing further constituted promises and obligations on the part of AIG that it would do nothing to injure, frustrate or interfere with the rights of Tesoro under the Policy to receive the benefits of the Policy and would give at least the same level of consideration to the interests of Tesoro as it would give to its own interests.

130.     AIG has breached the implied covenant of good faith and fair dealing by engaging in a course of conduct wrongfully and vexatiously to refuse to provide insurance coverage due and owing to Tesoro.  In contravention of its duties and obligations, AIG has, among other things:

a.     decided without any reasonable basis in fact or law, and for its own purposes and to serve its own desires, to deny all benefits due to Tesoro under the Policy, specifically including without limitation coverage for the Clean-Up Costs, and to repudiate its obligations under the Policy to pay any such benefits or Costs;

b.     construed facts to support its own position rather than construing the facts in favor of coverage, as required by California law;

c.     consciously failed to conduct a reasonable and thorough investigation of the facts and claim(s) and of possible bases for coverage, all in violation of accepted insurance industry custom, practice and standards, and its duties to Tesoro;

d.     in the midst of what were – on Tesoro's part – good faith settlement negotiations, wrongfully refused and declined to respond to Tesoro's reasonable requests for clarification and information about AIG's coverage positions and information about the Policy;

COMPLAINT

e.      engaged in a pattern of delay and evasiveness, designed not to pay Tesoro

for covered costs and expenses while AIG attempted to manufacture

reasons or bases to deny Tesoro coverage under the Policy;

f.      rather than honor its obligations under the Policy, vexatiously filed a

declaratory judgment action asserting claims without any reasonable basis

in fact or law;

g.      intentionally and willfully refused to honor its obligations, including those

under the Policy; and

h.      placing more weight on its own interests than it has to Tesoro's interests

by, among other acts and omissions, ignoring applicable law, unreasonably

and improperly asserting an interpretation of Policy language contrary to

the facts and the law, and fabricating excuses, contriving defenses,

undertaking a sham investigation, and ultimately filing a pre-emptive

lawsuit against Tesoro all designed to gain improper leverage against

Tesoro (all the while knowing that it was and is at all times obligated to

pay costs submitted to it by Tesoro, as above alleged).

131.    AIG did the things and committed the acts alleged above for the purpose of
consciously withholding from Tesoro the rights and benefits to which Tesoro is entitled under the
Policy, and without considering the interests of the insured at least to the same extent as it did its
own interests.

132.    AIG's acts are inconsistent with the reasonable expectations of the insured, are
contrary to established norms, practices and legal requirements related to insurance claims, are
contrary to the express terms of the Policy, and constitute bad faith and a breach of the implied
covenant of good faith and fair dealing.

133.    AIG's conduct is and has been undertaken with a conscious disregard of Tesoro's rights as beneficiary of the Policy.

134.    In light of information, facts, and relevant law to the contrary, AIG, by acting as alleged above and as will be proved at trial, consciously disregarded Tesoro's rights and has prejudiced.  AIG has forced Tesoro to incur substantial unreimbursed financial losses in connection with the cleanup, defense of AIG's declaratory judgment action, and to take action to pursue the insurance coverage to which Tesoro rightfully is entitled.

135.    AIG has ignored Tesoro's interests and concerns through oppressive, malicious and fraudulent conduct within the meaning of California Civil Code Section 3294.

136.    Tesoro is entitled to recover punitive damages from AIG in an amount sufficient to punish AIG and to deter similar conduct in the future.

137.    As a direct and proximate result of AIG's breaches, Tesoro has suffered and continues to suffer substantial damages, in an amount exceeding the jurisdictional minimum of this Court, and to be determined at trial.  Such damages include, among other things, amounts paid or to be paid in connection with cleanup costs for the pollution condition.  Tesoro also has incurred and continues to incur significant, recoverable attorneys' fees and costs to obtain the benefits to which it is entitled and which AIG wrongfully has denied under the Policy, pursuant to *Brandt v. Superior Court*, 37 Cal. 3d 813, 210 Cal. Rptr. 211 (1985).  Tesoro also is entitled to recover all such attorneys' fees and costs, plus interest.

WHEREFORE, Tesoro requests this Court to enter a judgment as follows:

1.    With respect to the First Claim for Relief, for damages against AIG according to proof at the time of trial, plus interest;

COMPLAINT

2.     With respect to the Second Claim for Relief:

    a.     A declaration of the parties' obligations and duties under the Policy as to scheduled pollution conditions;

    b.     Attorneys fees and costs incurred in obtaining the benefits due under the Policy according to proof at the time of trial;

    c.     Interest on such attorneys fees and costs.

3.     With respect to the Third Cause of Action, for damages against AIG according to proof at the time of trial, plus interest;

4.     With respect to the Fourth Claim for Relief:

    a.     A Declaration of the parties' obligations and duties under the Policy as to the Amorco Terminal;

    b.     Attorneys fees and costs incurred in obtaining the benefits due under the Policy according to proof at the time of trial; and

    c.     Interest on such attorneys fees and costs.

5.     With respect to the Fifth Claim for Relief:

    a.     Damages according to proof at the time of trial, plus interest;

    b.     Attorneys fees and costs incurred in obtaining the benefits due under the Policy according to proof at the time of trial;

    c.     Interest on such attorneys fees and costs; and

    d.     Punitive damages in an amount to be determined at the time of trial.

6.     With respect to all claims, Tesoro's costs of suit incurred herein, and such other relief as the Court may deem just and proper.

**COMPLAINT**

1

## **JURY DEMAND**

2              Plaintiffs Tesoro Corporation and Tesoro Refining and Marketing Company hereby

3      demand trial by jury in this action.

4

5      Dated: November 29, 2011                          JONES DAY

6

7                                                        By: _David W. Steuber /DK_
                                                         David W. Steuber

8                                                        Attorneys for Plaintiffs
                                                         TESORO CORPORATION AND TESORO
9                                                        REFINING AND MARKETING COMPANY

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT B

TPC

Mtg of AIC Re Environmental Policy        600
                                          03/29/02

1. JP made opening comment.

2. Rob S. gave overview of corporate + environmental. (45 Minutes)

3. Jeff - Periodic updates on expenditures to certify. The Texaco
        indemnity bills s/be submitted to AIG in
        anticipation of the reductions under the policy.
        UDS has made no reports yet to AIG.

        - New issues (those not w/in Texaco's indemnity) s/be
          notified RMP and these will carry their own deductible.

        - Known conditions - see a Documents List.

4. Rob + Rob will pursue in obtaining info on expenditures
        made since UDS' purchase in 08/00 + get
        to Jeff Hubbard. They will do periodic (semi-annual)
        updates.

5. Jeff Hubbard noted some of the policy's items - no USTs,
        no asbestos, etc.  Discovery trigger had been removed.
        Trigger for coverage is an outside agency's order.

6. Jeff Hubbard will get the schedule of contracts amended in the policy.

7. J.H. said there's coverage for ^(that's 3rd party) disposal sites if they have been
        identified. We need to identify which ever they may be.

8. Jeff Hubbard confirmed there is no admin surcharge assessed by AIG for the expenditure schedules/support that we submit for application to the STF.

**Jeffrey Hubbard**
Assistant Vice President
National Accounts

**AIG**

**AIG Environmental®**
A Division of American International Companies®
8144 Walnut Hill Lane, Suite 1600
Dallas, TX 75231
214.932.2159
214.932.2277 Fax
888.980.8621 Pager
jeff.hubbard@aig.com

Insurance Provided by Members of American International Group, Inc.

**Jay Halpin**
Manager, Western Region
Environmental Management Division

**AIG**

AIG Consultants, Inc.

8144 Walnut Hill Lane, Suite 1600
Dallas, TX 75231

Tel   214-932-2160
Fax   214-932-2153
E-Mail Jay.Halpin@AIG.com

# EXHIBIT C



**Subject:**
Re: Tesoro/Chartis meetings

**From:**
Dave Campagne
11/04/2011 04:30 PM

**To:**
Bernard P Bell
Please respond to Dave Campagne
Show Details

History: This message has been replied to.
Flipped your email to them on receipt. No responses.     REDACTED     They are now gone for the day.
Will chase down confirmation Monday morning. Sorry.

Sent from my Verizon Wireless BlackBerry

---

**From:** Bernard P Bell <bpbell@JonesDay.com>
**Date:** Fri, 4 Nov 2011 12:09:00 -0700
**To:** Dave Campagne<DCampagne@spcclaw.com>
**Subject:** Re: Tesoro/Chartis meetings

Dave – Any word on this?  We'd like to lock travel.  Thanks,

Bernard P. Bell
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC  20001
(202) 879-3727
BPBell@JonesDay.com

| From: | Bernard P Bell/JonesDay |
| --- | --- |
| To: | Dave Campagne <DCampagne@spcclaw.com> |
| Date: | 11/03/2011 12:15 PM |
| Subject | Tesoro/Chartis meetings |

---

Dave --

Regarding the meetings we've been discussing, can we lock in Tuesday, November 15, in NY to begin at 11:00 a.m., and also Thursday December 15 at a location TBD?

file://C:\Documents and Settings\jp013282\Local Settings\Temp\notesD9BE7B\~web179...   11/29/2011

Also, please let us know where you would like to meet in NY.  We can use Jones Day NY if you'd like; the office is on East 41st between 2d and 3d Aves.

Thanks,

Bernie

Bernard P. Bell
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC  20001
(202) 879-3727
BPBell@JonesDay.com

==========
This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege.  If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.
==========


==========
This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege.  If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.
==========

# EXHIBIT D

August 29, 2000

Post-it® Fax Note  7671  Date 8/29/00  # of pages ► 9

| To Rudd Marlcue | From H. Straer |
| Co./Dept. Tino Harvey | Co |
| Phone # | Phone # |
| Fax # | Fax # |

Ms. Beverly A. McCoy
Marsh USA Inc.
1000 Louisiana Street, Ste. 4000
Houston, TX 77002-5008

Dear Beverly:

RE:   ULTRAMAR DIAMOND SHAMROCK
      N. LOOP 1604 WEST
      SAN ANTONIO, TX 78249-1112
      BINDER CONFIRMATION
      FLL SELECT
      DESCRIPTION OF OPERATIONS: PETROLEUM REFINING & MARKETING

We are respectfully submitting this binder confirmation for insurance coverage for Ultramar Diamond Shamrock Corporation, Inc Avon Refinery Acquisition.   Terms, conditions and premium pricing are stated below. The Insurer will be American International Specialty Lines Insurance Co Form #72187 (1/00)

Section I - The following Coverage Sections will apply:

| COVERAGE SECTION | EACH INCIDENT LIMIT | COVERAGE SECTION AGGREGATE LIMIT | DEDUCTIBLE EACH INCIDENT |
|---|---|---|---|
| A | 1.  $100,000,000 | 1.  $100,000,000 | A)  $500,000 |
| C | 1.  $100,000,000 | 1.  $100,000,000 | A)  $500,000 |
| D | 1.  $100,000,000 | 1.  $100,000,000 | A)  $500,000 |
| F | 1.  $100,000,000 | 1.  $100,000,000 | A)  $500,000 |
| G | $5,000,000 | $5,000,000 | A.  $500,000 |
| H | $5,000,000 | $5,000,000 | A)  $500,000 |

- Policy Aggregate Limit:        $100,000,000
- Policy Number:                 PLS 619 0132
- Policy Term:                   August 31, 2000 to August 31, 2010
- Premium:                       $990,629.00
- Covered Locations : Former Avon Refinery, Martinez, CA (PHYSICAL ADDRESS NEEDED)
                      Amorco Wharf, Diablo Services, Pittsburgh, CA

Section II

1.  The following coverage sections will apply for this proposal subject to Sections I and II above (other options available):
➤  Coverage A - On-Site Cleanup of Pre-Existing Conditions
➤  Coverage C - Third Party Claims for On-Site Bodily Injury and Property Damage
➤  Coverage D - Third Party Claims for Off-Site Cleanup Resulting from Pre-Existing Conditions
➤  Coverage F - Third Party Claims for Off-Site Bodily Injury and Property Damage
➤  Coverage G- Third-Party Claims For Off-Site Clean-Up Costs – Non-Owned Locations
➤  Coverage H- Third-Party Claims For Off-Site Bodily Injury, Property Damage, or Clean-Up Costs – Non-Owned Locations

2.  No coverage will be provided for any identified underground storage tank(s) unless satisfactory integrity testing results (AISLIC acceptable method) certifying that the tank(s) are tight, are received

and approved by the underwriter.  Coverage will only be provided for those tanks specifically scheduled onto the policy by endorsement.

3.  Coverage C & F will only apply to claims arising from pollution conditions commencing prior to the inception date of this policy.

4.  All premiums will be 100% minimum earned at inception.

5.  This policy shall have a $50,000,000 SIR with respect to known conditions at the site for a period of five years only after which known conditions will be excluded.  This term limitation will be reevaluated on an annual basis to determine to what extent term can be extended in the future.  It is our understanding Tosco will be responsible for the $50,000,000 exclusive of any fines, penalties, punitives or monies provided by the JFRC committee.

6.  Coverages G & H will be provided (subject to underwriting) for five Non-Owned Disposal sites subject to a $5,000,000 sublimit.  These sites must be disclosed to the company and endorsed onto the policy.

7.  The lead and asbestos exclusion will be modified to provide Coverage under Coverages C, D and F;

8.  The responsible insured definition will be modified as per previous UDS policies;

9.  Definition of claim will be amended to provide for oral demand when followed by a written notice.

10. Section VII, Item J. to include "to have access coordinated through the Insured's broker";

11. Amend Section II., Notice Requirements and Claim Provisions to include "for third party administrator or broker reporting"; and

12. Notice of Occurrence to provide that failure of any agent, servant or employee other than the Risk Manager of the Named Insured to notify the Company shall not invalidate the insurance afforded by policy;

13. The policy will be amended to provide that unintentional Failure to Report Claims solely due to the insureds reasonable belief that the pollution condition is not covered under this policy will not prejudice this policy, unless AIG Environmental's position is prejudiced by their failure to report.

14. Coverage A will be modified to provide 3rd party trigger only;

15. Contractual liability will be provided for the lease agreements between Equilon will be provided subject to receipt and review of the lease agreements. Contractual liability for the Purchase Sale Agreement between UDS and Tosco will be provided (subject to underwriting).

16. Definition of Responsible Insured will be modified as previously agreed.

**Section III**

The above quote is subject to the following conditions
1.  AIG must receive completed Pollution Legal Liability application within ten (10) days binding coverage for this site.
2.  Receipt and acceptability of the final Purchase Sale Agreement evidencing Tosco's environmental responsibilities under the contract within ten (10) days of signature.

C:\Temp\Aven Pollution Binder 8-29-00.doc                                                    2

The policy will be issued by the American International Specialty Lines Insurance Company, a member company of the American International Group, Inc.

The premium must be remitted to Southern Risk Specialists, Inc. Within thirty (30) days of the effective date of the policy or within fifteen (15) days from the date of billing, whichever is later. We must have a copy of your surplus lines license. Please fax a copy to Jeffrey Hubbard @ 214-932-2277. As a Surplus Lines Broker, it is your responsibility to follow the surplus lines law of the applicable state in which the risk is located and to see that the appropriate premium tax is collected and paid. A copy of the filing evidencing that taxes have been filed on one hundred percent (100%) of the CA premium must be received by us within 20 days of binding.

We thank you for the opportunity to provide environmental insurance products to your client and look forward to the working with you on this endeavor, and appreciate the excellent work you have done on your clients behalf.

Respectfully Yours,


Jeffrey Hubbard
National Accounts Regional Manager


Cc:     Ms. Helen H. Groos
        Marsh USA Inc.
        112 E. Pecan Street
        San Antonio, TX 78205

        Mr. John K. Welter
        Vice President
        AIG Environmental
        175 Water Street, Ste. 1200
        New York, NY

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| Chartis Specialty Insurance Company, | |
| *Plaintiff* | |
| v. | Civil Action No. 5:11-cv-00927-OLG |
| Tesoro Corporation, | |
| *Defendant.* | |

**COMPENDIUM OF OUT-OF-STATE CASES**

The following out-of-state cases cited in Defendant Tesoro Corporation's Motion to Dismiss, Stay, or Transfer these Proceedings to the Northern District of California are attached hereto in their entirety:

1. *AmSouth Bank v. Dale*, 386 F.3d 763 (6th Cir. 2004)

2. *Frontier Oil Corporation v. RLI Insurance Company*, 63 Cal. Rptr. 3d 816 (Cal. Ct. App. 2007)

3. *In re Western Asbestos Company*, 416 B.R. 670 (N.D. Cal. 2009)

Page 1

386 F.3d 763, 2004 Fed.App. 0321P
**(Cite as: 386 F.3d 763)**



United States Court of Appeals,
Sixth Circuit.
AMSOUTH BANK (03–5517); First Tennessee
Bank (03–5521), Plaintiffs–Appellees,
v.
George DALE et al., Defendants–Appellants.

Nos. 03–5517, 03–5521.
Argued: June 9, 2004.
Decided and Filed: Sept. 21, 2004.

**Background:** Two banks brought declaratory judgment actions against receivers for insolvent insurance companies, seeking determination that banks were not liable to receivers in connection with money-laundering scheme, and seeking injunction barring receivers from bringing future lawsuits against them. The United States District Court for the Middle District of Tennessee, William J. Haynes, Jr., J., denied receivers' motions to dismiss and barred them from pursuing related litigation against banks in different state. Receivers appealed.

**Holdings:** The Court of Appeals, Moore, Circuit Judge, held that:

(1) order barring receivers' pursuit of related litigation was "injunction" for purposes of appellate jurisdiction;

(2) order denying motion to dismiss was subject to review under pendent appellate jurisdiction;

(3) federal question jurisdiction did not exist over banks' actions;

(4) jurisdictional defect in one action was cured by dismissal of non-diverse defendant;

(5) McCarran-Ferguson Act did not apply to reverse-preempt Declaratory Judgment Act in banks' actions;

(6) *Burford* abstention was not warranted; and

(7) district court abused its discretion in assuming jurisdiction over banks' actions.

Reversed and remanded; injunction dissolved.

Boggs, Chief Judge, concurred in the judgment.

West Headnotes

**[1] Federal Courts 170B** ⟜573

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(C) Decisions Reviewable
         170BVIII(C)2 Finality of Determination
            170Bk572 Interlocutory Orders Appealable
               170Bk573 k. Injunction and Stay Orders. Most Cited Cases

Statute addressing appellate jurisdiction over interlocutory appeals provides jurisdiction over orders that grant or deny injunctions and orders that have the practical effect of granting or denying injunctions and have serious, perhaps irreparable, consequence. 28 U.S.C.A. § 1292(a)(1).

**[2] Federal Courts 170B** ⟜576.1

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(C) Decisions Reviewable
         170BVIII(C)2 Finality of Determination
            170Bk576 Particular Actions, Interlocutory Orders Appealable
               170Bk576.1 k. In General. Most Cited Cases

Order in which district court, in declaratory judgment actions brought by banks, barred receivers for insolvent insurance companies from pursuing related litigation against banks in different state was "injunction" within meaning of statute addressing appellate jurisdiction over interlocutory appeals, rather than order which was immediately appealable only if it had practical effect of granting or denying injunction and had serious, perhaps irreparable, consequence, even though banks, which had specifically asked for such relief in their complaints, did not move for injunction pursuant to procedural rule. 28 U.S.C.A. § 1292(a)(1); Fed.Rules

© 2011 Thomson Reuters. No Claim to Orig. U.S. Gov. Works.

386 F.3d 763, 2004 Fed.App. 0321P
**(Cite as: 386 F.3d 763)**

Civ.Proc.Rule 65, 28 U.S.C.A.

**[3] Federal Courts 170B ☞573**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(C) Decisions Reviewable
      170BVIII(C)2 Finality of Determination
       170Bk572 Interlocutory Orders Appealable
        170Bk573 k. Injunction and Stay Orders. Most Cited Cases

When order granting injunctive relief would be appealable if a party requested it, fact that district court issued order sua sponte cannot insulate order from review.

**[4] Federal Courts 170B ☞576.1**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(C) Decisions Reviewable
      170BVIII(C)2 Finality of Determination
       170Bk576 Particular Actions, Interlocutory Orders Appealable
        170Bk576.1 k. In General. Most Cited Cases

Order entered in banks' actions for declaratory judgment, barring receivers for insolvent insurance companies from pursuing related litigation against banks in different state, was appealable injunction. 28 U.S.C.A. § 1292(a)(1).

**[5] Federal Courts 170B ☞572.1**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(C) Decisions Reviewable
      170BVIII(C)2 Finality of Determination
       170Bk572 Interlocutory Orders Appealable
        170Bk572.1 k. In General. Most Cited Cases

"Collateral order" doctrine renders appealable a preliminary or interim decision when it (1) conclusively determines the disputed question, (2) re-

solves an important issue completely separate from the merits of the action, and (3) is effectively unreviewable on appeal from a final judgment.

**[6] Federal Courts 170B ☞753**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)1 In General
       170Bk753 k. Questions Considered in General. Most Cited Cases

In reviewing injunction that was entered in declaratory judgment actions brought by banks and barred receivers for insolvent insurance companies from pursuing related litigation against banks in different court, Court of Appeals could consider receivers' arguments going to power of district court to exercise jurisdiction over banks' actions and district court's discretionary responsibility to decline such jurisdiction, inasmuch as such arguments addressed merits of injunction, which was premised on district court's proper assumption of jurisdiction.

**[7] Federal Courts 170B ☞768.1**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)1 In General
       170Bk768 Interlocutory, Collateral and Supplementary Proceedings and Questions
        170Bk768.1 k. In General. Most Cited Cases

"Pendent appellate jurisdiction" allows unappealable orders to be reviewed only when they are "inextricably intertwined" with appealable orders.

**[8] Federal Courts 170B ☞770**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)1 In General
       170Bk768 Interlocutory, Collateral and Supplementary Proceedings and Questions

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

386 F.3d 763, 2004 Fed.App. 0321P
**(Cite as: 386 F.3d 763)**

170Bk770 k. On Separate Appeal from Interlocutory Judgment or Order. Most Cited Cases

Determination, on interlocutory appeal from order granting banks preliminary injunctive relief in their declaratory judgment actions against receivers for insolvent insurance companies, that district court abused its discretion when it entertained actions necessarily also established that district court had erred in denying receivers' motions to dismiss, and therefore order denying motion to dismiss was inextricably intertwined with order granting injunction and subject to review under Court of Appeals' pendent appellate jurisdiction.

**[9] Federal Courts 170B ⟷231**

170B Federal Courts
    170BIII Federal Question Jurisdiction
        170BIII(C) Cases Arising Under Laws of the United States
            170Bk231 k. National Banks or Receivers Thereof, Actions by or Against. Most Cited Cases

Character of threatened actions, rather than of banks' defense, governed determination as to whether federal question jurisdiction existed over two declaratory judgment actions commenced by banks in anticipation of coercive actions by receivers for insolvent insurance companies.

**[10] Federal Courts 170B ⟷24**

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(A) In General
            170Bk20 Ancillary and Incidental Jurisdiction
                170Bk24 k. Cross-Claims and Counterclaims. Most Cited Cases
    (Formerly 334k25(1))

"Complete preemption" is a narrow exception to the well-pleaded complaint rule, whereby plaintiff is master of his complaint and can choose to assert only state-law claims, applicable in situations in which Congress has indicated an intent to occupy the field so completely that any ostensibly state-law claim is in fact a federal claim for purposes of arising-under federal jurisdiction.

**[11] Federal Courts 170B ⟷241**

170B Federal Courts
    170BIII Federal Question Jurisdiction
        170BIII(D) Pleading
            170Bk241 k. Allegations in Pleadings in General. Most Cited Cases

Only Congress could completely preempt state cause of action, and therefore federal regulation was not basis for establishing federal question jurisdiction in banks' declaratory judgment actions against receivers for insolvent insurance companies based on complete preemption of receivers' ostensibly state-law claims; rather, proper inquiry was directed to regulations' enabling statute.

**[12] Federal Courts 170B ⟷241**

170B Federal Courts
    170BIII Federal Question Jurisdiction
        170BIII(D) Pleading
            170Bk241 k. Allegations in Pleadings in General. Most Cited Cases

Only Congress can completely preempt a state cause of action, so as to give rise to federal question jurisdiction over ostensibly state-law claim.

**[13] Federal Courts 170B ⟷191**

170B Federal Courts
    170BIII Federal Question Jurisdiction
        170BIII(C) Cases Arising Under Laws of the United States
            170Bk191 k. In General; What Constitute "Laws of the United States". Most Cited Cases

Although federal agency can create federal law, it cannot expand federal jurisdiction.

**[14] Federal Courts 170B ⟷241**

170B Federal Courts
    170BIII Federal Question Jurisdiction
        170BIII(D) Pleading
            170Bk241 k. Allegations in Pleadings in

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

386 F.3d 763, 2004 Fed.App. 0321P
**(Cite as: 386 F.3d 763)**

General. Most Cited Cases

Federal Reserve Act, as enabling statute for regulations governing wire transfers on wire transfer system of federal reserve banks, did not completely preempt state-law claims that receivers for insolvent insurance companies sought to assert against two banks, based on use of accounts held at banks in money-laundering scheme, and thus did not support federal question jurisdiction in declaratory judgment actions brought by banks against receivers to preclude receivers' anticipated coercive actions. Federal Reserve Act, §§ 1(i, j, o), 13, 19(f), 12 U.S.C.A. §§ 248(i, j, o), 342, 464; 12 C.F.R. § 210.25 et seq.

**[15] Banks and Banking 52 ⬡➔216**

52 Banks and Banking
    52III Functions and Dealings
        52III(H) Actions
            52k216 k. Nature and Form of Remedy.
Most Cited Cases

**Federal Courts 170B ⬡➔241**

170B Federal Courts
    170BIII Federal Question Jurisdiction
        170BIII(D) Pleading
            170Bk241 k. Allegations in Pleadings in General. Most Cited Cases

Bank Secrecy Act did not create private right of action, and therefore incorporation of Act's standards into state-law cause of action by receivers for insolvent insurance companies did not transform receivers' anticipated complaints against banks into ones raising federal questions, so as to establish federal question jurisdiction over banks' declaratory judgment actions against receivers under complete preemption doctrine. 31 U.S.C.A. § 5311 et seq.

**[16] Federal Courts 170B ⬡➔246**

170B Federal Courts
    170BIII Federal Question Jurisdiction
        170BIII(D) Pleading

            170Bk246 k. Anticipation of Defense.
Most Cited Cases

In determining whether federal question jurisdiction exists in declaratory judgment action which seeks, in essence, to assert defense to impending or threatened state-court action, question to be asked is whether, under defendant's hypothetical state-law action, well-pleaded federal question would appear on face of complaint.

**[17] Federal Courts 170B ⬡➔306**

170B Federal Courts
    170BIV Citizenship, Residence or Character of Parties, Jurisdiction Dependent on
        170BIV(B) Controversies Between Citizens of Different States
            170Bk306 k. Dismissal as to One or More Parties. Most Cited Cases

**Federal Courts 170B ⬡➔307**

170B Federal Courts
    170BIV Citizenship, Residence or Character of Parties, Jurisdiction Dependent on
        170BIV(B) Controversies Between Citizens of Different States
            170Bk307 k. Time as of Which Jurisdiction Determined; Change of Citizenship Pending Suit. Most Cited Cases

Although normally jurisdiction depends upon the facts as they are at the time of filing, curing a jurisdictional defect through dismissal of a party that destroys diversity is an exception to the time-of-filing rule, and this dismissal can be effected by district court, even subsequent to adjudication on the merits, or by appellate court.

**[18] Federal Courts 170B ⬡➔306**

170B Federal Courts
    170BIV Citizenship, Residence or Character of Parties, Jurisdiction Dependent on
        170BIV(B) Controversies Between Citizens of Different States
            170Bk306 k. Dismissal as to One or More

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

386 F.3d 763, 2004 Fed.App. 0321P
**(Cite as: 386 F.3d 763)**

Parties. Most Cited Cases

Subject matter jurisdiction existed over declaratory judgment action brought by bank against receivers for insolvent insurance companies when dismissal of only non-diverse defendant created diversity jurisdiction, thereby curing jurisdictional defect arising from lack of federal question jurisdiction, upon which jurisdiction originally had erroneously been premised. 28 U.S.C.A. § 1653.

**[19] Federal Civil Procedure 170A ☞928**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(I) Motions in General
         170Ak928 k. Determination. Most Cited Cases

In cases in which a post-filing jurisdictional cure is allowed, all intermediate decisions are rendered not void for lack of jurisdiction.

**[20] Federal Courts 170B ☞306**

170B Federal Courts
   170BIV Citizenship, Residence or Character of Parties, Jurisdiction Dependent on
      170BIV(B) Controversies Between Citizens of Different States
         170Bk306 k. Dismissal as to One or More Parties. Most Cited Cases

Particular rule used to dismiss party destroying diversity is immaterial in assessing whether federal jurisdiction was created by that party's dismissal.

**[21] Insurance 217 ☞1100**

217 Insurance
   217III What Law Governs
      217III(B) Preemption; Application of State or Federal Law
         217k1100 k. In General. Most Cited Cases

**Insurance 217 ☞1101**

217 Insurance
   217III What Law Governs
      217III(B) Preemption; Application of State

or Federal Law
         217k1101 k. The "Business of Insurance" in General. Most Cited Cases

**States 360 ☞18.41**

360 States
   360I Political Status and Relations
      360I(B) Federal Supremacy; Preemption
         360k18.41 k. Insurance. Most Cited Cases

Reverse preemption under McCarran–Ferguson Act, which precludes application of federal statute to invalidate or impair state law enacted to regulate insurance, depends upon the policies that undergird state law, and when state law protects state insurance-policyholders, it is a law enacted for the purpose of regulating the business of insurance within meaning of Act; however, when state law protects other interests, such as those of stockholders in insurance companies, it is not such a law within the meaning of the Act. McCarran–Ferguson Act, § 2(b), 15 U.S.C.A. § 1012(b).

**[22] Insurance 217 ☞1100**

217 Insurance
   217III What Law Governs
      217III(B) Preemption; Application of State or Federal Law
         217k1100 k. In General. Most Cited Cases

**States 360 ☞18.41**

360 States
   360I Political Status and Relations
      360I(B) Federal Supremacy; Preemption
         360k18.41 k. Insurance. Most Cited Cases

When assessing whether a general federal statute that creates a cause of action "impairs" the operation of a state law, within meaning of prohibition under McCarran–Ferguson Act against application of federal statute to invalidate or impair state law enacted to regulate the business of insurance, proper inquiry is whether the particular suit being brought would impair state law. McCarran–Ferguson Act, § 2(b), 15 U.S.C.A. § 1012(b).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

386 F.3d 763, 2004 Fed.App. 0321P
**(Cite as: 386 F.3d 763)**

**[23] Insurance 217 ☞1111**

217 Insurance
   217III What Law Governs
      217III(B) Preemption; Application of State or Federal Law
         217k1102 Particular Laws or Activities
            217k1111 k. Insolvency or Bankruptcy. Most Cited Cases

**States 360 ☞18.41**

360 States
   360I Political Status and Relations
      360I(B) Federal Supremacy; Preemption
      360k18.41 k. Insurance. Most Cited Cases
   Declaratory judgment actions that were brought by banks against receivers of insolvent insurance companies for the purpose of evading liability in threatened common-law coercive actions by receivers had only attenuated connection to regulation of insurance business, and therefore bar under McCarran-Ferguson Act against application of federal statute to invalidate or impair state law enacted to regulate business of insurance did not apply to reverse-preempt Declaratory Judgment Act in banks' actions. McCarran–Ferguson Act, § 2(b), 15 U.S.C.A. § 1012(b); 28 U.S.C.A. § 2201.

**[24] Federal Courts 170B ☞51**

170B Federal Courts
   170BI Jurisdiction and Powers in General
      170BI(B) Right to Decline Jurisdiction; Abstention Doctrine
         170Bk47 Particular Cases and Subjects, Abstention
            170Bk51 k. Declaratory Judgment in General. Most Cited Cases
   *Burford* abstention was not warranted in declaratory judgment actions in which banks sought to avoid tort liability, based on non-insurance-related activities, to receivers for insolvent insurance companies, inasmuch as actions did not threaten disruption of state liquidation proceedings.

**[25] Federal Courts 170B ☞41**

170B Federal Courts
   170BI Jurisdiction and Powers in General
      170BI(B) Right to Decline Jurisdiction; Abstention Doctrine
         170Bk41 k. Nature and Grounds in General. Most Cited Cases
   "*Burford* abstention" requires a federal court to abstain from jurisdiction when to assume jurisdiction would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

**[26] Federal Courts 170B ☞43**

170B Federal Courts
   170BI Jurisdiction and Powers in General
      170BI(B) Right to Decline Jurisdiction; Abstention Doctrine
         170Bk43 k. Questions of State or Foreign Law Involved. Most Cited Cases
   *Burford* abstention is not required whenever there exists a complex state administrative process, or even in all cases in which there is a potential for conflict with state regulatory law or policy; instead, *Burford* abstention is extraordinary and narrow exception to district court's duty to adjudicate a controversy properly before it.

**[27] Federal Courts 170B ☞43**

170B Federal Courts
   170BI Jurisdiction and Powers in General
      170BI(B) Right to Decline Jurisdiction; Abstention Doctrine
         170Bk43 k. Questions of State or Foreign Law Involved. Most Cited Cases
   Because *Burford* abstention is concerned with potential disruption of a state administrative scheme, rather than the mere existence of such a scheme, looking behind the action to determine whether it implicates such concerns is necessary in determining whether abstention is warranted.

**[28] Federal Courts 170B ☞813**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

386 F.3d 763, 2004 Fed.App. 0321P
**(Cite as: 386 F.3d 763)**

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
         170BVIII(K)4 Discretion of Lower Court
            170Bk813 k. Allowance of Remedy and Matters of Procedure in General. Most Cited Cases

    Court of Appeals reviews district court's exercise of discretion under the Declaratory Judgment Act for abuse of discretion. 28 U.S.C.A. § 2201(a).

**[29] Declaratory Judgment 118A ⟳5.1**

118A Declaratory Judgment
   118AI Nature and Grounds in General
      118AI(A) In General
         118Ak5 Discretion of Court
            118Ak5.1 k. In General. Most Cited Cases

    District courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites. 28 U.S.C.A. § 2201(a).

**[30] Declaratory Judgment 118A ⟳4**

118A Declaratory Judgment
   118AI Nature and Grounds in General
      118AI(A) In General
         118Ak4 k. Right to Declaratory Relief in General. Most Cited Cases

**Declaratory Judgment 118A ⟳5.1**

118A Declaratory Judgment
   118AI Nature and Grounds in General
      118AI(A) In General
         118Ak5 Discretion of Court
            118Ak5.1 k. In General. Most Cited Cases

    Declaratory Judgment Act is an enabling Act which confers a discretion on the courts, rather than an absolute right upon the litigant. 28 U.S.C.A. § 2201(a).

**[31] Declaratory Judgment 118A ⟳7**

118A Declaratory Judgment
   118AI Nature and Grounds in General
      118AI(A) In General
         118Ak7 k. Necessity, Utility and Propriety. Most Cited Cases

**Declaratory Judgment 118A ⟳45**

118A Declaratory Judgment
   118AI Nature and Grounds in General
      118AI(C) Other Remedies
         118Ak45 k. Pendency of Other Action. Most Cited Cases

    Propriety of declaratory relief in a particular case will depend upon a circumspect sense of its fitness informed by the teachings and experience concerning the functions and extent of federal judicial power, and these concerns are heightened when there are pending state-court proceedings representing the same issues of state law, in that district court might be indulging in gratuitous interference if it permits federal declaratory action to proceed. 28 U.S.C.A. § 2201(a).

**[32] Declaratory Judgment 118A ⟳45**

118A Declaratory Judgment
   118AI Nature and Grounds in General
      118AI(C) Other Remedies
         118Ak45 k. Pendency of Other Action. Most Cited Cases

    In determining the propriety of entertaining a declaratory judgment action, competing state and federal interests weigh in the balance, with courts particularly reluctant to entertain federal declaratory judgment actions premised on diversity jurisdiction in the face of a subsequently-filed state-court coercive action. 28 U.S.C.A. § 2201(a).

**[33] Declaratory Judgment 118A ⟳7**

118A Declaratory Judgment
   118AI Nature and Grounds in General
      118AI(A) In General
         118Ak7 k. Necessity, Utility and Propriety. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

386 F.3d 763, 2004 Fed.App. 0321P
**(Cite as: 386 F.3d 763)**

**Declaratory Judgment 118A ⟲8**

118A Declaratory Judgment
  118AI Nature and Grounds in General
    118AI(A) In General
      118Ak8 k. Termination or Settlement of
Controversy. Most Cited Cases

**Declaratory Judgment 118A ⟲41**

118A Declaratory Judgment
  118AI Nature and Grounds in General
    118AI(C) Other Remedies
      118Ak41 k. Existence and Effect in General. Most Cited Cases

    Five-factor test for determining when district court should exercise jurisdiction over declaratory judgment action considers (1) whether the judgment would settle the controversy, (2) whether the declaratory judgment action would serve a useful purpose in clarifying the legal relations at issue, (3) whether the declaratory remedy is being used merely for the purpose of procedural fencing or to provide an arena for a race for res judicata, (4) whether the use of a declaratory action would increase the friction between federal and state courts and improperly encroach on state jurisdiction, and (5) whether there is an alternative remedy that is better or more effective. 28 U.S.C.A. § 2201(a).

**[34] Declaratory Judgment 118A ⟲45**

118A Declaratory Judgment
  118AI Nature and Grounds in General
    118AI(C) Other Remedies
      118Ak45 k. Pendency of Other Action. Most Cited Cases

    Assuming jurisdiction over declaratory judgment actions in which banks sought determination that they were not liable under state law to receivers for insolvent insurance companies was abuse of discretion, given that only useful purpose which declaratory judgments could serve would be an ultimate determination of liability on already-accrued damages claims also addressed in receivers' pending coercive action, and that banks engaged in

procedural fencing in filing actions to secure their choice of forum. 28 U.S.C.A. § 2201(a).

**[35] Declaratory Judgment 118A ⟲45**

118A Declaratory Judgment
  118AI Nature and Grounds in General
    118AI(C) Other Remedies
      118Ak45 k. Pendency of Other Action. Most Cited Cases

**Declaratory Judgment 118A ⟲46**

118A Declaratory Judgment
  118AI Nature and Grounds in General
    118AI(C) Other Remedies
      118Ak46 k. Anticipation of Other Action. Most Cited Cases

    Normally, when a putative tortfeasor sues an injured party for a declaration of nonliability, courts will decline to hear the action in favor of a subsequently-filed coercive action by the natural plaintiff, but this general rule is subject to exception when some additional harm, not merely waiting for the natural plaintiff to sue, will befall declaratory plaintiff in the meantime.

**[36] Declaratory Judgment 118A ⟲2**

118A Declaratory Judgment
  118AI Nature and Grounds in General
    118AI(A) In General
      118Ak2 k. Object and Purpose. Most Cited Cases

    Useful purpose served by declaratory judgment action is the clarification of legal duties for the future, rather than the past harm that a coercive tort action is aimed at redressing.

**[37] Declaratory Judgment 118A ⟲46**

118A Declaratory Judgment
  118AI Nature and Grounds in General
    118AI(C) Other Remedies
      118Ak46 k. Anticipation of Other Action. Most Cited Cases

    Finding that settlement negotiations in which

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

386 F.3d 763, 2004 Fed.App. 0321P
**(Cite as: 386 F.3d 763)**

bank and receivers for insolvent insurance companies engaged before bank filed declaratory judgment action involved "continuous accusations" was clearly erroneous, and did not support determination that exercise of jurisdiction over bank's action pursuant to Declaratory Judgment Act was appropriate, given that receivers made no formal demands to bank, but rather made only oral indication that they intended to assert claims if they could not be resolved through negotiation, that bank signed tolling agreement, thereby indicating some willingness to negotiate settlement, and that bank had asked for formal settlement demand which was being prepared when bank filed suit. 28 U.S.C.A. § 2201(a).

**[38] Declaratory Judgment 118A ⚷46**

118A Declaratory Judgment
    118AI Nature and Grounds in General
        118AI(C) Other Remedies
            118Ak46 k. Anticipation of Other Action.
Most Cited Cases
    When a pending coercive action, filed by the natural plaintiff, would encompass all the issues in a declaratory judgment action, the policy reasons underlying the creation of the extraordinary remedy of declaratory judgment are not present, and the use of that remedy is unjustified, regardless of the nature of the coercive action underlying the declaratory action; the important distinction is between situations in which some uncertainty beyond the possibility of litigation exists and those in which the injury is already complete. 28 U.S.C.A. § 2201(a).

**[39] Declaratory Judgment 118A ⚷46**

118A Declaratory Judgment
    118AI Nature and Grounds in General
        118AI(C) Other Remedies
            118Ak46 k. Anticipation of Other Action.
Most Cited Cases
    Finding that banks did not engage in procedural fencing when they filed declaratory judgment actions against receivers for insolvent insurance com-

panies in which they sought declarations that they were not liable to receivers under state law was clearly erroneous, and thus did not support determination that exercise of jurisdiction over bank's actions under Declaratory Judgment Act was appropriate, given that banks filed actions after indicating willingness to consider settlement and signing tolling agreements. 28 U.S.C.A. § 2201(a).

**[40] Declaratory Judgment 118A ⚷61**

118A Declaratory Judgment
    118AI Nature and Grounds in General
        118AI(D) Actual or Justiciable Controversy
            118Ak61 k. Necessity. Most Cited Cases
    Inasmuch as presence of a controversy is a prerequisite for the district court's initial power to hear a declaratory judgment action, and its absence strips the district court of jurisdiction, its presence should have no weight in determining whether a declaratory judgment action is appropriate. 28 U.S.C.A. § 2201(a).

**[41] Declaratory Judgment 118A ⚷46**

118A Declaratory Judgment
    118AI Nature and Grounds in General
        118AI(C) Other Remedies
            118Ak46 k. Anticipation of Other Action.
Most Cited Cases
    Whether forum chosen by declaratory plaintiff is logical can have only a minimal value in determining whether procedural fencing has occurred, as part of evaluation of whether exercising jurisdiction over declaratory judgment action is appropriate, inasmuch as question is not which party has chosen the better forum, but whether declaratory plaintiff has filed in an attempt to get her choice of forum by filing first. 28 U.S.C.A. § 2201(a).

**[42] Federal Courts 170B ⚷1145**

170B Federal Courts
    170BXIII Concurrent and Conflicting Jurisdiction and Comity as Between Federal Courts
        170Bk1145 k. Pendency and Scope of Prior

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

386 F.3d 763, 2004 Fed.App. 0321P
**(Cite as: 386 F.3d 763)**

Proceedings; Prisoners Under Arrest. Most Cited Cases

First-filed rule, encouraging comity among federal courts of equal rank, only applies to two cases filed in separate federal courts.

West Codenotes
Recognized as Unconstitutional Ohio R.C. § 3927.05 **\*769** Anthony J. McFarland (briefed), David R. Esquivel (briefed), Catherine A. Colley (briefed), Bass, Berry & Sims, Nashville, TN, Randall D. Quarles (briefed), Larry B. Childs (argued and briefed), Walston, Wells, Anderson & Bains, Birmingham, AL, for Plaintiffs–Appellees.

Alan F. Curley (briefed), C. Philip Curley, Robert L. Margolis (briefed), Robert S. Michaels (argued and briefed), Robinson, Curley, & clayton, Chicago, IL, Douglas J. Schmidt, Kansas, City, MO, Susan B. Loving, Lester, Loving & Davies, Edmond, CA, for Defendants–Appellants.

Before: BOGGS, Chief Judge; MOORE, Circuit Judge; QUIST, District Judge.[FN*]

> [FN*] The Honorable Gordon J. Quist, United States District Judge for the Western District of Michigan, sitting by designation.

**\*770** MOORE, J., delivered the opinion of the court, in which QUIST, D. J., joined. BOGGS, C. J., concurred in the judgment only.

## OPINION

KAREN NELSON MOORE, Circuit Judge.

Defendants–Appellants George Dale ("Dale"), Scott B. Lakin, Carroll Fisher, and Mike Pickens,[FN1] all commissioners of insurance or the equivalent for their respective states, who were sued in their official capacity as receivers for various insolvent insurance companies (collectively, "Receivers"), appeal from the district court's grant

of a preliminary injunction barring them from pursuing their coercive action originally filed in Mississippi state court in these ongoing declaratory judgment suits brought by Plaintiffs–Appellees AmSouth Bank ("AmSouth") and First Tennessee Bank ("FTB") (collectively, "Banks"). The Receivers argue that the district court improperly entertained this action, because it lacked jurisdiction or because it should have declined jurisdiction in its discretion. Because the district court abused its discretion in entertaining these declaratory actions, we DISSOLVE the injunction, REVERSE the district court's decision, and REMAND the case to the district court with instructions to dismiss the actions.

> FN1. Mike Pickens is a defendant only in the action brought by First Tennessee Bank, and not that brought by AmSouth Bank, and therefore is a party only to Appeal No. 03–5521.

### I. BACKGROUND

This case concerns the latest effort of the Receivers to recover some of the funds embezzled from a number of southern insurance companies by the infamous Martin Frankel ("Frankel"). *See, e.g., Lakin v. Prudential Sec., Inc.,* 348 F.3d 704 (8th Cir.2003); *United States v. Peoples Benefit Life Ins. Co.,* 271 F.3d 411 (2d Cir.2001); *Dale v. Ala Acquisitions, Inc.,* 203 F.Supp.2d 694 (S.D.Miss.2002); *Dale v. Frankel,* 206 F.Supp.2d 315 (D.Conn.2001). Frankel had purchased seven insurance companies in five states through various entities, while at the same time controlling the unregistered brokerage that was supposedly investing the large cash reserves that insurance companies typically have on hand. Instead, he was funneling the money to overseas bank accounts. Dale, insurance commissioner for Mississippi, became suspicious and placed the Frankel-controlled insurance companies under state supervision, and in May 1999, Frankel fled the country as his scheme dissolved. Frankel was the subject of a four-month, world-wide manhunt, culminating in his capture in Germany. Frankel pleaded guilty to numerous

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

386 F.3d 763, 2004 Fed.App. 0321P
**(Cite as: 386 F.3d 763)**

charges in the United States District Court for the District of Connecticut.

Bank accounts used in Frankel's money-laundering scheme were held by the insurance companies at both AmSouth, from 1991 to 1999, and FTB, from 1997 to 1999. Essentially, the Receivers argue that the Banks were negligent in not realizing the massive fraud that those accounts were being used to commit. In the course of the receivership proceedings, the Receivers concluded they might have claims against AmSouth, and contacted AmSouth to begin settlement discussions. On June 28, 2001, attorneys for AmSouth and the Receivers executed on behalf of their clients a tolling agreement through August 27, 2001. That tolling agreement was extended six times, through July 31, 2002. During the pendency of that tolling agreement,**771** negotiations were ongoing; on September 27, 2001, explicitly "for settlement purposes," the Receivers sent draft allegations to AmSouth. Joint Appendix No. 03–5517 ("J.A. AmS") at 566. On June 28, 2002, the Receivers' counsel sent a draft complaint that they intended to file "on or before July 31, 2002" if that "effort at compromise [was] unsuccessful," including a "written, pre-filing demand" that AmSouth had "asked [the Receivers] to make," and indicating that the settlement offer would expire on July 10. J.A. AmS at 567–68. On July 10, 2002, AmSouth's counsel sent a letter to the Receivers' counsel indicating that AmSouth's counsel had discussed settlement and litigation options with their client, but requested 1) a meeting "among the parties and their counsel"; 2) an insurance-company-by-insurance-company breakdown of damages suffered; and 3) an extension of the time for response through July 19. J.A. AmS at 570. A phone conversation between counsel took place on July 15, 2002, the contents of which are contested, but which likely led to some sort of agreement that the extension had been approved. On July 17, 2002, AmSouth's counsel sent a letter regarding the Receivers' ongoing concerns with respect to Federal Rule of Evidence 408, governing the disclosure of settlement discussions, in which the last paragraph

stated that AmSouth was "still considering" the Receivers' demand and AmSouth's options, and that counsel would "be in touch in the near future concerning a written response and a possible meeting on July 24." J.A. AmS at 572. On July 18, 2002, counsel for the Receivers sent a letter formalizing their approval of the extension to July 19, 2002, for a response to their settlement offer, indicating their openness to a meeting on July 24, and including a detailed breakdown of damages by bank account. Unbeknownst to the Receivers, on July 18, 2002, AmSouth had filed a complaint for declaratory relief in the U.S. District Court for the Middle District of Tennessee. On July 19, 2002, AmSouth sent a letter formally rejecting the settlement offer, but failing to mention the suit they had filed the previous day. The Receivers learned of the filing through the call of a newspaper reporter on July 19.

Negotiations with FTB took place in a shorter period of time, but followed a similar track. In May 2002, the Receivers' counsel initiated negotiations with FTB through phone conversations; to this end, they signed a tolling agreement that extended from May 3 through May 31, 2002. This agreement was extended once, on May 24, 2002, through July 31, 2002 (the same date as the final date of the Am-South tolling agreement). In July 2002, FTB requested a formal settlement demand; while Receivers' counsel was drafting this demand, they learned that FTB had filed the instant declaratory judgment action in the Middle District of Tennessee.

On July 31, 2002, at the end of the tolling period, the Receivers filed an action in Mississippi state court against both AmSouth and FTB ("the Mississippi litigation"). AmSouth removed the action to the U.S. District Court for the Southern District of Mississippi with FTB's consent on September 5, 2002, based on alleged improper joinder of FTB, and asserted complete preemption of the Receivers' claims under Federal Reserve Board Regulation J, 12 C.F.R. § 210.25 *et seq.* ("Regulation J"), governing wire transfers. FTB then filed a motion to dismiss for improper venue, or in the alternative to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

386 F.3d 763, 2004 Fed.App. 0321P
**(Cite as: 386 F.3d 763)**

transfer the case, on September 26, 2002. On October 7, 2002, the Receivers filed a remand motion. When the Middle District of Tennessee ("district court") decided in the instant actions to enjoin the further prosecution of the Mississippi litigation, **\*772** the Mississippi litigation was stayed by the federal district court in Mississippi.

In the instant actions (collectively, "the Tennessee litigation"), AmSouth and FTB ask for declaratory relief that they are not liable to the Receivers, relying both on federal law and state law defenses, and both complaints ask the district court to enjoin the Receivers from bringing any future lawsuits and require them instead to bring all claims as counterclaims in the Tennessee litigation. The Receivers filed motions to dismiss both FTB's and AmSouth's actions on August 23, 2002. A hearing was held on that motion on January 13, 2003, and the district court issued its decision and orders denying the motions to dismiss and enjoining further prosecution of the Mississippi litigation on March 31, 2003. A timely notice of appeal was filed in each case on April 4, 2003.

Subsequently, the Mississippi litigation was stayed on April 16, 2003. In mid–2003, apparently out of concern for risking mounting legal fees for a limited potential recovery, Paula Flowers, Commissioner of Commerce and Insurance for the State of Tennessee, then a defendant in the Tennessee litigation and a plaintiff in the Mississippi litigation, decided that Tennessee should withdraw from the Mississippi litigation, and in response, FTB and AmSouth agreed to dismiss her from the Tennessee litigation. *See* Getahn Ward, *Tennessee Pulls Out of Suit Against 2 Banks,* The Tennessean, July 29, 2003, at 4E. On June 23, 2003, Flowers filed a motion to dismiss her appeals in this court which we granted on June 25, 2003; on June 26, 2003, Flowers's claims in the Mississippi litigation were dismissed with prejudice; on July 18, 2003, FTB and AmSouth's claims against Flowers in the Tennessee litigation were dismissed in the district court. Finally, in the district court below, which has

continued proceedings during this interlocutory appeal, having denied Receivers' motions to stay same, FTB and AmSouth have moved for summary judgment, and oral argument on the motion was held on May 26, 2004.

## II. ANALYSIS

### A. Appellate Jurisdiction

### 1. Whether the Injunction is Appealable under § 1292(a)(1)

The Banks argue that this court lacks appellate jurisdiction over the district court's order enjoining the Receivers from further prosecution of the Mississippi litigation. FTB argues first that the district court's order was not an "injunction" within the meaning of the statute, and therefore, as merely an order with the practical effect of an injunction, subject to the "serious, perhaps irreparable, consequence" limitation under *Carson v. American Brands, Inc.,* 450 U.S. 79, 84, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981) (internal quotation marks omitted), in order to be appealable under 28 U.S.C. § 1292(a)(1). FTB next argues that this court should follow the Third Circuit in holding that an injunction against litigating in another forum is not an appealable injunction, as not going to the ultimate relief demanded by the plaintiff. *See Hershey Foods Corp. v. Hershey Creamery Co.,* 945 F.2d 1272 (3d Cir.1991).

[1][2][3] "Section 1292(a)(1) ... provide[s] appellate jurisdiction over orders that grant or deny injunctions and orders that have the practical effect of granting or denying injunctions and have " 'serious, perhaps irreparable, consequence.' " " *Gulfstream Aerospace Corp. v. Mayacamas Corp.,* 485 U.S. 271, 287–88, 108 S.Ct. 1133, 99 L.Ed.2d 296 (1988). FTB argues that the injunction below falls into the second, rather than the first category. This contention rests on the lack of a **\*773** motion under Federal Rule of Civil Procedure 65 in the district court by either FTB or AmSouth asking for the injunction issued by the district court. FTB relies on *I.A.M. National Pension Fund Benefit Plan A v.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

386 F.3d 763, 2004 Fed.App. 0321P
**(Cite as: 386 F.3d 763)**

*Cooper Industries, Inc.,* 789 F.2d 21, 24 n. 3 (D.C.Cir.), *cert. denied,* 479 U.S. 971, 107 S.Ct. 473, 93 L.Ed.2d 417 (1986), which notes that "*Carson* ['s requirement of serious or irreparable consequence] does not apply to an order clearly granting or denying a specific request for injunctive relief." *See also MAI Basic Four, Inc. v. Basis, Inc.,* 962 F.2d 978, 980 n. 3 (10th Cir.1992) (noting that while the motion for the injunction was not pursuant to Rule 65, "this is a Rule 65(a) motion in all but name," and relying on that characterization in distinguishing *Hershey* ). But both FTB's and AmSouth's complaints specifically ask for injunctive relief against the Receivers' prosecution of claims in other forums. It is therefore rather disingenuous of FTB to claim the district court issued the injunction "sua sponte." In any case, it is difficult to see what difference this distinction would make; if the order would be appealable had a party requested it, that the district court issued an order sua sponte cannot insulate the order from review. *See Phillips v. Chas. Schreiner Bank,* 894 F.2d 127, 129–30 (5th Cir.1990) (finding appealable an order granting relief that "[n]either party had moved formally for," because the "challenged order prevents [the defendant] from taking any 'further action in any state or federal court' " and was therefore an injunction); *FDIC v. Santiago Plaza,* 598 F.2d 634, 635–36 (1st Cir.1979) (district court issued order sua sponte but circuit court still applied general rule that injunctions against proceedings in other courts are appealable under § 1292(a)(1)).

[4][5] Next, FTB argues that this circuit should go against the weight of authority and adopt the Third Circuit's outlier opinion in *Hershey. Hershey* held that an injunction, issued in a coercive trademark action in the Middle District of Pennsylvania, against prosecution of a "motion for order construing and enforcing" an earlier consent judgment between the parties in the Southern District of New York, was not appealable under the earlier Third Circuit en banc decision in *Cohen v. Board of Trustees of the University of Medicine and Dentistry,* 867 F.2d 1455 (3d Cir.1989). *Hershey,*

945 F.2d at 1279. *Hershey's* rule has not been adopted by any other circuit. Instead, courts have held, "An order that prohibits a party from pursuing litigation in another forum unquestionably is an injunction for purposes of § 1292(a)(1), despite a carefully reasoned rejection of this proposition by the Third Circuit." 16 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3923, at 123 (2d ed.1996). *See HBE Leasing Corp. v. Frank,* 48 F.3d 623, 632 n. 6 (2d Cir.1995) (quoting § 3923); *MAI Basic Four,* 962 F.2d at 981–82 (same); *Phillips,* 894 F.2d at 130 (rule in Fifth Circuit is that orders prohibiting proceedings in other courts are always appealable as injunctions); *Katz v. Lear Siegler, Inc.,* 909 F.2d 1459, 1461 (Fed.Cir.1990) ("[T]he grant of an injunction against continuing suit in another forum is appealable as of right [under] 28 U.S.C. § 1292(a) ."); *Asset Allocation & Mgmt. Co. v. W. Employers Ins. Co.,* 892 F.2d 566, 568 (7th Cir.1989) (injunction against proceeding in pending litigation in other court was appealable under 28 U.S.C. § 1292(a)(1)); *Santiago Plaza,* 598 F.2d at 635–36 (An "injunction against appellant proceeding in state court ... is clearly appealable under 28 U.S.C. § 1292(a)(1)."). Most fatal to FTB's argument, a prior Sixth Circuit case treated an injunction against prosecution of other litigation as an appealable injunction. *See *774 Guy v. Citizens Fid. Bank & Trust Co.,* 429 F.2d 828, 831 (6th Cir.1970) (district court's injunction restraining parties from prosecuting certain actions was an appealable order under § 1292(a)(1)).[FN2] Finally, even under the *Hershey* test, this injunction would be appealable, as it contains relief sought in the complaint. The whole point of this litigation is to prevent the Receivers from prosecuting claims against FTB and AmSouth.

FN2. *Coleman v. American Red Cross,* 979 F.2d 1135, 1137 (6th Cir.1992), cited by the Receivers, holds this sort of injunction appealable under the collateral order doctrine, rather than § 1292(a)(1), which doctrine renders appealable a "preliminary or

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

386 F.3d 763, 2004 Fed.App. 0321P
**(Cite as: 386 F.3d 763)**

interim decision ... when it (1) 'conclusively determine[s] the disputed question,' (2) 'resolve[s] an important issue completely separate from the merits of the action,' and (3) is 'effectively unreviewable on appeal from a final judgment.' " *Sell v. United States,* 539 U.S. 166, 176, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003) (alterations in original). This separate basis for review is unnecessary in the face of the explicit language of § 1292(a)(1), however. *American Motors Corp. v. FTC,* 601 F.2d 1329, 1331–32 (6th Cir.), *cert. denied,* 444 U.S. 941, 100 S.Ct. 294, 62 L.Ed.2d 307 (1979), dealt with a district court's direction to an administrative agency to cease its investigations, which was held appealable as an order having the substance of an injunction.

## 2. The Scope of This Court's Review

[6] On appeal, the Receivers argue that the reasons given in their motion to dismiss each independently require dissolution of the injunction. *See* infra note 3. The Banks object on the basis of this court's limited appellate jurisdiction, arguing that this court can only narrowly evaluate the propriety of the injunction, without reference to the Receivers' arguments. This seems deliberately to misunderstand the nature of those arguments: because each of them goes to the power of the district court to exercise jurisdiction over these actions or its discretionary responsibility to decline to do so, they all go to the "merits" of the injunction issued by the district court, which was premised on the proper assumption of jurisdiction. The Banks' admonition that this court should only review the propriety of the injunction, without examining whether the case was properly in the district court in the first place, defies logic. While not all of the Receivers' arguments are strictly jurisdictional in the sense of attacking the bare power of the district court to hear the case, they are all jurisdictional in the sense that they attack the propriety of the district court's assumption of jurisdiction.[FN3] The injunction is only

proper as preventing duplicative litigation if the declaratory judgment action should have been allowed to proceed. The "harm or effect" of the preliminary injunction that FTB faults the Receivers for not identifying and arguing is precisely what the Receivers are in fact arguing: that for a plethora of reasons, their coercive action, the Mississippi litigation, is the proper vehicle for this dispute—the litigation which they were specifically prohibited from pursuing.

> FN3. The Receivers argue a lack of federal question jurisdiction and McCarran–Ferguson reverse preemption of the Declaratory Judgment Act, both of which would render the district court's injunction void for lack of jurisdiction over these actions, and that *Burford* abstention was proper and that these are not proper declaratory actions, which doctrines go to the discretionary assumption of jurisdiction and would render the injunction below an abuse of the district court's discretion.

[7][8] The Banks assert that the issues argued by the Receivers can only be recognized by this court under "pendent appellate jurisdiction," which allows unappealable orders to be reviewed only when they are "inextricably intertwined" with appealable orders; they then argue that the grant of the preliminary injunction is **\*775** not so intertwined with the motion to dismiss. *See Brennan v. Township of Northville,* 78 F.3d 1152, 1157–58 (6th Cir.1996). While the Receivers disclaim any reliance on the doctrine of pendent appellate jurisdiction, arguing instead that under any meaningful scheme of review an appeal from an injunction necessarily sweeps up any issues that bear on the district court's power to issue the injunction, they do correctly note that in order to reverse the district court's denial of their motion to dismiss, this court would have to find that it had pendent appellate jurisdiction over that denial. Because we conclude that the district court abused its discretion in entertaining this declaratory action, we necessarily decide

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

that the denial of the Receivers' motion was improper, satisfying the "inextricably intertwined" rule. *See id.* at 1158 ("Our finding on the first issue necessarily and unavoidably decides the second."). We will therefore remand with orders to dismiss the actions in their entirety.

## B. Subject Matter Jurisdiction in the District Court

[9] The district court's jurisdiction over AmSouth's action was premised on both federal question and diversity jurisdiction, whereas its jurisdiction over FTB's action was premised solely on federal question jurisdiction. In determining whether federal question jurisdiction was properly determined to exist in the district court, we look to the Receivers' threatened coercive action. Because the Banks' actions are declaratory judgment actions "seek[ing] in essence to assert a defense to an impending or threatened state court action, it is the character of the threatened action, and not of the defense, which will determine whether there is federal-question jurisdiction in the District Court." *Pub. Serv. Comm'n v. Wycoff Co.,* 344 U.S. 237, 248, 73 S.Ct. 236, 97 L.Ed. 291 (1952). "Federal courts will not seize litigations from state courts merely because one, normally a defendant, goes to federal court to begin his federal-law defense before the state court begins the case under state law." *Id.;see also Franchise Tax Bd. v. Constr. Laborers Vacation Trust,* 463 U.S. 1, 15–16, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983) (reaffirming rule of *Skelly Oil Co. v. Phillips Petroleum Co.,* 339 U.S. 667, 70 S.Ct. 876, 94 L.Ed. 1194 (1950)), that "if, but for the availability of the declaratory judgment procedure, the federal claim would arise only as a defense to a state created action, jurisdiction is lacking" (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2767 (2d ed.1983)); *Heydon v. Mediaone of Southeast Mich., Inc.,* 327 F.3d 466, 470 (6th Cir.2003) (relying on *Skelly Oil* in finding no subject matter jurisdiction over declaratory judgment action). The Receivers suggest that therefore the district court should have looked to their sub-

sequently-filed state complaint in the Mississippi litigation in determining whether, under the well-pleaded complaint rule, their causes of action arose under federal law. At least one case from another circuit, however, suggests that the proper inquiry is not into the complaint as subsequently filed, but instead whether the declaratory plaintiff "could reasonably have anticipated" a federal cause of action from the conduct of the other party. *PHC, Inc. v. Pioneer Healthcare, Inc.,* 75 F.3d 75, 78–79 (1st Cir.1996). Under that formulation, the appropriate place to look is the correspondence and conversations between the Banks and the Receivers. Neither party addresses this point, however, and the record is relatively silent as to the character of the claims made on FTB by the Receivers, as opposed to their claims on AmSouth, who received a draft complaint.

**\*776** [10] Instead, FTB defends the district court's finding of subject matter jurisdiction entirely on the basis of the so-called "complete preemption" of Regulation J. Complete preemption is a narrow exception to the well-pleaded complaint rule, whereby plaintiff is master of his complaint and can choose to assert only state law claims, in situations where Congress has indicated an intent to occupy the field so completely that any ostensibly state law claim is in fact a federal claim for purposes of arising-under jurisdiction. *See Beneficial Nat'l Bank v. Anderson,* 539 U.S. 1, 6–9, 123 S.Ct. 2058, 156 L.Ed.2d 1 (2003). The Supreme Court has only found three statutes that evince this sort of Congressional intent: § 301 of the LMRA, *see Avco Corp. v. Aero Lodge No. 735, Int'l Ass'n of Machinists,* 390 U.S. 557, 560, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968), and § 502(a)(1)(B) of ERISA, *see Metro. Life Ins. Co. v. Taylor,* 481 U.S. 58, 63–66, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987), and §§ 85 and 86 of the National Bank Act, *see Beneficial Nat'l Bank,* 539 U.S. at 10–11, 123 S.Ct. 2058. The district court, in finding that Regulation J might completely preempt the Receivers' state law claims,[FN4] characterized two Fourth Circuit opinions as deciding the question in favor of complete preemption,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

386 F.3d 763, 2004 Fed.App. 0321P
**(Cite as: 386 F.3d 763)**

namely *Eisenberg v. Wachovia Bank, N.A.,* 301 F.3d 220, 223–24 (4th Cir.2002), and *Donmar Enterprises, Inc. v. Southern National Bank,* 64 F.3d 944, 948–50 (4th Cir.1995). These decisions, however, clearly deal with *ordinary* preemption, rather than the complete preemption that would justify original arising-under jurisdiction.

> FN4. The district court specifically stated, "Thus, clearly federal questions are present here and the Court concludes that a federal scenario is presented in which Defendants' state law claims could be completely preempted by Regulation J." *First Tenn. Bank v. Dale,* No. 3:02–0683, slip op. at 28 (M.D.Tenn. Mar. 31, 2003), Joint Appendix No. 03–5521 ("J.A. FTB") at 76. As the Receivers note, this formulation misunderstands the narrowly drawn nature of complete preemption and the necessity of looking to the character of the threatened action on its face in determining federal question jurisdiction in a declaratory action.

[11][12][13] The district court erred in holding that Regulation J, a federal regulation promulgated by the Federal Reserve Board, a federal agency, could completely preempt the Receivers' state law claims; only Congress can completely preempt a state cause of action. *See Beneficial Nat'l Bank,* 539 U.S. at 8, 9 & n. 5, 123 S.Ct. 2058 (describing doctrine of complete preemption as when a "federal *statute* completely pre-empts the state-law cause of action"; "Only if *Congress* intended [the statute at issue] to provide the exclusive cause of action ... would the *statute* " completely preempt state law claims; "[T]he proper inquiry focuses on whether *Congress* intended the federal cause of action to be exclusive." (emphases added)); *Metro. Life Ins.,* 481 U.S. at 66, 107 S.Ct. 1542 (the touchstone of complete preemption is "the intent of *Congress* " (emphasis added)); *Peters v. Lincoln Elec. Co.,* 285 F.3d 456, 468 n. 11 (6th Cir.2002) ("Without evidence of *Congress's* intent to transfer jurisdiction to

federal courts, there is no basis for invoking federal judicial power." (emphasis added)); *Hyzer v. Cigna Prop. Cas. Ins. Co.,* 884 F.Supp. 1146, 1152 (E.D.Mich.1995) (no support for contention that agency regulations could completely preempt area). This conclusion fits in more generally with the balance struck between an agency's ability to promulgate regulations with the force of federal law—and therefore its ability to preempt state causes of action through ordinary preemption—and its *inability* to create a right of action where Congress has not intended it **\*777** do so. *See generally Alexander v. Sandoval,* 532 U.S. 275, 291, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) ("Language in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not."); *Marx v. Centran Corp.,* 747 F.2d 1536, 1544 (6th Cir.1984) ("It is plain that the [agency] is without authority [to create an implied cause of action]. The true question is whether Congress, in enacting [the enabling statute], intended to create a remedy for violations of [the regulation]."), *cert. denied,* 471 U.S. 1125, 105 S.Ct. 2656, 86 L.Ed.2d 273 (1985). While the agency can create federal law, it cannot expand federal jurisdiction.

[14] Therefore, the proper inquiry in determining complete preemption is directed to the enabling statute, here the Federal Reserve Act, ch. 6, 38 Stat. 251 (1913) (codified as amended at 12 U.S.C. § 221 et seq.). The regulations in question govern wire transfers on Fedwire, the wire transfer system of the Federal Reserve Banks. The regulations were promulgated pursuant to the authority granted by four different sections of the Act: § 11(i) and (j) (12 U.S.C § 248(i) and (j)); § 13 (12 U.S.C. § 342); paragraph fourteen of § 16 (12 U.S.C. § 248(*o*)); and § 19(f) (12 U.S.C. § 464). None of these sections provide specific authority for the Fedwire system—instead, they are general provisions—and none of them reference causes of action having to do with the Federal Reserve system, or any of the markers associated with complete preemption. This argument is unavailing.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

386 F.3d 763, 2004 Fed.App. 0321P
**(Cite as: 386 F.3d 763)**

[15][16] The district court also relied upon the Bank Secrecy Act ("BSA") in determining that federal jurisdiction existed, reasoning that "Defendants' factual allegations and claim implicate the BSA," and therefore, since the BSA did not create a private right of action, "FTB's complaint raises a federal question, if FTB's [presumably, should be Receivers'] claims are, in effect, asserting an implied right of action under the Bank Secrecy Act." *First Tenn. Bank v. Dale,* No. 3:02–0683, slip op. at 28 (M.D.Tenn. Mar. 21, 2003), Joint Appendix No. 03–5521 ("J.A.FTB") at 76. The court then stated, "To the extent that Plaintiff's complaint raises this issue, clearly this is a legal question that gives rise to federal jurisdiction." J.A. FTB at 76 (Mem. Op. at 28). These statements mischaracterize the nature of the inquiry under the well-pleaded complaint rule and the *Skelly Oil* rule: the question to be asked is whether, under the hypothetical state-law action of the Receivers, a well-pleaded federal question would appear on the face of the complaint. This question must be answered in the negative under *Merrell Dow Pharmaceuticals, Inc. v. Thompson,* 478 U.S. 804, 807–12, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986), in which the Court held that where a federal statute does not create a private right of action, mere incorporation of federal statutory standards into a state-law tort action cannot create federal question jurisdiction. Because the Bank Secrecy Act does not create a private right of action, the Receivers' incorporation of its standards into a state-law cause of action cannot transform their complaint into one that raises a federal question.

[17][18] FTB argues on appeal that as Flowers, the only non-diverse defendant, has been dismissed from the case, diversity subject matter jurisdiction now exists. Although normally jurisdiction depends upon the facts as they are at the time of filing, curing a jurisdictional defect through dismissal of a party that destroys diversity "ha[s] long been an exception to the time-of-filing rule." **\*778***Grupo Dataflux v. Atlas Global Group, L.P.,* No. 02–1689, 541 U.S. ——, —— – ——, 124 S.Ct. 1920, 158 L.Ed.2d 866 (2004). This dismissal can be effected by the district court, even subsequent to adjudication on the merits, and even by an appellate court. *See Newman–Green, Inc. v. Alfonzo–Larrain,* 490 U.S. 826, 836–38, 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989).

[19][20] The Receivers make three arguments in an attempt to distinguish the instant case from this clear precedent. They first argue that under the authority of *United States Fidelity & Guaranty Co. v. Thomas Solvent Co.,* 955 F.2d 1085, 1087 (6th Cir.1992), the district court never had jurisdiction over the case, and therefore its order dismissing Flowers is void. This argument is unavailing; the court in *United States Fidelity* came to the ultimate conclusion that jurisdiction was lacking, whereas in cases where a post-filing jurisdiction cure is allowed, all intermediate decisions are rendered not void for lack of jurisdiction. *See Caterpillar Inc. v. Lewis,* 519 U.S. 61, 73–77, 117 S.Ct. 467, 136 L.Ed.2d 437 (1996). Next, the Receivers attempt to distinguish the clear holdings of *Caterpillar* and *Newman–Green.*[FN5] With respect to *Newman–Green,* they emphasize that *Newman–Green* was a Rule 21 case, and that Flowers was dismissed pursuant to Rule 41. The Receivers further argue that Rule 21 permits dismissal only of non-indispensable parties, and that because Flowers was a plaintiff in the Mississippi litigation, she was therefore indispensable. While it is unclear from the record pursuant to which Rule Flowers was dismissed, although we note that we have in the past indicated that dismissal of a party, rather than of an entire action, is more proper pursuant to Rule 21, *see Letherer v. Alger Group, L.L.C.,* 328 F.3d 262, 265–66 (6th Cir.2003), we conclude that the particular rule used is immaterial in assessing whether jurisdiction was created by a party's dismissal. *See Safeco Ins. Co. v. City of White House, Tenn.,* 36 F.3d 540, 546 (6th Cir.1994) (either Rule 15 or Rule 21 can provide mechanism for post-filing jurisdiction cure). The Receivers then note that the Court in *Newman–Green* and *Caterpillar* relied on practical considerations of less weight here:

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

386 F.3d 763, 2004 Fed.App. 0321P
**(Cite as: 386 F.3d 763)**

"considerations of finality, efficiency, and economy," *Caterpillar,* 519 U.S. at 75, 117 S.Ct. 467, that arise only after trial is completed.

> FN5. *Faysound Ltd. v. United Coconut Chemicals, Inc.,* 878 F.2d 290, 296 (9th Cir.1989),* cited by the Receivers for the proposition that a post-filing dismissal of parties cannot confer diversity jurisdiction, is something of an outlier. It can perhaps be best explained by a rule that once the district court properly decides it has no jurisdiction at a time when all non-diverse parties are indispensable, actions subsequent to that decision aimed at making those parties dismissable cannot confer jurisdiction.

We are reluctant to expand this narrow exception to the time-of-filing rule (the post-filing jurisdiction cure through dismissal of a party) in light of *Grupo Dataflux's* rejection of an expansion of the exception to a change in citizenship of a partnership based on individuals leaving the association. However, we also take note of the *Grupo Dataflux* Court's characterization of the dismissal of a non-diverse party as an "established exception" to the time-of-filing rule. Op. at 772, 124 S.Ct. 1920. What is most disturbing in this case is not the particular rule pursuant to which Flowers was dismissed, or the extent of the litigation activity which has transpired before the jurisdictional defect is noticed and/or corrected, but instead that jurisdiction in the district court was alleged to be federal question jurisdiction. The more difficult question is not whether Flowers's dismissal is the equivalent of those in *Caterpillar* or *Newman–Green* but whether the original defective allegation***779** of federal question can be corrected by a subsequent happenstance creation of diversity jurisdiction.

In *Grupo Dataflux* and *Caterpillar,* the Court indicated that the cure of jurisdiction accomplished by the dismissal of a nondiverse party can also serve to cure the statutory defect existing where a case is removed at a time when it is not in the original jurisdiction of the district courts of the United States within the meaning of 28 U.S.C. § 1441(a). *Grupo Dataflux,* 541 U.S. at ——, 124 S.Ct. 1920. The district court now has jurisdiction over FTB's action based on diversity of citizenship; the question is whether the prior defects are the sort that are remedied by the post-filing jurisdiction cures of *Caterpillar* and *Newman–Green.* Two distinctions may serve to oust jurisdiction here: first, the prior defect is different in kind, as jurisdiction was not originally alleged on the basis of diversity, and second, the jurisdictional defect was noticed early (and often) and the action had not proceeded to judgment at the time of this appeal.

Title 28 U.S.C. § 1653 provides, "Defective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts." Relying upon this section, courts have often reached beyond the specific statutory sections cited by the complaint to reach a different basis for jurisdiction—albeit one that exists on the face of that complaint. *See, e.g., LeBlanc v. Salem (* In re Mailman Steam Carpet Cleaning Corp.) 196 F.3d 1, 5 (1st Cir.1999) ("Affirmative pleading of the precise statutory basis for federal subject matter jurisdiction is not required as long as a complaint alleges sufficient facts to establish jurisdiction."), *cert. denied,* 530 U.S. 1230, 120 S.Ct. 2661, 147 L.Ed.2d 275 (2000) ; *Gerritsen v. de la Madrid Hurtado,* 819 F.2d 1511, 1515 (9th Cir.1987) ("[I]n determining the existence of subject matter jurisdiction, we are not limited to the jurisdictional statutes identified in the complaint."); *Vukonich v. Civil Serv. Comm'n,* 589 F.2d 494, 496 n. 1 (10th Cir.1978) ("The failure to alleged this alternate basis for jurisdiction is not fatal where the complaint revealed a basis for § 1331 jurisdiction."); *Rohler v. TRW, Inc.,* 576 F.2d 1260, 1264 (7th Cir.1978) ("[I]t is not essential that a complainant set forth the statutory basis for the court's jurisdiction in order for the court to assume jurisdiction, if the facts alleged provide a basis for the assumption of jurisdiction."). Of particular interest in this line are two Sixth Circuit cases allowing amendment of a complaint to change the asser-

386 F.3d 763, 2004 Fed.App. 0321P
**(Cite as: 386 F.3d 763)**

ted basis of jurisdiction from federal question to diversity and vice versa. In *Miller v. Davis,* 507 F.2d 308, 311 (6th Cir.1974), although the complaint's allegation of federal question jurisdiction was deficient, "It appears, however, that [diversity] jurisdiction could have been alleged.... Appellants are most probably citizens of Kentucky ..., Appellees are not Kentucky citizens, and the Fund is situated in the District of Columbia." Relying on 28 U.S.C. § 1653, the court proceeded to the merits of the appeal but directed the appellants to "file, within ten days of this decision, a proper amendment *in this Court* alleging diversity jurisdiction." 507 F.2d at 311 (emphasis added). Two aspects of *Miller* stand out: first, diversity jurisdiction was not "apparent" on the face of the complaint, as evidenced by this court's hesitant language ("could have been alleged," "most probably"); second, we allowed an amended complaint to be filed in the Sixth Circuit itself, suggesting that the *Newman–Green* rule should extend to reach a case like this one. In an earlier case, *Blanchard v. Terry & Wright, Inc.,* 331 F.2d 467, 468–69 (6th Cir.), *cert. denied,* 379 U.S. 831, 85 S.Ct. 62, 13 L.Ed.2d 40 (1964), this court held that **\*780** although the diversity jurisdiction alleged on the face of the complaint was not present, the factual allegations in the complaint were sufficient to confer federal question jurisdiction. "Even though the allegations of the original complaint with respect to jurisdiction of the court were defective, the trial or appellate court had full power to correct them." *Id.* at 469. In the case at bar, the district court has jurisdiction over the case under *Caterpillar* and *Newman–Green,* as all parties are now diverse. The antecedent defective allegations of jurisdiction should not serve, following these cases, to defeat this general rule.

Because we decide that this action should be dismissed because it is an inappropriate declaratory action, we do not need to decide whether, when such a jurisdictional defect is raised in an interlocutory appeal, we have discretion to disallow a post-filing jurisdiction cure, or, if we do have such discretion, if we should exercise it in such a situa-

ation. Instead, we hold subject matter jurisdiction exists and exercise it for the limited purpose of remanding this action for dismissal with prejudice.

**C. McCarran–Ferguson Act and *Burford* Abstention**

In their AmSouth appeal, the Receivers argue that McCarran–Ferguson Act reverse preemption and *Burford* abstention form independent grounds for the district court to have found it lacked jurisdiction. The district court did not address the McCarran–Ferguson Act argument, but it was raised by the Receivers below. Reviewing the lines of cases cited by the parties, it becomes clear that often when faced with suit in the federal courts, a state commissioner of insurance as receiver or liquidator of an insurance company placed under the state's care will rely on one or both of these doctrines to attempt to defeat federal court jurisdiction. Because state liquidation proceedings of insolvent insurers are exactly the sort of intricate state regulation on behalf of state-resident policyholders that these doctrines are intended to protect, these arguments have some force when angry creditors attempt to sue insolvent insurance companies in federal court to jump ahead in the queue of claims, but they have less force here, where the insurance companies are themselves the natural plaintiffs, as Receivers vociferously argue. This dispute involves the Receivers' attempt to recover money in an ordinary common-law-damages suit; the Banks do not here attempt to disrupt a coherent state scheme in favor of enriching their own pockets.

First, the Receivers claim that the McCarran–Ferguson Act, 15 U.S.C. § 1012(b), which provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ... unless such Act specifically relates to the business of insurance," reverse-preempts the Declaratory Judgment Act in this case. They argue that if the Declaratory Judgment Act allows this action against them, it impairs the operation of state laws providing for the liquid-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

386 F.3d 763, 2004 Fed.App. 0321P
**(Cite as: 386 F.3d 763)**

ation of insurance companies, including those providing for antisuit injunctions. Antisuit injunctions were issued as part of the liquidation proceedings for each of the insolvent insurance companies controlled by the Receivers. *See, e.g., Tenn. ex rel. Sizemore v. Franklin Am. Life Ins. Co.,* No. 99–1326–II (Tenn. Ch. Oct. 25, 1999) (Consent Final Order of Liquidation; Finding of Insolvency; and Permanent Injunction, at 4) ("[N]o action at law or equity or in arbitration shall be brought against the insurer or liquidator."), J.A. FTB at 812, 815. Those injunctions bar suits against the insurance companies in any court; both parties agree on appeal that the injunctions of their own force **781** cannot limit federal judicial power, but the Receivers argue that McCarran–Ferguson gives them that power.

[21][22] McCarran–Ferguson reverse preemption depends upon the policies that undergird state law. Where a state law protects state insurance-policyholders, it is a "law enacted ... for the purpose of regulating the business of insurance"; when it protects other interests, for instance, those of stockholders in those insurance companies, it is not such a law within the meaning of the Act. *See SEC v. Nat'l Sec. Inc.,* 393 U.S. 453, 457, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969). The connection to the protection of policyholders cannot be too attenuated; in *United States Department of the Treasury v. Fabe,* 508 U.S. 491, 508, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993), in the course of finding that an Ohio insurer-liquidation statute providing for a creditor-preference order contrary to general federal law reverse-preempted the federal law to the extent it privileged policyholders and the administration of the system in furtherance of the privilege of policyholders, the Court noted the difficulty.

Of course, every preference accorded to the creditors of an insolvent insurer ultimately may redound to the benefit of policyholders by enhancing the reliability of the insurance company. This argument, however, goes too far: "But in that sense, every business decision made by an

insurance company has some impact on its reliability ... and its status as a reliable insurer." [ *Group Life & Health Ins. Co. v. Royal Drug Co.,* 440 U.S. 205, 216–17, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979) ]. *Royal Drug* rejected the notion that such indirect effects are sufficient for a state law to avoid pre-emption under the McCarran–Ferguson Act.

*Fabe,* 508 U.S. at 508–09, 113 S.Ct. 2202. Finally, when assessing whether a general federal statute that creates a cause of action "impairs" the operation of a state law, the proper inquiry is whether the particular suit being brought would impair state law. *See Humana Inc. v. Forsyth,* 525 U.S. 299, 311, 313, 119 S.Ct. 710, 142 L.Ed.2d 753 (1999) (analyzing effect of McCarran–Ferguson Act on RICO suit with respect to particular suit, rather than only general operation of statute).

This court has previously rejected a claim that an Ohio law, Ohio Rev.Code § 3927.05, requiring the insurance commissioner to revoke the license of any foreign insurance company that removes an action initiated by a citizen of Ohio to federal court, was saved from its otherwise conceded unconstitutionality by the operation of the McCarran–Ferguson Act. *See Int'l Ins. Co. v. Duryee,* 96 F.3d 837, 838–40 (6th Cir.1996). The question in that case boiled down to whether the statute was "aimed at protecting or regulating the performance of an insurance contract," the standard announced in *Fabe,* 508 U.S. at 505, 113 S.Ct. 2202 (internal quotation marks omitted). We held it was not, noting that whether litigation itself could be integral to that performance, the choice of forum was not; that unlike the statute at issue in *Fabe,* § 3927.05 did not increase the substantive rights of policyholders, but was in fact not limited to policyholders; and that the reach of the statute was not confined to policy disputes. Finding the statute "not enacted so much 'for the purpose of regulating the business of insurance' as for the parochial purpose of regulating a foreign insurer's choice of forum," *Duryee,* 96 F.3d at 840, we concluded that the statute was not

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

386 F.3d 763, 2004 Fed.App. 0321P
**(Cite as: 386 F.3d 763)**

within McCarran–Ferguson's sweep.

Two cases cited by the Receivers concluded that McCarran–Ferguson reverse **\*782** preemption protects state insurer-liquidation courts' antitrust injunctions. In *Munich American Reinsurance Co. v. Crawford,* 141 F.3d 585, 590–96 (5th Cir.), *cert. denied,* 525 U.S. 1016, 119 S.Ct. 539, 142 L.Ed.2d 448 (1998), the Fifth Circuit faced the question of whether Oklahoma's antisuit injunctions, part of its Uniform Insurers Liquidation Act (the "OUILA"), were protected by McCarran–Ferguson such that they preempted the Federal Arbitration Act and the insolvent insurance company could not be compelled to enter arbitration. Deciding that the OUILA as a whole and its antisuit provisions in particular were enacted for the purpose of regulating the business of insurance, the court went on to conclude that ordering the reinsurers' action "resolved in a forum other than the receivership court nevertheless conflicts with the Oklahoma law giving the state court the power to enjoin any action interfering with the delinquency proceedings." *Id.* at 595. The court did note that "the precise degree to which a state statute may be impaired so as to trigger the McCarran–Ferguson Act is not well-settled," but found "impairment sufficient to trigger it" there. *Id.* Following *Munich American,* the Tenth Circuit in *Davister Corp. v. United Republic Life Insurance Co.,* 152 F.3d 1277, 1280–82 (10th Cir.1998), *cert. denied,* 525 U.S. 1177, 119 S.Ct. 1112, 143 L.Ed.2d 108 (1999), held similarly that the Federal Arbitration Act was reverse-preempted by the Utah statute "consolidating all claims against a liquidating insurer." An earlier Second Circuit case, not cited by the Receivers, reaches a similar conclusion with respect to the effect on the Federal Arbitration Act of the Kentucky Insurers Rehabilitation and Liquidation Law, which contains an anti-arbitration clause. *See Stephens v. Am. Int'l Ins. Co.,* 66 F.3d 41, 43–45 (2d Cir.1995). Finally, the Receivers cite *Covington v. Sun Life of Canada (U.S.) Holdings, Inc.,* No. C–2–00–069, 2000 WL 33964592, \*3–\*10 (S.D.Ohio May 17, 2000), which held that the federal removal and diversity

jurisdiction provisions were reverse-preempted by Ohio law granting exclusive jurisdiction in liquidation-related legal matters to the Franklin County Court of Common Pleas.

On the other side is a different line of cases refusing to find reverse preemption. In *Gross v. Weingarten,* 217 F.3d 208, 222–23 (4th Cir.2000), the court rested its holding, after treating critically *Munich American* and its progeny, on the conclusion that "concurrent federal jurisdiction over the defendants' counterclaims [does not] threaten[ ] to 'invalidate, impair, or supersede'.... Virginia's efforts to establish a single equitable proceeding to liquidate or rehabilitate insolvent insurers." *Id.* at 222 (citing *Humana,* 525 U.S. at 307–10, 119 S.Ct. 710). This conclusion was dependent on the facts of the particular case before it, but the court also indicated that the sort of interference contemplated by the parties in that case could be dealt with through abstention doctrines. In *Suter v. Munich Reinsurance Co.,* 223 F.3d 150, 160–62 (3d Cir.2000), the court, assuming the "enacted for the purpose" prong, found no impairment on the facts of the case, where the proceeding was "a suit instituted by the Liquidator against a reinsurer to enforce contract rights for an insolvent insurer, which, if meritorious, will benefit the insurer's estate." In *Grode v. Mutual Fire, Marine and Inland Insurance Co.,* 8 F.3d 953, 960 (3d Cir.1993), the court tersely rejected the McCarran–Ferguson Act argument made by the Insurance Commissioner, noting that the "action instituted by the Commissioner in this case has nothing to do with Pennsylvania's regulation of insurance." And in *Nichols v. Vesta Fire Insurance Corp.,* 56 F.Supp.2d 778, 780 (E.D.Ky.1999), the court concluded that **\*783** under the Kentucky law the action it had before it—"a common law breach of contract action which merely happens to involve an insolvent insurer"—was not subject to the exclusive jurisdiction of the liquidation court.

[23] Where the insolvent insurer is itself a plaintiff in an ordinary contract or tort action,

386 F.3d 763, 2004 Fed.App. 0321P
**(Cite as: 386 F.3d 763)**

courts tend to look unfavorably on claims of Mc-Carran–Ferguson preemption of the FAA or the removal statutes so as to insulate that action from the federal courts. That seems to be motivated as much by frustration over the attempts by parties to evade federal jurisdiction as by reasoned doctrinal analysis, but one way to cast it in a favorable doctrinal light is to extend the rule of *Humana*—that impairment must be defined with respect to the particular cause of action—to the question of purpose. That is, an ordinary suit against a tortfeasor by an insolvent insurance company implicates a "regulation of the business of insurance" only in the attenuated fashion rejected in *Fabe;* an antisuit injunction would only be a regulation of the business of insurance to the extent it protected the assets of the insurance company from suit. Here, of course, the Banks seek only declaratory judgment, based in turn on a threatened ordinary common-law action against them, and the assets of the insurance companies are up for grabs only in that attenuated fashion. A second wrinkle is the narrow or broad definition of "impair": in *Munich American,* impairment was defined ultimately quite broadly, in that any suit which was in violation of the antisuit provision would have impaired that provision. The *Gross* court, looking to the purpose of the antisuit provision, held that impairment does not occur unless the integrity of the core liquidation proceedings is attacked. Here those core proceedings are not implicated. Ultimately, we conclude that it would be an overly expansive reading of the case law and the purposes of the doctrine to find McCarran–Ferguson reverse preemption here. The threatened declaratory judgment actions against insolvent insurance companies for the purpose of evading liability in a threatened common-law coercive action by the insurance companies have only an attenuated connection to regulating the business of insurance.

[24][25][26] *Burford* abstention is similarly inapplicable here. First invoked in *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), *Burford* abstention requires a federal court

to abstain from jurisdiction where to assume jurisdiction would "be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Colo. River Water Conservation Dist. v. United States,* 424 U.S. 800, 814, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). But *Burford* "does not require abstention whenever there exists [a complex state administrative process], or even in all cases where there is a 'potential for conflict' with state regulatory law or policy." *New Orleans Pub. Serv., Inc. v. Council of New Orleans,* 491 U.S. 350, 362, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989) (quoting *Colo. River,* 424 U.S. at 815–16, 96 S.Ct. 1236). Instead, "This balance only rarely favors abstention, and the power to dismiss recognized in *Burford* represents an extraordinary and narrow exception to the duty of the District Court to adjudicate a controversy properly before it." *Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 728, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996) (quotation omitted). State liquidation proceedings seem like an excellent candidate for *Burford* abstention, but it is difficult to see how a federal court's pronouncement on issues of common-law liability having nothing to do with insurance could be disruptive of those proceedings. Like under **\*784** the McCarran–Ferguson analysis, that Receivers are covered by the antisuit provisions of the various liquidation laws seems mere coincidence, and abstention seems inappropriate. The cases cited by the Receivers are all distinguishable.

[27] *Gonzalez v. Media Elements, Inc.,* 946 F.2d 157, 157 (1st Cir.1991), involved a dispute over coverage with a solvent insurer that apparently became insolvent on appeal. A coverage claim against a now-insolvent insurer that arose prior to the insolvency is of course exactly the sort of claim that must be heard in the liquidation proceedings; although dismissal under *Burford* abstention is no longer appropriate under *Quackenbush* in damages actions, presumably McCarran–Ferguson protection would extend to this kind of claim. The court in *Martin Insurance Agency, Inc. v. Prudential Reinsurance Co.,* 910 F.2d 249, 254–55 (5th Cir.1990),

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

386 F.3d 763, 2004 Fed.App. 0321P
**(Cite as: 386 F.3d 763)**

predicated its decision that *Burford* abstention was appropriate where the "claims involve what are, on their face, assets of [the insolvent insurance company] owned solely by the receiver." And while *Grimes v. Crown Life Insurance Co.,* 857 F.2d 699 (10th Cir.1988), does involve a receiver-instituted suit, the subject matter of the suit was recovering money damages from another insurance company based on a coverage dispute. The "appeal center[ed] on the interpretation of certain provisions contained in the [reinsurance] Agreement [and] the effect of the interpretation of the Agreement by the Oklahoma Commissioner of Insurance." *Id.* at 700. Because *Burford* abstention is concerned with potential disruption of a state administrative scheme, rather than the mere existence of such a scheme, looking behind the action to determine whether it implicates the concerns of *Burford* is necessary, and the issues in this litigation, concerning the liability of the Banks for various non-insurance-related activities, federal law defenses, and state tort law, do not warrant *Burford* abstention. The district court thus did not abuse its discretion in refusing to abstain under *Burford.*

**D. Appropriateness of Declaratory Relief**

[28][29][30][31][32] "This court reviews the district court's exercise of discretion under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), for abuse of discretion." *Scottsdale Ins. Co. v. Roumph,* 211 F.3d 964, 967 (6th Cir.2000). "[D]istrict courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites." *Wilton v. Seven Falls Co.,* 515 U.S. 277, 282, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995). The Declaratory Judgment Act is " 'an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant.' " *Id.* at 287, 115 S.Ct. 2137 (quoting *Wycoff,* 344 U.S. at 241, 73 S.Ct. 236). " '[T]he propriety of declaratory relief in a particular case will depend upon a circumspect sense of its fitness informed by the teachings and experience concerning the functions and extent of federal judi-

cial power.' " *Id.* (quoting *Wycoff,* 344 U.S. at 243, 73 S.Ct. 236). These concerns are heightened where, as in *Wilton,* there are pending state-court proceedings representing the same issues of state law; "a district court might be indulging in 'gratuitous interference' if it permitted the federal declaratory action to proceed." *Id.* at 283, 115 S.Ct. 2137 (quoting *Brillhart v. Excess Ins. Co. of Am.,* 316 U.S. 491, 495, 62 S.Ct. 1173, 86 L.Ed. 1620 (1942)) (alteration in original) (citations omitted). This case represents an interesting conundrum in that at the time the motion to dismiss was filed, the Mississippi litigation was in state court; when the Tennessee district **\*785** court's injunctive order was entered, the Mississippi litigation had been, possibly incorrectly, removed to the federal district court for the Southern District of Mississippi; but now, the Mississippi litigation is likely correctly in federal court under *Caterpillar,* as the incorrect removal can be cured by the subsequent creation of jurisdiction. Had the Tennessee district court ruled immediately on the Receivers' motion, the district court would also have been bound by the Anti–Injunction Act, 28 U.S.C. § 2283, and cases interpreting it to dismiss the Banks' complaint, as the Banks pray for injunctive relief against the prosecution of state-court proceedings (the Mississippi litigation) instituted before decision in the Tennessee district court and seek a declaratory judgment which will have the same practical effect. *See Martingale LLC v. City of Louisville,* 361 F.3d 297, 303 (6th Cir.2004); *Tropf v. Fidelity Nat'l Title Ins. Co.,* 289 F.3d 929, 941–42 (6th Cir.2002), *cert. denied,* 537 U.S. 1118, 123 S.Ct. 887, 154 L.Ed.2d 797 (2003). While the Anti–Injunction Act does not by its terms apply now, where the Mississippi litigation will likely take place in federal court, that it did apply at the time the motion to dismiss the Tennessee litigation was filed, and would have applied at the time of the district court's decision below but for a potentially erroneous removal of the Mississippi litigation by AmSouth, is extremely disturbing. In determining the propriety of entertaining a declaratory judgment action, competing state and federal interests weigh in the balance, with courts

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

386 F.3d 763, 2004 Fed.App. 0321P
**(Cite as: 386 F.3d 763)**

particularly reluctant to entertain federal declaratory judgment actions premised on diversity jurisdiction in the face of a subsequently-filed state-court coercive action. These background concerns—that even if the Banks acted in good faith, the ultimate outcome of their procedural behavior has been to wrest this case away from the state courts—should come into play in assessing the appropriateness of assuming jurisdiction over these claims.

[33][34] This court has adopted a five-factor test to determine when a district court should exercise jurisdiction over a declaratory judgment:

(1)whether the judgment would settle the controversy;

(2)whether the declaratory judgment action would serve a useful purpose in clarifying the legal relations at issue;

(3)whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata";

(4)whether the use of a declaratory action would increase the friction between our federal and state courts and improperly encroach on state jurisdiction; and

(5)whether there is an alternative remedy that is better or more effective.

*Scottsdale Ins. Co.,* 211 F.3d at 968. The district court noted this test, but did not apply each factor, instead deciding that the pendency of a related state action did not necessarily bar a federal declaratory-judgment action, finding that the Banks had not engaged in procedural fencing, and finding that "Tennessee is a logical forum for this dispute." J.A. FTB at 64 (Mem. Op. at 16). Because we find clear error in certain of the district court's factual findings, and misapplication of legal standards, we conclude that the district court abused its discretion in assuming jurisdiction over these declaratory actions.

**1. Whether the Judgment Would Settle the Controversy?**

The district court did not consider this factor in its analysis, but the parties dispute on appeal whether it weighs in favor of entertaining the actions or dismissing them. The crux of the argument between *786 the parties is whether or not the ability of the Receivers to file counterclaims that will dispose of all issues in the declaratory-judgment actions can be considered in determining whether the judgments would settle the controversy. Each side argues that the rule the other proposes will swallow this factor, as counterclaims will so often be possible or even compulsory that all declaratory judgments will either be able to or not be able to settle the controversy. We conclude only that in this case, this first factor does not weigh heavily in favor of or against allowing these actions.

**2. Whether the Declaratory Judgment Action Would Serve a Useful Purpose in Clarifying the Legal Relations at Issue?**

This factor weighs heavily in favor of dismissing the declaratory judgment suit. The only "useful purpose" these declaratory-judgment actions could serve is an ultimate determination of liability on an already-accrued damages claim. Its usefulness is therefore severely undercut by the presence of the Mississippi litigation. This is not a situation in which a declaratory plaintiff will suffer injury unless legal relations are clarified; the Banks do not currently "act at their peril." *See Tempco Elec. Heater Corp. v. Omega Eng'g, Inc.,* 819 F.2d 746, 749–50 (7th Cir.1987) (where declaratory defendant "promptly filed suit to enforce its [underlying] claim ... a declaratory judgment would serve no useful purpose and was properly denied").

[35][36] Normally, when a putative tortfeasor sues an injured party for a declaration of nonliability, courts will decline to hear the action in favor of a subsequently-filed coercive action by the "natural plaintiff." *See* 10B Wright, Miller & Mary Kay Kane § 2765 at 638 (3d ed.1998) ("The courts have also held that it is not one of the purposes of the de-

386 F.3d 763, 2004 Fed.App. 0321P
**(Cite as: 386 F.3d 763)**

claratory judgments act to enable a prospective negligence action defendant to obtain a declaration of nonliability."). This general rule is subject to exception when some additional harm, not merely waiting for the natural plaintiff to sue, will befall the declaratory plaintiff in the meantime. That is, a party who wants, for example, to embark on a marketing campaign, but has been threatened with suit over trademark infringement, can go to court under the Declaratory Judgment Act and seek a judgment that it is not infringing that trademark, thereby allowing it to proceed without the fear of incurring further loss. Similarly, a party with an ongoing contractual relationship who has been accused of breach can go to court and have the contract definitively interpreted, thus allowing it to conform its behavior to the law and stop the potential accrual of damages. The "useful purpose" served by the declaratory judgment action is the clarification of legal duties for the future, rather than the past harm a coercive tort action is aimed at redressing. Here, the Banks incurred no further loss while settlement negotiations continued, and at the time they filed, even the "uncertainty" of awaiting suit on past behavior would have extended less than two weeks, from the filing dates of July 18 and 19 to the end of the tolling period on July 31. While AmSouth describes the two-year settlement negotiations as a "danse macabre" in which a "Damoclean sword hung over its head," all AmSouth ever had to do to stop this "danse macabre" was to refuse to renew the tolling agreement or to cease settlement negotiations, at which time, if the Receivers did not file suit promptly, a declaratory suit may have been appropriate. *See Hyatt Int'l Corp. v. Coco,* 302 F.3d 707, 712 (7th Cir.2002) ("[T]he threat of suit, however immediate, is not by itself sufficient for the invocation of the federal power to issue a declaratory judgment."); **\*787** *Int'l Ass'n of Entrepreneurs v. Angoff,* 58 F.3d 1266, 1270 (8th Cir.1995) ("[T]he Declaratory Judgment Act is not to be used to bring to the federal courts an affirmative defense which can be asserted in a pending state action."), *cert. denied,* 516 U.S. 1072, 116 S.Ct. 774, 133 L.Ed.2d 726 (1996); *Morrison v. Parker,*

90 F.Supp.2d 876, 881 (W.D.Mich.2000) ("Viewed from the perspective of [the Sixth Circuit's five] standards, an action by a putative tortfeasor fares poorly as a declaratory judgment action."); *Plough, Inc. v. Allergan, Inc.,* 741 F.Supp. 144, 147–48 (W.D.Tenn.1990) (in Lanham Act case, where declaratory plaintiff was under threat of suit for ongoing marketing activities, declaratory judgment appropriate).

[37] The district court characterized the settlement negotiations engaged in by FTB and the Receivers as " 'continuous[ ] accus[ations]' " for "at least several months before FTB brought this suit 'to secure an adjudication of its rights.' " J.A. FTB at 63 (Mem. Op. at 15). The district court relied on *Eli's Chicago Finest, Inc. v. Cheesecake Factory, Inc.,* 23 F.Supp.2d 906, 908 (N.D.Ill.1998), for the point that continuous accusations without adjudication of rights can justify entertaining a declaratory judgment suit. But as demonstrated by *Eli's Chicago Finest,* in which a single cease-and-desist letter was held not to constitute continuous accusations, the factual circumstances surrounding those accusations are dispositive. First, as the Receivers point out, it is unclear what "two demands" the district court was referring to in finding "continuous accusations"; the Receivers made no formal demands to FTB, only an oral indication that they intended to assert claims if they could not be resolved through negotiation. FTB had signed a tolling agreement, indicating some willingness to negotiate a settlement rather than forcing a legal action, had engaged in preliminary negotiations, and had in fact *asked for a formal settlement demand* that was being prepared as it filed suit. This is clearly not the case of the plaintiff who accuses continuously but does not file, but instead the case of the defendant who races to the courthouse while at the same time assuring the plaintiff that the defendant is still interested in at least discussing settlement options. The district court clearly erred in these historical findings of fact.

[38] FTB also argues on appeal that many of

386 F.3d 763, 2004 Fed.App. 0321P
**(Cite as: 386 F.3d 763)**

the claims advanced by the Receivers are not torts, but instead contract claims, and therefore, FTB does not fit into the category of "putative tortfeasor." At most, this can only undermine reliance on those cases that rely on that particular formulation of the type of declaratory plaintiff at issue here. In any case, it is irrelevant to the policy considerations that underly the doctrine: Where a pending coercive action, filed by the natural plaintiff, would encompass all the issues in the declaratory judgment action, the policy reasons underlying the creation of the extraordinary remedy of declaratory judgment are not present, and the use of that remedy is unjustified. This is true whatever the nature of the coercive action underlying the declaratory action—the important distinction in the case law is between situations where some uncertainty beyond the possibility of litigation exists (i.e., trademark infringement) and those where the injury is already complete. Contract claims can sometimes fall into the first category because of the ongoing nature of a contractual relationship, whereas tort claims will often fall into the second because they are dependent on historical occurrences rather than ongoing conditions. All of the claims extended by the Receivers fall into the second category, in that they allege no present or continual **788 wrongdoing on the part of the Banks that would require immediate clarification of the parties' respective rights. While the Banks might have a continuing contractual relationship with the insurance companies and the Receivers, the historical incidents giving rise to liability are finished. Ultimately, this factor weighs heavily against the exercise of jurisdiction over these declaratory actions, where a pending coercive action exists.

**3. Whether the Declaratory Remedy is Being Used Merely for the Purpose of Procedural Fencing or to Provide an Arena for a Race for Res Judicata?**

Courts take a dim view of declaratory plaintiffs who file their suits mere days or weeks before the coercive suits filed by a "natural plaintiff" and who seem to have done so for the purpose of acquiring a favorable forum. Allowing declaratory actions in these situations can deter settlement negotiations and encourage races to the courthouse, as potential plaintiffs must file before approaching defendants for settlement negotiations, under pain of a declaratory suit. This also dovetails with the previous factor: where a putative defendant files a declaratory action whose only purpose is to defeat liability in a subsequent coercive suit, no real value is served by the declaratory judgment except to guarantee to the declaratory plaintiff her choice of forum—a guarantee that cannot be given consonant with the policy underlying the Declaratory Judgment Act. See *Hyatt Int'l,* 302 F.3d at 712 (the Act "is not a tactical device whereby a party who would be a defendant in a coercive action may choose to be a plaintiff by winning the proverbial race to the courthouse." (internal quotation marks omitted)); *NGS Am., Inc. v. Jefferson,* 218 F.3d 519, 523 (6th Cir.2000) ("[A] rule permitting [this sort of declaratory] action could frustrate a plaintiff's choice of forum and encourage forum shopping, races to the courthouse, needless litigation occasioning waste of judicial resources, delay in the resolution of controversies, and misuse of judicial process to harass an opponent in litigation," irrespective of the actual motives of the declaratory plaintiff); *BASF Corp. v. Symington,* 50 F.3d 555, 558–59 (8th Cir.1995) ("declaratory actions founded exclusively on a defense to a state law claim should be dismissed as a tactical maneuver calculated to deny potential plaintiffs of their traditional right to choose the forum and time of suit"; "the natural plaintiff's choice of forum and law will be disturbed only in exceptional circumstances"); *Tempco,* 819 F.2d at 750 ("[T]he federal declaratory judgment is not a prize to the winner of the race to the courthouse." (internal quotation marks omitted)); *UAW v. Dana Corp.,* No. 3:99CV7603, 1999 WL 33237054, *5–*6 (N.D.Ohio Dec.6, 1999) (where declaratory plaintiff filed suit in order to "preempt the choice of forum that otherwise would be for the union to make," declaratory judgment inappropriate; noting "a presumption that a first filed declaratory judgment action should be dismissed or stayed in favor

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

386 F.3d 763, 2004 Fed.App. 0321P
**(Cite as: 386 F.3d 763)**

of the substantive suit," and that at the least, "the declaratory judgment plaintiff should have the burden or showing persuasive cause why its suit should not be enjoined").

[39][40][41] The district court found "that this declaratory judgment action FN6 was not **789** filed in Tennessee for procedural fencing." J.A. FTB at 65 (Mem. Op. at 17). We conclude that the factual determination underlying this finding was clearly erroneous, as were the legal standards used to reach this conclusion. The district court first found that the Receivers had continuously accused FTB for several months before FTB's action was brought to secure an adjudication of its rights; then that Tennessee was a logical forum for this dispute; and finally that a controversy was presented by the Receivers' threat of suit. Taking up this last conclusion first, we note that the presence of a controversy is a prerequisite for the district court's initial power to hear a declaratory judgment action; its absence strips the district court of jurisdiction, and its presence therefore should have no weight in determining whether a declaratory-judgment action is appropriate. Next, whether the forum chosen by the declaratory plaintiff is "logical" can have only a minimal value in determining whether procedural fencing has occurred. FN7 The question is not which party has chosen the better forum, but whether the declaratory plaintiff has filed in an attempt to get her choice of forum by filing first. That a particular forum is better or worse is irrelevant in answering that factual question.

FN6. The district court issued a memorandum decision in FTB's action against the receivers making findings only as to FTB's action, but then denied the Receivers' motion to dismiss in the AmSouth action "[f]or the reasons stated in the *First Tennessee* action." *AmSouth Bank v. Dale,* No. 3:02–0677 (M.D.Tenn. Mar. 31, 2003) (order denying motion to dismiss and granting injunction), Joint Appendix No. 03–5517 ("J.A. AmSouth") at 42. We find

it to be clear on the record that AmSouth engaged in procedural fencing, and therefore we do not need to remand for separate factual findings to evaluate the propriety of each of these actions.

FN7. It is unclear whether the propriety of Tennessee as a forum was weighed by the district court as part of the "procedural fencing" analysis, or as a separate factor in determining whether the declaratory judgment was appropriate. The parties vigorously contest whether the district court appropriately considered the logic of the forum. The Receivers cite *Essex Group, Inc. v. Cobra Wire & Cable, Inc.,* 100 F.Supp.2d 912, 916 (N.D.Ind.2000) ("[R]egardless of whether Indiana is the more appropriate venue ... it is inappropriate for the Plaintiffs to file for a declaratory judgment for the purposes of forum-shopping.") and *UAW v. Dana Corp.,* No. 3:99CV7603, 1999 WL 33237054, *4 (N.D.Ohio Dec.6, 1999) (differentiating proper forum selection, where a "plaintiff seeking redress for a cognizable injury is entitled" to choose among appropriate forums, from improper forum shopping, where a party "manipulate[s] procedural devices to secure an advantage which, were those devices not available, it could not employ to defeat its opponent's choice of forum"). AmSouth relies on *United States Fire Insurance Co. v. Goodyear Tire & Rubber Co.,* 920 F.2d 487, 489 n. 7 (8th Cir.1990) (footnote remarking as an aside to rejecting the declaratory defendant's claims of procedural fencing that the dispute was one over a Minnesota judgment and involved a Minnesota accident); *Telephonics Corp. v. Lindly & Co.,* 291 F.2d 445, 446–47 (2d Cir.1961) (in weighing propriety of an antisuit injunction entered by district court in declaratory action, noting that New York was a more appropriate

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

386 F.3d 763, 2004 Fed.App. 0321P
**(Cite as: 386 F.3d 763)**

venue for the suit); and *DP–Tek, Inc. v. Villalobos,* 809 F.Supp. 811, 813 (D.Kan.1992) (using traditional forum selection factors in weighing appropriateness of declaratory action). Whether or not the district court's consideration of this factor was incorrect, given that both parties have a reasonable claim to their respective forum, this factor is something of a wash, and we decline to decide whether a district court is always precluded from considering it. To the extent it may weigh in favor of the declaratory action, the other factors—explicitly required by prior circuit case law—still weigh heavily in favor of the Mississippi litigation.

Instead, we conclude that a review of the factual record leads to the unavoidable conclusion that procedural fencing has occurred. The Receivers, alerted to the possibility of claims against the Banks in the course of litigation against other parties, notified the Banks of their exploration of those claims and initiated settlement negotiations. The Banks indicated their willingness to consider settlement, most notably by signing a number of tolling agreements, and in AmSouth's case, **\*790** through correspondence indicating that those negotiations were ongoing. FTB requested a settlement demand, and while that demand was being prepared, filed this action. Just one day before filing its declaratory action, AmSouth's counsel sent a letter stating that AmSouth was "still considering" the Receivers' demand and its options, and that counsel would "be in touch in the near future concerning a written response and a possible meeting on July 24." J.A. AmS at 572. It seems clear that the Banks filed declaratory actions not to resolve issues of liability that were hindering their normal behavior, but instead to gain procedural advantage. *See Zide Sport Shop of Ohio, Inc. v. Ed Tobergte Assocs., Inc.,* No. 00–3183, 2001 WL 897452, *4 (6th Cir. July 31, 2001)* (where declaratory plaintiffs filed suit after requesting extension to respond to settlement demand, one day before extension's expira-

tion, a "finding of bad faith is overwhelmingly supported in the record"); *Nortek, Inc. v. Molnar,* 36 F.Supp.2d 63, 70 (D.R.I.1999) (where declaratory plaintiff asked for letter outlining legal reasoning and promised to respond, then filed action prior to responding to letter, party "certainly shopped for a forum," and court therefore declined jurisdiction over first-filed action); *Columbia Pictures Indus., Inc. v. Schneider,* 435 F.Supp. 742, 747–48 (S.D.N.Y.1977) (allowing six-days-earlier declaratory action to proceed "would create disincentives to responsible litigation," and instead, "Potential plaintiffs should be encouraged to attempt settlement discussions (in good faith and with dispatch) prior to filing lawsuits without fear that the defendant will be permitted to take advantage of the opportunity to institute litigation in a district of its own choosing before plaintiff files an already drafted complaint."). *Cf. N. Shore Gas Co. v. Salomon Inc.,* 152 F.3d 642, 647 (7th Cir.1998) (where settlement negotiations had reached acknowledged impasse, declaratory judgment filed one month after last contact between parties was not "racing to the courthouse"); *Kmart Corp. v. Key Indus., Inc.,* 877 F.Supp. 1048, 1052–55 (E.D.Mich.1994) (finding declaratory judgment appropriate; key consideration is whether the declaratory plaintiff "misled the defendant into believing that their dispute could be resolved amicably so that the plaintiff could win the race to the courthouse").

We conclude that the practical effect of FTB's and AmSouth's participation in settlement negotiations and affirmative representations of that participation was to lull the Receivers into believing that amicable negotiation was still possible, and that the filing of these declaratory actions was an effort to engage in procedural fencing to secure the Banks' choice of forum. The district court clearly erred in concluding otherwise. This factor weighs heavily against entertaining these actions under the Declaratory Judgment Act.

**4. Whether allowing the action would cause friction between state and federal courts?**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

386 F.3d 763, 2004 Fed.App. 0321P
**(Cite as: 386 F.3d 763)**

This is a factor that, as noted above, would have at the outset of this litigation been dispositive under the Anti–Injunction Act, and before the dismissal of Flowers from the suit weighed heavily against entertaining this action in favor of allowing the Mississippi litigation to proceed. It seems unfortunate that happenstance and procedural maneuvering by the Banks should serve to undercut this particularly important factor in the balance, but at this point it is difficult to say that requiring the district court to dismiss the action will decrease the friction between the state and federal courts.

**\*791 5. Whether there is an alternative remedy that is better or more effective?**

The Receivers argue that the Mississippi litigation presents a better remedy, because a coercive action is an inherently more effective litigation vehicle, because the Receivers proceed in one action in the Mississippi litigation, rather than the two actions in the district court and this court, and because the parties are naturally aligned in the Mississippi litigation, noting with respect to this last point the evident misstatements in the district court's opinion switching the two sets of parties. AmSouth notes that the material witnesses reside in Tennessee, the underlying events occurred in that state, relevant documents are located in Tennessee, and Tennessee law will likely govern. The Receivers reply that Tennessee and Mississippi are adjacent, reducing the burden of travel, that two-thirds of the total loss suffered was by Mississippi insurance companies, and that the scheme was nationwide, with documents in numerous fora.

The existence of a coercive action is important to our determination that this declaratory action would serve no useful purpose. *See, e.g., Albie's Foods, Inc. v. Menusaver, Inc.,* 170 F.Supp.2d 736, 740 (E.D.Mich.2001) (relying on *Tempco* in deferring to a subsequently-filed coercive action, noting that invocation of coercive remedy will "help sharpen and refine the issues to be decided"); *Pakideh v. Ahadi,* 99 F.Supp.2d 805, 807–09 (E.D.Mich.2000) (dismissing declaratory judgment

action in favor of coercive action pending in other federal district court after removal); *Essex Group, Inc. v. Cobra Wire & Cable, Inc.,* 100 F.Supp.2d 912, 915–17 (N.D.Ind.2000) (dismissing first-filed declaratory judgment in favor of coercive action in other federal court because to do otherwise would discourage settlement and encourage costly duplicate litigation). Beyond recognizing that an alternative remedy exists, we are unsure that this factor weighs heavily in favor of or against entertaining these declaratory actions.

[42] Ultimately, then, two factors, that the declaratory judgments would serve no useful purpose and that FTB and AmSouth are using these actions for the purpose of procedural fencing, weigh heavily in favor of declining jurisdiction over these declaratory actions, with no factors weighing in favor of proceeding with the declaratory-judgment action.[FN8] The district court therefore abused its discretion in entertaining these actions.

> FN8. The district court also relied on the first-filed rule in denying the Receivers' motion to dismiss, which was likely improper, in that the first-filed rule only applies to two cases filed in separate federal courts, *see Zide Sport Shop of Ohio, Inc. v. Ed Tobergte Assocs., Inc.,* No. 00–3183, 2001 WL 897452, *3 (6th Cir. July 31, 2001) ("The first-to-file rule is a well-established doctrine that encourages comity among *federal* courts of equal rank." (emphasis added)) *Healthcare Capital, LLC v. Healthmed, Inc.,* 213 F.Supp.2d 850, 856 (S.D.Ohio 2002), and the Mississippi litigation was filed in state court. In any case, the first-filed rule is not a strict rule and much more often than not gives way in the context of a coercive action filed subsequent to a declaratory action. *See, e.g., Zide,* 2001 WL 897452 at *3 ("A plaintiff, even one who files first, does not have a right to bring a declaratory judgment action in the forum of his choos-

386 F.3d 763, 2004 Fed.App. 0321P
**(Cite as: 386 F.3d 763)**

ing".); *Essex, 100 F.Supp.2d at 915–17* (dismissing first-filed declaratory judgment in favor of subsequent coercive action in other federal court); *UAW, 1999 WL 33237054 at *6* ("Cases construing the interplay between declaratory judgment actions and suits based on the merits of underlying substantive claims create, in practical effect, a presumption that a first filed declaratory judgment action should be dismissed or stayed in favor of the substantive suit."); *Nortek, Inc. v. Molnar, 36 F.Supp.2d 63, 70 (D.R.I.1999)* (dismissing first-filed declaratory judgment in favor of subsequent coercive action).

**\*792 III. CONCLUSION**

For the foregoing reasons, we **DISSOLVE** the injunction, **REVERSE** the district court's decision, and **REMAND** the case to the district court with instructions to dismiss the actions.

C.A.6 (Tenn.),2004.
AmSouth Bank v. Dale
386 F.3d 763, 2004 Fed.App. 0321P

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
**(Cite as: 153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816)**

**H**

Court of Appeal, Second District, Division 3, California.
FRONTIER OIL CORPORATION et al., Plaintiffs
and Appellants,
v.
RLI INSURANCE COMPANY, Defendant and Respondent.

No. B189158.
Aug. 6, 2007.
As Modified Sept, 5, 2007.
Review Denied Nov. 14, 2007. FN*

FN* George, J., did not participate therein.

**Background:** Oil company and wholly-owned subsidiary brought action against their liability insurer, seeking declaration that insurer was obligated to defend them in personal injury actions arising out of the operation of an oil and gas production facility. The Superior Court of Los Angeles County, No. BC311259, Richard L. Fruin, J., granted insurer summary judgment. Company and subsidiary appealed.

**Holdings:** The Court of Appeal, Croskey, J., held that:
(1) intended place of performance, for purposes of choice-of-law statute applicable to contracts, could be gleaned from a contract's nature and surrounding circumstance;
(2) governmental interest choice-of-law analysis did not supplant choice-of-law statute which provided that contracts were to be interpreted according to the law of the intended place of performance;
(3) California was the intended place of performance of insurance policy issued to oil company;
(4) insurer had a duty to defend oil company from pollution claims arising from sudden and accidental releases from oil and gas production facility;
(5) under either California or Texas law, insurer

had a duty to defend oil company in the underlying personal injury actions; and
(6) insurer failed to satisfy on summary judgment motion its burden to present evidence that subsidiary was not an insured with respect to underlying personal injury actions.

Reversed and remanded.

West Headnotes

**[1] Statutes 361 ⟷181(1)**

361 Statutes
    361VI Construction and Operation
        361VI(A) General Rules of Construction
            361k180 Intention of Legislature
                361k181 In General
                    361k181(1) k. In general. Most Cited Cases

**Statutes 361 ⟷184**

361 Statutes
    361VI Construction and Operation
        361VI(A) General Rules of Construction
            361k180 Intention of Legislature
                361k184 k. Policy and purpose of act.
Most Cited Cases
    A court's fundamental task in construing a statute is to ascertain the legislative intent so as to effectuate the purpose of the law.

**[2] Statutes 361 ⟷188**

361 Statutes
    361VI Construction and Operation
        361VI(A) General Rules of Construction
        361k187 Meaning of Language
            361k188 k. In general. Most Cited Cases
    Because the statutory language ordinarily is the most reliable indicator of legislative intent, when interpreting a statute courts begin by examining the words of the statute.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
**(Cite as: 153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816)**

**[3] Statutes 361 ☞188**

361 Statutes
  361VI Construction and Operation
    361VI(A) General Rules of Construction
      361k187 Meaning of Language
        361k188 k. In general. Most Cited Cases

**Statutes 361 ☞208**

361 Statutes
  361VI Construction and Operation
    361VI(A) General Rules of Construction
      361k204 Statute as a Whole, and Intrinsic Aids to Construction
        361k208 k. Context and related clauses. Most Cited Cases

**Statutes 361 ☞223.1**

361 Statutes
  361VI Construction and Operation
    361VI(A) General Rules of Construction
      361k223 Construction with Reference to Other Statutes
        361k223.1 k. In general. Most Cited Cases

When interpreting a statute, courts give the words of the statute their ordinary and usual meaning and construe them in the context of the statute as a whole and the entire scheme of law of which it is a part.

**[4] Statutes 361 ☞188**

361 Statutes
  361VI Construction and Operation
    361VI(A) General Rules of Construction
      361k187 Meaning of Language
        361k188 k. In general. Most Cited Cases

**Statutes 361 ☞189**

361 Statutes
  361VI Construction and Operation

361VI(A) General Rules of Construction
    361k187 Meaning of Language
      361k189 k. Literal and grammatical interpretation. Most Cited Cases

**Statutes 361 ☞190**

361 Statutes
  361VI Construction and Operation
    361VI(A) General Rules of Construction
      361k187 Meaning of Language
        361k190 k. Existence of ambiguity. Most Cited Cases

**Statutes 361 ☞212.7**

361 Statutes
  361VI Construction and Operation
    361VI(A) General Rules of Construction
      361k212 Presumptions to Aid Construction
        361k212.7 k. Other matters. Most Cited Cases

If the language of a statute is clear and a literal construction would not result in absurd consequences that the Legislature did not intend, when interpreting statutes courts presume that the Legislature meant what it said and the plain meaning governs.

**[5] Statutes 361 ☞184**

361 Statutes
  361VI Construction and Operation
    361VI(A) General Rules of Construction
      361k180 Intention of Legislature
        361k184 k. Policy and purpose of act.
Most Cited Cases

**Statutes 361 ☞217.4**

361 Statutes
  361VI Construction and Operation
    361VI(A) General Rules of Construction
      361k213 Extrinsic Aids to Construction
        361k217.4 k. Legislative history in general. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
**(Cite as: 153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816)**

If the language of a statute is ambiguous, courts may consider a variety of extrinsic aids, including the purpose of the statute, legislative history, and public policy.

**[6] Contracts 95 ☞144**

95 Contracts
  95II Construction and Operation
    95II(A) General Rules of Construction
      95k144 k. What law governs. Most Cited Cases

Statute, providing that a contract is to be interpreted according to the law and usage of the place where it is to be performed if the contract indicates a place of performance, is intended to give effect to the parties' presumed intention that the law of the place a contract is to be performed should govern its interpretation. West's Ann.Cal.Civ.Code § 1646.

**[7] Contracts 95 ☞129(1)**

95 Contracts
  95I Requisites and Validity
    95I(F) Legality of Object and of Consideration
      95k129 Obstructing or Perverting Administration of Justice
        95k129(1) k. Agreements relating to actions and other proceedings in general. Most Cited Cases

If the parties to a contract state their intention regarding contract interpretation in an express choice-of-law clause, courts ordinarily will enforce the parties' stated intention unless: (1) the chosen state has no substantial relationship to the parties or their transaction, and there is no other reasonable basis for the parties' choice, or (2) the chosen state's law is contrary to a fundamental policy of the state whose law otherwise would apply, and the latter state has a materially greater interest in the matter than does the chosen state.

**[8] Contracts 95 ☞144**

95 Contracts

  95II Construction and Operation
    95II(A) General Rules of Construction
      95k144 k. What law governs. Most Cited Cases

The parties' intention as to the place of performance, for purposes of statute providing that a contract is to be interpreted according to the law of the place where it is to be performed, can be gleaned from the nature of the contract and the surrounding circumstances, even if the contract does not expressly specify a place of performance. West's Ann.Cal.Civ.Code § 1646.

**[9] Contracts 95 ☞144**

95 Contracts
  95II Construction and Operation
    95II(A) General Rules of Construction
      95k144 k. What law governs. Most Cited Cases

The intended place of performance is a question of contract interpretation for the court to decide, for purposes of statute providing that a contract is to be interpreted according to the law of the place where it is to be performed, except to the extent the answer may depend on the credibility of extrinsic evidence. West's Ann.Cal.Civ.Code § 1646.

**[10] Contracts 95 ☞144**

95 Contracts
  95II Construction and Operation
    95II(A) General Rules of Construction
      95k144 k. What law governs. Most Cited Cases

Governmental interest analysis choice-of-law rule, under which a court applies the law of the jurisdiction whose interest would be more significantly impaired if its law was not applied, does not supplant statute which provides that a contract is to be interpreted according to the law of the place in which it is to be performed. West's Ann.Cal.Civ.Code § 1646.

**[11] Insurance 217 ☞2268**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
**(Cite as: 153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816)**

217 Insurance
   217XVII Coverage—Liability Insurance
    217XVII(A) In General
     217k2267 Insurer's Duty to Indemnify in General
      217k2268 k. In general. Most Cited Cases

**Insurance 217 ⌐══2911**

217 Insurance
   217XXIII Duty to Defend
    217k2911 k. In general; nature and source of duty. Most Cited Cases

An indemnity obligation in an insurance policy entails the payment of money in order to resolve liability, while a defense obligation, in contrast, entails the rendering of a service, the mounting and funding of a defense.

**[12] Insurance 217 ⌐══1091(4)**

217 Insurance
   217III What Law Governs
    217III(A) Choice of Law
     217k1086 Choice of Law Rules
      217k1091 Particular Applications of Rules
       217k1091(3) Liability Insurance
       217k1091(4) k. In general. Most Cited Cases

**Insurance 217 ⌐══1091(5)**

217 Insurance
   217III What Law Governs
    217III(A) Choice of Law
     217k1086 Choice of Law Rules
      217k1091 Particular Applications of Rules
       217k1091(3) Liability Insurance
       217k1091(5) k. Environmental coverages or exclusions. Most Cited Cases

California was the intended place of performance of commercial general liability insurance policy issued in Texas by Texas insurer to Texas-based oil company, and thus California rather than Texas law governed interpretation of the policy pursuant to California statute that provided that a contract was to be interpreted according to the law of the place in which it was to be performed, as policy specifically referred to claims from oil and gas operations at a drill site in California, endorsements named California city and department of transportation of another California city as additional insureds, and in a third endorsement insurer waived its right of recovery against a California city for certain payments made with respect to the specified claims. West's Ann.Cal.Civ.Code § 1646.

**[13] Insurance 217 ⌐══1806**

217 Insurance
   217XIII Contracts and Policies
    217XIII(G) Rules of Construction
     217k1806 k. Application of rules of contract construction. Most Cited Cases

Courts interpret an insurance policy under California law using the same rules of interpretation applicable to other contracts.

**[14] Insurance 217 ⌐══2097**

217 Insurance
   217XV Coverage—in General
    217k2096 Risks Covered and Exclusions
     217k2097 k. In general. Most Cited Cases

Courts interpret an insuring clause broadly consistent with the reasonable expectations of the insured.

**[15] Insurance 217 ⌐══2098**

217 Insurance
   217XV Coverage—in General
    217k2096 Risks Covered and Exclusions
     217k2098 k. Exclusions and limitations in general. Most Cited Cases

An exclusion from coverage otherwise within the scope of an insuring clause must be clear and unmistakable to be given effect.

**[16] Insurance 217 ⌐══2098**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
**(Cite as: 153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816)**

217 Insurance
   217XV Coverage—in General
      217k2096 Risks Covered and Exclusions
         217k2098 k. Exclusions and limitations in general. Most Cited Cases

An exclusionary clause in an insurance policy must be conspicuous, plain and clear.

**[17] Insurance 217 ⟲2098**

217 Insurance
   217XV Coverage—in General
      217k2096 Risks Covered and Exclusions
         217k2098 k. Exclusions and limitations in general. Most Cited Cases

An exception to an exclusion in an insurance policy is treated in the same manner as a coverage provision and therefore is interpreted broadly consistent with the insured's reasonable expectations.

**[18] Insurance 217 ⟲1845(1)**

217 Insurance
   217XIII Contracts and Policies
     217XIII(G) Rules of Construction
       217k1838 Materials Related or Attached to Policies
         217k1845 Margins or Backs of Policies; Endorsements
          217k1845(1) k. In general. Most Cited Cases

Insurance 217 ⟲1874

217 Insurance
   217XIII Contracts and Policies
     217XIII(J) Modification of Policies
       217k1874 k. Endorsements or attachments. Most Cited Cases

An endorsement in an insurance policy modifies the basic insuring forms of the policy and is an integral part of the policy.

**[19] Insurance 217 ⟲1845(1)**

217 Insurance
   217XIII Contracts and Policies

217XIII(G) Rules of Construction
       217k1838 Materials Related or Attached to Policies
         217k1845 Margins or Backs of Policies; Endorsements
          217k1845(1) k. In general. Most Cited Cases

Standing alone, an endorsement in an insurance policy means nothing; an endorsement forms a part of the insurance contract, and the policy of insurance with the endorsements and riders thereon must be construed together as a whole.

**[20] Insurance 217 ⟲1874**

217 Insurance
   217XIII Contracts and Policies
     217XIII(J) Modification of Policies
       217k1874 k. Endorsements or attachments. Most Cited Cases

An endorsement can expand or restrict the coverage otherwise provided by an insurance policy.

**[21] Insurance 217 ⟲1845(2)**

217 Insurance
   217XIII Contracts and Policies
     217XIII(G) Rules of Construction
       217k1838 Materials Related or Attached to Policies
         217k1845 Margins or Backs of Policies; Endorsements
          217k1845(2) k. Conflicts between policies and endorsements. Most Cited Cases

If there is any conflict between an endorsement and the body of an insurance policy, the endorsement controls, provided that any reduction in coverage reasonably expected under the body of a policy must be conspicuous, plain and clear.

**[22] Insurance 217 ⟲2325**

217 Insurance
   217XVII Coverage—Liability Insurance
     217XVII(B) Coverage for Particular Liabilities

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
**(Cite as: 153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816)**

217k2323 Environmental Liabilities; Pollution
217k2325 k. Scope of coverage. Most Cited Cases

**Insurance 217 ☞2911**

217 Insurance
217XXIII Duty to Defend
217k2911 k. In general; nature and source of duty. Most Cited Cases

General liability insurer had a duty to defend oil company from pollution claims arising from sudden and accidental releases from company's oil and gas production facility, though pollution liability endorsement which provided the coverage for sudden and accidental releases did not mention a duty to defend, where the body of general liability policy to which the endorsement was attached expressly promised both indemnity and a defense, and pollution endorsement, which deleted pollution exclusion, provided indemnity and did not clearly and unmistakably exclude pollution claims from the duty to defend stated in the body of the policy.

**[23] Action 13 ☞17**

13 Action
13II Nature and Form
13k17 k. What law governs. Most Cited Cases

The first step in the governmental interest choice-of-law analysis is to determine whether the applicable rules of law of the potentially concerned jurisdictions materially differ; if there is no material difference, there is no choice-of-law problem and the court may proceed to apply California law.

**[24] Action 13 ☞17**

13 Action
13II Nature and Form
13k17 k. What law governs. Most Cited Cases

The party arguing that foreign law governs, under the governmental interest choice-of-law analys-is, has the burden to identify the applicable foreign law, show that it materially differs from California law, and show that the foreign law furthers an interest of the foreign state.

**[25] Insurance 217 ☞2914**

217 Insurance
217XXIII Duty to Defend
217k2912 Determination of Duty
217k2914 k. Pleadings. Most Cited Cases

**Insurance 217 ☞2915**

217 Insurance
217XXIII Duty to Defend
217k2912 Determination of Duty
217k2915 k. Matters beyond pleadings. Most Cited Cases

A liability insurer has a duty to defend its insured if facts alleged in the complaint, or other facts known to the insurer, potentially could give rise to coverage under the policy.

**[26] Insurance 217 ☞2913**

217 Insurance
217XXIII Duty to Defend
217k2912 Determination of Duty
217k2913 k. In general; standard. Most Cited Cases

The facts need only raise the possibility that the insured will be held liable for covered damages in order for the insurer to have a duty to defend.

**[27] Insurance 217 ☞2913**

217 Insurance
217XXIII Duty to Defend
217k2912 Determination of Duty
217k2913 k. In general; standard. Most Cited Cases

An insurer has a duty to defend, if the facts raise the possibility that the insured will be held liable for covered damages, even if the claims against the insured are groundless, false, or fraudulent.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031

**(Cite as: 153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816)**

**[28] Insurance 217 ☞2913**

217 Insurance
  217XXIII Duty to Defend
    217k2912 Determination of Duty
      217k2913 k. In general; standard. Most Cited Cases

Any doubt as to whether the facts establish the existence of a defense duty under an insurance policy must be resolved in the insured's favor.

**[29] Insurance 217 ☞2919**

217 Insurance
  217XXIII Duty to Defend
    217k2916 Commencement of Duty; Conditions Precedent
      217k2919 k. Tender or other notice. Most Cited Cases

**Insurance 217 ☞2930**

217 Insurance
  217XXIII Duty to Defend
    217k2930 k. Termination of duty; withdrawal. Most Cited Cases

A duty to defend arises upon the tender to the insurer of a potentially covered claim and continues until the lawsuit is concluded or until the insurer shows that facts extrinsic to the third party complaint conclusively negate the potential for coverage.

**[30] Insurance 217 ☞2922(1)**

217 Insurance
  217XXIII Duty to Defend
    217k2920 Scope of Duty
      217k2922 Several Grounds or Causes of Action
        217k2922(1) k. In general. Most Cited Cases

If a duty to defend arises, the insurer must defend the action in its entirety, including claims that are not potentially covered.

**[31] Insurance 217 ☞2930**

217 Insurance
  217XXIII Duty to Defend
    217k2930 k. Termination of duty; withdrawal. Most Cited Cases

If a duty of an insurer to defend has arisen by virtue of the existence of a potential for coverage but is later extinguished, it is extinguished prospectively only, and not retroactively.

**[32] Insurance 217 ☞2914**

217 Insurance
  217XXIII Duty to Defend
    217k2912 Determination of Duty
      217k2914 k. Pleadings. Most Cited Cases

A liability insurer has a duty to defend its insured under Texas law if facts alleged in the complaint potentially could give rise to coverage under the policy.

**[33] Insurance 217 ☞2914**

217 Insurance
  217XXIII Duty to Defend
    217k2912 Determination of Duty
      217k2914 k. Pleadings. Most Cited Cases

Under Texas law, a plaintiff's factual allegations that potentially support a covered claim is all that is needed to invoke the insurer's duty to defend.

**[34] Insurance 217 ☞2914**

217 Insurance
  217XXIII Duty to Defend
    217k2912 Determination of Duty
      217k2914 k. Pleadings. Most Cited Cases

Under Texas law, where a complaint against the insured does not state facts sufficient to clearly bring the case within or without the coverage, the general rule is that the insurer is obligated to defend if there is, potentially, a case under the complaint within the coverage of the policy.

**[35] Insurance 217 ☞2914**

217 Insurance

153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
(Cite as: 153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816)

217XXIII Duty to Defend
217k2912 Determination of Duty
217k2914 k. Pleadings. Most Cited Cases

Under Texas law, in case of doubt as to whether or not the allegations of a complaint against the insured state a cause of action within the coverage of a liability policy sufficient to compel the insurer to defend the action, such doubt will be resolved in insured's favor.

**[36] Insurance 217 ⬥2914**

217 Insurance
217XXIII Duty to Defend
217k2912 Determination of Duty
217k2914 k. Pleadings. Most Cited Cases

**Insurance 217 ⬥2915**

217 Insurance
217XXIII Duty to Defend
217k2912 Determination of Duty
217k2915 k. Matters beyond pleadings. Most Cited Cases

Under Texas law, the duty to defend is determined based on the policy terms and the allegations of the complaint, without regard to the truth or falsity of those allegations and without regard to extrinsic evidence.

**[37] Insurance 217 ⬥2914**

217 Insurance
217XXIII Duty to Defend
217k2912 Determination of Duty
217k2914 k. Pleadings. Most Cited Cases

Under Texas law, any doubt as to whether a complaint alleges facts that give rise to a duty to defend under an insurance policy must be resolved in favor of the insured.

**[38] Insurance 217 ⬥2922(1)**

217 Insurance
217XXIII Duty to Defend
217k2920 Scope of Duty
217k2922 Several Grounds or Causes of

Action
217k2922(1) k. In general. Most Cited Cases

Under Texas law, if the duty to defend arises, the insurer must defend the action in its entirety, including claims that are not potentially covered.

**[39] Insurance 217 ⬥2325**

217 Insurance
217XVII Coverage—Liability Insurance
217XVII(B) Coverage for Particular Liabilities
217k2323 Environmental Liabilities; Pollution
217k2325 k. Scope of coverage. Most Cited Cases

Under both California and Texas law, Texas insurer that issued commercial general liability policy covering Texas-based oil company's oil and gas production facility in California had a duty to defend company in California personal injury actions arising out of the operation of the facility, based on complaints asserting that company's operations resulted in releases, discharges, emissions, leaks and spills; such allegations did not foreclose the possibility that plaintiffs' alleged damages were caused by a sudden and accidental release, which were potentially covered by policy's pollution endorsement. West's Ann.Cal.Civ.Code § 1646.

**[40] Judgment 228 ⬥185.3(12)**

228 Judgment
228V On Motion or Summary Proceeding
228k182 Motion or Other Application
228k185.3 Evidence and Affidavits in Particular Cases
228k185.3(12) k. Insurance. Most Cited Cases

Insurer, which had issued general liability policy to oil and gas company that named joint venture of company's subsidiary as an additional insured, failed to satisfy on summary judgment motion its burden to present evidence that subsidiary was not an insured with respect to underlying per-

© 2011 Thomson Reuters. No Claim to Orig. U.S. Gov. Works.

153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
**(Cite as: 153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816)**

sonal injury actions arising out of subsidiary's operation of oil and gas production facility, as policy specifically identified the facility and raised inference that the parties intended policy to provide coverage for subsidiary's operations at the facility, nothing in either the policy or the complaints in the underlying actions foreclosed the possibility that subsidiary's operations at the facility pertained to its joint venture, and insurer cited no evidence, apart from the policy and the complaints, supporting its argument that conduct alleged in the personal injury complaints did not pertain to subsidiary's joint venture activities.

**\*\*820** Dickstein Shapiro Morin & Oshinsky, Kirk A. Pasich, Clyde M. Hettrick and Daniel H. Rylaarsdam, Los Angeles, for Plaintiffs and Appellants.

**\*\*821** Morison–Knox Holden & Prough, William C. Morison, Michael D. Prough, Walnut Creek, and Richard A. Eggerth for Defendant and Respondent.

CROSKEY, J.

**\*1442** Frontier Oil Corporation (Frontier) and its wholly-owned subsidiary, Wainoco Oil & Gas Company (Wainoco), appeal a summary judgment in favor of RLI Insurance Company (RLI). Frontier and Wainoco contend RLI has a duty to defend them in several personal injury actions arising from the operation of an oil and gas production facility adjacent to Beverly Hills High School in Beverly Hills, California. Frontier's predecessor and RLI's predecessor had entered into a liability insurance policy in Texas. The parties dispute whether RLI agreed under the terms of the policy to defend pollution claims and whether a duty to defend the underlying actions has arisen. Each of these questions presents a choice-of-law issue concerning the law governing our determination. Each choice-of-law issue in turn presents the threshold question of the applicable choice-of-law rule.

We conclude that notwithstanding the application of the governmental interest analysis to *other*

**\*1443** choice-of-law issues, Civil Code section 1646 is the choice-of-law rule that determines the law governing the *interpretation* of a contract. Section 1646 states that a contract is to be interpreted according to the law and usage of the place it is to be performed if the contract "indicate[s] a place of performance" and according to the law and usage of the place it was made if the contract "does not indicate a place of performance." FN1 A contract "indicate[s] a place of performance" within the meaning of section 1646 if the contract expressly specifies a place of performance or if the intended place of performance can be gleaned from the nature of the contract and its surrounding circumstances. California, as the location of the risk insured under the policy, was the state where RLI would be obligated to perform its defense obligations under the policy, and the contracting parties knew this at the time the policy was issued. Indeed, the policy included several endorsements reflecting the existence of a covered risk located in California. The law of California therefore governs the interpretation of the policy. Interpreting the policy under California law, we will hold that it includes a contractual duty to defend and that the facts alleged in the underlying complaints were sufficient to create a potential for coverage giving rise to a duty to defend. We will therefore reverse the judgment.

> FN1. Civil Code section 1646 provides: "A contract is to be interpreted according to the law and usage of the place where it is to be performed; or, if it does not indicate a place of performance, according to the law and usage of the place where it is made."

### FACTUAL AND PROCEDURAL BACKGROUND

*1. The Insurance Policy*

Underwriters Indemnity Company, RLI's predecessor in interest, issued a commercial general liability insurance policy to Wainoco Oil Corporation, Frontier's predecessor in interest, in January 1988. Wainoco Oil Corporation, acting through an

153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
**(Cite as: 153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816)**

insurance brokerage, and Underwriters Indemnity Company entered into the insurance contract in Texas. The policy was effective from October 1, 1987, to October 1, 1988.

The policy's liability insuring clause states: "We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies.... The 'bodily injury' or 'property **822 damage' must be caused by an 'occurrence'.... *We will have the right and duty to defend any 'suit' seeking those damages.*" (Italics added.) "Exclusion of," in the same coverage form, provided for an "absolute" pollution exclusion: "This insurance does not apply to: [¶] ... [¶] ... 'Bodily injury' or 'property damage' arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants...."

The policy includes several contemporaneously issued endorsements, including one entitled "Oil and Gas Lease Operators' Pollution Liability *1444 Coverage" (the pollution liability endorsement), which states at the top of its first page, "This endorsement forms a part of the policy to which attached, effective on the inception date of the policy unless otherwise stated herein." The pollution liability endorsement *deletes* "exclusion f" from the policy and states: "We will pay those sums that the 'insured' becomes legally obligated to pay as compensatory damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by a 'pollution incident'." The endorsement defines "pollution incident" as "the sudden and accidental emission, discharge, release or escape of pollutants into or upon land or the atmosphere, provided that such emission, discharge, release or escape emanates from operations conducted on land and results in 'environmental damage'." FN2 "Environmental damage" is defined as "the injurious presence in or upon land or the atmosphere of solid, liquid, gaseous or thermal contaminants, irritants or pollutants." The endorsement, however, does not mention a duty to defend.

FN2. The effect of this endorsement was to remove the *absolute* pollution exclusion from the original policy and provide in its place a limited promise of coverage for claims arising from any "sudden and accidental emission, discharge, release or escape of pollutants."

The policy also includes three additional endorsements relating specifically to the oil and gas operations in Beverly Hills, California. One adds the City of Beverly Hills as an additional insured ("with respect to claims arising out of the following project: Oil and Gas Operations at 9865 Olympic Blvd., City of Beverly Hill[s], CA"), apparently as a public entity that had issued a permit to conduct oil and gas operations at the site; the second adds the Department of Transportation of the City of Los Angeles as an additional insured, also apparently as a public entity that had issued a permit; and the third is a "Waiver of Transfer Rights of Recovery Against Others" made out in favor of the City of Beverly Hills with respect to claims arising from the same project.

Finally, an endorsement for certain "Texas Changes" apparently conforms this policy issued in Texas with Texas law with respect to three specific areas, none of which is relevant to the issues raised in this appeal: (1) the "notice prejudice" rule, (2) policy cancellation, and (3) policy renewal. That endorsement also states that the insured may complain to the Texas State Board of Insurance if any dispute concerning the premium or a claim is not resolved.

2. *Underlying Actions and Tender of Defense*

Lori Lynn Moss and numerous other plaintiffs filed a complaint against Frontier, Wainoco, and other oil and gas industry defendants in June 2003 ( *Moss v. Venoco, Inc.* (Super.Ct.L.A.County, No. BC297083)). The plaintiffs alleged that the defendants' oil and gas operations at "Drill–Site # 1" *1445 and other locations at the Beverly Hills site caused releases of toxic chemicals into the environment resulting in personal injuries and deaths.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 11
153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
**(Cite as: 153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816)**

**\*\*823** Other plaintiffs filed similar complaints against Frontier, Wainoco, and others alleging the same operative facts in six additional actions filed from July 2003 to May 2005. Frontier and Wainoco tendered defense of all of these actions to several primary liability insurers, including RLI. RLI responded that it would investigate the matter.

In January 2004, Frontier and Wainoco made a written demand on numerous insurers, including RLI, to provide a defense in the underlying actions. On February 12, 2004, RLI filed a complaint in the United States District Court for the Southern District of Texas seeking a declaratory judgment that it had no duty to defend or indemnify Frontier or Wainoco in the underlying actions (*RLI Insurance Co. v. Wainoco Oil & Gas Co.* (S.D.Tex., No. H–04–0553)). RLI sent a letter to Frontier and Wainoco the next day denying coverage and a defense.

3. *Trial Court Proceedings*

Frontier and Wainoco filed their complaint in this action against RLI and other insurers in February 2004, alleging counts for (1) declaratory relief, (2) breach of contract, and (3) breach of the implied covenant of good faith and fair dealing, all relating to the insurers' refusal to defend the underlying actions. The Texas federal district court stayed RLI's declaratory relief action in April 2004 under its broad discretionary authority to abstain from ruling on a declaratory relief action where there is a pending state court action in which the matters in controversy might be fully resolved. Frontier and Wainoco later resolved this action with respect to all of the insurer defendants except RLI.

RLI moved for summary judgment against Frontier in November 2005, arguing that it had no duty to defend Frontier in the underlying actions. RLI argued that Texas law governed the dispute pursuant to Civil Code section 1646 and Code of Civil Procedure section 1857 and that under Texas law, RLI had no duty to indemnify or defend Frontier. Specifically, RLI argued that under Texas law (1) the pollution liability endorsement does not

promise a defense of pollution claims, so the policy provides for indemnity of pollution claims but not a defense; and, in any event (2) the allegations in the underlying complaints did not create a potential for coverage. RLI moved for summary judgment against Wainoco on the same grounds, and also argued that Wainoco was entitled to no relief because it was not a named insured under the policy.

**\*1446** The trial court concluded that Civil Code section 1646 determined whether the law of California or Texas governed the dispute.[FN3] Noting the "Texas Changes" endorsement, the court stated, "The insurance policy as a whole shows the intent of the parties at the time the insurance contract was made was that Texas law would apply to any disputes arising out of the contract." The court concluded, "the insurance contract was made and accepted between a Texas insurer and a Texas-based insured in Texas and was to be performed under Texas law." The court therefore held that Texas law governed this dispute. The court acknowledged that "[t]he major risk identified by the parties in their contract was the insured's petroleum drilling operation in California," but stated that such circumstance alone did not compel the conclusion that California law governed.

FN3. The trial court also apparently relied on Code of Civil Procedure section 1857 (see fn. 4, *post* ).

**\*\*824** The trial court concluded that, under Texas law, the policy did not include a duty to defend pollution claims because the pollution liability endorsement did not expressly promise a defense. The court therefore held that RLI had no duty to defend Frontier or Wainoco regardless of the allegations in the underlying actions. The court granted the summary judgment motions against both Frontier and Wainoco and entered a judgment in favor of RLI. Frontier and Wainoco filed a timely appeal.

### CONTENTIONS

Frontier and Wainoco contend (1) the governmental interest analysis is the choice-of-law rule

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 12

153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
**(Cite as: 153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816)**

that determines whether California law or Texas law governs the parties' rights under the policy, and under that analysis California law applies; (2) even under Civil Code section 1646 and Code of Civil Procedure section 1857, the contemplated place of performance was California, so California law applies; (3) interpreted in accordance with California law, the policy includes a contractual duty to defend that extends to claims arising from pollution incidents; (4) the allegations of the third party complaints establish a potential for coverage under the policy and therefore create a duty to defend; and (5) RLI has a duty to defend under Texas law, even if it applies.

RLI disputes these contentions and argues that (1) Civil Code section 1646 and Code of Civil Procedure section 1857 establish the choice-of-law rule that determines whether California law or Texas law governs the interpretation of the policy and, under that analysis, Texas law applies because the policy does not expressly specify a place of performance and the contract was made in Texas; (2) even under the governmental interest analysis, Texas law **\*1447** applies; (3) interpreted in accordance with Texas law, the policy does not include a duty to defend pollution claims; (4) the allegations of the third party complaints do not establish a potential for coverage under the policy and therefore cannot support a duty to defend under Texas law; (5) if California law applies, the matter should be remanded to the superior court to consider extrinsic evidence that was not considered in ruling on the prior summary judgment motion; and (6) Wainoco is not an insured under the policy, so the judgment should be affirmed as to Wainoco.

### *DISCUSSION*
1. *Standard of Review*

A party is entitled to summary judgment only if there is no triable issue of material fact and the party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) A defendant moving for summary judgment must show that one or more elements of the plaintiff's cause of action

cannot be established or that there is a complete defense. (*Id.*, subd. (p)(2).) A defendant can satisfy its burden by presenting evidence that negates an element of the cause of action or evidence that the plaintiff cannot reasonably obtain needed evidence. (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1003, 4 Cal.Rptr.3d 103, 75 P.3d 30.) If the defendant meets this burden, the burden shifts to the plaintiff to set forth "specific facts" showing that a triable issue of material fact exists. (Code Civ. Proc., § 437c, subd. (p)(2).) We review the trial court's ruling de novo, liberally construe the evidence in favor of the opposing party, and resolve all doubts concerning the evidence in favor of the opposing party. (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460, 30 Cal.Rptr.3d 797, 115 P.3d 77.)

**\*\*825** 2. *Choice–of–Law Doctrine*

Choice of law refers to the determination of which state's or other jurisdiction's law applies to a particular issue. Choice of law is one branch of the larger doctrine of conflicts of laws, which also includes the questions in which jurisdiction a suit can be brought and the effect of a foreign judgment. (See Weintraub, Commentary on the Conflict of Laws (5th ed.2006) § 1.1, p. 1; Rest.2d Conflict of Laws, § 2, com. a, pp. 2–3.) Choice-of-law rules can be statutory or based on common law. (See Rest.2d Conflict of Laws, § 5, coms. b, c, p. 9; Leflar, *Choice–of–Law Statutes* (1977) 44 Tenn. L.Rev. 951.) Courts and commentators have long struggled with differing approaches to challenging choice-of-law problems.

The determination whether RLI has a duty to defend under the policy presents two principal issues. The first is whether the policy includes a duty **\*1448** to defend pollution claims. This is a question of contract interpretation. The second is whether the underlying personal injury actions trigger the duty to defend. Each of these questions presents a choice-of-law issue as to whether the law of California or another state governs. Each choice-of-law issue in turn presents the threshold question of

153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
**(Cite as: 153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816)**

which choice-of-law rule properly applies.

We first will decide that Civil Code section 1646 is the choice-of-law rule that determines the law governing the interpretation of the policy. We then will apply section 1646, conclude that California law governs, and interpret the policy under California law. Such interpretation will require us to conclude that the policy includes a duty to defend pollution claims. Next, we will consider the choice of law with respect to whether the underlying actions trigger the duty to defend. We will hold that California law governs under either section 1646 or the governmental interest analysis. Applying California law, we will conclude that RLI has a duty to defend Frontier and Wainoco in the underlying actions.

3. *Civil Code Section 1646 Is California's Choice–of–Law Rule that Determines the Law Governing the Interpretation of a Contract* FN4

Civil Code section 1646 (see fn. 1, *ante* ) was first enacted in 1872 based on an identical provision in the Field Code (Field's Draft N.Y. Civ.Code (1865) § 811) and remains unchanged today. Published opinions by California courts have applied the statute as a choice-of-law rule determining the law governing the interpretation of a contract very infrequently, and those opinions (discussed *post* ) provide little guidance as to the meaning of the critical phrase "indicate a place of performance" (Civ.Code, § 1646).

FN4. Code of Civil Procedure section 1857 states, in terms somewhat similar to Civil Code section 1646: "The language of a writing is to be interpreted according to the meaning it bears in the place of its execution, unless the parties have reference to a different place." In light of our conclusion that Civil Code section 1646 determines the law governing the interpretation of a contract and the apparent similarities between the two statutes, we need not decide whether Code of Civil Procedure section 1857 also states a choice-of-law rule

or only an interpretive rule concerning usage.

[1][2][3][4][5] Our fundamental task in construing a statute is to ascertain the legislative intent so as to effectuate the purpose of the law. (*Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 715, 3 Cal.Rptr.3d 623, 74 P.3d 726.) Because the statutory language ordinarily is the most reliable indicator of legislative intent, we begin by examining the words of the statute. (*Ibid.*) We give the words of the statute their ordinary and usual meaning **826 and construe them in the context of the statute as a whole and the entire scheme of law of which it is a part. *1449(State Farm Mutual Automobile Ins. Co. v. Garamendi* (2004) 32 Cal.4th 1029, 1043, 12 Cal.Rptr.3d 343, 88 P.3d 71.) If the language is clear and a literal construction would not result in absurd consequences that the Legislature did not intend, we presume that the Legislature meant what it said and the plain meaning governs. (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737, 21 Cal.Rptr.3d 676, 101 P.3d 563.) If the language is ambiguous, we may consider a variety of extrinsic aids, including the purpose of the statute, legislative history, and public policy. (*Ibid.*)

Civil Code section 1646, by its express terms, prescribes a choice-of-law rule concerning the interpretation of contracts. It states that a contract is to be interpreted according to the law and usage of the place where it is to be performed, but only if the contract "indicate[s] a place of performance," and is to be interpreted according to the law and usage of the place where it was made if the contract "does not indicate a place of performance." FN5 Frontier and Wainoco construe the quoted language to mean that a contract must be interpreted according to the law of the place where it is to be performed if the contract *contemplates* performance in a particular place, while RLI construes the same language to mean that the law of the place where the contract is to be performed governs only if the contract *expressly specifies* a place of performance.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
**(Cite as: 153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816)**

FN5. Civil Code section 1646 prescribes both a choice-of-law rule concerning the interpretation of contracts and a rule of interpretation regarding word usage. The California Supreme Court has cited section 1646 in several opinions to support the admissibility of evidence of usage for the purpose of interpreting a contract. (*Callahan v. Stanley* (1881) 57 Cal. 476, 479; *Burns v. Sennett & Miller* (1893) 99 Cal. 363, 371–372, 33 P. 916; *Law v. Northern Assurance Co.* (1913) 165 Cal. 394, 407, 132 P. 590; *Alta Planing Mill Co. v. Garland* (1914) 167 Cal. 179, 183, 138 P. 738; *Buckner v. A. Leon & Co.* (1928) 204 Cal. 225, 227, 267 P. 693; *Alamitos Land Co. v. Shell Oil Co.* (1935) 3 Cal.2d 396, 404, 44 P.2d 573; *Ermolieff v. R.K.O. Radio Pictures* (1942) 19 Cal.2d 543, 550, 122 P.2d 3; *Beneficial Fire & Cas. Ins. Co. v. Kurt Hitke & Co.* (1956) 46 Cal.2d 517, 525–526, 297 P.2d 428.) Those opinions typically cited section 1646 together with other statutes stating that the words of a contract or writing are to be interpreted in accordance with any special meaning intended by the parties (e.g., Civ.Code, §§ 1644, 1645; Code Civ. Proc., § 1861), and did not discuss the meaning of "indicate a place of performance" in section 1646. The California Supreme Court has never cited section 1646 as a choice-of-law rule.

The apparent purpose of Civil Code section 1646 is to determine the choice of law with respect to the interpretation of a contract in accordance with the parties' presumed intention at the time they entered into the contract. This was the explanation given by courts and commentators for the former common law rule on which section 1646 apparently was based. Judge Joseph Story, in his highly regarded treatise on conflict of laws, described an exception to the general rule that the law of the place of making governed the validity and interpretation of a contract: "[W]here the contract is, either expressly or tacitly, to be performed in any other place, there the general rule **\*1450** is in conformity to the presumed intention of the parties that the contract as to its validity, nature, obligation, and interpretation is to be governed by the law of the place of performance." (Story, Conflict of Laws (7th ed. 1872) § 280, p. 325.) Similarly, Kent's Commentaries explained that the law of the place a contract is to be performed should govern because, "The rights of the parties are to be judged of by that law by which they intended, or rather by which **\*\*827** they may justly be presumed to have bound themselves. [Citations.]." FN6 (2 Kent, Commentaries on American Law (12th ed. 1873) p. 622(459) fn. 1.) Numerous contemporary judicial opinions followed this rule based on the parties' presumed intention. (See e.g., *Vanzant, Jones & Co. v. Arnold, Hamilton & Johnson* (1860) 31 Ga. 210; *McDaniel v. Chicago & Northwestern R. Co.* (1868) 24 Iowa 412, *Dyke v. Erie R. Co.* (1871) 45 N.Y. 113, 116–117; *First Nat. Bank of Waverly v. Hall* (1892) 150 Pa. 466, 472–473, 24 A. 665.)

FN6. The former common law rule described by these commentators was not limited to the choice-of-law issue of *contract interpretation,* as is Civil Code section 1646.

[6][7][8][9] In our view, Civil Code section 1646 was intended to give effect to the parties' presumed intention that the law of the place a contract is to be performed should govern its interpretation. FN7 The parties' intention as to the place of performance sometimes can be gleaned from the nature of the contract and the surrounding circumstances, even if the contract does not expressly specify a place of performance. This was Story's view. (Story, Conflict of Laws, *supra,* § 280, p. 325 ["where the contract is, *either expressly or tacitly,* to be performed in any other place, ..." (italics added) ]; see also *Pomeroy v. Ainsworth* (N.Y.Sup.1856) 22 Barb. 118, 128 ["If no place of performance is expressly stated, *or implied from the terms of the contract,* the law of the place where it

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
**(Cite as: 153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816)**

was made will govern" (italics added) ].) [FN8] Moreover, the use of the word "indicate" in section 1646 in lieu of a more restrictive word such as "specify" or "state" suggests that the Legislature intended a less restrictive meaning. Accordingly, we conclude that a contract "indicate[s]" a place of performance within the meaning of section 1646 if the intended place of performance can be gleaned from the nature of the contract and its surrounding circumstances. The intended place of performance is a question of contract interpretation for the court to decide, except **\*1451** to the extent the answer may depend on the credibility of extrinsic evidence. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865, 44 Cal.Rptr. 767, 402 P.2d 839; *American Alternative Ins. Corp. v. Superior Court* (2006) 135 Cal.App.4th 1239, 1245, 37 Cal.Rptr.3d 918.)

> FN7. If the parties state their intention in an express choice-of-law clause, California courts ordinarily will enforce the parties' stated intention unless (1) the chosen state has no substantial relationship to the parties or their transaction, and there is no other reasonable basis for the parties' choice, or (2) the chosen state's law is contrary to a fundamental policy of the state whose law otherwise would apply, and the latter state has a materially greater interest in the matter than does the chosen state. ( *Nedlloyd Lines B.V. v. Superior Court* (1992) 3 Cal.4th 459, 464–466, 11 Cal.Rptr.2d 330, 834 P.2d 1148 & fns. 5 & 6.)

> FN8. Both of these authorities were among the references cited in the notes to section 811 of the Field's Draft New York Civil Code, which was the source for the identical language in Civil Code section 1646.

4. *Prior California Opinions Offer Little Guidance on the Application of Civil Code Section 1646 as a Choice–of–Law Rule*

The California Courts of Appeal have cited

Civil Code section 1646 in several opinions involving choice-of-law issues, but those opinions offer little or no meaningful guidance as to the meaning of "indicate a place of performance."

*Blochman etc. Bank v. Ketcham* (1918) 36 Cal.App. 284, 171 P. 1084 (*Blochman* ) was the first opinion by a California court to expressly invoke Civil Code section 1646 as a choice-of-law rule. *Blochman* involved**\*828** a promissory note executed and delivered in Mexico, with the place of payment left blank. The plaintiff later inserted in the blank a location in California. (*Blochman, supra,* at p. 285, 171 P. 1084.) *Blochman* concluded that the parties intended to allow the holder to designate a place for payment. The court stated that this was the law of California when a blank was left in a note for the holder to fill in, stated that there was nothing in the record to indicate that Mexican law was to the contrary, and therefore presumed that Mexican law was the same. (*Id.* at pp. 286–287, 171 P. 1084.) Although this discussion concerned the choice of law with respect to the interpretation of the contract, *Blochman* did not cite section 1646 in this context. Instead, *Blochman* cited section 1646 in support of its conclusion that California law, rather than the law of Mexico, governed the validity and enforceability of the note because the note was payable in California. [FN9] (*Id., supra,* at p. 287, 171 P. 1084.) *Blochman* did not discuss whether there was any indication that the contracting parties anticipated that the note would be made payable in California.

> FN9. Civil Code section 1646 states that a contract is to be interpreted according to the law and usage of the place it is to be performed if the contract indicates a place of performance, but does not state that the validity and enforceability of a contract are to be determined according to the law of the intended place of performance.

*Blair v. New York Life Ins. Co.* (1940) 40 Cal.App.2d 494, 104 P.2d 1075 (*Blair* ) was an action by an insured for payment of disability insur-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
**(Cite as: 153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816)**

ance benefits. The defendant executed and issued the policy in New York, and delivered it to the insured in the State of Washington. The insured moved to California several years later. The insured received disability benefits in Washington and California before the defendant discontinued the payment of benefits based on the insured's failure to disclose material facts concerning her physical condition. (*Id.* at p. 496, 104 P.2d 1075.) The choice-of-law issue concerned the **\*1452** interpretation of an incontestability clause. (*Id.* at p. 500, 104 P.2d 1075.) *Blair* quoted Civil Code section 1646 and stated that the statute "means that the place where the contract is made is of importance when the contract does not indicate a specific place of performance." (*Blair, supra,* at p. 498, 104 P.2d 1075.) After an intervening discussion, *Blair* stated, "The law of the place of performance of an insurance contract controls as to its legal construction and effect, but that of the place where made governs on all questions of execution and validity (*Flittner v. Equitable Life Assur. Soc.* [ (1916) ] 30 Cal.App. 209 [157 Pac. 630] ), unless the terms of the contract provide otherwise or the circumstances indicate a different intention." [FN10] **\*\*829** (*Id.* at p. 499, 104 P.2d 1075.) *Blair* did not cite section 1646 with regard to this last quoted statement.

> FN10. *Flittner v. Equitable Life Assur. Soc., supra,* 30 Cal.App. 209, 157 P. 630 held that a minor could rescind a life insurance policy and recover the premiums paid, applying California law. (*Id.* at pp. 215–216, 157 P. 630.) The choice-of-law issue was whether the law of California or New York governed the minor's right to rescind the contract. The contract was made in California, and *Flittner* concluded that the contract contemplated performance in New York. (*Id.* at p. 213, 157 P. 630.) *Flittner* stated: "All matters connected with the performance of a contract are regulated by the law of the place where the contract by its terms is to be performed. All matters bearing upon the execution, the

*interpretation,* and the validity of contracts including the capacity of the parties to contract, are *determined by the law where the contract is made.* (*Union Nat. Bank v. Chapman,* 169 N.Y. 538, [88 Am. St. Rep. 614, 57 L.R.A. 513, 62 N.E. 672]; *Phoenix Mut. Life Ins. Co. v. Simons,* 52 Mo.App. 357; 2 Wharton on Conflict of Laws, sec. 401; note in *Mayer v. Roche,* 26 L.R.A. (N.S.) 767; *Hauck Clo. Co. v. Sharpe,* 83 Mo.App. 385)." (*Id.* at p. 215, 157 P. 630, italics added.) *Flittner* did not cite Civil Code section 1646 with respect to the law governing the interpretation of a contract and cited no California authority in support of the quoted statement.

The terms of the insurance policy in *Blair* provided for payment of premiums at the defendant's home office in New York or to an authorized agent elsewhere. (*Blair, supra,* 40 Cal.App.2d at p. 498, 104 P.2d 1075.) *Blair* concluded, "[u]nder this provision, the contract was to be performed partly in New York and partly in any other place where the premiums were paid or other necessary business could be transacted." (*Id.* at p. 499, 104 P.2d 1075; but see *Flittner v. Equitable Life Assur. Soc., supra,* 30 Cal.App. at p. 213, 157 P. 630, reaching a different conclusion on similar facts.) *Blair* stated that the contract was performed partly in New York and partly in Washington, that the defendant waived the right to apply Washington law by paying benefits to the plaintiff in California, and that the law of California governed because the breach occurred in California.[FN11] (*Id.* at p. 499, 104 P.2d 1075; see also *Braun v. New York Life Ins. Co.* (1941) 46 Cal.App.2d 335, 344–346, 115 P.2d 880 [followed *Blair* and declined to **\*1453** discuss the argument that *Blair* failed to give effect to Civ.Code, § 1646].) The holding in *Blair* apparently was based on the stated choice-of-law rule that in the circumstances of that case, liability for breach of contract was governed by the laws of the state where the breach occurred; the holding apparently was not based on section 1646.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
**(Cite as: 153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816)**

FN11. *Blair, supra,* 40 Cal.App.2d at page 499, 104 P.2d 1075 stated: "In recognizing California as the place for the payment of benefits by delivery thereof in this state, defendant waived any right to insist that the Washington law governed. The waiver is not one of jurisdiction, but of the right to apply the Washington law to an action tried in California. The intention of the parties, as gathered from attending circumstances, is controlling in determining the place of trial and the governing laws. Liability for the breach of a contract partly performed in one state, and made and partly performed in another, is fixed by the laws of the state wherein the breach occurred. (17 C.J.S., p. 343.) The breach in this case was defendant's refusal to pay further disability income benefits to plaintiff in California."

*Shippers Dev. Co. v. General Ins. Co.* (1969) 274 Cal.App.2d 661, 79 Cal.Rptr. 388 (*Shippers* ) involved the interpretation of an insurance policy exclusion. (*Id.* at pp. 673–674, 79 Cal.Rptr. 388.) *Shippers* stated that the insurer relied on Civil Code section 1646, quoted the statute, and then stated: "The insurer's argument fails to consider the following rule: 'The law of the place of performance of an insurance contract controls as to its legal construction and effect, but that of the place where made governs on all questions of execution and validity [citation], unless the terms of the contract provide otherwise or the circumstances indicate a different intention. In this case, the circumstances do not indicate that in the matter of the interpretation of the contract, the parties intended to be restricted to the laws of the State of Washington, where the contract was consummated by the delivery of the policy.' (*Blair v. New York Life Ins. Co.* (1940) 40 Cal.App.2d 494, 499 [104 P.2d 1075].) It was contemplated that the policy would be effective and might have to be performed outside the State of Washington. The law of this state in interpreting the policy will govern the extent of the coverage

with respect to losses occurring within this state. [Citation.]" (*Shippers, supra,* at p. 674, 79 Cal.Rptr. 388, fn. omitted.) Thus, it appears that rather than construe and apply section 1646, *Shippers* followed dicta **830 from *Blair.* Although it appears that the dicta may be somewhat consistent with section 1646 with respect to the law governing contract interpretation, we must construe and apply the statute rather than a purported rule of law of some other origin.

Some California opinions citing Civil Code section 1646 have concluded that there was no conflict between the laws of the states involved, and therefore have not determined whether the contract indicated a place of performance. (See e.g., *Gitano Group, Inc. v. Kemper Group* (1994) 26 Cal.App.4th 49, 56–57 & fn. 4, 31 Cal.Rptr.2d 271; *International Service Ins. Co. v. Gonzales* (1987) 194 Cal.App.3d 110, 116, 239 Cal.Rptr. 341.) Other opinions have cited section 1646 to support conclusions on choice-of-law issues other than the law governing the interpretation of a contract (e.g., *Hambrecht & Quist Venture Partners v. American Medical Internat., Inc.* (1995) 38 Cal.App.4th 1532, 1540–1541, 46 Cal.Rptr.2d 33 [statute of limitations]; *Klein v. Superior Court* (1988) 198 Cal.App.3d 894, 902, 244 Cal.Rptr. 226 [formation of an oral contract]; *1454Henderson v. Superior Court* 1978) 77 Cal.App.3d 583, 592–593, 142 Cal.Rptr. 478 [validity and enforceability of a contract, statute of limitations, statute of frauds, and parol evidence rule]; *Wheeling v. Financial Indem. Co.* (1962) 201 Cal.App.2d 36, 40, 19 Cal.Rptr. 879 [validity of an insurance policy exclusion]; *Bracker v. American Nat. Food* (1955) 133 Cal.App.2d 338, 344, 284 P.2d 163 [measure of contract damages]; *Hardy v. Musicraft Records* (1949) 93 Cal.App.2d 698, 702, 209 P.2d 839 [validity of a stock sale under securities laws]; *Blochman, supra,* 36 Cal.App. at p. 287, 171 P. 1084 [validity of a promissory note] ), without explaining why a statute that by its express terms establishes a choice-of-law rule only as to the interpretation of a contract should determine other choice-of-law issues. These and other

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
**(Cite as: 153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816)**

California opinions offer little or no analysis of the meaning of "indicate a place of performance" in section 1646.FN12

FN12. *Wheeling v. Financial Indemnity Co., supra,* 201 Cal.App.2d 36, 19 Cal.Rptr. 879 and *In re Grace's Estate* (1948) 88 Cal.App.2d 956, 200 P.2d 189 reflect differing views on the meaning of "indicate a place of performance" (Civ.Code, § 1646). *Wheeling* stated that an automobile liability insurance policy "was made and delivered in California, and did not specify a place of performance," and therefore applied California law to a claim arising from an accident in Virginia. (*Wheeling, supra,* at p. 40, 19 Cal.Rptr. 879.) In contrast, *Grace's Estate* stated that an adoption contract made in both Texas and California "necessarily would be performed wherever the Graces might take the child," and held that the contract was enforceable in California although void in Texas. (*Grace's Estate, supra,* at pp. 962–963, 966, 200 P.2d 189.)

5. *The Governmental Interest Analysis Does Not Supplant Civil Code Section 1646 as to the Law Governing the Interpretation of Contracts*

[10] The most prevalent modern choice-of-law rule in California is the governmental interest analysis. It replaced former common law choice-of-law rules, and is sometimes labeled California's modern choice-of-law rule. Some courts and commentators (discussed *post*) have inferred or suggested that the judicially developed governmental interest analysis supplants the choice-of-law rule stated in Civil Code section 1646. Our careful review of the governmental interest analysis as developed by the California Supreme Court, however, causes us to conclude that it does not supplant the legislative command of section 1646.

Under the governmental interest analysis, the court first determines whether the **831 applicable rules of law of the potentially concerned jurisdic-

tions are the same or different. If the applicable rules of law are identical, the court may apply California law. If the applicable rules of law differ materially, the court proceeds to the second step, which involves an examination of the interests of each jurisdiction in having its own law applied to the particular dispute. If each jurisdiction has an interest in applying its own law to the issue, there is a "true conflict" and the court must proceed to the third step. In *1455 the third step, known as the comparative impairment analysis, the court determines which jurisdiction has a greater interest in the application of its own law to the issue or, conversely, which jurisdiction's interest would be more significantly impaired if its law were not applied. The court must apply the law of the jurisdiction whose interest would be more significantly impaired if its law were not applied. (*Kearney v. Salomon Smith Barney, Inc.* (2006) 39 Cal.4th 95, 107–108, 45 Cal.Rptr.3d 730, 137 P.3d 914 (*Kearney* ); *Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906, 919–920, 103 Cal.Rptr.2d 320, 15 P.3d 1071 (*Washington Mutual* ).)

The California Supreme Court first definitively adopted the governmental interest analysis for use in tort actions in *Reich v. Purcell* (1967) 67 Cal.2d 551, 63 Cal.Rptr. 31, 432 P.2d 727 (*Reich* ), a wrongful death action arising from the collision of two automobiles in Missouri driven by residents of California and Ohio.FN13 (*Id.* at p. 552, 63 Cal.Rptr. 31, 432 P.2d 727.) The choice-of-law issue involved the amount of tort damages. A Missouri statute limited the amount of damages in a wrongful death action, while there was no such limitation under the laws of California and Ohio. (*Id.* at pp. 552–553, 63 Cal.Rptr. 31, 432 P.2d 727.) *Reich* rejected the former common law rule that the law of the place of the wrong governed in tort actions. (*Id.* at pp. 553, 555, 63 Cal.Rptr. 31, 432 P.2d 727.) *Reich* stated, "The forum must search to find the proper law to apply based upon the interests of the litigants and the involved states" (*id.* at p. 553, 63 Cal.Rptr. 31, 432 P.2d 727), and stated that the former rigid rule "must be subordinated to the ob-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
**(Cite as: 153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816)**

jective of proper choice of law in conflict cases, i.e., to determine the law that most appropriately applies to the issue involved [citation]" (*id.* at p. 555, 63 Cal.Rptr. 31, 432 P.2d 727). *Reich* concluded that California had no interest in applying its law to the benefit of the defendant because California did not limit the amount of damages awardable, and that Missouri had no interest in applying its law limiting damages to the benefit of a defendant who was not a resident of that state as of the date of injury. The court therefore concluded that the law of Ohio governed the amount of damages and that the Missouri limitation on damages did not apply. (*Id.* at pp. 555–556, 63 Cal.Rptr. 31, 432 P.2d 727.)

> FN13. *Bernkrant v. Fowler* (1961) 55 Cal.2d 588, 12 Cal.Rptr. 266, 360 P.2d 906, a precursor to *Reich, supra,* 67 Cal.2d 551, 63 Cal.Rptr. 31, 432 P.2d 727, was an action to cancel a promissory note pursuant to an oral contract. (*Bernkrant, supra,* at pp. 590–591, 12 Cal.Rptr. 266, 360 P.2d 906.) *Bernkrant* concluded that California had no interest in applying its own statute of frauds to a transaction made and performed in Nevada involving the refinancing of a loan secured by land in Nevada, and therefore held that the Nevada statute of frauds governed. (*Id.* at pp. 595–596, 12 Cal.Rptr. 266, 360 P.2d 906.)

The California Supreme Court subsequently applied the governmental interest analysis in several other cases involving questions of tort and contract law. *Travelers Ins. Co. v. Workmen's Comp.App. Bd.* (1967) 68 Cal.2d 7, 64 Cal.Rptr. 440, 434 P.2d 992 was an action for workmen's compensation benefits. The plaintiff originally **832 entered into an oral employment contract in California, and later was injured in Utah. (*Id.* at pp. 9–11, 64 Cal.Rptr. 440, 434 P.2d 992.) The plaintiff was entitled to benefits under California's workmen's compensation statute only if *1456 he was injured while working under an employment contract that was entered into in California. (*Id.* at p. 11, 64 Cal.Rptr. 440, 434 P.2d 992.) The choice-of-law issues concerned the place of formation of the employment contract, whether an employment agency in Colorado acted as the employer's agent for purposes of transmitting an employment offer to the plaintiff, and whether the parties had rescinded the oral contract and formed a new employment contract in Wyoming. (*Ibid.*) *Travelers* decided each of these questions by considering the governmental interests of the states involved, stating, "California has rejected the traditional mechanical solutions to choice-of-law problems and adopted foreign law only when it is appropriate in light of the significant interests in the particular case. [Citations.]" (*Id.* at p. 11, 64 Cal.Rptr. 440, 434 P.2d 992.) *Travelers* concluded that California had a strong interest in applying its own laws to determine whether an injured Californian was entitled to benefits under the workmen's compensation act and that the other states involved had no significant interest in applying their laws to the dispute. (*Id.* at pp. 11–14, 64 Cal.Rptr. 440, 434 P.2d 992.) The court therefore concluded that California law governed the place-of-contracting, agency, and rescission issues. (*Id.* at p. 14, 64 Cal.Rptr. 440, 434 P.2d 992.)

*Hurtado v. Superior Court* (1974) 11 Cal.3d 574, 114 Cal.Rptr. 106, 522 P.2d 666 was a wrongful death action arising from a collision in California involving three automobiles driven by residents of California and Mexico. (*Id.* at p. 578, 114 Cal.Rptr. 106, 522 P.2d 666.) The choice-of-law issue involved the amount of tort damages. *Hurtado* concluded that Mexico had no interest in the application of its law limiting the amount of damages in a wrongful death action to the benefit of defendants who were not residents of Mexico, so there was no true conflict and the measure of damages of California, as the forum state, should apply. (*Id.* at pp. 580–582, 114 Cal.Rptr. 106, 522 P.2d 666.)

*Bernhard v. Harrah's Club* (1976) 16 Cal.3d 313, 128 Cal.Rptr. 215, 546 P.2d 719 (*Bernhard* ) involved a collision in California between an auto-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
**(Cite as: 153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816)**

mobile driven by a California resident and a motor-cycle driven by the plaintiff, who was also a California resident. The automobile driver allegedly was intoxicated after drinking liquor served by the defendant at a gambling casino in Nevada. (*Id.* at pp. 315–316, 128 Cal.Rptr. 215, 546 P.2d 719.) The choice-of-law issue concerned the existence of tort liability. The allegations of the complaint supported negligence liability under California law, but did not support liability under Nevada law. (*Id.* at p. 317, 128 Cal.Rptr. 215, 546 P.2d 719.) *Bernhard* concluded that each state was interested in the application of its own law, so there was a true conflict, and that the true conflict should be resolved by a comparative impairment analysis. (*Id.* at pp. 318–321, 128 Cal.Rptr. 215, 546 P.2d 719.) *Bernhard* concluded that California's interest in preventing the sale of alcoholic beverages to intoxicated persons whose intoxicated state is likely to contribute to injuries in California would be more significantly impaired than would Nevada's interest in protecting its tavern keepers from unlimited liability. (*Id.* at pp. 322–323, 128 Cal.Rptr. 215, 546 P.2d 719.) The court therefore concluded that **\*1457** California law applied and that the complaint alleged facts sufficient to state a cause of action under California law. (*Id.* at pp. 323, 325, 128 Cal.Rptr. 215, 546 P.2d 719.)

**\*\*833** *Offshore Rental Co. v. Continental Oil Co.* (1978) 22 Cal.3d 157, 148 Cal.Rptr. 867, 583 P.2d 721 (*Offshore Rental* ) was a negligence action arising from a personal injury suffered by an officer of the plaintiff corporation while on the defendant's premises in Louisiana. The plaintiff sought to recover damages for injuries to its business interests resulting from the loss of the officer's services. (*Id.* at pp. 160–161, 148 Cal.Rptr. 867, 583 P.2d 721.) The choice-of-law issue concerned the existence of tort liability. *Offshore Rental* assumed that California law (Civ.Code, § 49) allowed a cause of action for negligent injury to a business employee, and concluded that Louisiana law did not allow such a cause of action. (*Offshore Rental, supra,* at pp. 162–163, 148 Cal.Rptr. 867, 583 P.2d 721.) *Off-*

*shore Rental* noted that no California court had squarely held that the California statute supported such a cause of action, while a Louisiana appellate court nine years earlier had held that Louisiana law did not allow a cause of action by a corporate plaintiff for the loss of services of its officer. (*Id.* at pp. 162, 168, 148 Cal.Rptr. 867, 583 P.2d 721.) *Offshore Rental* characterized the California statute as "unusual and outmoded" and concluded that California's interest in establishing liability under the statute was less strong than Louisiana's interest in the application of its " 'prevalent and progressive' " law. (*Id.* at p. 168, 148 Cal.Rptr. 867, 583 P.2d 721.) The court therefore concluded that Louisiana law applied and that the trial court's dismissal of the cause of action was proper. (*Id.* at pp. 169–170, 148 Cal.Rptr. 867, 583 P.2d 721.)

*Washington Mutual, supra,* 24 Cal.4th 906, 103 Cal.Rptr.2d 320, 15 P.3d 1071, was an action against a home mortgage lender for breach of contract, breach of the implied covenant of good faith and fair dealing, unfair business practices under the unfair competition law (UCL) (Bus. & Prof.Code, § 17200 et seq.), unjust enrichment, and conversion. The deed of trust included a choice-of-law provision stating that the security instrument was governed by federal law and the law of the jurisdiction where the secured property was located. (*Washington Mutual, supra,* at p. 912, 103 Cal.Rptr.2d 320, 15 P.3d 1071.) The trial court certified the action as a nationwide class action without determining which law would apply to the class members. (*Id.* at p. 913, 103 Cal.Rptr.2d 320, 15 P.3d 1071.) The *Washington Mutual* court stated that a consideration of the law applicable to the class members' claims was essential to an informed decision on class certification. (*Id.* at p. 915, 103 Cal.Rptr.2d 320, 15 P.3d 1071.) It also stated that the trial court must apply the analysis set forth in *Nedlloyd Lines B.V. v. Superior Court, supra,* 3 Cal.4th 459, 11 Cal.Rptr.2d 330, 834 P.2d 1148, to determine whether the class causes of action were subject to enforceable choice-of-law agreements. (*Washington Mutual, supra,* at pp. 915–916, 103 Cal.Rptr.2d

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
**(Cite as: 153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816)**

320, 15 P.3d 1071.) The court also stated that if the choice-of-law agreements were unenforceable or did not apply to the class causes of action and the party opposing class certification continued to assert that the law of another state applied to nonresident class members, the trial court must apply the governmental interest analysis to determine which state's law to apply. (*Id.* at pp. 918–919, 103 Cal.Rptr.2d 320, 15 P.3d 1071.) Thus, the choice-of-law issues concerned the law **\*1458** governing the plaintiffs' causes of action for breach of contract, breach of the implied covenant, unfair business practices, unjust enrichment, and conversion.

*Washington Mutual, supra,* 24 Cal.4th at page 919, 103 Cal.Rptr.2d 320, 15 P.3d 1071, stated, "California follows a three-step 'governmental interest analysis' to **\*\*834** address conflict of laws claims and ascertain the most appropriate law applicable to the issues where there is no effective choice-of-law agreement. [Citations.]" After describing the governmental interest analysis, the court concluded, "[t]hese rules apply whether the dispute arises out of contract or tort [citations], and a separate conflict of laws inquiry must be made with respect to each issue in the case [citations]." ( *Id.* at p. 920, 103 Cal.Rptr.2d 320, 15 P.3d 1071.) *Washington Mutual* reversed the judgment by the Court of Appeal with directions to issue a peremptory writ of mandate directing the trial court to vacate its certification order and conduct the choice-of-law analyses described in the opinion. (*Id.* at p. 929, 103 Cal.Rptr.2d 320, 15 P.3d 1071.)

In *Kearney, supra,* 39 Cal.4th 95, 45 Cal.Rptr.3d 730, 137 P.3d 914, clients of the defendant brokerage firm alleged that the defendant had surreptitiously recorded their telephone conversations without their consent in violation of a California statute (Pen.Code, § 632). The plaintiffs, in a class action complaint, alleged violations of the statute and unfair business practices under the UCL. (*Kearney, supra,* at pp. 102–103 & fn. 1, 45 Cal.Rptr.3d 730, 137 P.3d 914.) The choice-of-law issue concerned the law governing those statutory

causes of action. The court stated that the allegations of the complaint supported the alleged causes of action under California law, but did not support liability under Georgia law. (*Id.* at pp. 120–122.) *Kearney* concluded that California's interest in protecting individuals in California from the secret recording of their confidential telephone conversations would be more significantly impaired than would Georgia's interest in protecting the right of a business to record telephone conversations for legitimate business reasons. (*Id.* at pp. 124–128, 45 Cal.Rptr.3d 730, 137 P.3d 914.) The court therefore held that California law applied and that the complaint alleged facts sufficient to state a cause of action under California law. (*Id.* at pp. 123, 125, 45 Cal.Rptr.3d 730, 137 P.3d 914.)

Some federal courts have concluded or suggested that the governmental interest analysis has judicially supplanted the choice-of-law rule stated in Civil Code section 1646 or that the state of California law on this point is uncertain. The Ninth Circuit in *Strassberg v. New England Mut. Life Ins. Co.* (9th Cir.1978) 575 F.2d 1262 applied the governmental interest analysis to determine the law governing whether an insurance policy had lapsed due to nonpayment of insurance premiums. *Strassberg* stated, "California conflicts law has developed significantly since the original enactment of California Civil Code § 1646," and "California law moved away from a mechanical choice of law process to employ the 'governmental interest analysis.' " (*Id.* at p. 1263.) Later, in *Arno v. Club Med Inc.* (9th Cir.1994) 22 F.3d 1464, the Ninth Circuit applied the governmental interest analysis to determine the law **\*1459** governing the existence of an implied in fact contract. *Arno* stated that section 1646 would yield the same result and, "[t]here appears to be some difference of opinion as to whether California's choice of law rule for contracts is the governmental interest test ... or the test of Cal.Civ.Code § 1646." [FN14] **\*\*835** (*Id.* at pp. 1468–1469 & fn. 6.) Although section 1646 states a choice-of-law rule only as to contract interpretation, *Strassberg* and *Arno,* in making these statements, did not distin-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
**(Cite as: 153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816)**

guish contract interpretation from other choice-of-law issues.

> FN14. See also *Shannon–Vail Five Inc. v. Bunch* (9th Cir.2001) 270 F.3d 1207, 1210–1213 (Nevada law governed the viability of a usury cause of action under either Civil Code section 1646 or the governmental interest analysis), and *Costco Wholesale Corp. v. Liberty Mut. Ins. Co.* (S.D.Cal.2007) 472 F.Supp.2d 1183, 1197–1198, 1207 (Connecticut law governed the scope of an insurance policy exclusion under either section 1646 or the governmental interest analysis). In contrast, *Royal Indemnity Group v. Travelers Indemnity Co.* (N.D.Cal.2005) 2005 WL 2176896, pages 4–5 concluded that the California courts had not abrogated the choice-of-law rule in section 1646.

The Sixth Circuit in *Northland Insurance Co. v. Guardsman Products, Inc.* (6th Cir.1998) 141 F.3d 612 applied the governmental interest analysis to determine the law governing the interpretation of an insurance policy, stating, "the California Supreme Court 'has moved away from the mechanical application of § 1646' " and " 'now employs what is commonly termed the 'governmental interest analysis' approach to choice of law questions' [citation]." (*Id.* at p. 616.) Similarly, *Vestrock Partners v. California Energy Co.* (S.D.N.Y. Aug. 26, 1993, No. 92 Civ. 5690) 1993 WL 328912 stated with regard to the governmental interest analysis, "California courts normally employ the choice of law test in contracts cases notwithstanding § 1646." (*Id.* at p. 5; see also Reppy, *Choice of Law Problems Arising when Unmarried Cohabitants Change Domicile* (2002) 55 S.M.U. L.Rev. 273, 292, fn. 90 [stating, "the California Supreme Court's adoption of interest analysis had worked a judicial repeal of the ... choice of law rule in section 1646"].) Again, in making these statements, these authorities did not distinguish contract interpretation from other choice-of-law issues.

After reviewing all of these authorities, and in light of the fact that our Supreme Court has not addressed this issue, we are unable to conclude that California has "judicially abrogated" the express legislative mandate of Civil Code section 1646 relating to the *interpretation* of contracts. Instead, we hold that the choice-of-law rule in Civil Code section 1646 determines the law governing the interpretation of a contract, notwithstanding the application of the governmental interest analysis to other choice-of-law issues.FN15 The California Supreme Court has never applied the governmental interest analysis to determine the law governing the interpretation of a contract and has **\*1460** never stated or suggested that section 1646 does not determine the law governing the interpretation of a contract. Broad statements declaring the governmental interest analysis California's choice-of-law rule FN16 and rejecting traditional choice-of-law rules FN17 should be viewed in light of the particular choice-of-law issues that were before the court in those cases.

> FN15. Whether this differentiated approach is either wise or desirable is a question best addressed to the Legislature, which has the sole authority to repeal a statute.

> FN16. *Washington Mutual, supra,* 24 Cal.4th at page 919, 103 Cal.Rptr.2d 320, 15 P.3d 1071 ("California follows a three-step 'governmental interest analysis' to address conflict of laws claims and ascertain the most appropriate law applicable to the issues where there is no effective choice-of-law agreement"); *Offshore Rental, supra,* 22 Cal.3d at page 161, 148 Cal.Rptr. 867, 583 P.2d 721 ("Questions of choice of law are determined in California, as plaintiff correctly contends, by the 'governmental interest analysis' rather than by the trial court's 'most significant contacts theory' ").

> FN17. *Travelers Ins., supra,* 68 Cal.2d at

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
**(Cite as: 153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816)**

p. 11, 64 Cal.Rptr. 440, 434 P.2d 992 ("California has rejected the traditional mechanical solutions to choice-of-law problems and adopted foreign law only when it is appropriate in light of the significant interests in the particular case").

The opinions by the California Courts of Appeal cited by Frontier and Wainoco are not inconsistent with our conclusion that **836 Civil Code section 1646 determines the law governing contract interpretation notwithstanding the application of the governmental interest analysis to other choice-of-law issues. *Robert McMullan & Son, Inc. v. United States Fid. & Guar. Co.* (1980) 103 Cal.App.3d 198, 162 Cal.Rptr. 720 was a declaratory relief action against a liability insurer. The trial court determined that the insurer had a duty to defend an action against the insured, and the question on appeal was whether the insured was entitled to recover its attorney fees incurred in the declaratory relief action. Applying the governmental interest analysis, the *McMullan* court concluded that the laws of California and the other states involved did not differ on that question and that even if laws differed, only California had an interest in applying its own laws to the dispute. (*Id.* at pp. 203–206, 162 Cal.Rptr. 720.) The choice-of-law issue concerned the right to recover attorney fees in an action to enforce the insured's rights under the policy and did not involve an issue of contract interpretation.

*Stonewall Surplus Lines Ins. Co. v. Johnson Controls, Inc.* (1993) 14 Cal.App.4th 637, 17 Cal.Rptr.2d 713 (*Stonewall*) was a declaratory relief action by excess liability insurers against their insured. The trial court concluded that the insurers were not required to indemnify the insured for a punitive damages award because California law, for reasons of public policy, prohibits indemnity for punitive damages. (*Id.* at pp. 640–641, 17 Cal.Rptr.2d 713.) The question on appeal was whether the insurers could be required to indemnify the insured for punitive damages. Applying the governmental interest analysis, the Court of Appeal

concluded that the laws of California and Wisconsin differed on that question and that California had a greater interest in applying its own laws to the dispute. (*Id.* at pp. 645, 649, 17 Cal.Rptr.2d 713.) In deciding that California law governed, *Stonewall* placed particular importance on the location of the *1461 insured risk.[FN18] (*Id.* at pp. 646–647, 17 Cal.Rptr.2d 713, citing Rest.2d Conflict of Laws, § 193 & com. f.) The choice-of-law issue concerned the existence of a right of indemnity for punitive damages and did not involve an issue of contract interpretation.

FN18. We cited *Stonewall, supra,* 14 Cal.App.4th 637, 17 Cal.Rptr.2d 713, on this point in *Downey Venture v. LMI Ins. Co.* (1998) 66 Cal.App.4th 478, 514, 78 Cal.Rptr.2d 142 (*Downey Venture* ), and stated, "[a] liability insurance policy issued on a nationwide basis may be construed in accordance with the law of the jurisdiction in which a particular claim arises. [Citation.] Thus, the same policy language may receive different construction and application in different jurisdictions." We held in *Downey Venture* that Insurance Code section 533 precluded indemnification for malicious prosecution under California law but did not relieve an insurer of the duty to defend a malicious prosecution claim. (*Downey Venture, supra,* at pp. 506, 509, 78 Cal.Rptr.2d 142.) We concluded that despite the bar of indemnification under California law, an express promise to provide coverage for malicious prosecution was not illusory, not only because the insurer was required to defend such claims, but also because a California court could enforce the laws of other states that might not preclude indemnification. (*Id.* at pp. 514–516, 78 Cal.Rptr.2d 142.) Our statement with regard to such a choice-of-law decision by a California court concerned the enforceability of an express contractual promise, rather than contract interpreta-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
**(Cite as: 153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816)**

tion.

6. *The Intended Place of Performance of a Liability Insurance Policy Is the Place of the Insured Risk*

[11][12] The liability insurance policy at issue in this case includes both indemnity and defense obligations. An indemnity obligation "entails the payment of money in order to resolve liability. [Citations.]" **837 (*Buss v. Superior Court* (1997) 16 Cal.4th 35, 46, 65 Cal.Rptr.2d 366, 939 P.2d 766 (*Buss* ).) A defense obligation, in contrast, "entails the rendering of a service, viz., the mounting and funding of a defense [citations]." (*Ibid.*) An insurer performs its defense obligation by providing defense services through an attorney. If the insured risk involves operations at one or more fixed locations, as here, a third party complaint against the insured arising from those operations typically is prosecuted in the jurisdiction where the operations are located. The insurer provides defense services in the jurisdiction where the suit is prosecuted. There is little doubt that this was the understanding of the parties at the time they entered into the insurance contract in this case.

The policy provides general liability coverage and specifically refers to claims arising from oil and gas operations at "Drill–Site # 1" in Beverly Hills, California. Two policy endorsements name the City of Beverly Hills and the Department of Transportation of the City of Los Angeles as additional insureds "with respect to claims arising out of ... [¶] Oil or Gas Operations" in the City of Beverly Hills, California. In another endorsement, RLI waives its right of recovery against the City of Beverly Hills for certain payments made under the policy with respect to the same specified claims. These three endorsements clearly demonstrate that the parties intended the policy to provide coverage for the insureds' oil and gas operations in Beverly Hills. *1462 Accordingly, we conclude that the parties anticipated that a suit arising from those operations in Beverly Hills could be prosecuted in California and that RLI would be obligated to provide a defense in California if the claims were potentially covered under the policy.

We therefore conclude that California was the intended place of performance of the contract with respect to those claims, that the policy thus "indicate[s] a place of performance" within the meaning of Civil Code section 1646 with respect to such claims, and that California law governs the interpretation of the policy. Accordingly, we have no need to apply a governmental interest analysis or give consideration to Texas law with respect to the interpretation of the policy.

7. *Interpreted Under California Law, the RLI Policy Includes a Duty to Defend Pollution Claims Arising from "Sudden and Accidental" Releases*

[13] We interpret an insurance policy under California law using the same rules of interpretation applicable to other contracts. (*Palmer v. Truck Ins. Exchange* (1999) 21 Cal.4th 1109, 1115, 90 Cal.Rptr.2d 647, 988 P.2d 568.) "The mutual intention of the contracting parties at the time the contract was formed governs. (*Civ.Code, § 1636*; *Palmer, supra,* at p. 1115 [, 90 Cal.Rptr.2d 647, 988 P.2d 568].) We ascertain that intention solely from the written contract if possible, but also consider the circumstances under which the contract was made and the matter to which it relates. ( *Civ.Code, §§ 1639, 1647.*) We consider the contract as a whole and interpret the language in context, rather than interpret a provision in isolation. (*Id., §* 1641.) We interpret words in accordance with their ordinary and popular sense, unless the words are used in a technical sense or a special meaning is given to them by usage. (*Id., § 1644.*) If contractual language is clear and explicit and does not involve an absurdity, the plain meaning governs. (*Id., §* 1638.)" (*American Alternative Ins. Corp. v. Superior Court, supra,* 135 Cal.App.4th at p. 1245, 37 Cal.Rptr.3d 918.)

**838 [14][15][16][17] We interpret an insuring clause broadly, consistent with the reasonable expectations of the insured. (*MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 648, 3 Cal.Rptr.3d 228, 73 P.3d 1205; *AIU Ins. Co. v. Su-*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
**(Cite as: 153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816)**

*perior Court* (1990) 51 Cal.3d 807, 822, 274 Cal.Rptr. 820, 799 P.2d 1253.) An exclusion from coverage otherwise within the scope of an insuring clause must be clear and unmistakable to be given effect. (*MacKinnon, supra,* at p. 648, 3 Cal.Rptr.3d 228, 73 P.3d 1205.) " 'The exclusionary clause "must be *conspicuous, plain and* **\*1463** *clear.* [Citation.]" ' " (*Ibid.*) An exception to an exclusion is treated in the same manner as a coverage provision and therefore is interpreted broadly, consistent with the insured's reasonable expectations. (*TRB Investments, Inc. v. Fireman's Fund Ins. Co.* (2006) 40 Cal.4th 19, 27–28, 50 Cal.Rptr.3d 597, 145 P.3d 472.)

[18][19][20][21] An endorsement modifies the basic insuring forms of the policy and is an integral part of the policy.[FN19] (*Adams v. Explorer Ins. Co.* (2003) 107 Cal.App.4th 438, 450–451, 132 Cal.Rptr.2d 24.) "Standing alone, an endorsement means nothing. 'Endorsements on an insurance policy form a part of the insurance contract [citation], and the policy of insurance with the endorsements and riders thereon must be construed together as a whole [citation].' " (*Id.* at p. 451, 132 Cal.Rptr.2d 24.) An endorsement can expand or restrict the coverage otherwise provided by the policy. If there is any conflict between an endorsement and the body of a policy, the endorsement controls, provided that any reduction in coverage reasonably expected under the body of a policy must be " 'conspicuous, plain and clear.' " (*Haynes v. Farmers Ins. Exchange* (2004) 32 Cal.4th 1198, 1208, 13 Cal.Rptr.3d 68, 89 P.3d 381.)

> FN19. Moreover, the pollution liability endorsement here expressly states that it "forms a part of the policy to which attached."

[22] The policy here expressly promises both indemnity and a defense. The insuring clause in the commercial general liability coverage form provides coverage for sums that the insured becomes legally obligated to pay as damages because of bodily injury or property damage caused by "an

'occurrence,' " and states that RLI has the right and duty to defend any suit seeking those damages. "Exclusion of" in the same coverage form states that the insurance does not apply to bodily injury or property damage caused by the actual or threatened release of pollutants at premises owned, occupied, or used by the insured. The pollution liability endorsement deletes exclusion f and provides coverage for sums that the insured becomes legally obligated to pay as damages because of bodily injury or property damage caused by "a 'pollution incident.' " The endorsement does not mention the duty to defend, does not clearly and unmistakably exclude pollution claims from the duty to defend stated in the body of the policy, and therefore does not exclude pollution claims from the contractual duty to defend.

The insuring clause in the pollution endorsement provides coverage for damages arising from "a 'pollution incident,' " which is defined in relevant part as a "sudden and accidental" release resulting in environmental damage. California courts interpret the phrase "sudden and accidental" when used in this context to mean abrupt in time, unexpected, and unintended. (*Shell Oil Co. v. Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th 715, 755, 15 Cal.Rptr.2d 815.)

**\*\*839 \*1464** Interpreting the policy under California law, we conclude that RLI promised to defend claims for damages arising from pollution incidents with respect to the oil and gas operations in Beverly Hills notwithstanding that the pollution liability endorsement does not mention a duty to defend.

8. *The Allegations of the Third Party Complaints Create a Duty to Defend*

a. *The Applicable Choice–of–Law Rule*

The fundamental principles under California law regarding whether a duty to defend arises were established in *Gray v. Zurich Insurance Co.* (1966) 65 Cal.2d 263, 54 Cal.Rptr. 104, 419 P.2d 168 (

153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
**(Cite as: 153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816)**

*Gray* ). *Gray* rejected the argument that an insurer had a duty to defend under the policy only if the insured was entitled to indemnity, and held that the duty to defend was independent of and broader than the duty to indemnify. (*Id.* at pp. 274–275, 54 Cal.Rptr. 104, 419 P.2d 168.) *Gray* stated that uncertainties concerning policy interpretation must be resolved in favor of the reasonable expectations of the insured, and that in light of the policy language, the insured reasonably would expect the insurer to defend a suit involving a loss of the nature and kind covered by the policy. (*Ibid.*) *Gray* therefore concluded that an insurer must defend a suit that *potentially* seeks damages covered by the policy. (*Id.* at p. 275, 54 Cal.Rptr. 104, 419 P.2d 168.)

*Gray* seemed to state that these conclusions reflected the court's interpretation of policy provisions, as distinguished from a rule of law imposed on the parties for public policy reasons regardless of their intentions upon entering into the insurance contract. (*Gray, supra,* 65 Cal.2d at p. 274, 54 Cal.Rptr. 104, 419 P.2d 168.) FN20 This suggests that the fundamental principals discussed above regarding whether a duty to defend arises are rules of law regarding policy interpretation and that Civil Code section 1646 determines the appropriate choice of law governing these issues. On the other hand, it was not necessary for the court in *Gray* to decide whether these rules of law were rules of policy interpretation for purposes of section 1646; these rules could be characterized as public policy choices that do not necessarily reflect the actual or presumed intention of the parties. Moreover, *Gray* stated further that the duty to defend arises whenever the insurer ascertains facts that create a potential for liability under the policy, whether the insurer learns those facts from the complaint, the insured, or other sources, and did not explain that **\*1465** conclusion as a question of policy interpretation or refer to the reasonable expectations of the insured. (*Gray, supra,* at pp. 276–277, 54 Cal.Rptr. 104, 419 P.2d 168.) FN21 We need not decide **\*\*840** whether these or other rules regarding the duty to defend are rules of policy interpretation for purposes of

section 1646 because our conclusion under either section 1646 or the governmental interest analysis is that California law governs, as we will explain. FN22

> FN20. *Gray, supra,* 65 Cal.2d at page 274, 54 Cal.Rptr. 104, 419 P.2d 168, stated: "Since we must resolve uncertainties in favor of the insured and *interpret the policy provisions according to the layman's reasonable expectations,* [fn. omitted] and since the effect of the exclusionary clause is neither conspicuous, plain, nor clear, we hold that in the present case the policy provides for an obligation to defend and that such obligation is independent of the indemnification coverage." (Italics added.)

> FN21. In *Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 24 Cal.Rptr.2d 467, 861 P.2d 1153 (*Montrose* ), the Supreme Court made clear that its analysis in *Gray, supra,* 65 Cal.2d 263, 54 Cal.Rptr. 104, 419 P.2d 168, was not limited to policy interpretation: "Because the policy at issue in *Gray* was ambiguous, and could be read either to exclude or to provide for coverage, we held that ordinary principles of insurance contract interpretation required it be construed in the insured's favor, according to his reasonable expectations. (*Gray, supra,* 65 Cal.2d at pp. 275–276, 54 Cal.Rptr. 104, 419 P.2d 168; [citation].) As a distinct, separate, and alternative basis for our decision, we recognized that the insured is entitled to a defense if the underlying complaint alleges the insured's liability for damages *potentially* covered under the policy, or if the complaint might be amended to give rise to a liability that would be covered under the policy. (*Gray, supra,* 65 Cal.2d at pp. 275–276, 54 Cal.Rptr. 104, 419 P.2d 168.) [¶] The alternative holding in *Gray, supra,* 65 Cal.2d 263, 54 Cal.Rptr. 104, 419 P.2d

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
**(Cite as: 153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816)**

168, establishes the rule that the insurer must defend in some lawsuits where liability under the policy ultimately fails to materialize; this is one reason why it is often said that the duty to defend is broader than the duty to indemnify. [Citation.]" (*Montrose, supra,* at p. 299, 24 Cal.Rptr.2d 467, 861 P.2d 1153.)

FN22. We explain our conclusion under Civil Code section 1646 that California law governs the interpretation of the policy in section 6, *ante.*

b. *The Applicable Rules of Law of California and Texas Do Not Materially Differ*

[23][24] The first step in the governmental interest analysis is to determine whether the applicable rules of law of the potentially concerned jurisdictions materially differ. (*Washington Mutual, supra,* 24 Cal.4th at p. 919, 103 Cal.Rptr.2d 320, 15 P.3d 1071.) If there is no material difference, there is no choice-of-law problem and the court may proceed to apply California law. (See *id.* at p. 920, 103 Cal.Rptr.2d 320, 15 P.3d 1071.) The party arguing that foreign law governs has the burden to identify the applicable foreign law, show that it materially differs from California law, and show that the foreign law furthers an interest of the foreign state. (*Id.* at p. 919, 103 Cal.Rptr.2d 320, 15 P.3d 1071; *Bernhard, supra,* 16 Cal.3d at pp. 317–318, 128 Cal.Rptr. 215, 546 P.2d 719.)

[25][26][27][28] A liability insurer has a duty to defend its insured under California law if facts alleged in the complaint, or other facts known to the insurer, potentially could give rise to coverage under the policy. (*Scottsdale Ins. Co. v. MV Transportation* (2005) 36 Cal.4th 643, 654–655, 31 Cal.Rptr.3d 147, 115 P.3d 460 (*Scottsdale* ); *Gray, supra,* at 65 Cal.2d pp. 275–277, 54 Cal.Rptr. 104, 419 P.2d 168.) The facts need only "raise the possibility" that the insured will be held liable for covered damages. (*Montrose, supra,* 6 Cal.4th at p. 304, 24 Cal.Rptr.2d 467, 861 P.2d 1153.) An insurer has a duty to defend even if the claims against the insured are " 'groundless, false, or fraudulent.' " (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 19, 44 Cal.Rptr.2d 370, 900 P.2d 619.) "Any doubt as to whether the facts *1466 establish the existence of the defense duty must be resolved in the insured's favor." (*Montrose, supra,* at pp. 299–300, 24 Cal.Rptr.2d 467, 861 P.2d 1153.)

[29][30][31] A duty to defend arises under California law upon the tender to the insurer of a potentially covered claim and continues until the lawsuit is concluded or until the insurer shows that facts extrinsic to the third party complaint conclusively negate the potential for coverage. (*Scottsdale, supra,* 36 Cal.4th at p. 655, 31 Cal.Rptr.3d 147, 115 P.3d 460; *Montrose, supra,* 6 Cal.4th at pp. 298–300, 24 Cal.Rptr.2d 467, 861 P.2d 1153.) If a duty to defend arises, the insurer must defend the action in its entirety, including claims that are not potentially covered. (*Buss, supra,* 16 Cal.4th at pp. 48–49, 65 Cal.Rptr.2d 366, 939 P.2d 766.) If a duty to defend has **841 arisen by virtue of the existence of a potential for coverage but is later extinguished, it is extinguished prospectively only, and not retroactively. (*Id.* at p. 46, 65 Cal.Rptr.2d 366, 939 P.2d 766.)

[32][33][34][35][36][37][38] A liability insurer has a duty to defend its insured under Texas law if facts alleged in the complaint potentially could give rise to coverage under the policy. (*GuideOne Elite v. Fielder Rd. Baptist Church* (Tex.2006) 197 S.W.3d 305, 310 (*GuideOne* ); *Heyden Newport Chemical Corp. v. Southern Gen. Ins. Co.* (Tex.1965) 387 S.W.2d 22, 26 (*Heyden* ).) "A plaintiff's factual allegations that potentially support a covered claim is all that is needed to invoke the insurer's duty to defend [citation]." (*GuideOne, supra,* at p. 310.) " 'Where the complaint does not state facts sufficient to clearly bring the case within or without the coverage, the general rule is that the insurer is obligated to defend if there is, potentially, a case under the complaint within the coverage of the policy. Stated differently, in case of doubt as to whether or not the allegations of a complaint

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
**(Cite as: 153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816)**

against the insured state a cause of action within the coverage of a liability policy sufficient to compel the insurer to defend the action, such doubt will be resolved in insured's favor.' " (*Heyden, supra,* at p. 26; accord, *Nat. Union Fire v. Merch. Fast Motor Lines* (Tex.1997) 939 S.W.2d 139, 141 (*Nat. Union* ).) Under Texas law, the duty to defend is determined based on the policy terms and the allegations of the complaint, "without regard to the truth or falsity of those allegations" and without regard to extrinsic evidence. (*GuideOne, supra,* at p. 308; see also *Heyden, supra,* at p. 24.) Any doubt as to whether the complaint alleges facts that give rise to a duty to defend must be resolved in favor of the insured.[FN23] (*Allstate Ins. Co. v. Hallman* (Tex.2005) 159 S.W.3d 640, 643; *Heyden, supra,* at p. 26.) If the duty to defend arises, the insurer must defend the action in its **\*1467** entirety, including claims that are not potentially covered. (*Warrantech Corp. v. Steadfast Ins. Co.* (Tex.Ct.App.2006) 210 S.W.3d 760, 766; *Nokia, Inc. v. Zurich American Ins. Co.* (Tex.Ct.App.2006) 202 S.W.3d 384, 388.)

> FN23. RLI quotes language from *Nat. Union, supra,* 939 S.W.2d at page 142, stating: "We will not read facts into the pleadings. [Citation.] ... Nor will we look outside the pleadings, or imagine factual scenarios which might trigger coverage." The complaint against the insured in that case alleged that the insured's driver negligently discharged a firearm while driving a truck, killing a passenger in another vehicle. ( *Ibid.*) The Texas Supreme Court concluded that the facts alleged in the complaint did not indicate that the death resulted from use of the insured vehicle, as required for coverage under the policy. (*Id.* at p. 142.) The court stated, "the facts alleged in the pleadings do not suggest even a remote causal relationship between the truck's operation and Gonzalez's injury." (*Ibid.*) It was in this context that the court, in the language quoted *ante,* refused to augment

the allegations of the complaint in the guise of a liberal construction.

[39] Texas law differs from California law in that under Texas law, facts extrinsic to the complaint cannot give rise to a duty to defend. ( *GuideOne, supra,* 197 S.W.3d at p. 308; *Heyden, supra,* 387 S.W.2d at p. 24.) Under California law, in contrast, extrinsic facts known to the insurer give rise to a duty to defend if the facts create a potential for coverage under the policy. (*Scottsdale, supra,* 36 Cal.4th at p. 654, 31 Cal.Rptr.3d 147, 115 P.3d 460; *Gray, supra,* 65 Cal.2d 263, 276–277, 54 Cal.Rptr. 104, 419 P.2d 168.) Because the complaints in the underlying actions allege facts that create a potential for coverage without regard to extrinsic evidence, as explained *post,* this difference between California law and the law of Texas is not relevant here. Apart from this distinction, the foregoing Texas rules of law do not **\*\*842** materially differ from California law, and no party has shown that any other Texas rule of law applicable to these facts materially differs from California law. We therefore conclude that the applicable rules of law of California and Texas are substantially identical with respect to a liability insurer's duty to defend; thus, even if the governmental interest analysis was the choice of law rule that we were to use to determine if a duty to defend ever arose, California law would be applied. (*Washington Mutual, supra,* 24 Cal.4th at p. 920, 103 Cal.Rptr.2d 320, 15 P.3d 1071.)

c. *The Third Party Complaints Allege Claims that Are Potentially Covered Under the Policy*

[40] The complaints allege that the defendants, including Frontier and Wainoco, conducted oil and gas exploration, production, processing, and storage activities at Drill–Site # 1. They allege that as a result of those operations, hazardous substances were "spilled, emitted, released, [and] discharged" into the environment. They allege further that the operations resulted in "releases, discharges, fugitive emissions, leaks and spills." The complaints allege damage of a nature and kind covered by the policy

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
**(Cite as: 153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816)**

and do not foreclose the possibility that the damage was caused by a sudden and accidental release, and therefore create a *potential* for coverage under the policy. (*Waller v. Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at p. 19, 44 Cal.Rptr.2d 370, 900 P.2d 619; *Gray, supra,* 65 Cal.2d at pp. 274–275, 54 Cal.Rptr. 104, 419 P.2d 168.) This is sufficient to establish RLI's duty to defend. (*Montrose, supra,* 6 Cal.4th at pp. 299–300, 24 Cal.Rptr.2d 467, 861 P.2d 1153; *Horace Mann Ins. Co. v. Barbara B.* (1993) 4 Cal.4th 1076, 1082–1083, 17 Cal.Rptr.2d 210, 846 P.2d 792.) RLI **\*1468** potentially could extinguish its defense duty prospectively, but cannot extinguish it retroactively. (*Scottsdale, supra,* 36 Cal.4th at p. 655, 31 Cal.Rptr.3d 147, 115 P.3d 460; *Buss, supra,* 16 Cal.4th at p. 46, 65 Cal.Rptr.2d 366, 939 P.2d 766.) RLI failed to show that facts extrinsic to the third party complaints conclusively negated the potential for coverage before the termination of the underlying actions and therefore failed to extinguish the duty to defend before the termination of those actions. Because RLI failed to establish the absence of a duty to defend, RLI was not entitled to summary judgment against Frontier and Wainoco on that basis.

9. *RLI Failed to Establish that Wainoco Is Not an Insured*

The policy declarations identify the named insured as "Wainoco Oil Corporation, et al." [FN24] (Capitalization omitted.) An endorsement referenced on the declarations page and incorporated in the policy lists several additional named insureds, including "Wainoco Oil & Gas Company, and the Northwestern Mutual Life Insurance Co., A Joint Venture" and several "Wainoco Appalachian" partnerships. The commercial general liability coverage form states that if the named insured is a partnership or joint venture, the insured's members and partners "are also insureds, but only with respect to the conduct of [the partnership's or joint venture's] business."

[FN24]. Wainoco Oil Corporation was predecessor in interest to Frontier, as stated

*ante,* and is to be distinguished from Frontier's wholly-owned subsidiary, Wainoco.

RLI argued in its summary judgment motion against Wainoco and argues again on appeal that Wainoco is not an insured with respect to the underlying actions because the alleged conduct does not pertain to Wainoco's joint venture activities. As the party moving for summary judgment, RLI had the burden to present either evidence**\*843** that negates an element of the cause of action or evidence that Frontier and Wainoco cannot reasonably obtain needed evidence. (*Kahn v. East Side Union High School Dist., supra,* 31 Cal.4th at p. 1003, 4 Cal.Rptr.3d 103, 75 P.3d 30.) RLI cited no evidence in support of its argument that Wainoco is not an insured apart from the policy and the third party complaints. A policy endorsement specifically identifies the Beverly Hills site and supports a reasonable inference that the parties intended the policy to provide coverage for Wainoco's operations at the site. The third party complaints allege that Wainoco conducted oil and gas operations at the Beverly Hills site. Nothing in either the policy or the third party complaints forecloses the possibility that Wainoco's operations at the Beverly Hills site pertained to its joint venture with Northwestern Mutual Life Insurance Co. Absent evidence to compel the conclusion that Wainoco's operations at the site did not pertain to its joint venture business, RLI failed to establish that Wainoco is not an insured.

### *\*1469 DISPOSITION*

The judgment is reversed. The matter is remanded for further proceedings not inconsistent with the views expressed herein. Frontier and Wainoco are entitled to recover their costs on appeal.

WE CONCUR: KLEIN, P.J., and KITCHING, J.

Cal.App. 2 Dist.,2007.
Frontier Oil Corp. v. RLI Ins. Co.
153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
**(Cite as: 153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816)**

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

416 B.R. 670
**(Cite as: 416 B.R. 670)**

H

United States District Court,
N.D. California.
In re WESTERN ASBESTOS COMPANY, et al.,
Debtors.
Hon. Charles Renfrew (Ret.), Futures Representat-
ive to the Western Asbestos Settlement Trust, and
the Trust Advisory Committee to the Western As-
bestos Settlement Trust, Plaintiffs/Appellees,
and
The Western Asbestos Settlement Trust,
Plaintiff–Intervenor/Appellee–Intervener
v.
Hartford Accident and Indemnity Company, De-
fendant/Appellant.

Nos. C 08–4127 PJH, 08–4376 PJH.
Bankruptcy No. 02–46284.
Adversary No. 07–4141.
Sept. 10, 2009.

**Background:** Distributors of asbestos products
filed Chapter 11 cases pursuant to settlement agree-
ment between debtor-distributors, their insurers,
and asbestos claimants. Court entered channeling
injunction and judgment in case and appeal was
taken.

**Holdings:** The District Court, Phyllis J. Hamilton,
J., held that:
(1) bankruptcy court was not only permitted, but re-
quired, to consider extrinsic evidence in its inter-
pretation of language of provision in asbestos set-
tlement trust that gave right to insurer to review and
audit trust payments;
(2) bankruptcy court did not abuse its discretion in
admitting statement of what one of two attorneys
who had negotiated settlement agreement on behalf
of official unsecured creditors committee had said
during settlement negotiations, submitted in sum-
mary judgment declaration of other of those two at-
torneys;
(3) bankruptcy court did not abuse its discretion in

admitting assertion in summary judgment declara-
tion that had been made by one of two attorneys
who had negotiated settlement agreement on behalf
of official unsecured creditors committee, that rep-
resentatives of insurer had not responded to state-
ment made by other of those two attorneys, as ad-
mission of party-opponent;
(4) insurer's failure to submit extrinsic evidence on
summary judgment regarding mutual intent of
parties did not transform trust fiduciaries' evidence
into mere evidence of "unilateral intent";
(5) insurer's silence could be viewed as assent to
limitation on its use of asbestos settlement trust in-
formation;
(6) asbestos settlement trust claimants possessed
legally protected privacy interest in their claim in-
formation;
(7) bankruptcy court did not abuse its discretion in
granting permanent injunctive relief to prevent in-
surer from disclosing confidential information of
asbestos settlement trust claimants; and
(8) condition in permanent injunction limiting in-
surer's retention of asbestos settlement trust inform-
ation to six months was reasonable.

Affirmed.

West Headnotes

**[1] Bankruptcy 51 ☞3779**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3779 k. Scope of review in general.
Most Cited Cases
    An appellate court may affirm a summary judg-
ment on any ground that has support in the record,
whether or not relied upon by the lower court.
Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[2] Bankruptcy 51 ☞3782**

51 Bankruptcy
    51XIX Review

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

416 B.R. 670
**(Cite as: 416 B.R. 670)**

51XIX(B) Review of Bankruptcy Court
51k3782 k. Conclusions of law; de novo review. Most Cited Cases

Where a bankruptcy court grants summary judgment on a contract claim, the bankruptcy court's interpretation and meaning of contract provisions are reviewed de novo; the determination as to whether contract language is ambiguous and whether the written contract is reasonably susceptible of a proffered meaning, is a question of law that also is reviewed de novo. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[3] Bankruptcy 51 ☜3782**

51 Bankruptcy
51XIX Review
51XIX(B) Review of Bankruptcy Court
51k3782 k. Conclusions of law; de novo review. Most Cited Cases

**Bankruptcy 51 ☜3787**

51 Bankruptcy
51XIX Review
51XIX(B) Review of Bankruptcy Court
51k3785 Findings of Fact
51k3787 k. Particular cases and issues. Most Cited Cases

When a bankruptcy court uses extrinsic evidence to interpret a contract, findings of fact are reviewed for clear error and the principles of law applied to those facts are reviewed de novo.

**[4] Bankruptcy 51 ☜3784**

51 Bankruptcy
51XIX Review
51XIX(B) Review of Bankruptcy Court
51k3784 k. Discretion. Most Cited Cases

An abuse of discretion standard of review applies to a bankruptcy court's admission of extrinsic evidence to interpret a contract.

**[5] Bankruptcy 51 ☜3785.1**

51 Bankruptcy

51XIX Review
51XIX(B) Review of Bankruptcy Court
51k3785 Findings of Fact
51k3785.1 k. In general. Most Cited Cases

**Bankruptcy 51 ☜3786**

51 Bankruptcy
51XIX Review
51XIX(B) Review of Bankruptcy Court
51k3785 Findings of Fact
51k3786 k. Clear error. Most Cited Cases

If a bankruptcy court's findings are plausible in light of the record viewed in its entirety, an appellate court cannot reverse even if it is convinced it would have found differently; additionally, the court pays special deference to a trial court's credibility findings.

**[6] Injunction 212 ☜9**

212 Injunction
212I Nature and Grounds in General
212I(B) Grounds of Relief
212k9 k. Nature and existence of right requiring protection. Most Cited Cases

A plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief, and is required to show the following: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

**[7] Bankruptcy 51 ☜3782**

51 Bankruptcy
51XIX Review
51XIX(B) Review of Bankruptcy Court
51k3782 k. Conclusions of law; de novo

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

416 B.R. 670
**(Cite as: 416 B.R. 670)**

review. Most Cited Cases

**Bankruptcy 51 ☞3784**

51 Bankruptcy
   51XIX Review
      51XIX(B) Review of Bankruptcy Court
         51k3784 k. Discretion. Most Cited Cases

**Bankruptcy 51 ☞3787**

51 Bankruptcy
   51XIX Review
      51XIX(B) Review of Bankruptcy Court
         51k3785 Findings of Fact
         51k3787 k. Particular cases and issues.
Most Cited Cases

    The legal conclusions made by a bankruptcy court in granting a permanent injunction are reviewed de novo, any factual findings supporting the decision to grant the injunction are reviewed for clear error, and the scope of the injunction is reviewed for abuse of discretion. Fed.Rules Civ.Proc.Rule 52(a), 28 U.S.C.A.

**[8] Federal Civil Procedure 170A ☞2554**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)3 Proceedings
            170Ak2547 Hearing and Determination
               170Ak2554 k. Matters considered.
Most Cited Cases

    A reviewing court may not rely on factual findings made incident to the issuance of a permanent injunction when deciding a motion for summary judgment. Fed.Rules Civ.Proc.Rule 52(a), 28 U.S.C.A.

**[9] Bankruptcy 51 ☞3784**

51 Bankruptcy
   51XIX Review
      51XIX(B) Review of Bankruptcy Court
         51k3784 k. Discretion. Most Cited Cases

    Under the abuse of discretion standard, a reviewing court must have a firm conviction that the court below committed a clear error of judgment in the conclusion it reached before reversal is proper; an error of law is per se an abuse of discretion.

**[10] Bankruptcy 51 ☞3784**

51 Bankruptcy
   51XIX Review
      51XIX(B) Review of Bankruptcy Court
         51k3784 k. Discretion. Most Cited Cases

    A bankruptcy court necessarily abuses its discretion if it bases its decision on an erroneous view of the law or clearly erroneous factual findings.

**[11] Bankruptcy 51 ☞3786**

51 Bankruptcy
   51XIX Review
      51XIX(B) Review of Bankruptcy Court
         51k3785 Findings of Fact
         51k3786 k. Clear error. Most Cited Cases

    Review under the "clearly erroneous" standard is significantly deferential, requiring a definite and firm conviction that a mistake has been committed; where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

**[12] Bankruptcy 51 ☞3570**

51 Bankruptcy
   51XIV Reorganization
      51XIV(B) The Plan
         51k3570 k. Execution and performance.
Most Cited Cases

    Bankruptcy court was not only permitted, but required, to consider extrinsic evidence under California law in its interpretation of language of provision in asbestos settlement trust that gave right to insurer to review and audit trust payments, where meaning urged by trust fiduciaries was reasonable.

**[13] Contracts 95 ☞147(1)**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

416 B.R. 670
**(Cite as: 416 B.R. 670)**

95 Contracts
   95II Construction and Operation
     95II(A) General Rules of Construction
      95k147 Intention of Parties
        95k147(1) k. In general. Most Cited Cases

Under California law, the goal of contract interpretation is to give effect to the mutual intent of the parties at the time of contracting.

**[14] Contracts 95 ⟲143(4)**

95 Contracts
   95II Construction and Operation
     95II(A) General Rules of Construction
      95k143 Application to Contracts in General
        95k143(4) k. Subject, object, or purpose as affecting construction. Most Cited Cases

**Contracts 95 ⟲147(1)**

95 Contracts
   95II Construction and Operation
     95II(A) General Rules of Construction
      95k147 Intention of Parties
        95k147(1) k. In general. Most Cited Cases

**Contracts 95 ⟲169**

95 Contracts
   95II Construction and Operation
     95II(A) General Rules of Construction
      95k169 k. Extrinsic circumstances. Most Cited Cases

**Contracts 95 ⟲170(1)**

95 Contracts
   95II Construction and Operation
     95II(A) General Rules of Construction
      95k170 Construction by Parties
        95k170(1) k. In general. Most Cited Cases

Under California law, the mutual intention to which courts give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract, the object, nature and subject matter of the contract, and the subsequent conduct of the parties.

**[15] Evidence 157 ⟲455**

157 Evidence
   157XI Parol or Extrinsic Evidence Affecting Writings
     157XI(D) Construction or Application of Language of Written Instrument
      157k454 Meaning of Words, Phrases, Signs, or Abbreviations
        157k455 k. In general. Most Cited Cases

Under California law, the test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether the instrument appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.

**[16] Contracts 95 ⟲143(2)**

95 Contracts
   95II Construction and Operation
     95II(A) General Rules of Construction
      95k143 Application to Contracts in General
        95k143(2) k. Existence of ambiguity. Most Cited Cases

Under California law, contractual ambiguity arises when the contract's language is reasonably susceptible of more than one application to material facts.

**[17] Evidence 157 ⟲397(1)**

157 Evidence
   157XI Parol or Extrinsic Evidence Affecting Writings

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

416 B.R. 670
**(Cite as: 416 B.R. 670)**

157XI(A) Contradicting, Varying, or Adding to Terms of Written Instrument
    157k397 Contracts in General
        157k397(1) k. In general. Most Cited Cases

**Evidence 157 ☞448**

157 Evidence
    157XI Parol or Extrinsic Evidence Affecting Writings
        157XI(D) Construction or Application of Language of Written Instrument
           157k448 k. Grounds for admission of extrinsic evidence. Most Cited Cases

Under California law, extrinsic evidence is not admissible to add to, detract from, or vary the terms of a written integrated contract, but only to interpret the terms in the contract.

**[18] Evidence 157 ☞452**

157 Evidence
    157XI Parol or Extrinsic Evidence Affecting Writings
        157XI(D) Construction or Application of Language of Written Instrument
           157k449 Nature of Ambiguity or Uncertainty in Instrument
                157k452 k. Latent ambiguity. Most Cited Cases

**Evidence 157 ☞455**

157 Evidence
    157XI Parol or Extrinsic Evidence Affecting Writings
        157XI(D) Construction or Application of Language of Written Instrument
           157k454 Meaning of Words, Phrases, Signs, or Abbreviations
                157k455 k. In general. Most Cited Cases

Under California law, where the meaning of the words used in a contract is disputed, a trial court must provisionally receive any proffered extrinsic evidence that is relevant to show whether the contract is reasonably susceptible of a particular meaning; even if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible.

**[19] Contracts 95 ☞147(1)**

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
           95k147 Intention of Parties
                95k147(1) k. In general. Most Cited Cases

Under California law, rational contractual interpretation requires at least a preliminary consideration of all credible evidence offered to prove the intention of the parties; the fact that the terms of an instrument appear clear to a judge does not preclude the possibility that the parties chose the language of the instrument to express different terms.

**[20] Bankruptcy 51 ☞3570**

51 Bankruptcy
    51XIV Reorganization
        51XIV(B) The Plan
           51k3570 k. Execution and performance. Most Cited Cases

Provision in asbestos settlement agreement that gave right to insurer to review and audit trust payments was ambiguous on its face under California law, where there was no plain meaning contained within agreement itself regarding purpose for, and limitations on, insurer's audit/review rights or regarding insurer's "copying" rights.

**[21] Bankruptcy 51 ☞2164.1**

51 Bankruptcy
    51II Courts; Proceedings in General
        51II(B) Actions and Proceedings in General
        51k2164 Judgment or Order
           51k2164.1 k. In general. Most Cited

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

416 B.R. 670
**(Cite as: 416 B.R. 670)**

Cases

Bankruptcy court did not abuse its discretion in admitting statement of what one of two attorneys who had negotiated settlement agreement on behalf of official unsecured creditors committee had said during settlement negotiations, submitted in summary judgment declaration of other of those two attorneys, on basis that statement possessed sufficient guarantees of trustworthiness such that it satisfied residual hearsay exception. Fed.Rules Evid.Rule 807, 28 U.S.C.A.; Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[22] Bankruptcy 51 ⟿2164.1**

51 Bankruptcy
   51II Courts; Proceedings in General
      51II(B) Actions and Proceedings in General
         51k2164 Judgment or Order
            51k2164.1 k. In general. Most Cited Cases

Bankruptcy court did not abuse its discretion in admitting assertion in summary judgment declaration that had been made by one of two attorneys who had negotiated settlement agreement under California law on behalf of official unsecured creditors committee, that representatives of insurer had not responded to statement made by other of those two attorneys, as admission of party-opponent, to extent that insurer's statement, or lack thereof, could have constituted hearsay. Fed.Rules Evid.Rule 801(d)(2), 28 U.S.C.A.; Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[23] Bankruptcy 51 ⟿3784**

51 Bankruptcy
   51XIX Review
      51XIX(B) Review of Bankruptcy Court
         51k3784 k. Discretion. Most Cited Cases
A bankruptcy court's admission of challenged statements is reviewed for an abuse of discretion.

**[24] Bankruptcy 51 ⟿2164.1**

51 Bankruptcy

51II Courts; Proceedings in General
   51II(B) Actions and Proceedings in General
      51k2164 Judgment or Order
         51k2164.1 k. In general. Most Cited Cases

Insurer's failure to submit extrinsic evidence on summary judgment regarding mutual intent of parties did not transform trust fiduciaries' evidence, that parties had understood that any asbestos settlement trust information that insurer obtained through audit could not be used for purposes unrelated to trust under California law, into mere evidence of "unilateral intent"; insurer could not simply argue that trust fiduciaries' evidence should have been disregarded as irrelevant or self-serving to create genuine issue of material fact as to intent of agreement. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[25] Bankruptcy 51 ⟿3570**

51 Bankruptcy
   51XIV Reorganization
      51XIV(B) The Plan
         51k3570 k. Execution and performance. Most Cited Cases

Insurer's silence could be viewed under California law as assent to limitation on its use of asbestos settlement trust information, to extent that insurer objected to reciprocal limitation on its audit and review rights, given length and intensity of settlement negotiations, parties' course of dealing of limited use, and parties' concern with connection between insurer's payments and trust's purposes, as indicated by limitation on trust fiduciaries' use of insurer's payments under settlement agreement.

**[26] Contracts 95 ⟿22(1)**

95 Contracts
   95I Requisites and Validity
      95I(B) Parties, Proposals, and Acceptance
         95k22 Acceptance of Offer and Communication Thereof
            95k22(1) k. In general. Most Cited Cases

As a general rule, silence or inaction does not

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

416 B.R. 670
**(Cite as: 416 B.R. 670)**

constitute acceptance of an offer under California law.

**[27] Contracts 95 ☞22(1)**

95 Contracts
    95I Requisites and Validity
        95I(B) Parties, Proposals, and Acceptance
            95k22 Acceptance of Offer and Communication Thereof
                95k22(1) k. In general. Most Cited Cases

Under California law, where circumstances or the previous course of dealing between the parties places the offeree under a duty to act or be bound, his silence or inactivity will constitute his assent.

**[28] Bankruptcy 51 ☞2162**

51 Bankruptcy
    51II Courts; Proceedings in General
        51II(B) Actions and Proceedings in General
            51k2162 k. Pleading; dismissal. Most Cited Cases

**Bankruptcy 51 ☞3570**

51 Bankruptcy
    51XIV Reorganization
        51XIV(B) The Plan
            51k3570 k. Execution and performance. Most Cited Cases

When determining whether asbestos settlement trust information that insurer obtained through audit could be used for purposes unrelated to trust, bankruptcy court could rely on expert opinion to resolve issue under California law of whether industry usage of terms "audit and/or review" generally allowed for information obtained during course of audit to be used for purposes other than those related to audit.

**[29] Evidence 157 ☞506**

157 Evidence
    157XII Opinion Evidence
        157XII(B) Subjects of Expert Testimony

            157k506 k. Matters directly in issue. Most Cited Cases

Under California law, an expert is not permitted to offer a legal opinion on the meaning of a contract.

**[30] Evidence 157 ☞506**

157 Evidence
    157XII Opinion Evidence
        157XII(B) Subjects of Expert Testimony
            157k506 k. Matters directly in issue. Most Cited Cases

Although an expert may testify under California law to industry custom and usage with respect to particular contractual terms, it is not appropriate for the expert to opine on the ultimate contract interpretation issue.

**[31] Bankruptcy 51 ☞2162**

51 Bankruptcy
    51II Courts; Proceedings in General
        51II(B) Actions and Proceedings in General
            51k2162 k. Pleading; dismissal. Most Cited Cases

**Bankruptcy 51 ☞3570**

51 Bankruptcy
    51XIV Reorganization
        51XIV(B) The Plan
            51k3570 k. Execution and performance. Most Cited Cases

Bankruptcy court did not abuse its discretion in implicitly determining that former vice-president for American Institute of Certified Public Accountants (AICPA) qualified as expert on financial audits and that his opinion regarding financial audits was helpful, in determination of whether asbestos settlement trust information that insurer obtained through audit could be used for purposes unrelated to trust. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[32] Bankruptcy 51 ☞3047(2)**

51 Bankruptcy

416 B.R. 670
**(Cite as: 416 B.R. 670)**

51IX Administration
    51IX(A) In General
        51k3040 Examination and Discovery
            51k3047 Scope and Extent of Inquiry
                51k3047(2) k. Privilege. Most Cited Cases

**Bankruptcy 51 ⟶3570**

51 Bankruptcy
    51XIV Reorganization
        51XIV(B) The Plan
            51k3570 k. Execution and performance. Most Cited Cases

**Constitutional Law 92 ⟶1228**

92 Constitutional Law
    92XI Right to Privacy
        92XI(B) Particular Issues and Applications
            92k1227 Records or Information
                92k1228 k. In general. Most Cited Cases

**Constitutional Law 92 ⟶1231**

92 Constitutional Law
    92XI Right to Privacy
        92XI(B) Particular Issues and Applications
            92k1227 Records or Information
                92k1231 k. Medical records or information. Most Cited Cases

Asbestos settlement trust claimants possessed legally protected privacy interest under California Constitution in their claim information, which in large part included medical records, financial details, and other information of highly personal nature, and thus such information, that insurer obtained through audit, could not be used for purposes unrelated to trust; although claimants voluntarily submitted their medical information to trust, claimants were not suing insurer, they were not demanding payment from insurer, and insurer was not seeking discovery. West's Ann.Cal. Const. Art. 1, § 1.

**[33] Constitutional Law 92 ⟶963**

92 Constitutional Law
    92VI Enforcement of Constitutional Provisions
        92VI(C) Determination of Constitutional Questions
            92VI(C)1 In General
                92k963 k. Questions of law or fact. Most Cited Cases

Whether a legally recognized privacy interest exists under the California Constitution is a question of law, and whether the circumstances give rise to a reasonable expectation of privacy and a serious invasion thereof are mixed questions of law and fact. West's Ann.Cal. Const. Art. 1, § 1.

**[34] Constitutional Law 92 ⟶1210**

92 Constitutional Law
    92XI Right to Privacy
        92XI(A) In General
            92k1210 k. In general. Most Cited Cases

**Constitutional Law 92 ⟶1215**

92 Constitutional Law
    92XI Right to Privacy
        92XI(A) In General
            92k1215 k. Reasonable, justifiable, or legitimate expectation. Most Cited Cases

Under the California Constitution, a privacy right claimant must possess a legally protected privacy interest, the claimant must have a reasonable expectation of privacy under the particular circumstances, including the customs, practices, and physical settings surrounding particular activities, and the invasion of privacy must be serious in nature, scope, and actual or potential impact; then the privacy interest at stake is balanced against other competing or countervailing interests. West's Ann.Cal. Const. Art. 1, § 1.

**[35] Bankruptcy 51 ⟶3570**

51 Bankruptcy
    51XIV Reorganization
        51XIV(B) The Plan
            51k3570 k. Execution and performance.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

416 B.R. 670
**(Cite as: 416 B.R. 670)**

Most Cited Cases

**Constitutional Law 92 ☞1228**

92 Constitutional Law
   92XI Right to Privacy
      92XI(B) Particular Issues and Applications
         92k1227 Records or Information
            92k1228 k. In general. Most Cited
Cases

**Constitutional Law 92 ☞1231**

92 Constitutional Law
   92XI Right to Privacy
      92XI(B) Particular Issues and Applications
         92k1227 Records or Information
            92k1231 k. Medical records or inform-
ation. Most Cited Cases

   Inclusion of nonconfidential information, in ad-
dition to confidential information, which in large
part included medical records, financial details, and
other information of highly personal nature, in
claimant submissions to asbestos settlement trust
did not undermine confidential nature of submis-
sions generally, as required for claimants to have
privacy right in such information under California
Constitution. West's Ann.Cal. Const. Art. 1, § 1.

**[36] Bankruptcy 51 ☞2367**

51 Bankruptcy
   51IV Effect of Bankruptcy Relief; Injunction
and Stay
      51IV(A) In General
         51k2363 Protection Against Discrimina-
tion or Collection Efforts in General; "Fresh Start."
            51k2367 k. Injunction or stay of other
proceedings. Most Cited Cases

**Bankruptcy 51 ☞3048**

51 Bankruptcy
   51IX Administration
      51IX(A) In General
         51k3040 Examination and Discovery
            51k3048 k. Use and effect in evidence.

Most Cited Cases

**Bankruptcy 51 ☞3570**

51 Bankruptcy
   51XIV Reorganization
      51XIV(B) The Plan
         51k3570 k. Execution and performance.
Most Cited Cases

   Bankruptcy court did not abuse its discretion in
granting permanent injunctive relief to prevent in-
surer from disclosing confidential information of
asbestos settlement trust claimants, since such dis-
closure was not permitted by settlement agreement
or under California law and would have resulted in
irreparable harm for which monetary damages
would have been inadequate.

**[37] Bankruptcy 51 ☞2367**

51 Bankruptcy
   51IV Effect of Bankruptcy Relief; Injunction
and Stay
      51IV(A) In General
         51k2363 Protection Against Discrimina-
tion or Collection Efforts in General; "Fresh Start."
            51k2367 k. Injunction or stay of other
proceedings. Most Cited Cases

**Bankruptcy 51 ☞3048**

51 Bankruptcy
   51IX Administration
      51IX(A) In General
         51k3040 Examination and Discovery
            51k3048 k. Use and effect in evidence.
Most Cited Cases

**Bankruptcy 51 ☞3570**

51 Bankruptcy
   51XIV Reorganization
      51XIV(B) The Plan
         51k3570 k. Execution and performance.
Most Cited Cases

   Condition in permanent injunction limiting in-
surer's retention of asbestos settlement trust inform-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

416 B.R. 670
**(Cite as: 416 B.R. 670)**

ation to six months was reasonable, since trust information was confidential and settlement agreement limited insurer's use of information; limitation afforded insurer reasonable access to that information in order to conduct audit and/or review permitted by settlement agreement, while at the same time, recognized that certain restrictions were appropriate given confidential nature of that information.

## *675 ORDER RE: CONSOLIDATED APPEALS

PHYLLIS J. HAMILTON, District Judge.

Appellant Hartford Accident and Indemnity Company ("Hartford") appeals the bankruptcy court's August 11, 2008 order in adversary case no. 07–4141 granting appellees' motion for partial summary judgment and for a permanent injunction and denying Hartford's motion for judgment on the pleadings and/or for summary judgment.[FN1] Hartford Appx. 20. Additionally, Hartford appeals the bankruptcy court's August 21, 2008 order in the main chapter 11 bankruptcy case, no. 02–46284, denying as moot Hartford's motion to enforce a settlement agreement and appellees' motion for clarification. Hartford Appx. 5. For the reasons that follow, the court AFFIRMS the decisions and judgments of the bankruptcy court.

> FN1. Four months earlier, on April 11, 2008, the bankruptcy court issued a more comprehensive memorandum decision in the adversary case explaining the numerous bases for the summary August 11, 2008 order and permanent injunction. Hartford Appx. 4.

### BACKGROUND

On October 21, 2008, this court related the above two bankruptcy appeals because the bankruptcy court's August 11, 2008, and August 21, 2008 orders from which *676 Hartford involved the same issues and parties. The court also consolidated briefing on appeal. Subsequently, on February 5, 2009, the court permitted plaintiff-intervener, Western Asbestos Settlement Trust ("the

Trust"), to retain on appeal its intervener status, granted by the bankruptcy court, and allowed it to file an opposition brief. The court also permitted Hartford to reply to the Trust's brief. Accordingly, there are a total of five briefs on appeal before this court, including Hartford's opening brief, appellees' opposition brief, Hartford's reply brief, the Trust's opposition brief, and Hartford's reply to the Trust's brief.

### A. Factual and Procedural Background

This appeal stems from the bankruptcy court's orders in the main bankruptcy case, *In re Western Asbestos Company,* 02–46284, and in an adversary case, *Hon. Charles Renfrew et al. v. Hartford Accident and Indemnity Company, 07–4141.* In 2002, the debtors, MacArthur Companies and Western Asbestos, filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code for the purpose of establishing an asbestos claimants' trust, the Western Asbestos Settlement Trust ("the Trust"), funded by a settlement with insurance companies with whom the debtors had been in coverage litigation for several years.

Such a trust is recognized by Bankruptcy Code § 524(g), which establishes a procedure for dealing with personal injury claims against the debtor based on exposure to asbestos-containing products in chapter 11 reorganization cases. 140 Cong. Rec H 10,765 (October 1994). The procedure under § 524(g) involves the establishment of a trust to pay the future claims, coupled with an injunction, referred to as a "channeling injunction," which prevents future claimants from suing the debtor. *Id.* The section allows the bankruptcy court to enter the channeling injunction, a sweeping injunction against any entity taking legal action to collect a claim that is to be paid in whole or part by a trust created through a qualifying plan of reorganization. *See* 4 Collier on Bankruptcy § 524.07 (15th ed. rev'd).

In this case, the chapter 11 plan confirmation trial began on November 10, 2003, and continued for more than three weeks. The plan included provi-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

416 B.R. 670
**(Cite as: 416 B.R. 670)**

sion for the appointment of a futures representative to represent the interests of holders of Trust claims to be asserted in the future.[FN2] The plan also provided for the creation of the Trust Advisory Committee ("TAC"), which represents the interests of current holders of Trust claims. Collectively, the futures representative and the TAC are referred to as the "trust fiduciaries."

> FN2. The Honorable Charles Renfrew, a plaintiff in the underlying adversary proceeding and an appellee before this court, was appointed as the futures representative.

At the time of the plan confirmation hearings, Hartford was *not* one of the debtors' insurers that had settled with them. Instead, Hartford continued to dispute coverage of the debtors' liability, and vehemently objected to confirmation of debtors' "pre-packaged" chapter 11 plan. In spite of Hartford's objections, following the lengthy plan confirmation hearing, the bankruptcy court confirmed the debtors' plan and issued a channeling injunction. However, on December 19, 2003, prior to the final hearing before a district court judge on the channeling injunction issued by the bankruptcy court,[FN3] Hartford and the debtors, the unofficial committee of *677 unsecured creditors, several law firms representing asbestos claimants, and the trust fiduciaries entered into a settlement agreement. *See* Complaint, Doc. 1, 07–4141, Exh. 1.

> FN3. Section 524(g)(2)(A) suggests that district court approval of a channeling injunction issued by a bankruptcy court may be necessary, and the bankruptcy court in this case interpreted the section in that manner.

That settlement agreement resolved disputes related to Hartford's obligation to provide coverage under its third-party liability insurance policies issued to the debtors, and required Hartford to pay $1.15 billion to the Trust. *Id.* at ¶ 3.1. On January 20, 2004, the bankruptcy court approved the settle-

ment agreement, *id.* at 19, and on January 27, 2004, the court confirmed the second amended chapter 11 plan, thus creating the Trust and requiring the parties to comply with the settlement agreement.[FN4] *See* January 27, 2004 Order at ¶ 46. The January 27, 2004 order recognized that:

> FN4. The January 27, 2004 order confirming the second amended joint plan of reorganization provided in pertinent part:
>
> > [T]he Trust is hereby designated as successor to the Debtors and as a representative of the chapter 11 estates, and is authorized as a matter of law to appear in and act on behalf of the Debtors in all pending actions and to pursue all such causes of action for the benefit of the holders of Asbestos Related Claims without any further required action by the Debtors or the Court.
>
> > ¶ 9.

[T]he Trust shall assume all of the liabilities of each of the Debtors (whether existing at the time of the Trust's creation or arising at any time thereafter) arising from or relating to all Asbestos Related Claims. The Trust shall use the assets and income of the Trust to pay holders of such Asbestos Related Claims and to perform any and all other Trust duties and obligations as set forth in the Plan and in accordance with the Trust Agreement, in such a way that all holders of similar Asbestos Related Claims are treated in a substantially equivalent manner and to comply in all respects with the requirements for a trust as provided in Bankruptcy Code section 524(g).
¶ 13.

One of the provisions of the settlement agreement approved by the bankruptcy court, section 14.1 entitled "Audit Rights," set forth Hartford's right to review and audit the Trust and Trust payments. That section provides in pertinent part:

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Hartford shall have the right, at its own expense, upon reasonable notice, at a time and place convenient to the Trust, to review and/or audit the Trust and Trust payments. The Trust shall have no obligation to create any new documents in connection with any such review beyond those ordinarily created or maintained by the Trust, and Hartford shall not be permitted to challenge the allowance or payment of the Claims by the Trust or any administrative payments or costs of the Trust.

Unlike the settlement agreement,[FN5] the Trust itself is a Nevada Trust. It contains a choice of law provision, specifying that: "This Trust Agreement shall be governed by, and construed in accordance with, the laws of the State of Nevada without regard to Nevada conflict of laws principles." September 7, 2007 Trust Complaint in Intervention, Exh. B. at § 7.11. However, that same section provides that "the Trust is subject to the continuing jurisdiction of the Bankruptcy Court."[FN6]

> **FN5.** The agreement itself does not appear to contain a choice of law provision, and the parties have all assumed that California law governs the interpretation of the agreement.

> **FN6.** As the Trust recognized in its motion to intervene before the bankruptcy court, the Trustees could ordinarily seek instructions from a Nevada court on their powers and duties in connection with Hartford's audit demand. However, because the bankruptcy court was the supervising court for the Trust, with jurisdiction over the interpretation and enforcement of the settlement agreement, the Trustees conceded that any interpretation issues were properly brought before the bankruptcy court.

**\*678** Several years later, on March 6, 2007, Hartford contacted the Trust, stating that it was providing notice, pursuant to the Settlement Agreement, of its intent to "review and audit the Trust

and Trust payments." The Trust subsequently requested assurances from Hartford regarding the protection of the privacy rights of present and future Trust claimants. It requested that Hartford execute a confidentiality agreement that provided protection for personal information regarding the Trust claimants, or alternatively, that it acknowledge that a prior stipulated protective order approved by the bankruptcy court on June 13, 2003, applied to the Trust information sought by Hartford. The Trust also sought to clarify the purpose for which Hartford wanted to review the information.

Regarding its purpose, Hartford responded that it "wish[ed] to review the facts alleged by claimants making a claim to the trust." It noted that "[i]n light of recent reports and disclosures in other contexts about alleged inconsistencies or alleged fraud in claimant exposure and/or medical information, [Hartford] wish[ed] to explore this issue ourselves." As for confidentiality, Hartford asserted that it would comply with existing confidentiality requirements in the settlement agreement and with any statutory obligations, but refused to execute a formal confidentiality agreement.

Subsequently, on July 3, 2007, Hartford filed a motion to enforce its audit rights, initiating a contested matter in the main bankruptcy case. Hartford Appx., Exh. 2. Hartford argued that it was entitled to audit and review Trust documents with no further restrictions regarding the purpose of its review, and that it was not required to agree to further confidentiality requirements beyond those contained in the settlement agreement.

Two days later, the trust fiduciaries filed a motion for clarification, seeking an order that the June 13, 2003 stipulated protective order applied to the information Hartford requested from the Trust. Hartford Appx., Exh. 1. Alternatively, the trust fiduciaries requested that the bankruptcy court issue a new protective order protecting the privacy rights of the Trust claimants. The bankruptcy court heard the motions on August 20, 2007, and following arguments, concluded on the record that the June 13,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

416 B.R. 670
**(Cite as: 416 B.R. 670)**

2003 stipulated protective order was no longer in effect. It also held that procedurally, a separate adversary proceeding—as opposed to a contested matter in the main bankruptcy case—was the correct manner in which to proceed. It took Hartford's enforcement motion under submission, and ordered the parties to participate in a judicially supervised settlement conference.

On August 31, 2007, the trust fiduciaries filed a complaint, initiating an adversary proceeding, 04–7171. The trust fiduciaries' complaint raised three claims, including one for declaratory relief, one for preliminary injunctive relief, and one for permanent injunctive relief. In their first claim for declaratory relief, the trust fiduciaries requested the bankruptcy court declare that:

a. the personal and medical information required by the [Chapter 11 plan] Confirmation Order to be submitted to the Trust by individuals who have personal injury or wrongful death actions seeking damages allegedly caused by the presence of, or exposure to, asbestos or asbestos containing products used, furnished **\*679** or sold by Debtors in order to obtain an offer of settlement from the Trust is information that warrants privacy protection and may not be publicly disclosed;

b. Hartford's Audit Right is limited to financial information related to payments made by the Trust (i.e., Audit Data) and with the express limitation that Hartford can not challenge the allowance or payment of claims or Trust costs;

c. Hartford's Audit Right does not include claimant-specific settlement information, including settlement amounts paid by the Trust;

d. Hartford's use of any Audit Data it is permitted access to pursuant to its Audit Right is limited to this Bankruptcy Case; and

e. Hartford is permitted access to Audit Data pursuant to its Audit Right, subject to the stipulated

protective order.

Complaint at 17–18.

As for claims two and three, which sought preliminary and permanent injunctive relief, the trust fiduciaries sought to enjoin Hartford from:

a. Seeking non-public personal, medical, and claimant-specific settlement information of Trust beneficiaries from the Trust based on a claim that paragraph 14.1 of the Settlement Agreement authorizes the release of such information;

b. Using any Audit Data beyond this Bankruptcy Case it is permitted access to pursuant to its Audit Right; and

c. Disclosing, other than in compliance with the Stipulated Protective Order, any Audit Data Hartford is permitted access to pursuant to its Audit Right.

Complaint at 18.

Hartford answered and counterclaimed for breach of contract, based on its right to review and audit the Trust. Subsequently, the Trust, through its trustees, sought to intervene in the adversary proceedings. In support, it noted that although the Trust itself was not a party to the settlement agreement at issue, the agreement and order identified the Trust as the party obligated to respond to a request to review and audit.

The bankruptcy court granted the Trust's motion to intervene,[FN7] and the Trust filed its complaint in intervention. It sought declaratory relief, and, among other things, requested that the bankruptcy court "instruct the Trustees in their powers and duties under the Audit Right and how to comply with the audit provision in a way that takes account of the context in which the Hartford Settlement Agreement was reached and the Trustees' obligations to the beneficiaries."

FN7. The bankruptcy court did not specify

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

416 B.R. 670
**(Cite as: 416 B.R. 670)**

whether it was granting intervention as of right or permissively, even though the Trust requested both.

After participating in mediation for several months and concluding that settlement was not feasible, Hartford filed a motion for judgment on the pleadings and/or for summary judgment in the adversary case. Hartford Appx., Exh. 10. The trust fiduciaries filed a cross-motion for summary judgment. Hartford Appx., Exh. 11. Both parties, especially the trust fiduciaries, submitted numerous declarations and exhibits, including expert witness testimony. The bankruptcy court heard the motions on March 31, 2008. On April 11, 2008, the bankruptcy court denied Hartford's motion for enforcement in the main case and its motion for summary judgment in the adversary case, and granted**\*680** the trust fiduciaries' cross-motion for summary judgment as to two of the three claims in the complaint, the claims for declaratory and permanent injunctive relief. Hartford Appx., Exh. 4. The court, however, held that the scope of the permanent injunction proposed by plaintiffs was too broad, and ordered them to submit a revised order. *Id.*

On August 12, 2008, the bankruptcy court issued an order and permanent injunction permitting Hartford to conduct its audit, but enjoined Hartford in accordance with restrictions set forth in its April 11, 2008 decision. Hartford Appx., Exh. 20. The court also dismissed plaintiffs' claim for preliminary injunctive relief as moot. *Id.* Subsequently, on August 21, 2008, the bankruptcy court issued an order in the main bankruptcy case denying Hartford's motion to enforce the settlement agreement and the trust fiduciaries' motion for clarification as moot in light of its August 12, 2008 order in the adversary case. Hartford Appx., Exh. 5.

On August 25, 2008, the bankruptcy court entered judgment in the adversary proceeding. The judgment clarified that the court granted in part and denied in part plaintiffs' claims for declaratory and permanent injunctive relief, that the claim for preliminary injunctive relief was dismissed as moot,

that Hartford's counterclaim was denied, and that the bankruptcy court would retain jurisdiction to enforce the judgment.

Hartford appealed, and elected to have the appeal heard by this court instead of the Ninth Circuit Bankruptcy Appellate Panel.

**B. Parties' Arguments/Evidence before the Bankruptcy Court**

**1. Motions in Main Bankruptcy Case**

Hartford filed the initial motion, a motion to enforce its rights under the settlement agreement. In that motion, Hartford argued that in exchange for its $1.15 billion in payments under the settlement agreement, it received a number of rights, including an explicit right to review and audit the Trust and Trust payments. It argued that it had fulfilled all of its obligations under the settlement agreement, but that the Trust and trust fiduciaries refused to permit it to exercise its audit rights absent its agreement to a number of conditions. Hartford requested that the bankruptcy court order the trust fiduciaries and the Trust to comply with the terms of the settlement agreement and allow it to review the requested Trust information.

Days later, the trust fiduciaries filed their own motion in the main bankruptcy case, one for clarification regarding the effect of a prior stipulated protective order, or alternatively for the issuance of a protective order covering Trust information requested by Hartford. They noted that on June 13, 2003, prior to confirmation of the chapter 11 plan, the bankruptcy court approved a protective order under which documents containing Trust claimants' personal information were deemed confidential, and requiring the receiving party to maintain the documents in confidence and to use them only for purposes related to the bankruptcy case. The trust fiduciaries further noted that following Hartford's request for information from the Trust, the Trust requested Hartford to agree to abide by terms of the protective order, but that it refused to do so, stating

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

416 B.R. 670
**(Cite as: 416 B.R. 670)**

only that it would abide by statutory protections and those in the settlement agreement. The trust fiduciaries argued that the stipulated protective order continued to apply to Trust information, and that if it did not, a similar order should be entered protecting the confidential information. They further contended that Hartford's use of any Trust information should be circumscribed, and that it should not be **\*681** allowed to use the information to further its own interests in other cases or forums.

The Trust joined in the trust fiduciaries' motion for clarification. In its joinder, the Trust acknowledged that Hartford had a right to audit the Trust, and noted that it did not seek to prevent it from exercising that right. It only opposed Hartford's attempt to exercise that right absent its agreement to protect personal information submitted by Trust claimants. The Trust thus requested that the bankruptcy court allow it to make Trust information available to Hartford for inspection and audit, but not allow Hartford to copy the information. It further requested the court to prohibit Hartford from disclosing information obtained during the course of its audit and from using the information for any business or commercial purpose, or in any other litigation or proceeding unless the claimant whose confidential information was concerned consented to such use.

As noted above, the bankruptcy court did not decide the motions in the main bankruptcy case until after the motions discussed below were filed and heard in the adversary case.

**2. Motions in the Adversary Case**
The issues and arguments in the motions in the adversary case overlapped with the motions described above from the main bankruptcy case. However, the parties further expanded on the above arguments and submitted numerous declarations and exhibits in conjunction with the summary judgment motions in the adversary case.

In its opening motion for judgment on the pleadings and/or for summary judgment, Hartford

argued that it was entitled to judgment on the pleadings, and alternatively, if the bankruptcy court chose to rely on facts outside the pleadings, that the facts were undisputed and that it was entitled to summary judgment on the three claims brought by the trust fiduciaries, and on its counterclaim. It contended that the settlement agreement did not restrict its access to Trust information, and that it was not required to obtain the consent of the Trust or any of the parties to the settlement agreement prior to its audit.

As for the trust fiduciaries' claim for declaratory relief, Hartford argued that the relief the plaintiffs sought was inconsistent with the plain language of the settlement agreement, and with prior statements made by the trust fiduciaries, and that the settlement agreement was clear and unambiguous. Hartford further argued that because the settlement agreement was unambiguous, under California law, the bankruptcy court should not consider any extrinsic evidence submitted by the plaintiffs regarding the negotiating history of the agreement. In support, it noted the existence of an integration clause in the settlement agreement. Turning to the claims for injunctive relief, Hartford essentially argued that the claims failed for the same reasons that the trust fiduciaries' claim for declaratory relief should fail. It argued that the trust fiduciaries were unable to demonstrate any harm to Trust claimants because by filing a claim, the claimants made the information public and essentially waived any special privacy or confidentiality interest in the information.

Finally, regarding its counterclaim, Hartford argued that the trust fiduciaries were in breach of the settlement agreement because it had complied with all of its obligations and properly informed the Trust of its intent to audit, but the trust fiduciaries repeatedly denied Hartford access. Hartford therefore contended that it was entitled to specific performance of the audit provision, which it asserted included the right to copy the documents.

**\*682** In their own motion for partial summary

416 B.R. 670
**(Cite as: 416 B.R. 670)**

judgment, the trust fiduciaries sought summary judgment on parts (a),(b), and (d) of their claim for declaratory relief, and permanent injunctive relief in accordance with their third claim. The trust fiduciaries offered evidence in support of their motion consisting of exemplars filed under seal of the types of confidential information Hartford sought from the Trust, an expert declaration regarding the meaning of the terms "audit and/or review," and declarations regarding the negotiating history of the settlement agreement.

The evidence submitted by the trust fiduciaries in support of their motion included a declaration from Alan Brayton, a partner at Brayton Purcell LLP. Brayton, along with David McClain, was one of two primary attorneys who negotiated the settlement agreement on behalf of the official unsecured creditors committee. Brayton also represented numerous individual plaintiffs in the state court asbestos coverage litigation. Brayton attested to the settlement history and negotiations, and numerous term sheets were attached to Brayton's declaration.

Brayton explained in his declaration that the settlement negotiations with Hartford commenced with a term sheet. *See* April 11, 2008 Order at 12; Brayton Decl. ¶ 9. He stated that the settlements were the result of approximately ten days of "intense negotiations" with Hartford and its representatives, and that attorney William Bowman was the lead negotiator for Hartford. *Id.* Brayton explained that the term sheet was amended twice and then signed. Order at 12. In all three of the term sheets, including the final one, Hartford's "review and/or audit" right appeared in the same paragraph as the requirement that the trust fiduciaries use all of the payments made by Hartford either to pay Trust claims or "in connection with" Trust claims. *Id.;* Brayton Decl. ¶ 13. However, Brayton noted that the final settlement agreement shifted the location of Hartford's audit/review right, and stated in pertinent part:

Within several hours after we [the trust fiduciaries] sent Hartford the executed Final Term Sheet,

[Hartford] provided a draft settlement agreement. No negotiations took place between the signing of the Final Term Sheet and the sending of the draft settlement agreement. In the draft settlement agreement, the review/audit language that had previously been part of paragraph one in the terms sheets was moved to its own section fourteen. No changes were made in the actual language. This change in location did not occur as the result of any discussion about the review/audit right. At no [sic] time did [sic] Hartford state or suggest that changing the location of the Hartford audit rights in the Settlement Agreement as compared to the Final Term Sheet affected the purpose of that provision as solely to ensure that the Hartford payments were used in connection with the Asbestos Related Claims, and not for any other purpose.

Brayton Decl. ¶ 14.

Brayton further attested that:

In the settlement discussions, Mr. McClain told Hartford's representatives that the plan proponents would not agree that Hartford could use individual claimant submissions to the Trust for purposes other than those connected to the Trust. Hartford's representatives did not state or suggest in response that Hartford believed the review/audit right it was requesting would allow use of individual claimant submissions for any purposes other than those connected to the trust or for Hartford's own purposes. Rather, Hartford at all times conveyed to the plan proponents that the sole intended purpose of the review**\*683** /audit right was to verify the use of settlement funds as being in connection with Asbestos Related Claims as part of Hartford's submission of claims to its reinsurers.

Brayton Decl. at ¶ 16.[FN8]

[FN8]. At the March 31, 2008 hearing, the bankruptcy court queried the trust fiduciaries as to why *Brayton's* declaration was

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

416 B.R. 670
**(Cite as: 416 B.R. 670)**

submitted as evidence of what McClain had said during the settlement negotiations, and why the recipient of the statement on behalf of Hartford was not named. *See* April 11, 2008 Order at 11 & n. 6. The trust fiduciaries explained that at the time they submitted their motion for summary judgment in the adversary case, McClain was outside of the country and unavailable, and noted that in any event, his declaration containing this statement was submitted at an earlier date in the main bankruptcy case. The court was also advised that Hartford's current attorney, and the attorney representing it at the hearing, was actually the recipient of McClain's statement and that he had not been named in the declaration out of sensitivity to the fact that Bowman was Hartford's lead counsel. Bowman did not deny the explanation, and the bankruptcy court concluded that "the evidence presented [was] sufficient to establish a prima facie case that the statement was made by McClain to Bowman during settlement negotiations." *Id.*

Additionally, the trust fiduciaries already had a declaration on file from David McClain. McClain, a named partner at the law firm, Kazan, McClain, Abrams, Lyons, Farrise & Greenwood, previously submitted a declaration in the main bankruptcy case in support of the trust fiduciaries' opposition to Hartford's motion to enforce the settlement agreement. Like Brayton, McClain attested that:

The Hartford Settlement Agreement did not provide that the *quid pro quo* for an individual to receive compensation for his or her asbestos injury caused by the debtors was the individual granting to Hartford a license to disclose and use that individual's personal information as Hartford pleases, including for purposes beyond this bankruptcy case. I specifically told Hartford's representative in the settlement negotiations that I would not agree that Hartford could use individu-

al claimant submissions to the trust for purposes other than those connected to the Trust. I would never have agreed to such a provision on behalf of the Committee. No representative of Hartford ever suggested during the negotiations for the Hartford Settlement Agreement that the review and audit provision was so intended. Instead, I believed that a contrary intention, under which any review or audit would respect the confidentiality of claimants' personal information, should be presumed from the fact that all previous disclosures of such information during the course of the bankruptcy case were made pursuant to a stipulated protective order preventing the disclosure of this information or its use for purposes other than in the case.

McClain Decl. at ¶ 14.

In addition to Brayton, another attorney who participated in the settlement negotiations, Jeffrey Rehfield, an attorney at Sheppard, Mullin Richter & Hampton ("Sheppard Mullin"), submitted a declaration. Sheppard Mullin was counsel for the official unsecured creditors committee and also for the TAC, which came into existence on the effective date of the confirmed chapter 11 plan. Email communications between Sheppard Mullin and Hartford's counsel, William Bowman, were attached to Rehfield's declaration.

Additionally, the Trust submitted a declaration from an expert on audits conducted by certified public accountants, Dr. Dan Guy, a former vice president for the American Institute of Certified Public Accountants ("AICPA"). In support of the trust fiduciaries' motion, Guy opined that applicable rules prohibited

**\*684** an auditor from disclosing any confidential information obtained from the Trust without the specific consent of that entity. The confidentiality rule also prohibits a CPA from using to his or her own advantage or disclosing any confidential information that comes to the CPA's attention in carrying out an audit or a review.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

416 B.R. 670
**(Cite as: 416 B.R. 670)**

Guy Decl. ¶¶ 18–19. Regarding confidentiality, Guy further opined:

In my opinion, if an audit or review of financial or other information was not premised on confidentiality, the audit or review process would be thwarted, if not rendered impossible. The audited or reviewed entity simply would not be willing to agree to contractual terms requiring an audit or review. If the audited or reviewed entity believed that entity records and documents could be used for reasons other than for the purpose of the audit or review—perhaps to the detriment of the audited or reviewed entity and to the benefit or enrichment of the auditor or the reviewer—audits and reviews would be so draconian that they would not be included in agreements or contracts.

The trust fiduciaries also submitted two declarations from Sara Beth Brown, the executive director of the Trust. Brown described the process for submitting claims to the Trust, and attached as an exhibit a copy of the claim form that claimants are required to utilize. Brown Decl., Exh. 1. She attested that in her role as the director, she was familiar with the type of information that a claimant was required to provide the Trust in order for a claim to be considered for settlement. *Id.* at ¶ 6. She noted the personal and private nature of much of the information that was submitted. *Id.* at ¶ 12. Given the private nature of the claims, Brown stated that the Trust utilizes "a third-party disclosure policy that sets forth the procedures pursuant to which the Trust will provide individual claimant information to a third party." *Id.* at ¶ 14, Exh. 5. That policy provides that certain private information will only be made available if the requesting party provides "a subpoena issued by a court with competent jurisdiction over the Western Asbestos Settlement Trust, headquartered in Reno, Nevada." *Id.* Brown also submitted a separate supplemental declaration, which attached examples of the types of detailed narrative medical examination reports received and maintained by the Trust in conjunction with Trust claims. As noted, the exemplars were submitted under seal and pursuant to a protective order.

The trust fiduciaries argued generally that, in accordance with the extrinsic evidence offered, the term "review and/or audit" as used in the settlement agreement was intended to have a special meaning, and that Hartford was precluded from using the Trust information except for the purpose of supporting its claims for reinsurance for payments it made pursuant to the settlement agreement. Alternatively, even if a customary meaning of "review and/or audit" was employed, the trust fiduciaries argued that Hartford's audit and review rights were nevertheless limited by confidentiality requirements and a prohibition against its use of the information for personal advantage. In support, they pointed to Guy's expert testimony that AICPA rules prevented Hartford, in its role as an auditor, from disclosing confidential information obtained from the Trust without the consent of individual Trust claimants, and from disclosing such information for its own advantage.

The trust fiduciaries also argued that the extrinsic evidence revealed that section 14.1 of the settlement agreement limited Hartford's review and/or audit of the Trust information to supporting claims it intended**\*685** to make to its reinsurers. They pointed primarily to the negotiating history of the agreement, contained in the Brayton, McClain, and Rehfield declarations, and the exhibits thereto. Specifically, the trust fiduciaries pointed to written term sheets from the negotiations and statements by Hartford's representatives, in arguing that the parties' intent with respect to Hartford's audit rights was that Hartford be able to "determine for reinsurance purposes whether the Trust had used the Hartford Payments in connection with Asbestos Related Claims, with the express limitation that Hartford could not challenge the allowance or payment of claims or Trust costs." The trust fiduciaries asserted that Hartford was advised in the settlement negotiations that they did not agree to Hartford's use of individual claimant submissions to the Trust for purposes other than those connected to the Trust.

The trust fiduciaries further argued that the per-

416 B.R. 670
**(Cite as: 416 B.R. 670)**

sonal information that claimants submit to the Trust was confidential, and that the claimants possessed a legally protected privacy interest in the information.

In sum, the trust fiduciaries argued that the bankruptcy court should grant declaratory and injunctive relief preventing Hartford from obtaining access to Trust information unless it was maintained in confidence and used only for purposes related to the Trust. They argued that injunctive relief was proper given that a violation of the claimants' privacy rights could not be adequately remedied through monetary damages.

In their opposition to Hartford's summary judgment motion, the trust fiduciaries argued that Hartford was not entitled to judgment as a matter of law or summary judgment on those claims. As for Hartford's counterclaim, they argued that, at a minimum, there was a disputed issue of material fact regarding restrictions on Hartford's audit and/or review rights that prevented the bankruptcy court from granting Hartford summary judgment.[FN9]

> [FN9]. The Trust, as intervener, also submitted a brief in support of the trust fiduciaries' motion and in opposition to Hartford's motion. It contained many of the same arguments described above.

In opposition to the trust fiduciaries' motion, Hartford generally argued that the trust fiduciaries' extrinsic evidence was insufficient to create a triable issue of fact, let alone entitle them to summary judgment. It refuted what it asserted were the trust fiduciaries' primary arguments. First, it argued that Guy's expert opinion did not shed light on the parties' intent with respect to the meaning of the phrase "review and/or audit" because Guy had no firsthand knowledge of the settlement talks. Second, Hartford argued that the bankruptcy court should not consider the trust fiduciaries' extrinsic evidence, namely the parties' prior term sheets, to discern restrictions on Hartford's audit rights because the phrase "audit and/or review" possessed a

plain meaning. Third, Hartford contended that Trust claims were not confidential and were no different than the materials routinely offered in asbestos cases.

As for Guy's expert opinion, Hartford contended that it was worthless because CPAs like Guy were not utilized in the negotiations underlying the settlement agreement; there was no requirement that a CPA conduct a review or audit under the settlement agreement; and there was no evidence that the parties intended that the review be a *financial* audit. Hartford instead advocated using the plain, ordinary meaning of "review" and "audit," which according to dictionary definitions, it argued entitled it to a "critical and deliberate examination, including a formal investigation of the Trust's claim accounts."

**\*686** Nevertheless, in the event that the bankruptcy court concluded that a specialized meaning was appropriate, Hartford submitted its own expert, Michael Ceppi's declaration, in which Ceppi attested that an insurance claim-type review and audit—as opposed to a financial audit—was more appropriate. Ceppi was the president of an independent audit and inspection service, and had more than twenty years conducting audits in the insurance industry. Ceppi attested in pertinent part that:

> Based on my experience in the insurance industry spanning more than two decades, I am aware that insurance companies such as Hartford have a wide range of legitimate motivations and goals for reviewing and auditing the files, documents, and information of entities, such as the Trust, which process and pay personal injury claims, including, by way of example: (1) examining Trust operations to learn about current and past claim activity; (2) examining whether funds paid by the insurer are being used consistent with the parties' respective obligations and expectations under an operative insurance policy and/or settlement; (3) examining the Trust's claims handling activities to analyze whether the Trust is properly paying only valid claims, and whether it has set up

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

416 B.R. 670
**(Cite as: 416 B.R. 670)**

mechanisms to ensure that; (4) obtaining information regarding claimants that may seek to recover damages from other parties for the same or similar claims; (5) examining Trust operations to determine whether the Trust is operating efficiently and to suggest improvements to ensure that claims are evaluated properly; (6) obtaining information as needed for the insurer's own financial reporting obligations or reporting obligations to other third parties such as reinsurers; and (7) ensuring that the Trust is using the proceeds of the insurer's settlement consistently with the settlement agreement. In addition, insurers may have other equally legitimate reasons for exercising rights such as the Review and Audit Rights in a variety of circumstances.

Ceppi Decl. ¶ 6.

Hartford did not submit any of its own declarations in response to the trust fiduciaries' evidence regarding the settlement negotiations. However, on the record at the March 31, 2008 hearing, William Bowman, Hartford's lead counsel in the settlement negotiations, responded to questions posed by the bankruptcy court. Bowman admitted that he advised Brayton and McClain that Hartford needed the right to review and/or audit the Trust and Trust payments for reinsurance purposes, but denied telling them that was the *sole* purpose for the provision. April 11, 2008 Order at 13; March 31, 2008 Transcripts at 23–31. Bowman also admitted that he never told Brayton or McClain that Hartford wanted the right to use the information for purposes unrelated to the Trust. *Id.* Additionally, Bowman declined to admit or deny McClain's statement that during the negotiations, McClain advised Bowman on behalf of the trust fiduciaries that it would not agree to Hartford's use of the information unrelated to the trust. *Id.*

Turning to confidentiality, Hartford contended that the trust fiduciaries focused on a "small sliver" of hand-picked claimant information. It argued that even the most sensitive type of information submitted by Trust claimants is similar to records

"provided every day in courts and to defendants by claimants."

Finally, Hartford argued that even if the trust fiduciaries were entitled to some sort of relief, they were not entitled to permanent injunctive relief. It noted that it had already reassured the Trust and trust fiduciaries that it would keep Trust claimants' social security numbers, dependant information, **\*687** and non-asbestos-related medical information confidential. In light of those assurances, Hartford asserted that the trust fiduciaries could not demonstrate irreparable harm.

### C. Bankruptcy Court Rulings

As noted above, the bankruptcy court decided the trust fiduciaries' motion for clarification, filed in the main bankruptcy case, on August 20, 2007, concluding that the June 13, 2003 stipulated protective order was no longer in effect. However, the court deferred decision on Hartford's motion for enforcement until the same time that it decided the summary judgment motions in the adversary case.

In its April 11, 2008 order denying Hartford's motion for enforcement and motion for summary judgment and granting the trust fiduciaries' partial motion for summary judgment, the bankruptcy court ultimately concluded that the phrase "review and/or audit" as contained in the settlement agreement was ambiguous. Considering the extrinsic evidence, the court concluded that "the parties' expressed understanding of the meaning of the phrase gives Hartford the right to obtain copies of any Trust documents to the extent necessary to perform the audit, but does not permit Hartford to use the information obtained through the audit for its own purposes or to disclose that information to third parties." It thus concluded that Hartford's use of the documents was limited to purposes related to the Trust.

As for the extrinsic evidence, the bankruptcy court found the trust fiduciaries' expert, Guy, more persuasive than Hartford's expert, Ceppi. It noted that Ceppi did not attest that as an auditor, Hartford

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

416 B.R. 670
**(Cite as: 416 B.R. 670)**

would be free to use information obtained during an audit for purposes unrelated to the audit absent the consent of the entity being audited.

The court was also persuaded that the communications surrounding the settlement agreement indicated that the parties understood that the information obtained through the audit could not be used for purposes unrelated to the audit. It pointed to McClain's declaration, in which McClain stated that he told Hartford's representatives in the settlement negotiations that the trust fiduciaries would not agree that Hartford could use individual claimant submissions to the Trust for purposes other than those connected to the Trust. It noted that McClain also attested that Hartford's representatives never suggested during the negotiations that they intended that was the case. The bankruptcy court found that Hartford had presented no evidence to rebut or contradict McClain's declaration.

The bankruptcy court further cited to McClain's declaration and that of Alan Brayton, in finding that there was no evidence that Hartford disagreed with such a limitation on its use of the information. The court found that under the circumstances, Hartford had a duty to speak up during the negotiations if it disagreed with such limitations on its use of Trust information.[FN10] Citing *Golden Eagle Ins. Co. v. Foremost Ins. Co,* the bankruptcy court noted that silence may be treated as acceptance of a term where the circumstances **\*688** establish a duty to speak. 20 Cal.App.4th 1372, 1386–87, 25 Cal.Rptr.2d 242 (Cal.Ct.App.1993). The bankruptcy court thus concluded that evidence regarding the settlement negotiation communications was sufficient to impose a limitation on Hartford's use of the Trust information.

FN10. While the bankruptcy court did not explicitly specify the circumstances in its order, it alluded to the circumstances on the record at the hearing. March 31, 2008 Transcripts at 85–90. The court implied that if it accepted that McClain's statement was made in the course of the settlement

negotiations, and Hartford simply remained silent, completed the negotiations, and then it was Hartford that ultimately drafted the final settlement agreement, which Hartford admitted was the case, that the court would have some difficulty "disregard[ing] ... the statement and the silence." *Id.* at 86–87 (noting that something "sit[s] badly about that scenario").

The court further rejected Hartford's argument that the only limitations intended by the parties were those expressly included in the settlement agreement. It concluded that in spite of the fact that neither was explicit in the agreement, that Hartford was entitled to copy Trust documents, contrary to the trust fiduciaries' position, and also that Hartford was limited in its use of Trust information. The court ultimately concluded that "the expressed intention of the parties was that Hartford could obtain copies of the Trust documents, if needed to conduct the audit for purposes related to the Trust, but that Hartford could not use the information contained in the Trust documents for unrelated purposes."

Turning to confidentiality, the bankruptcy court further agreed with the trust fiduciaries that much of the information contained in Trust claim forms was confidential. It found one of the primary cases relied on by Hartford, *Volkswagen v. Superior Court,* distinguishable because the allegedly private information in that case was sought by the defendant during discovery and concerned a claim for damages that the plaintiff/claimant had asserted against the defendant. 139 Cal.App.4th 1481, 43 Cal.Rptr.3d 723 (Cal.Ct.App.2006). The bankruptcy court concluded that contrary to *Volkswagen,* the information Hartford sought had no bearing on a claim for damages being asserted against it, either directly or as the insurer of a third party.

The bankruptcy court further rejected Hartford's argument that it needed the confidential Trust information because Hartford was involved in other litigation in which claims were being asserted against Hartford's insureds by the same claimants

416 B.R. 670
**(Cite as: 416 B.R. 670)**

submitting claims to the Trust, and that it needed to investigate whether the claims in the cases were consistent. The court noted that Hartford possessed other "more narrowly tailored means to accomplish [its] purpose," including seeking discovery from the claimants in the other bankruptcy cases or even third-party discovery against the Trust regarding the claimants in those cases.

Moving on to the trust fiduciaries' request for a permanent injunction, the bankruptcy court concluded that they had satisfied the requirement of a likelihood of success on the merits based on its conclusion that the trust fiduciaries were entitled to partial summary judgment on their claims for declaratory relief. It also determined that "Hartford's threatened use of the claimant's private information for purposes unrelated to the Trust threatens irreparable injury." As for the scope of the permanent injunction, the court concluded that the scope of the injunctive relief requested by the trust fiduciaries was too broad. It construed Hartford's audit rights to include the right to claimant-specific information, and noted that in the past, the trust fiduciaries had been willing to provide Hartford with such information as long as Hartford agreed to a new stipulated protective order. The court ultimately concluded that the terms of the permanent injunction should mirror the restrictions placed on Hartford's use of the Trust information as set forth in the stipulated protective orders.

In sum, the court noted that it was denying Hartford's motion for enforcement filed in the main bankruptcy case, and its summary judgment motion in the adversary case, and that it was granting partial summary judgment in favor of the trust fiduciaries. As for the permanent injunction,**689 the bankruptcy court ordered the trust fiduciaries to submit a revised order that complied with its ruling.

On August 11, 2008, the court signed the order for a permanent injunction submitted by the trust fiduciaries in conjunction with its April 11, 2008 order. That injunction contained several provisions regarding confidentiality that were nearly identical

to the previous stipulated protective order. The order provided that the Trust was to make documents available to Hartford not only for inspection, but also for copying. Significantly, the order also provided that:

> Hartford shall maintain the confidentiality of all Audit Materials and shall not disclose, release, share or disseminate any Audit Materials except as provided herein. Audit Materials produced pursuant to this Order shall only be used for purposes of this Trust in this bankruptcy proceeding (including this Adversary Proceeding) and shall not be used for any other purpose or in any other proceeding ("Allowed Purpose") or disclosed to any person not authorized by this Order to see Audit Materials. In the event that any person or entity not authorized by this Order to see Audit Materials ("third party") seeks access to such materials in the possession of any Party, or other person or entity, the Party, person or other entity from which Audit Materials are sought shall immediately inform the third party of the existence of this Order and notify the Trust of the existence of the request for access to Audit Materials.

August 11, 2008 Order, ¶ 7. The order did, however, allow Hartford to share the Trust information obtained during the course of its audit with its reinsurers, but clarified that the same restrictions and obligations applied to the reinsurers as did to Hartford.

Finally, the order also provided that

[e]xcept as provided in paragraph 8(d) below, no later than six months after Hartford's receipt of Audit Materials, those materials shall be returned to the Trust or destroyed and Hartford shall certify by affidavit to the Trust that all copies of the Audit Materials in Hartford's possession, custody, or control have been destroyed, provided however that Hartford may advise the Trust that it wishes to retain a limited number of documents or excerpts from them to memorialize or summarize the audit and review conclusions, in which

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

416 B.R. 670
**(Cite as: 416 B.R. 670)**

case the Trust and Hartford will seek to reach agreement on such retention and may bring any dispute to the Court.

*Id.* at ¶ 6.

## ISSUES ON APPEAL

Hartford asserts in its statement of issues that it is raising eight issues on appeal, including:

(1) Whether the audit provision, section fourteen, of the settlement agreement permitting Hartford "to review and/or audit the Trust and Trust payments" was clear and unambiguous, and should have been interpreted by the bankruptcy court according to its plain language without resort to extrinsic evidence;

(2) whether the Trust should be permitted to rewrite section fourteen four years later to add an entirely new provision, to which Hartford did not agree, requiring Hartford to maintain the confidentiality of the audit materials;

(3) whether the claim materials that a claimant directly puts at issue to prosecute his/her claim against the Trust are confidential under *Volkswagen;*

(4) whether, even if confidentiality were required as to certain of the audit materials, the bankruptcy court erred in failing to recognize, weigh, or even acknowledge Hartford's specific assurances**\*690** of confidentiality as to certain allegedly sensitive audit materials and its general assurances that it would meet any and all of its legal and statutory confidentiality obligations;

(5) whether the bankruptcy court erred in requiring Hartford to return all audit materials after six months, even though the Trust's motion did not so seek that and the audit provision did not so seek;

(6) whether the bankruptcy court erred in prohibiting Hartford from using audit materials for any purpose not related to the Trust or the bankruptcy

case, where the language of the audit provision does not contain such a limitation;

(7) whether the bankruptcy court erred in holding that Hartford had a duty to correct or rebut a single alleged oral statement of alleged unilateral intent made by the trust parties during extensive negotiations of a significant settlement, where those negotiations resulted in a written settlement agreement containing a[n][sic] integration clause; and

(8) whether the bankruptcy court erred, even if properly considered extrinsic evidence, in ruling in the trust fiduciaries' favor on summary judgment on what raised at most a disputed factual issue as to the parties' intent and understanding as to an alleged proposal that never became part of the integrated settlement agreement.

However, in its opening brief on appeal, Hartford has condensed the issues down into three "central" issues, including:

(1) Whether the bankruptcy court erred in relying on extrinsic evidence to interpret the settlement agreement, where the settlement agreement was undisputedly clear and unambiguous, where the plain language of the agreement authorizes Hartford to obtain and use the Trust materials for any lawful purpose, where neither the trust fiduciaries nor the bankruptcy court offered any other "reasonably susceptible" reading of the settlement agreement, and where Hartford, not the trust fiduciaries, is properly entitled to judgment as a matter of law;

(2) whether the bankruptcy court further erred in interpreting and applying extrinsic evidence to grant summary judgment in favor of the trust fiduciaries, where the extrinsic evidence failed to create an inference that Hartford agreed to limit its review/audit rights, at most raising a genuine issue of material fact; and

(3) whether the bankruptcy court erred in con-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

cluding that Hartford's audit/review rights threatened claimants' privacy rights warranting confidentiality restrictions and permanent injunctive relief, where the evidence demonstrated that the trust materials are overwhelmingly not confidential, claimants have put their claim-related data at issue by filing a claim, and Hartford has repeatedly agreed not to disclose social security numbers, dependent information, and non-asbestos-related medical information.

## DISCUSSION

**A. Standards of Review**

**1. Summary Judgment**

[1] The granting of summary judgment is reviewed *de novo,* making all reasonable inferences in favor of the non-movant to determine whether there exists any genuine issue of material fact precluding judgment in favor of the movant as a matter of law. *In re Lewis,* 97 F.3d 1182, 1185 (9th Cir.1996). Viewing the evidence in the light most favorable to the nonmoving party, the court must determine whether there are any genuine issues of material fact and whether the bankruptcy court correctly applied the substantive law. **\*691** *Id.* An appellate court may affirm a summary judgment on any ground that has support in the record, whether or not relied upon by the lower court. *Sicor Ltd. v. Cetus Corp.,* 51 F.3d 848, 860 n. 17 (9th Cir.1995); *Valdez v. Rosenbaum,* 302 F.3d 1039, 1043 (9th Cir.2002).

[2] Where the bankruptcy court grants summary judgment on a contract claim, the court reviews the bankruptcy court's interpretation and meaning of contract provisions *de novo. See U.S. Cellular Inv. Co. v. GTE Mobilnet, Inc.,* 281 F.3d 929, 933 (9th Cir.2002); *DP Aviation v. Smiths Indus. Aerospace & Def. Sys. Ltd.,* 268 F.3d 829, 836 (9th Cir.2001); *Mendler v. Winterland Prod., Ltd.,* 207 F.3d 1119, 1121 (9th Cir.2000). The determination as to whether contract language is ambiguous and whether the written contract is reasonably susceptible of a proffered meaning, is also a question

of law reviewed *de novo. U.S. Cellular Inv. Co.,* 281 F.3d at 934.

[3][4] However, when the bankruptcy court uses extrinsic evidence to interpret a contract, the court reviews the findings of fact for clear error and the principles of law applied to those facts *de novo. Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.,* 571 F.3d 873, 878 (9th Cir.2009); *DP Aviation,* 268 F.3d at 836. The court reviews the bankruptcy court's admission of the extrinsic evidence for abuse of discretion. *DP Aviation,* 268 F.3d at 836; *Lambert v. Ackerley,* 180 F.3d 997, 1009 n. 12 (9th Cir.1999) (en banc).

[5] In reviewing the bankruptcy court's findings regarding the extrinsic evidence, the Ninth Circuit has held that "review for clear error is significantly deferential and requires a definite and firm conviction that a mistake has been committed." *Marlyn Nutraceuticals,* 571 F.3d at 878. "[I]f the [bankruptcy] court's findings are plausible in light of the record viewed in its entirety, the appellate court cannot reverse even if it is convinced it would have found differently." *Id.* Additionally, the court pays special deference to a trial court's credibility findings. *Id.*

**2. Permanent Injunctive Relief**

[6][7][8] Because the bankruptcy court's "decision to grant a permanent injunction involves factual, legal, and discretionary components," the appellate court "evaluate[s] such a decision under three different standards of review." [FN11] *Walters v. Reno,* 145 F.3d 1032, 1047 (9th Cir.1998); *see also In re Dunbar,* 235 B.R. 465, 470 (9th Cir.BAP1999) (citing *Graham v. Teledyne–Continental Motors,* 805 F.2d 1386, 1388 (9th Cir.1986)). First, it reviews the bankruptcy court's legal conclusions *de novo. Id.* Second, it reviews any factual findings supporting the decision to grant the injunction for clear error. *Id.* Finally, it reviews the scope of the injunction for abuse of discretion. *Id.* However, the district court may not rely on factual findings made incident to the issuance of a permanent injunction when deciding a motion for

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

416 B.R. 670
**(Cite as: 416 B.R. 670)**

summary judgment. *Id.* (citing Fed.R.Civ.P. 52(a) (stating that findings of fact are unnecessary on decisions of motions under Rule 56)); *see also Rand v. Rowland,* 154 F.3d 952, 957 n. 4 (9th Cir.1998) **\*692** (stating that "[a] district court does not, of course, make 'findings of fact' in ruling on a summary judgment motion"); *Bothke v. Fluor Eng'rs & Constructors, Inc.,* 834 F.2d 804, 810 (9th Cir.1987) (stating that the "district court was not entitled to make findings of fact" at summary judgment and holding, therefore, that a prior panel in the same case "erred in applying the 'clearly erroneous' test of Fed.R.Civ.P. 52(a)").

> FN11. A plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief, and is required to show: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *eBay, Inc. v. MercExchange,* 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006); *Geertson Seed Farms v. Johanns,* 570 F.3d 1130, 1136 (9th Cir.2009).

[9][10][11] Under the abuse of discretion standard, the reviewing court must have a firm conviction that the court below committed a clear error of judgment in the conclusion it reached before reversal is proper. *AT&T Universal Card Servs. v. Black,* 222 B.R. 896, 899 (9th Cir. BAP 1998). An error of law is per se an abuse of discretion. *See In re Sternberg,* 85 F.3d 1400, 1405 (9th Cir.1996), *overruled on other grounds by In re Bammer,* 131 F.3d 788 (9th Cir.1997) (en banc). A bankruptcy court necessarily abuses its discretion if it bases its decision on an erroneous view of the law or clearly erroneous factual findings. *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 405, 110 S.Ct. 2447, 110

L.Ed.2d 359 (1990). Review under the "clearly erroneous" standard is significantly deferential, requiring a "definite and firm conviction that a mistake has been committed." *Easley v. Cromartie,* 532 U.S. 234, 242, 121 S.Ct. 1452, 149 L.Ed.2d 430 (2001). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *United States v. Working,* 224 F.3d 1093, 1102 (9th Cir.2000).

**B. Hartford's Appeal**

**1. Trust/Intervener Role on Appeal**

In its brief on appeal, the Trust notes that it is in a unique position because it was created after the settlement agreement was executed, and thus was not a party to the settlement agreement. It, however, was nevertheless recognized in the agreement since it is the Trust upon its subsequent creation that received and maintained the claimant information at issue here.

In terms of legal arguments, the Trust has, for the most part, joined in the trust fiduciaries' arguments. The court has included any supplemental arguments and/or authority added by the Trust to its discussion of the parties' arguments below. Additionally, as noted, the court permitted Hartford to file a separate, additional reply to the Trust's joinder brief. To the extent that Hartford made any new or supplemental arguments in that reply brief, the court has similarly included those in its discussion of the parties' arguments below.

**2. Consideration of Extrinsic Evidence**

Hartford argues that the bankruptcy court erred in considering extrinsic evidence because the settlement agreement was clear on its face. It suggests that any ambiguity was not in the language of the agreement itself, but instead was *created* by the extrinsic evidence. It further argues that the language of the settlement agreement was not "reasonably susceptible" to the interpretation adopted by the bankruptcy court.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

416 B.R. 670
**(Cite as: 416 B.R. 670)**

Based on non-controlling cases and dictionary definitions, Hartford then argues that the "usual and ordinary" meaning of the phrase "audit and/or review" includes a thorough investigation and a comprehensive right to copy and retain the records and to use them for any lawful purpose. Even though the bankruptcy court concluded that "common sense" dictated that Hartford had a right to copy the materials, Hartford argues that its process for reaching such a conclusion was flawed. Hartford implies that resort to "common sense" was unnecessary because the "intrinsic **\*693** breadth" of the terms was evident from their plain meaning.

As for restrictions on its use of the information, Hartford reiterates the argument it made before the bankruptcy court. It contends that the only limitations on its use were the express restrictions in the agreement itself. It points again to the integration clause, and argues that had the parties intended to limit Hartford's use any further, those limitations would have been contained in the agreement itself.

In response, the trust fiduciaries contend that Hartford is wrong in its assertion that consideration of extrinsic evidence to ascertain the parties' intent is appropriate only when the contract is shown to be ambiguous based on the contractual language itself. Instead, they argue that a court "does not decide whether to consider extrinsic evidence based on the facial ambiguity of the contract, but rather on whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." *Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.,* 69 Cal. 2d 33, 37– 40, 69 Cal.Rptr. 561, 442 P. 2d 641 ( Cal . 1968).

The trust fiduciaries challenge Hartford's assertion that the bankruptcy court "launched its inquiry on the wrong foot" in considering the extrinsic evidence. They note that California law actually provides that it is "reversible error for a trial court to refuse to consider [ ] extrinsic evidence on the basis of the trial court's own conclusion that the language of the contract appears to be clear and un-

ambiguous." *Circle Star Center Assoc. v. Liberate Tech.,* 147 Cal.App.4th 1203, 1211, 55 Cal.Rptr.3d 232 (2007); *see also Morey v. Vannucci,* 64 Cal.App.4th 904, 912, 75 Cal.Rptr.2d 573 (Cal.Ct.App.1998).

The trust fiduciaries argue that under California law, the court should follow a two-step process of contract interpretation. *See Wolf v. Superior Court,* 114 Cal.App.4th 1343, 1357, 8 Cal.Rptr.3d 649 (Cal.Ct.App.2004). First, they argue that the court should consider the extrinsic evidence to determine whether the contract term is susceptible of the interpretation offered. *Id.* at 1356–59, 8 Cal.Rptr.3d 649. If it is, then second, they assert the court construes the contract using the extrinsic evidence. *Id.* The trust fiduciaries also contend that the court may consider expert testimony regarding how words are usually understood by persons in the profession or business to which the agreement and/or terms relate. *Id.* at 1357, 8 Cal.Rptr.3d 649. They further argue that even when a contract is integrated, the meaning of the terms of the contract must still be ascertained. *Morey,* 64 Cal.App.4th at 913, 75 Cal.Rptr.2d 573.

In its joinder brief, the Trust adds that Hartford's proffered dictionary definitions for "review" and "audit" are not supported by the language of the settlement agreement or by the terms' alleged plain meaning. It contends that the maintenance of documents in perpetuity and the use of documents outside the context of the Trust is not intrinsic in either term. It further notes that Hartford itself recognized that the right to audit constitutes the right "to examine, verify or correct the financial accounts of an *organization."* The Trust notes that *it* is the organization—not the individual Trust claimants.

The Trust also argues that Hartford's interpretation of "review and/or audit" renders worthless the additional language permitting Hartford to conduct the review or audit at "a time and place convenient to the Trust." It contends that Hartford's position that it has the unfettered right to copy Trust information for dissemination and use the information as it

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

416 B.R. 670
**(Cite as: 416 B.R. 670)**

pleases cannot be reconciled with the fact that the settlement agreement provided the Trust **\*694** with control over the time and place for the review or audit. It argues that if the audit provision simply required the Trust to do as Hartford contends, there would be no need for any such limitation on the place or the timing of the audit.

In reply, Hartford argues that this is a textbook case for why a court should not consider extrinsic evidence when that evidence is offered to add restrictions that are not contained within the agreement itself. It refutes the trust fiduciaries' arguments regarding California law on the issue of the admissibility of extrinsic evidence, asserting that where the language of a contract is "plain," extrinsic evidence is *not* admissible to explain a "latent" ambiguity. Hartford contends that courts may not, as it asserts the bankruptcy court did here, admit extrinsic evidence to give the provision a meaning at odds with its plain language or to add new terms to an agreement. At most, Hartford asserts the bankruptcy court was permitted to "provisionally" consider the extrinsic evidence to determine whether the language in the settlement agreement was "reasonably susceptible" to the interpretation proffered by the trust fiduciaries. However, it contends that was not the case.

*Analysis*

[12] As noted above, the court reviews the bankruptcy court's determination as to whether contract language is ambiguous and whether the written contract is reasonably susceptible of a proffered meaning *de novo. U.S. Cellular,* 281 F.3d at 934.

[13][14] The goal of contract interpretation is to give effect to the mutual intent of the parties at the time of contracting. *Bank of the West v. Superior Court,* 2 Cal.4th 1254, 1264, 10 Cal.Rptr.2d 538, 833 P.2d 545 (Cal.1992). In interpreting contracts, the primary search is for a common meaning of the parties; the object of interpretation in the general law of contracts is to carry out the understanding of the parties rather than to impose obligations on them contrary to their understanding. Rest.2d, Con-

tracts, comment c; *see also* 1 Witkin, Summary, Contracts § 741. The mutual intention to which the courts give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties. *Hernandez v. Badger Constr. Equip. Co.,* 28 Cal.App.4th 1791, 1814, 34 Cal.Rptr.2d 732 (Cal.Ct.App.1994).

Under traditional contract principles, extrinsic evidence is inadmissible to interpret, vary, or add to the terms of an unambiguous integrated written contract instrument. *See, e.g.,* 4. S. Williston, A Treatise on the Law of Contracts § 631; *see also* E. Allen Farnsworth, Contracts, § 7.3 (quoting Williston: "It is generally held that the contract must appear on its face to be incomplete in order to permit parol evidence of additional terms."). California, however, does not follow the traditional rule; *Trident Ctr. v. Conn. Gen. Life Ins. Co.,* 847 F.2d 564, 568–69 (9th Cir.1988) (noting that under California law, "it matters not how clearly a contract is written, nor how completely it is integrated, nor how carefully it is negotiated, nor how squarely it addresses the issue before the court: the contract cannot be rendered impervious to attack by parol evidence. If one side is willing to claim that the parties intended one thing but the agreement provides for another, the court must consider extrinsic evidence of possible ambiguity").

[15][16][17] In *Pacific Gas,* the California Supreme Court established rules governing the use of parol evidence to determine the meaning of contractual language where **\*695** the contract appears clear and unambiguous and is "integrated." **69 Cal. 2d at 33, 69 Cal.Rptr. 561, 442 P. 2d 641**. Under *Pacific Gas,* "[t]he test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether [the instrument] appears to the court to be plain and unambiguous on its face, but

416 B.R. 670
**(Cite as: 416 B.R. 670)**

whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." **69 Cal. 2d at 37, 69 Cal.Rptr. 561, 442 P. 2d 641;** *accord Dore v. Arnold Worldwide, Inc.,* 39 Cal.4th 384, 391, 46 Cal.Rptr.3d 668, 139 P.3d 56 (Cal.2006). A contractual ambiguity arises when the contract's language is reasonably susceptible of more than one application to material facts. *See Dore,* 39 Cal.4th at 391, 46 Cal.Rptr.3d 668, 139 P.3d 56. The court's decision in *Pacific Gas* makes clear, though, that "extrinsic evidence is not admissible to add to, detract from, or vary the terms of a written [integrated] contract," but only to interpret the terms in the contract. **69 Cal. 2d at 39, 69 Cal.Rptr. 561, 442 P. 2d 641;** *Appling v. State Farm Mut. Auto. Ins. Co.,* 340 F.3d 769, 777 (9th Cir.2003).

[18][19] Where the meaning of the words used in a contract is disputed, the trial court must provisionally receive any proffered extrinsic evidence that is relevant to show whether the contract is reasonably susceptible of a particular meaning. *Pacific Gas,* **69 Cal. 2d at 39– 40, 69 Cal.Rptr. 561, 442 P. 2d 641.** Even if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible. *Id.* **at 40 & fn. 8, 69 Cal.Rptr. 561, 442 P. 2d 641.** The fact that the terms of an instrument appear clear to a judge does not preclude the possibility that the parties chose the language of the instrument to express different terms. *Id.* **at 37– 40, 69 Cal.Rptr. 561, 442 P. 2d 641.** Accordingly, rational interpretation requires at least a preliminary consideration of all credible evidence offered to prove the intention of the parties. *Id.*

[20] The court concludes that the bankruptcy court did not err in considering the extrinsic evidence in this case. It finds that the language of the audit/review provision is reasonably susceptible to the meaning urged by the trust fiduciaries, such that

the bankruptcy court was not only permitted, but required, to consider the extrinsic evidence. Hartford's characterization of California law is incorrect. As noted, the California Supreme Court has rejected the traditional approach regarding the consideration of parol evidence, so it was unnecessary that the bankruptcy court conclude that the settlement agreement was ambiguous prior to considering the extrinsic evidence. However, even if the court were to consider whether the agreement was ambiguous on its face, contrary to Hartford's argument otherwise, it finds that there is no plain meaning contained within the agreement itself regarding the purpose for and limitations on Hartford's audit/ review rights, and also regarding Hartford's "copying" rights, and therefore that, in addition to being reasonably susceptible to the trust fiduciaries' interpretation, the agreement is ambiguous.

Having concluded that is the case, the court turns now to the bankruptcy court's interpretation of the extrinsic evidence.

**3. Extrinsic Evidence regarding Settlement Negotiations**

**a. Hearsay Objection**

[21][22] Preliminarily, the court notes that in its briefing before this court, Hartford has lodged an evidentiary objection to declarations submitted by the trust fiduciaries in support of their motion for summary**\*696** judgment. The arguments it makes here were not well-developed in the bankruptcy court.

Although Hartford's papers before this court imply that it raised all of the evidentiary issues before the bankruptcy court, that is not the case. Instead, in tiny font in one of numerous footnotes in its brief in opposition to the trust fiduciaries' summary judgment motion, Hartford simply asserted that a statement in Brayton's declaration constituted "textbook hearsay" and was inadmissible under Federal Rule of Evidence 801. Adv. No. 45, at 15 n. 13. In their reply brief before the bankruptcy court,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

416 B.R. 670
**(Cite as: 416 B.R. 670)**

the trust fiduciaries responded that they offered Brayton's declaration, which contained statements made by McClain and Hartford during negotiations, not for the truth of the matters asserted, but for the fact that the statements were made as part of the contract negotiations. Adv. 60, at 10. That was the extent of the argument below.

The bankruptcy court did not explicitly rule on this hearsay objection. However, as noted above, at the March 31, 2008 hearing, the bankruptcy court queried the trust fiduciaries as to why *Brayton's* declaration was submitted as evidence of what *McClain* had said during the settlement negotiations, and why the recipient of the statement on behalf of Hartford was not named. *See* April 11, 2008 Order at 11 & n. 6. The trust fiduciaries explained that at the time they submitted their motion for summary judgment in the adversary case, McClain was out of the country and unavailable, and noted that in any event, his own declaration containing the same statement was submitted at an earlier date in the main bankruptcy case. The bankruptcy court was also advised that Hartford's current attorney, William Bowman, who was also the attorney representing it at the March 31, 2008 hearing, was actually the recipient of McClain's statement and that Bowman had not been named in the declaration out of sensitivity to the fact that he remained Hartford's lead counsel. Bowman did not deny this fact, and, in its April 11, 2008 order, the bankruptcy court concluded that "the evidence presented [was] sufficient to establish a prima facie case that the statement [contained in Brayton's declaration] was made by McClain to Bowman during settlement negotiations." *Id.*

On appeal, Hartford has now raised the issue in much greater detail than it did before the bankruptcy court. It argues that the bankruptcy court inappropriately considered (and credited) not only Brayton's declaration—but also McClain's declaration, when it should have excluded the declarations as inadmissible hearsay. Hartford argues that the declarations were utilized in a manner in violation

of the hearsay rules, and that the statements in the declarations were accepted by the bankruptcy court to prove that the parties intended for Hartford's audit and review rights to be limited in purpose.

In response, the trust fiduciaries assert that they offered the declarations to demonstrate what occurred during the settlement negotiations and what the parties intended by the language used in the agreement. They argue that the evidence is nevertheless also admissible under Federal Rule of Evidence 801(d)(2) because it, at least in part, constitutes Hartford's own statements, the admissions of a party-opponent. Additionally, citing to the California Code instead of the Federal Rules of Evidence, which are applicable in this case and were applicable in the proceedings before the bankruptcy court, the trust fiduciaries also argue that statements made by McClain were offered not for the truth of the matter asserted, but simply to establish that the statements were made and to establish the scope of the settlement **\*697** agreement. Again, they cite to California law and further argue that the declarations were admissible because they reflect Hartford's knowledge of the trust fiduciaries' intent in entering into the settlement agreement.

In reply, Hartford implies that regardless of the purpose for which Brayton's and McClain's statements were proffered, the bankruptcy court utilized the statements as direct evidence of the trust fiduciaries' intent, a use that constitutes "textbook hearsay." It further argues that even if the statements were offered to show the scope of the settlement agreement, the circumstances surrounding the negotiations, and the issues addressed during negotiations, that the statements were unnecessary because the scope and circumstances were clear from the settlement agreement itself.

*Analysis*

[23] The court reviews the bankruptcy court's admission of the challenged statements for an abuse of discretion. *DP Aviation,* 268 F.3d at 836; *Lambert,* 180 F.3d at 1009 n. 12; *see also Domingo v. T.K.,* 289 F.3d 600, 605 (9th Cir.2002) (evidentiary

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

416 B.R. 670
**(Cite as: 416 B.R. 670)**

rulings made in context of summary judgment are reviewed for an abuse of discretion). The bankruptcy court did not rule explicitly on Hartford's hearsay objection, most likely because the issue was inadequately raised by Hartford. As noted, Hartford did not object in the bankruptcy court on hearsay grounds to McClain's declaration. Instead, the specific language that Hartford challenged included Brayton's statement in his declaration that

[i]n the settlement discussions, Mr. McClain told Hartford's representatives that the plan proponents would not agree that Hartford could use individual claimant submissions to the Trust for purposes other than those connected to the Trust. Hartford's representatives did not state or suggest in response that Hartford believed the review/ audit right it was requesting would allow use of individual claimant submissions for any purposes other than those connected to the trust or for Hartford's own purposes.

Brayton Decl. ¶ 16.

It appears to the court that the above statements were indeed being offered by the trust fiduciaries both for the truth of the matter—to demonstrate that McClain in fact advised Hartford of its opposition to use of Trust information for purposes not related to the Trust—and also *not* necessarily for the truth of the matter, but instead to demonstrate that there were indeed conversations during the course of the settlement conversations regarding limitations on Hartford's use of Trust information. It further appears to the court that the bankruptcy court relied on the evidence for both purposes. Because only the former purpose would need to satisfy a hearsay exception, this court is concerned with that one only.

Although the bankruptcy court did not explicitly rule on Hartford's hearsay objection, its April 11, 2008 order demonstrates that it clearly recognized the potential hearsay implications associated with the challenged statements in Brayton's declaration. First, to the extent that Brayton's declaration provided *McClain's* out-of-court statement, the

bankruptcy court essentially found that: (1) the statement was duplicative of a statement contained in McClain's own declaration for which such hearsay concerns did not appear to exist; and (2) that, even if such hearsay concerns existed with respect to the statement as contained in McClain's own declaration, the statement possessed sufficient "guarantees of trustworthiness" such that it would satisfy the residual hearsay exception of Rule 807. *See* April 11, 2008 Order **\*698** at 11 & n. 6 (noting that "the evidence presented [was] sufficient to establish a prima facie case that the statement was made by McClain to Bowman during settlement negotiations"). This court thus finds that the bankruptcy court did not abuse its discretion in admitting McClain's statement.

Second, regarding Brayton's assertion that *Hartford's* representatives failed to respond to McClain's statement, the court finds that to the extent that Hartford's statement, or lack thereof, could constitute hearsay, it was admissible under Rule 801(d)(2) as an admission of a party-opponent, and the bankruptcy court therefore did not abuse its discretion in admitting the statement regarding Hartford's response.

**b. Interpretation of Agreement and Settlement Negotiations Evidence**

[24][25] Hartford argues that even if it was proper for the bankruptcy court to consider the extrinsic evidence, the court interpreted the evidence improperly and that Hartford was actually entitled to judgment as a matter of law. It argues that the bankruptcy court erroneously accepted the extrinsic evidence of only one side of the negotiations—that of the trust fiduciaries. Hartford contends that there is no evidence of mutual intent, but simply evidence of unilateral statements of intent.

Hartford further argues that the bankruptcy court erred in concluding that based on McClain's and Brayton's statements, the trust fiduciaries did not agree to Hartford's use of the information for purposes unrelated to the case. It also disputes the bankruptcy court's determination that Hartford had

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

416 B.R. 670
**(Cite as: 416 B.R. 670)**

some sort of duty to rebut or "correct" the trust fiduciaries' unilateral statement of intent. Hartford asserts that silence or inaction in the face of an offer does not constitute acceptance. *Sorg v. Fred Weisz & Assocs.,* 14 Cal.App.3d 78, 81, 91 Cal.Rptr. 918 (Cal.Ct.App.1970). It argues that the case relied on by the bankruptcy court for this duty, *Golden Eagle,* is distinguishable from this case because in *Golden Eagle,* the parties had a pre-existing contractual relationship in addition to actual acceptance. 20 Cal.App.4th at 1389–90, 25 Cal.Rptr.2d 242. Hartford contends that, in this case, it never agreed to or accepted the proposed limitation on its audit or review rights. Moreover, Hartford argues that it actually rejected the proposed limitation as evidenced by the fact that such limitation is *not* included in the settlement agreement.[FN12]

> FN12. The court notes that this argument is contrary to Hartford's counsel, Bowman's statements on the record before the bankruptcy court at the March 31, 2008 hearing, and also to the findings of the bankruptcy court.

The trust fiduciaries respond that the bankruptcy court correctly interpreted the evidence and the settlement agreement, citing to a number of factors. They first note that at the time of the negotiations, the June 13, 2003 stipulated protective order governed disclosure of Trust claim information. They assert that the existence of the protective order sheds light on the status quo prior to and at the time of the settlement negotiations. They note that the parties negotiated the settlement agreement against a backdrop of existing restrictions on the use of the Trust information. *See* Cal. Civ.Code § 1647; *City of Atascadero v. Merrill Lynch et al.,* 68 Cal.App.4th 445, 474, 80 Cal.Rptr.2d 329 (Cal.Ct.App.1998).

Additionally, the trust fiduciaries argue that the fact that, in the settlement agreement, Hartford's audit rights are contained in a section separate from its payment obligations does not mean that the parties intended to extend Hartford's audit rights to purposes beyond those of the **\*699** agreement. They point out that in each of the term sheets exchanged by the parties in their negotiations, Hartford's right to audit and review was in the same section as the limitation on the trust fiduciaries' use of the settlement proceeds. The trust fiduciaries therefore assert that Hartford's audit right was tied to the reciprocal requirement that the trust fiduciaries utilize Hartford's settlement payments solely in connection with asbestos-related claims. Accordingly, the trust fiduciaries assert that Hartford's reciprocal right to audit is similarly restricted to Trust purposes only (including for purposes of obtaining reinsurance). The trust fiduciaries argue that although the final settlement agreement moved Hartford's audit right to a separate section, this did not affect the sole purpose of the audit provision, which was to permit Hartford to ensure that its payments under the agreement were used in connection with the asbestos-related claims, and for no other purpose.

The trust fiduciaries also argue that the absence of language that explicitly *permits* Hartford to use Trust information for any purpose is more significant than the absence of an express *limitation* on Hartford's use of the information. They argue that there is no evidence that Hartford bargained to acquire a right to audit the Trust information for any purpose. Rather, according to the trust fiduciaries, the parties "negotiated for Hartford's payment to the Trust to resolve litigation and the dismissal of [Hartford's] objections to the [chapter 11] plan of reorganization in return for a buy-back of the Hartford insurance policies and a release of claims under those policies." They assert that with the audit provision, Hartford sought to "preserve its rights to reinsurance for the sums it was paying into the Trust and the negotiators accommodated that desire with a limitation on the use of the settlement payments and a review/audit right."

Finally, the trust fiduciaries challenge Hartford's assertion that the extrinsic evidence demonstrates only "unilateral" intent. Instead, they argue

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

416 B.R. 670
**(Cite as: 416 B.R. 670)**

that the undisputed evidence regarding the negotiating history of the agreement demonstrates that the parties possessed a common understanding of Hartford's right to review/audit the trust.

In reply, Hartford contends that its statement during contract negotiations that it needed the audit right for reinsurance purposes suggests only that that was *one* purpose in obtaining its rights, but not that it was its *only* purpose. Hartford also argues that given the existence of the integration clause in the final settlement agreement, the "contextual" considerations regarding the settlement negotiations do not require the conclusion that the parties mutually agreed to a settlement that limited Hartford's audit rights in the manner adjudged by the bankruptcy court. It further contends that if the parties had intended for the non-disclosure provisions of the protective order in effect at the time of the negotiations to apply to its rights under the settlement agreement, the parties would have incorporated or referred to the protective order in the settlement agreement.

*Analysis*

As noted above, when the bankruptcy court uses extrinsic evidence to interpret a contract, the court reviews the findings of fact for clear error and the principles of law applied to those facts *de novo*. *Marlyn Nutraceuticals,* 571 F.3d at 878; *DP Aviation,* 268 F.3d at 836.

The court concludes that the bankruptcy court did not err in finding that the communications surrounding the settlement agreement indicated that the parties understood that any Trust information that Hartford obtained through the audit could not be used for purposes unrelated to the **\*700** Trust. Hartford's argument that the bankruptcy court relied on evidence of unilateral intent—as opposed to mutual intent—overlooks an important fact. Hartford failed to offer any evidence to refute the evidence submitted by the trust fiduciaries that during settlement negotiations, Hartford was advised that any review/audit rights granted by the trust fiduciaries would be limited to the purposes of the Trust. Hart-

ford made the tactical decision not to offer any extrinsic evidence creating a triable issue of fact regarding what occurred during the settlement negotiations, but instead chose to rely on its arguments that the bankruptcy court should not consider the trust fiduciaries' extrinsic evidence, and also that the trust fiduciaries' evidence regarding McClain's statement was irrelevant because Hartford never affirmatively agreed to any such limitation. *See* April 11, 2008 Order at 13.

Under Rule 56(e), an adverse party to a motion for summary judgment must allege specific facts supported by an affidavit that raise genuine issues for trial. *Brinson v. Linda Rose Joint Venture,* 53 F.3d 1044, 1049 (9th Cir.1995). It was not sufficient for Hartford to simply argue that the trust fiduciaries' evidence should be disregarded as irrelevant or self-serving. *See National Union Fire Ins. Co. v. Argonaut Ins. Co.,* 701 F.2d 95, 97 (9th Cir.1983); *Gasaway v. Northwestern Mut. Life Ins. Co.,* 26 F.3d 957, 960 (9th Cir.1994). In other words, Hartford's failure to submit extrinsic evidence regarding the mutual intent of the parties does not transform the trust fiduciaries' evidence into mere evidence of "unilateral intent."

[26][27] Hartford also failed to refute extrinsic evidence submitted by the trust fiduciaries that at the time of the settlement negotiations, it did not respond to or reject a limitation on its use of the Trust information. In light of the circumstances, Hartford had a duty to speak up and object to the limitation. "As a general rule, silence or inaction does not constitute acceptance of an offer." *Circuit City Stores, Inc. v. Najd,* 294 F.3d 1104, 1109 (9th Cir.2002) (citing *Golden Eagle,* 20 Cal.App.4th at 1372, 25 Cal.Rptr.2d 242). However, "where circumstances or the previous course of dealing between the parties places the offeree under a duty to act or be bound, his silence or inactivity will constitute his assent." *Id.* (citing *Beatty Safway Scaffold, Inc. v. Skrable,* 180 Cal.App.2d 650, 4 Cal.Rptr. 543 (Cal.Ct.App.1960)); *see also Golden Eagle,* 20 Cal.App.4th at 1387, 25 Cal.Rptr.2d 242 ("silence

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

or inaction operates as an acceptance 'where the offeror has stated or given the offeree reason to understand that assent may be manifested by silence or inaction' ") (citing Restatement of Contracts (Second) § 69(1)(b)); *but see Sorg,* 14 Cal.App.3d at 81, 91 Cal.Rptr. 918 ("[t]he tactic of attempting to create a contract by a letter stating a price, on the theory that silence and inaction would constitute an acceptance, has been consistently rejected by the courts").

Here, given the length and intensity of the settlement negotiations, the fact that the parties did indeed have a course of dealing throughout the bankruptcy case, and the undisputed evidence that the parties were concerned with the connection between Hartford's payments and the Trust's purposes, evidenced in part by a limitation on the trust fiduciaries' use of Hartford's payments under the agreement, the court concludes that to the extent that Hartford objected to a reciprocal limitation on its audit and review rights, it was, under the circumstances, obligated to speak up. Hartford indisputably failed to do so. Accordingly, under California law, Hartford's silence may be viewed as assent to the limitation on its use of Trust information.

**\*701** This court's conclusion that the parties understood that any Trust information that Hartford obtained through the audit could not be used for purposes unrelated to the Trust is further supported by the agreement itself and by the context of the negotiations. Even though the bankruptcy court determined that the June 13, 2003 stipulated protective order was no longer in effect at the time Hartford attempted to exercise its audit rights under the agreement in 2007, *at the time that the parties were negotiating the settlement agreement* in December 2003, that stipulated protective order was in effect. FN13

> FN13. On August 20, 2007, the bankruptcy court ruled on the record that the stipulated protective order was only in effect until the settlement agreement became effective. The settlement agreement did not become

effective until the bankruptcy court confirmed the chapter 11 plan on January 27, 2004. Accordingly, the stipulated protective order remained in effect at the time the parties conducted their settlement agreement negotiations.

That protective order designated Trust-related information "confidential" and "highly confidential" and placed restrictions on the use of such information. Specifically, the order provided that:

> All Protected Materials shall be used by the parties and their counsel solely for the purpose of prosecuting or defending the Litigation, and shall not be used for any other purpose, including but not limited to the prosecution or defense of any other litigation or claims, unless otherwise agreed to by the party who has designated the materials as protected.

June 13, 2003 Stipulated Protective Order at ¶ 5.

Accordingly, at the time the parties were drafting the settlement agreement, they would have been operating pursuant to an understanding that the use of the Trust information—at least at that time—was limited in purpose. The absence of any language in the settlement agreement altering the status quo, combined with the surrounding circumstances, further suggests that the parties intended that any Trust information that Hartford obtained through the audit could not be used for purposes unrelated to the Trust.

### 4. Expert Opinions/ Existence of Genuine Issues of Material Fact

[28] Hartford also argues that to the extent the trust fiduciaries' extrinsic evidence may be considered probative, the bankruptcy court improperly made factual findings as to disputed material issues, including the credibility of the experts and the persuasiveness of the proffered expert opinions. Specifically, Hartford asserts that: (1) the plain language of the agreement; (2) its expert, Ceppi's opin-

416 B.R. 670
**(Cite as: 416 B.R. 670)**

ion; and (3) the trust fiduciaries' expert, Guy's opinion, created disputed issues of fact. *See* Opening Br. at 17–20; Reply at 6–8.

Hartford asserts three categories of factual disputes that it contends are raised by the above three sources. They include alleged disputes as to: (1) limitations on Hartford's use of the Trust information; (2) Hartford's duty of confidentiality with respect to the Trust information; and (3) Hartford's ability to retain copies of the Trust information that it receives pursuant to any audit/review. At the outset, the court notes that it has *not* provided the parties' arguments with respect to, or addressed, the latter two categories in this section. Instead, the court has considered any issues related to privacy and confidentiality in a separate section below. Additionally, because the court finds that Hartford's ability to retain copies of Trust information is not associated with the declaratory relief granted to the trust fiduciaries in conjunction with their summary judgment motion, but instead concerns **\*702** *conditions of the permanent injunction* granted by the bankruptcy court, the court has included that issue below with its discussion of the permanent injunction. Accordingly, the only alleged factual dispute addressed in this section concerns the limitations on Hartford's use of the Trust information.

Regarding the plain language of the agreement, Hartford essentially reiterates its arguments above that the only limitations on its use of the Trust information were those contained in the agreement itself. As for its expert Ceppi's testimony, Hartford contends that summary judgment standards required the bankruptcy court to *credit* Ceppi's testimony wherever it contradicted Guy's testimony. *Id.* Hartford does not argue that Ceppi specifically stated that its audit/review of Trust information should be unlimited in purpose. Instead, with respect to limitations on its use of the Trust information, Hartford simply notes that "Mr. Ceppi explained that when an insurer conducts an audit there are a 'wide range of legitimate motivations' for that audit, ranging from 'obtaining information regard-

ing claimants that may seek to recover damages from other parties' to 'suggest[ing] improvements to ensure that claims are evaluated properly.' " Opening Br. at 19; Ceppi Decl. at ¶ 6. It asserts that the bankruptcy court should have construed this testimony to raise a factual issue as to the limitations on use asserted by the trust fiduciaries.

In response, the trust fiduciaries contend that Hartford cannot now, for the first time on appeal, argue that a disputed issue of material fact exists when it failed to raise the dispute before the bankruptcy court below. *Komatsu v. States Steamship Co.,* 674 F.2d 806, 812 (9th Cir.1982); *International Union of Bricklayers v. Jaska,* 752 F.2d 1401, 1405–06 (9th Cir.1985). They note that Hartford repeatedly argued to the bankruptcy court that there were no disputed issues of fact and that the court should interpret the contract as a matter of law. *See, e.g.,* March 31, 2008 Transcripts at 43. The trust fiduciaries thus contend that the court should decline to consider Hartford's argument that a genuine issue of material fact exists so as to preclude summary judgment.

Alternatively, even if Hartford is permitted to raise the argument now, the trust fiduciaries argue that it nevertheless has not presented evidence sufficient to establish a genuine issue of material fact. Oppos. at 7–10. They first argue that the contractual language and Hartford's proffered dictionary definitions were insufficient to create an issue of disputed fact. They contend that the dictionary definitions proffered by Hartford are actually in accordance with their expert, Guy's opinion. Oppos. at 9.

The trust fiduciaries further counter that Hartford's expert's declaration also did not create a triable issue, and argue that Ceppi did not disagree with the trust fiduciary's expert, Guy's opinion that an auditor is not permitted to use audit documents for his or her own purposes. In support, they note the bankruptcy court's finding that "[n]owhere in Ceppi's declaration does he expressly state that, in his opinion, an auditor would be free to use inform-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

416 B.R. 670
**(Cite as: 416 B.R. 670)**

ation obtained during an audit for purposes unrelated to the audit without the consent of the entity being audited." Order at 15.

The trust fiduciaries deny that the bankruptcy court weighed the expert declarations and made credibility findings regarding the experts. They characterize the bankruptcy court's statement regarding Ceppi as an observation that, like Hartford, its own expert similarly failed to provide any evidence to support Hartford's argument that the agreement allowed it to use and disseminate Trust materials for **703** any purpose it chose. Additionally, the trust fiduciaries also note that they objected to Ceppi's testimony before the bankruptcy court not only on the basis that he was biased by reason of his regular retention by Hartford, but also under Federal Rule of Evidence 702. They argued essentially that because Ceppi's experience was in the field of insurance audits, and that because the parties agreed in the settlement agreement that the agreement was "not an insurance contract," Ceppi's opinions were irrelevant and he failed to qualify as an expert.

In reply, Hartford argues that even if the extrinsic evidence in this case pointed to a meaning to which the agreement was susceptible, there was still a factual issue regarding the parties' intent. It contends that the bankruptcy court's resolution of factual issues and credibility determinations on summary judgment was inappropriate. It further argues that the bankruptcy court did not view the evidence in a light most favorable to Hartford; nor did it draw inferences in favor of Hartford or strictly construe the evidence in its favor.

In a footnote, Hartford also argues that it did not waive its right to assert a factual dispute. Reply at 6 n. 2. It concedes that it "first argued" before the bankruptcy court that it was entitled to judgment as a matter of law. However, it implies that by offering expert testimony from Ceppi in opposition to the trust fiduciaries' summary judgment motion, it was "establishing a genuine issue of material fact regarding contractual intent." *Id.*

It further asserts that Ceppi's declaration created a genuine issue of material fact. It argues that the bankruptcy court erred when it questioned Ceppi's persuasiveness. It notes that Ceppi's declaration spoke directly to any specialized meaning that the terms possessed in the context of this case. It also notes that Ceppi is an expert in conducting re-insurance audits.

Hartford also contends that the bankruptcy court erred in crediting Guy's testimony. It contends that none of the parties to the agreement were accountants, and that there is no evidence that the terms "review and/or audit" should be interpreted according to accounting principles. Therefore, it argues that Guy's opinions were irrelevant, and that Ceppi's testimony was the only relevant testimony on the issue, given his experience in the insurance field.

*Analysis*

The trust fiduciaries are correct that Hartford never argued before the bankruptcy court that a genuine issue of material fact existed that prevented the court from granting summary judgment. Instead, as noted, Hartford repeatedly argued that the extrinsic evidence submitted by the trust fiduciaries, including Guy's declaration, was irrelevant and also that the bankruptcy court was prevented from considering it. *See* Hartford's March 17, 2008 Brief in Oppos. to Pl. Mot. for Summary Judgment at 1 ("The Trust Parties necessarily contend in their cross-motion that there are no disputed issues of material fact, and that the Court can enter judgment as a matter of law. Hartford agrees."); *id.* at 2 ("The Trust Parties proposed 'evidence' is entirely insufficient to create an issue of fact—much less carry the burden of dispelling any dispute"); *id.* at 6 ("Hartford agrees with the first premise of the Trust Parties' motion that 'there is no dispute as to a genuine issue of material fact with respect to the contract interpretation of Section 14.1.' "). As noted above, other than Ceppi's declaration, Hartford chose not to submit any of its own extrinsic evidence to refute the trust fiduciaries' evidence,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

416 B.R. 670
**(Cite as: 416 B.R. 670)**

and further chose not to argue that a disputed issue of material fact prevented the court from ruling on the motion as a matter of law.

**\*704** The Ninth Circuit has held that "an appellant may not overturn a summary judgment by raising an issue of fact on appeal that was not plainly disclosed as a genuine issue in the trial court" unless it is "necessary to prevent manifest injustice." *Komatsu,* 674 F.2d at 812; *Kline v. Johns–Manville,* 745 F.2d 1217, 1221 (9th Cir.1984) (refusing to consider parties' argument "that there [was] a material factual dispute that rendered summary judgment improper" where party failed to raise the issue below in the district court). Here, based on the above Ninth Circuit cases, on appeal, this court similarly will not consider issues not raised by Hartford below. Unlike in its briefs on this appeal, Hartford did not point to a single triable issue of fact in its opposition brief or in its oral arguments before the bankruptcy court.

Hartford's mere presentation of Ceppi's declaration to the bankruptcy court without any explication does not somehow magically transform the nature of the arguments that it made before the court below, particularly given that Hartford explicitly clarified that it was *not* presenting Ceppi's declaration to demonstrate a disputed issue of material fact, but instead was presenting the declaration to show that an insurance claim review-type audit was appropriate—as opposed to the financial-type audit described by Guy. *See* Hartford's March 17, 2008 Brief in Oppos. to Pl. Mot. for Summary Judgment at 11. However, even if this court were to construe Hartford's submission of the Ceppi declaration as having sufficiently raised a claim that there was a genuine issue of material fact, the court nevertheless concludes that the bankruptcy court did not err in its resolution of the related issues.

[29][30] An expert is not permitted to offer a legal opinion on the meaning of a contract. *See Morrow v. Los Angeles Unified School Dist.* 149 Cal.App.4th 1424, 1444–45, 57 Cal.Rptr.3d 885 (Cal.Ct.App.2007); *Cooper Companies v.*

*Transcontinental Ins. Co.,* 31 Cal.App.4th 1094, 1100, 37 Cal.Rptr.2d 508 (Cal.Ct.App.1995). Although an expert may testify to industry custom and usage with respect to particular contractual terms, it is not appropriate for the expert to opine on the ultimate contract interpretation issue. *Id.; see also Balfour, Guthrie & Company, Ltd. v. Gourmet Farms,* 108 Cal.App.3d 181, 190, 166 Cal.Rptr. 422 (Cal.Ct.App.1980).

Here, the bankruptcy court employed the expert testimony for a proper purpose, and did not rely on expert opinion for the ultimate interpretation issue. It simply found that the trust fiduciaries' expert was more persuasive than Hartford's on *one* issue: whether the industry usage of the terms "audit and/or review" generally allowed for the information obtained during the course of the audit to be used for purposes other than those related to the audit. Hartford Appx., Exh. 4. at 15. Because Hartford's expert *failed* to offer a competing opinion on the issue, the bankruptcy court's finding was reasonable. In other words, this was not a case where the bankruptcy court improperly weighed competing expert opinions on the issue; instead, it was a case in which the bankruptcy court simply found that one of the experts failed to offer a competing opinion creating a triable issue of fact. Moreover, the court notes that the bankruptcy court does not appear to have relied *at all* on the expert opinions in its resolution of the issues for which there were indeed competing opinions: the duty of confidentiality or Hartford's retention of Trust information, discussed below.

[31] Because of the deficiency in Ceppi's declaration, his opinion was "not of sufficient quantum or quality to create [a] genuine issue[ ] of material fact," and the bankruptcy court did not err, much less **\*705** abuse its discretion, in its interpretation of Ceppi's declaration or in ruling that it was less persuasive than Guy's for this reason. *Triton Energy Corp.,* 68 F.3d at 1222 (concluding that plaintiff's expert's opinion did not create a genuine issue of material fact based on expert's failure to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

416 B.R. 670
**(Cite as: 416 B.R. 670)**

conduct sufficient inspection of device at issue). Moreover, the court further concludes that the bankruptcy court did not abuse its discretion in implicitly determining that Guy qualified as an expert and that his opinion regarding financial audits was helpful under Federal Rule of Evidence 702. *See Domingo,* 289 F.3d at 605 (evidentiary rulings made in the context of summary judgment are reviewed for an abuse of discretion).

Finally, Hartford's argument that the plain meaning of the agreement created a genuine issue of material fact has already been rejected above given that this court has concluded that the bankruptcy court was permitted to consider the extrinsic evidence, and that the undisputed extrinsic evidence pertaining to the settlement negotiations established that the parties intended that any Trust information that Hartford obtained through the audit could not be used for purposes unrelated to the Trust.

**5. Confidentiality**

[32] Hartford reiterates many of the same arguments that it made before the bankruptcy court regarding the confidentiality of the Trust materials, and contends that: (1) the majority of the materials are not confidential; (2) the Trust claimants waived confidentiality under California law; and (3) it agreed to adequate measures to protect confidential materials.

First, Hartford argues that the bankruptcy court ignored the fact that most of the information the Trust claimants provided was routine information, such as work history, smoking history, claimed economic loss, and other exposure information. Second, Hartford contends that under California law, claimants waived any confidentiality concerns by putting their medical status at issue. *See Volkswagen,* 139 Cal.App.4th at 1481, 43 Cal.Rptr.3d 723. It argues that the bankruptcy court's distinction of the *Volkswagen* case is unpersuasive.

Hartford also contends that claim submissions to the Trust are not confidential because the Trust itself has a quasi-public nature. It argues that trusts like the one here have a duty to compensate only valid claim holders, and that courts should not allow claimants to shield certain potentially fraudulent statements. Hartford cites to a case involving one of Brayton's clients, from an Ohio state court, in which Brayton acknowledged that his client, an asbestos claimant, overstated his exposure and submitted inconsistent submissions to several asbestos trusts. Finally, Hartford argues that its assurance that it would maintain the confidentiality of claimants' social security numbers, information regarding minor children, and non-asbestos-related medical information was more than sufficient to alleviate any privacy concerns.

In response, the trust fiduciaries dispute that the Trust claims are not actually confidential. They note that the Trust beneficiaries are required to submit extensive medial information, financial information, and also personal identifying information regarding themselves, their dependants, and their beneficiaries. They argue that the fact that some of the information is "routine" and publicly available does not destroy the privacy interests of the claimants with respect to the confidential information. The trust fiduciaries note some examples of confidential information, including the fact that a claimant used methadone and wore diapers, a claimant's discussion of the last days of his wife's life, **\*706** and a claimant's discussion of marijuana and other drug use, among others.

The trust fiduciaries argue that the Trust claimants possess a right to privacy in their confidential information. Although they acknowledge that the Trust is a Nevada trust subject to Nevada law, they assert that many of the beneficiaries are California residents with rights under California law. Accordingly, the trust fiduciaries have addressed the issues primarily under California law in arguing that the Trust claimants have a right to privacy. *Valley Bank of Nevada v. Superior Court,* 15 Cal.3d 652, 656, 125 Cal.Rptr. 553, 542 P.2d 977 (Cal.1975); *Board of Medical Quality Assurance v. Gherardini,* 93 Cal.App.3d 669, 678, 156 Cal.Rptr.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

416 B.R. 670
**(Cite as: 416 B.R. 670)**

55 (Cal.Ct.App.1979).

The trust fiduciaries argue that the claimants have *not* waived their confidentiality rights simply by submitting Trust claims. They argue that the *Volkswagen* case relied on by Hartford simply stands for the proposition that a defendant in a lawsuit is entitled to discovery regarding a plaintiff's medical conditions that are at issue in litigation. They assert that if indeed Hartford is actually a party to litigation in which the Trust claimants have put their medical condition at issue, then it can seek discovery of the type allowed in *Volkswagen.* They contend that Hartford's justification for the confidential information here—that a Trust claimant *may have* presented conflicting information in connection with another case or trust—is insufficient to overcome the claimants' confidentiality rights.

Additionally, the trust fiduciaries note that the Trust claimants were not themselves parties to the settlement agreement, and thus imply that the claimants could not have waived their confidentiality rights in the negotiation process. Instead, the trust fiduciaries assert that the agreement was made by the parties to the bankruptcy case and the state court coverage litigation, and that the scope of the negotiations concerned only resolution of disputes in those cases—not necessarily the claimants' confidentiality rights.

In its joinder brief, the Trust contends that at the time the parties entered into the settlement agreement, they necessarily understood that some of the claimant information was of a confidential nature since they were already litigating under a protective order that prohibited the dissemination of existing claimant information. The Trust argues that there were no successive events that changed the nature of the claimant information; nor are there any provisions in the settlement agreement that may be interpreted to waive the claimants' privacy rights.

The Trust further notes that since it came into creation, it has always treated the claimant information as confidential, and that it has a third-party disclosure policy by which it notifies a claimant of a request for claimant information, and provides the claimant with the opportunity to object to disclosure. Decl. of Sara Beth Brown, ¶¶ 11–14. It also states that it recognizes Hartford's legitimate audit rights, but that those rights are limited by the claimants' privacy concerns. The Trust further notes that it worked diligently to fashion a solution that would balance Hartford's audit rights with its claimants' privacy rights, but that its efforts were unsuccessful. It asserts that after it informed the trust fiduciaries of Hartford's demand, the subsequent litigation resulted. It contends that the resulting litigation has been time-consuming and very expensive, and has ultimately "taxed the resources available to this limited fund that exists to compensate—only in part, unfortunately—injured claimants." The Trust asserts that the bankruptcy court's decisions and injunction are in large part consistent with **\*707** the very offers the Trust made Hartford prior to the litigation, and states that the injunction strikes the appropriate balance between recognizing Hartford's audit rights and the continued confidentiality of claimants' information.

The Trust further adds that the claimants' expectations of privacy in the Trust process must be greater than those that would exist in the context of litigation. It notes that the Trust is not an adversary to the claimants, but is an entity established by the bankruptcy court to fairly resolve their claims against the debtors. Moreover, the Trust further disputes the notion that Trust claimants waived their confidentiality rights because they had actual or constructive notice of the settlement agreement. It asserts that it is unreasonable to assume, based on the language of the audit provision, that a claimant who read the settlement agreement would understand that s/he was relinquishing their privacy rights.

In reply, Hartford argues that the trust fiduciaries' attempt to distinguish the California court's decision in *Volkswagen* is unpersuasive. 139

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

416 B.R. 670
**(Cite as: 416 B.R. 670)**

Cal.App.4th at 1494, 43 Cal.Rptr.3d 723. It argues that the court's decision in that case, that similar information was not confidential or private, was *not* predicated on the procedural posture of the case, as assumed by the trust fiduciaries and the bankruptcy court. Instead, it argues that the *Volkswagen* court determined that such submissions were not confidential because they had been submitted to support a demand for payment on a claim. *Id.* Hartford argues that the same is the case here with the Trust claimants.

Hartford also implies that confidential Trust information should be segregated and treated differently than non-confidential Trust information. It concedes that there is a dispute that certain information is private,FN14 and implies that it should be able to freely use and disclose other non-confidential information. Hartford further contends that the cases relied on by the Trust and trust fiduciaries in support of their argument that the claimants' medical records are confidential are distinguishable because they concern privileged communications made exclusively between a doctor and patient, as opposed to the claim forms here that were submitted to a third party.

>    FN14. The only information for which Hartford contends there is a dispute as to confidentiality pertains to sections 4–8 of the Trust claim forms. Hartford's Reply to Trust's Joinder Br., at 3.

Hartford additionally disputes the trust fiduciaries' assertion that the Trust claimants were not parties to the settlement agreement. It asserts that the settlement agreement was negotiated in part by the official committee of unsecured creditors, a committee that it claims was composed entirely of Trust claimants, including the asbestos plaintiffs' firms that represented the claimants and the court-appointed representative of future claimants.

*Analysis*

Although Hartford hasn't recognized this fact, the confidentiality issue is actually relevant both to the bankruptcy court's granting of summary judgment *and* its granting of permanent injunctive relief to the trust fiduciaries. As noted above, one of the trust fiduciaries' declaratory relief claims on which the bankruptcy court granted summary judgment included a request that the bankruptcy court declare that:

>    the personal and medical information required by the [Chapter 11 plan] Confirmation Order to be submitted to the Trust by individuals who have personal injury or wrongful death actions seeking damages allegedly caused by the presence of, or exposure to, asbestos or asbestos**708** containing products used, furnished or sold by Debtors in order to obtain an offer of settlement from the Trust is information that warrants privacy protection and may not be publicly disclosed.

In its April 11, 2008 order, the bankruptcy court granted declaratory relief on that claim and made certain rulings regarding the confidentiality of the Trust information as described above. This court reviews those rulings pursuant to the standards of review associated with summary judgment motions.

Given the trust fiduciaries' success on the declaratory relief claims, the bankruptcy court also found that the trust fiduciaries were entitled to permanent injunctive relief. In conjunction with the August 11, 2008 permanent injunction issued, the bankruptcy court set forth certain requirements for maintaining the confidentiality of the Trust information. However, many of the confidentiality rulings are intertwined with those made on summary judgment, making it difficult for the court to classify them as *either* summary judgment rulings *or* as conditions of the permanent injunction. Accordingly, the court has reviewed those rulings under the standard of review associated with summary judgment rulings since that standard is more favorable to the losing party, Hartford.

Additionally, this court notes that in spite of the fact that the Trust document itself specifies that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

416 B.R. 670
**(Cite as: 416 B.R. 670)**

Nevada law governs the Trust agreement, the parties (including the Trust) and the bankruptcy court addressed the issue as one of California law. In their opening motion papers before the bankruptcy court, the trust fiduciaries noted that the "vast majority of [Trust] claims" were from California residents. Brayton Decl. ¶ 6. Therefore, the trust fiduciaries asserted that "the California beneficiaries have rights under California law." In opposition, Hartford did not object to the application of California law, and in fact implicitly conceded that application of California law was appropriate, arguing itself that the claim information was public under California law. March 17, 2008 Oppos. at 18. In its brief on intervention, like the trust fiduciaries, the Trust acknowledged that its "beneficiaries are from multiple states," and that "California claimants ... have rights under California law." March 17, 2008 Brief at 5.[FN15]

> FN15. The Trust also noted that Nevada statutory law supports the proposition that Nevada beneficiaries possess similar rights as those of California residents. *Id.*

The bankruptcy court ultimately relied on California law in holding that most of the information submitted by the Trust claimants is confidential. April 11, 2008 Order at 17. It did not, however, address the fact that some of the Trust claimants are not California residents, even though its ruling applied to *all* Trust claimants. Although this court questions whether California law should have been applied to ascertain the privacy rights of non-California Trust claimants, it notes that Hartford has *not* assigned error to the bankruptcy court's ruling on this basis, and even continues itself to rely on California law on appeal in support of its arguments that the information is public and that the Trust claimants waived confidentiality. Accordingly, on appeal, the court has similarly reviewed the issue in accordance with California privacy law.

The court additionally notes that in conjunction with the confidentiality issue, as discussed above, one of the challenges that Hartford makes to the

bankruptcy court's confidentiality ruling pertains to its treatment of the expert opinions. Hartford argues that its expert Ceppi's declaration, when compared to Guy's declaration, created a triable issue of fact, and asserts that **\*709** Ceppi's opinion that Hartford did not possess "a duty of confidentiality to the Trust," Ceppi Decl. at ¶ 11, should have been interpreted by the bankruptcy court as testimony that Hartford could use the audit materials publicly and was not required to keep them confidential. Reply at 7. However, as noted above, the bankruptcy court did not make a *credibility* determination regarding its expert, Ceppi, and did not rely *at all* on the expert opinions in its resolution of the confidentiality issue. Thus, there is no merit to Hartford's argument that somehow the bankruptcy court erroneously accepted the opinion of the trust fiduciaries' expert over that of its expert on the confidentiality issue.

[33] Turning now to the confidentiality of the Trust information under California law, the California Supreme Court has recognized that the right of privacy protects an individual's reasonable expectation of privacy against a serious invasion. *Pioneer Electronics (USA), Inc. v. Superior Court,* 40 Cal.4th 360, 370–71, 53 Cal.Rptr.3d 513, 150 P.3d 198 (Cal.2007). Whether a legally recognized privacy interest exists is a question of law, and whether the circumstances give rise to a reasonable expectation of privacy and a serious invasion thereof are mixed questions of law and fact. *Id.* "If the undisputed material facts show no reasonable expectation of privacy or an insubstantial impact on privacy interests, the question of invasion may be adjudicated as a matter of law." *Id.*

[34] Reiterating its holding in *Hill v. National Collegiate Athletic Assn.,* the California Supreme Court in *Pioneer Electronics* described the analytical framework for assessing claims of invasion of privacy under California's Constitution. *Id.* (citing 7 Cal.4th 1, 35, 26 Cal.Rptr.2d 834, 865 P.2d 633 (Cal.1994)). As a starting point, the claimant must possess a "legally protected privacy interest." *Id.* Next, the claimant must have a reasonable expecta-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

416 B.R. 670
**(Cite as: 416 B.R. 670)**

tion of privacy under the particular circumstances, including the customs, practices, and physical settings surrounding particular activities. *Id.* Third, the invasion of privacy must be serious in nature, scope, and actual or potential impact; trivial invasions do not create a cause of action. *Id.* If a claimant meets these criteria, then the court must balance the privacy interest at stake against other competing or countervailing interests. *Id.*

First, this court has reviewed the exhibits containing examples of claimant information submitted to the Trust, including those submitted under seal, and concludes that the Trust claimants indeed possess a legally protected privacy interest in their claim information, which in large part includes medical records, financial details, and other information of a highly personal nature. *See Valley Bank,* 15 Cal.3d at 657, 125 Cal.Rptr. 553, 542 P.2d 977 (concluding that the state's privacy provision "extends to one's confidential financial affairs as well as to the details of one's personal life"); *Board of Medical Quality Assurance,* 93 Cal.App.3d at 678, 156 Cal.Rptr. 55 ("[a] person's medical profile is an area of privacy infinitely more intimate, more personal in quality and nature than many areas already judicially recognized and protected"); *Hill,* 7 Cal.4th at 35, 26 Cal.Rptr.2d 834, 865 P.2d 633 (individuals have a privacy interest in their intimate personal decisions).

[35] Hartford has provided the court with no authority in support of its argument that the Trust itself is quasi-public; and that even if it is, that would somehow undermine the confidentiality of the information submitted by plaintiffs. Nor has Hartford provided the court with any authority for the proposition that the inclusion of nonconfidential information—in addition**710** to the confidential information—in the claimant submissions undermines the confidential nature of the submissions generally. In a FOIA case involving an individual's privacy interest in his rap sheet, which contained both private and public information, the United States Supreme Court recognized that the fact that

"an event is not wholly 'private' does not mean that an individual has no interest in limiting disclosure or dissemination of the information." *See United States Dep't of Justice v. Reporters Comm. for Freedom of the Press,* 489 U.S. 749, 770, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989).

Second, the fact that the claimants voluntarily submitted their medical information to the Trust does not undermine their reasonable expectation of privacy under the particular circumstances of the case. The case relied on by Hartford, *Volkswagen,* is distinguishable. In *Volkswagen,* the California Court of Appeal considered whether claim documents submitted to bankruptcy trusts to obtain compensation for asbestos-related injuries were discoverable in subsequent litigation that the claimant brought in state court for the same injuries. 139 Cal.App.4th at 1485, 43 Cal.Rptr.3d 723. The *Volkswagen* court held that "most such documents normally are," and it issued a writ of mandate to correct the trial court's "overly restrictive" discovery order which excluded claims submitted by the plaintiff's attorneys. *Id.* The court concluded that it would be an unjustifiable denial of discovery for the trial court to refuse to allow defendants to discover documents submitted to bankruptcy trusts by the plaintiff's attorneys in support of the plaintiff's claims to those trusts for compensation for the alleged asbestos-related injuries. *Id.* at 1490–92, 43 Cal.Rptr.3d 723. It concluded that the state trial court erred when it denied such a discovery request because it found that the document would not be admissible at trial based in part on privacy concerns. *Id.*

The *Volkswagen* court held that discoverability did not turn on the admissibility of the evidence. *Id.* Nevertheless, it noted that "although admissibility is not a prerequisite to discoverability, a heightened standard of discovery may be justified when dealing with information which, though not privileged, is sensitive or confidential." *Id.* at 1492, 43 Cal.Rptr.3d 723. It further noted that the cases that "have approved a heightened standard [of discov-

416 B.R. 670
**(Cite as: 416 B.R. 670)**

ery]" were "concerned primarily with protecting particularly sensitive matters, such as sexual or psychiatric histories, *or the privacy interests of third parties." Id.* (emphasis added). It concluded that such a heightened standard was not warranted in the case, though, because "what is at issue here is information bearing on the very injury for which [the asbestos trust claimant] is suing Volkswagen. No third party interest is at stake." *Id.*

Contrary to Hartford's arguments otherwise, the current proceedings are procedurally very different from those in *Volkswagen,* and the California appellate court's decision in *Volkswagen* hinged in large part on those differences. The Trust claimants here *are not suing* Hartford, at least not in the context of the main bankruptcy case or these adversary proceedings. Nor are they demanding payment from Hartford; instead they are simply utilizing the mechanism set up in the debtors' chapter 11 bankruptcy case for submitting their claims. Accordingly, the bankruptcy court did not err in finding that the information sought by Hartford "has no bearing on a claim of damages being asserted against it, either directly or as the insurer of a third party."

Moreover, in the event that a particular Trust claimant does sue Hartford in another forum, then, as recognized by the bankruptcy**\*711** court, to the extent permitted by law, Hartford can obtain discovery regarding that particular claimant's Trust submissions in the course of *that case.* This case also differs from *Volkswagen* in so far as Hartford is *not* seeking discovery here. Instead, it is seeking an interpretation of its audit rights.

Third, the court concludes that the potential invasion of privacy here is serious in nature, scope, and actual or potential impact. Hartford not only seeks *access* to the confidential information of the Trust claimants, but it also seeks a non-confidential designation enabling it to disclose the claimants' information to other third parties as it chooses.

Having concluded that the Trust information

satisfies the first three requirements, the court thus turns to the requisite balancing of interests. As noted above, it does not find this case comparable to *Volkswagen.* Instead, the court finds this case to be more akin to other California cases involving requests for information regarding the private information of *nonparties.* Typically, in cases involving the confidential information of nonparties, the nonparties must be provided with notice and an opportunity to object to disclosure of their private information. *See Valley Bank,* 15 Cal.3d at 658, 125 Cal.Rptr. 553, 542 P.2d 977; *Colonial Life & Acc. Ins. Co. v. Superior Court,* 31 Cal.3d 785, 794–95, 183 Cal.Rptr. 810, 647 P.2d 86 (Cal.1982); *Alch v. Superior Court,* 165 Cal.App.4th 1412, 1427, 82 Cal.Rptr.3d 470 (Cal.Ct.App.2008); *Pioneer Elect.,* 40 Cal.4th at 370, 53 Cal.Rptr.3d 513, 150 P.3d 198 .

Here, noting that the trust fiduciaries were willing to give Hartford access to the Trust claimants' confidential information pursuant to a protective order during the "active phase of the bankruptcy cases," the bankruptcy court construed Hartford's "audit and/or review" rights to allow it access to the confidential Trust claimant information in the course of its audit. In other words, the bankruptcy court did not curtail Hartford's access to the confidential information—or even rule that the Trust claimants were entitled to notice and an opportunity to object prior to *Hartford's* access to the information. Thus, it treated Hartford more favorably than the California courts have treated parties requesting confidential information from nonparties in other cases.

After balancing Hartford's interests with the privacy interests of the Trust claimants, the bankruptcy court simply restricted Hartford's ability to further disclose the confidential information to third parties *other than its reinsurers.* Given the claimants' privacy rights under California law, this court agrees that, at a minimum, such a restriction was required, and was justified by a balancing of the competing interests. Moreover, Hartford's uni-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

416 B.R. 670
**(Cite as: 416 B.R. 670)**

laterally proposed "protections" were not sufficient under the circumstances.

For these reasons, the trust fiduciaries were entitled to summary judgment on this claim for declaratory relief.

### 6. Permanent Injunction

#### a. Injunctive Relief Generally

[36] Hartford argues that the record does not support the permanent injunctive relief granted by the bankruptcy court. Specifically, Hartford argues that the trust fiduciaries failed to show sufficient irreparable harm. It contends that the trust fiduciaries did not demonstrate a specific, identifiable injury to their privacy rights.

The trust fiduciaries counter that the bankruptcy court correctly concluded that they had demonstrated a sufficient likelihood of irreparable harm to the Trust claimants' confidentiality rights that could not be remedied through damages. They contend that the entire dispute sprang from Hartford's refusal to recognize the **\*712** confidential nature of the Trust information, and that it was therefore appropriate for the bankruptcy court to grant injunctive relief.

*Analysis*

This court concludes that the bankruptcy court did not abuse its discretion in granting permanent injunctive relief because, for all of the reasons discussed above with respect to summary judgment, Hartford's threatened disclosure of the Trust claimants' confidential information was not permitted by the settlement agreement or under California law, and would have resulted in irreparable harm for which monetary damages would be inadequate. *See Nelson v. National Aeronautics and Space Admin.,* 530 F.3d 865, 882 (9th Cir.2008) (concluding that where employees raised serious constitutional concerns based on their right to informational privacy, such violations could not be adequately remedied through damages); *Monterey Mech. Co. v.*

*Wilson,* 125 F.3d 702, 715 (9th Cir.1997).

#### b. Conditions of Permanent Injunction

[37] Hartford also argues that the bankruptcy court erred in imposing one of the conditions of the permanent injunction. Specifically, Hartford challenges the condition in the August 11, 2008 permanent injunction that:

> Except as provided in paragraph 8(d) below, no later than six months after (d) Hartford's receipt of Audit Materials, those materials shall be returned to the Trust or destroyed and Hartford shall certify by affidavit to the Trust that all copies of the Audit Materials in Hartford's possession, custody, or control have been destroyed, provided however that Hartford may advise the Trust that it wishes to retain a limited number of documents or excerpts from them to memorialize or summarize the audit and review conclusions, in which case the Trust and Hartford will seek to reach agreement on such retention and may bring any dispute to the Court.

Hartford contends that the bankruptcy court erred in requiring it to return Trust materials within six months of its receipt of the materials. It notes that there was no evidence that the parties contemplated such a condition, and suggests that the time frame is not feasible. Hartford further contends that the trust fiduciaries did not even request this restriction, but the bankruptcy court simply added it *sua sponte.*

In opposition, the trust fiduciaries argue that the six-month restriction imposed by the bankruptcy court in the permanent injunction is reasonable. They imply that the six months afforded Hartford to study and review the Trust documents is sufficient, and note that the order even allowed for exceptions to the time period. They argue that neither the agreement nor the extrinsic evidence allow for indefinite audits.

In reply, Hartford argues that the because the bankruptcy court *sua sponte* imposed the six-month

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

416 B.R. 670
**(Cite as: 416 B.R. 670)**

restriction, it was denied an opportunity to brief the issue. Moreover, Hartford suggests that the evidence and expert opinions actually demonstrate that it should be allowed to retain indefinitely some of the Trust materials that it reviews.

*Analysis*

Although Hartford frames this as a summary judgment issue in its opening brief, it is more appropriately viewed as a condition of the injunction, which is reviewed for an abuse of discretion. Accordingly, its related argument that there was a genuine issue of material fact created by the expert declarations on the issue of the retention of documents is without merit because this was *not* a summary judgment issue. Moreover, there is no indication in **\*713** the record that the bankruptcy court even relied on the pertinent portions of the expert declarations in fashioning the scope and conditions of the injunction. However, if it had, it was entitled to do so.

Given this court's analysis of the summary judgment issues, and particularly its conclusions that the bankruptcy court did not err in concluding that the Trust information was confidential and that the settlement agreement limited Hartford's use of the information, the court finds that the challenged condition limiting Hartford's retention of the Trust information was reasonable. The bankruptcy court afforded Hartford reasonable access to the information in order to conduct the audit and/or review permitted by the settlement agreement, while at the same time, recognizing that certain restrictions were appropriate given the confidential nature of the information.

## CONCLUSION

For the reasons set forth above, the court AFFIRMS the bankruptcy court's August 11, 2008 order in adversary case no. 07–4141 granting appellees' motion for partial summary judgment and for a permanent injunction and denying Hartford's motion for judgment on the pleadings and/or for summary judgment, and also AFFIRMS the bankruptcy court's August 21, 2008 order in the main

chapter 11 bankruptcy case, no. 02–46284, denying as moot Hartford's motion to enforce the settlement agreement and appellees' motion for clarification.

This order fully adjudicates the consolidated appeals and terminates all pending motions in both cases. The clerk shall close the files.

**IT IS SO ORDERED.**

N.D.Cal.,2009.
In re Western Asbestos Co.
416 B.R. 670

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.